UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION


| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| VS. | ) No. 3:16-CR-00060-M |
| | ) |
| JOHN PAUL COOPER (02), WALTER NEIL | ) |
| SIMMONS (03), WILLIAM FRANK | ) |
| ELDER-QUINTANA (04), JEFFRY DOBBS | ) |
| COCKERELL (07), STEVEN BERNARD | ) |
| KUPER (08), and MICHAEL JOHN | ) |
| KISELAK (12), | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |


JURY TRIAL PROCEEDINGS -- VOLUME 12
BEFORE THE HONORABLE BARBARA M.G. LYNN
UNITED STATES DISTRICT COURT JUDGE
NOVEMBER 13, 2019
DALLAS, TEXAS

FOR THE PLAINTIFF:

    DOUGLAS B. BRASHER
    RYAN RAYBOULD
    RENEE M. HUNTER
    OFFICE OF U.S. ATTORNEY - NDTX
    1100 Commerce Street, Suite 300
    Dallas, TX  75242
    (214) 659-8600

FOR THE DEFENDANTS:

    JAMES P. WHALEN
    RYNE T. SANDEL
    WHALEN LAW OFFICE
    9300 John Hickman Parkway, Suite 501
    Frisco, TX  75035
    (214) 368-2560
    (John Paul Cooper)

    CHRISTOPHER M. KNOX
    LAW OFFICE OF CHRIS KNOX

900 Jackson Street, Suite 650
Dallas, TX  75202
(214) 741-7474
(John Paul Cooper)

SHIRLEY BACCUS-LOBEL
LAW OFFICES OF SHIRLEY BACCUS-LOBEL, PC
8350 Meadow Road, Suite 186
Dallas, TX  75231
(214) 220-8460
(Walter Neil Simmons)

CHERYL B. WATTLEY
LAW OFFICE OF CHERY B. WATTLEY
302 Windy Lane
Cedar Hill, TX  75104
(214) 882-0855
(Walter Neil Simmnons)

MARY STILLINGER
KATE GODINEZ
LAW OFFICE OF MARY STILLINGER
401 Boston Avenue
El Paso, TX  79902
(915) 775-0705
(William Frank Elder-Quintana)

SEAN RYAN BUCKLEY
SEAN BUCKLEY & ASSOCIATES
770 South Post Oak Lane, Suite 620
Houston, TX  77056
(713) 380-1220
(Jeffry Dobbs Cockerell)

JIM E. LAVINE
ZIMMERMAN, LAVIN & ZIMMERMANN, PC
770 S. Post Oak Lane, Suite 620
Houston, TX  77056
(713) 552-0300
(Jeffry Dobbs Cockerell)

JEFFREY J. ANSLEY
ARIANNA G. GOODMAN
BELL, NUNNALLY & MARTIN, LLP
2323 Ross Avenue, Suite 1900
Dallas, TX  75201
(214) 740-1408
(Steven Bernard Kuper)

NICOLE E. KNOX

```
        LAW OFFICE OF NICOLE KNOX
        3131 McKinney Avenue, Suite 800
        Dallas, TX  75204
        (214) 740-9955
        (Michael John Kiselak)


        Proceedings reported by mechanical stenography;
transcript produced by computer-aided transcription.
_____


            DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
               Federal Official Court Reporter
               1100 Commerce Street, 15th Floor
                     Dallas, TX  75242
                      (214) 753-2325
```

```
 1                      I N D E X

 2
     Plaintiff's
 3   Witnesses:          Direct      Cross      Redirect    Recross

 4   MIRANDA STEVENS                  9, 41       165          170
       (Continued)
 5
     VICTORIA CARTER     176          203        224
 6
     JOE L. STRAW        225          286
 7

 8                       **EXHIBITS**

 9                  GOVERNMENT EXHIBITS

10   EXHIBIT NUMBER              INTRODUCED        ADMITTED

11        11                        276              276

12        24                        246              246

13       247                        167              169

14       547                        231              232

15                    SIMMONS EXHIBITS

16   EXHIBIT NUMBER              INTRODUCED        ADMITTED

17       914                         26               27

18       915                         26               27

19                     ELDER EXHIBITS

20   EXHIBIT NUMBER              INTRODUCED        ADMITTED

21        22                         91

22        23                         91

23        66                         97               98

24        68                        127              127

25        69                        127              127
```

| | | | |
|---|---|---|---|
| 1 | 70 | 127 | 127 |
| 2 | 71 | 127 | 127 |
| 3 | 72 | 127 | 127 |
| 4 | 73 | 127 | 127 |
| 5 | 76 | 112 | 112 |
| 6 | 88 | 147 | 148 |
| 7 | 89 | 147 | |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

```
1              (PROCEEDINGS BEGAN AT 8:05 AM.)

2         THE COURT:  Be seated, please.

3         One of our jurors reported to Bernadette that his

4  LinkedIn account was hit recently by the DoD and the Marine

5  Corps, and he's never had anything like that, and he wanted to

6  bring that to our attention.  So I don't know quite what to

7  make of that.

8         MR. BRASHER:  It was not anyone at this table.  I can

9  check with our agents but they know they're not supposed to be

10 doing anything like that.

11        THE COURT:  Okay.  Well, I don't have any intention

12 of doing anything about it.  I -- If somebody at the DoD has

13 done that intentionally related to this case, I'll just say I

14 think it was unwise and imprudent to do it.

15        Is anyone asking that I do anything other than that?

16        MS. LOBEL:  Your Honor, I would like permission to

17 submit to the Court a proposed instruction, not bringing that

18 out necessarily but addressing generally fear of retaliation

19 in a way that is -- I've just got to think about how to

20 compose that.  I will submit something to the Court.  I think

21 that is chilling.

22        THE COURT:  Well, I mean I'll consider anything

23 that's submitted, of course, as I'm obligated to, but I'm not

24 inclined to give an instruction that would suggest that this

25 was done by the Government as some part of this case unless I
```

1    know that it was, and I think the juror will certainly know

2    I'm speaking to him.  And if I give an instruction like that,

3    I think it will suggest that this was done by someone

4    associated with the Government.

5            So it's probably a good idea, in light of the fact

6    that I'm now expecting such a submission, Mr. Brasher, for you

7    to find out.

8            MR. BRASHER:  I just checked with both of our DCS

9    Agents, and they reported to me they don't even know the

10   jurors' full names to be able to do that type of search.

11           THE COURT:  Okay.  Well, I'm not going to spend any

12   more time on this right now because no one's asking me to do

13   anything right now about it.  But if I assigned you to make a

14   search of whether this had been done, that wouldn't do it.

15           MS. LOBEL:  Your Honor, would we be out of line in

16   suggesting to the Court that it might be prudent in case

17   someone has taken this on as a project with the DoD to ask the

18   juror to -- if a screenshot can be made of what was received

19   and we put that in the record?

20           THE COURT:  Nothing was received.  Nothing was

21   received.  I'm not on LinkedIn, so I speak --

22           MS. LOBEL:  Nor am I.

23           THE COURT:  -- I speak from -- I'm shocked,

24   Ms. Lobel.  Surely you would be in my list of the top 300,000

25   people that might have a LinkedIn account.

 1              But my understanding is that you can tell, if you

 2    have a LinkedIn account, who has hit your account, and that's

 3    all.  So it isn't a question of some screenshot.  It shows

 4    you, if you check into it, who hit your account, and it says

 5    what I said it says, according to the juror, and I'm not going

 6    to require anything further.

 7              I'm not -- I'm not doing anything further about this

 8    right now.  So you all can think about it.

 9              MS. LOBEL:  Thank you, Your Honor.

10              THE COURT:  You can all make such motions as you

11    wish, but right now I'm not doing anything further about it.

12    I'm just telling you.

13              Okay.  Anything else we need to take up now?

14              MS. LOBEL:  I beg your pardon?

15              THE COURT:  Anything else we need to take up?

16              MS. WATTLEY:  No, Your Honor.

17              THE COURT:  All right.  Thank you.  Be seated,

18    please.

19              COURT SECURITY OFFICER:  All rise for the jury.

20              Hear ye!  Hear ye!  Hear ye!  The United States

21    District Court in and for the Northern District of Texas at

22    Dallas is now in session.  The Honorable United States Chief

23    Judge Barbara M.G. Lynn presiding.

24              THE COURT:  Be seated, please.  You can see I'm still

25    honorable even though you've been away.  Good to see you,

```
 1    Ladies and Gentlemen.  I hope you had a very pleasant break.

 2    We will resume where we left off.

 3                Ms. Lobel, you may examine.

 4                MS. LOBEL:  Thank you, Your Honor.

 5                    CONTINUED CROSS EXAMINATION

 6    QUESTIONS BY MS. LOBEL:

 7    Q    Good morning, Ms. Stevens.

 8    A    Good morning.

 9                MS. LOBEL:  May I approach, Your Honor?

10                THE COURT:  Yes, you may.

11    Q    (By Ms. Lobel) Ms. Stevens, I'm going to show you a

12    document that's been marked as Defendant's 214 and ask you to

13    take a look at it.

14    A    Okay.

15    Q    And did you look at it a moment ago with some

16    handwriting --

17    A    Yes.

18    Q    -- on it?  You could not identify that, correct?

19    A    I could not, no.

20    Q    So that's been removed.

21    A    Okay.

22    Q    And now I'll ask you to just look through it, if you

23    could, --

24    A    Okay.

25    Q    -- and see if you're able to identify it.
```

1    A    I don't recall seeing that before.

2    Q    Okay.  Well, let me see if this perhaps refreshes your

3    recollection.  Would you look at this fourth page where your

4    name is mentioned and just read to yourself what's under there

5    and see if that refreshes your recollection.

6    A    I still have never seen this before.

7    Q    Do you see where it says, "I send"?

8    A    I see that, but I have never seen that before.

9    Q    Even though it's under your name?

10    A    I have never seen that before.

11    Q    All right.  So whoever prepared it, in using the term "I"

12    under your name, was someone else.  They were using your name?

13    A    I would say so.  Again, for the -- I have never seen that

14    before.

15    Q    Okay.

16    A    I've never stated that before.

17    Q    Ms. Stevens, do you recall a number of years ago

18    discussing with agents of the Federal Government the time

19    period you worked at CMGRx?

20    A    Yes.

21    Q    Okay.  Do you recall specifically having met with them in

22    February of 2016?

23    A    Yes.

24    Q    And that was nearly four years ago, correct?

25    A    Correct.

1   Q    All right.  And do you recall having said to them at the

2   time that once a prescription was partially -- partially

3   filled out, the prescription was sent to Dr. Elder?

4   A    Yes.

5   Q    And that in the beginning it was Dr. Simmons but

6   Dr. Simmons left to work at ElevateSeniors.

7   A    Yes.

8   Q    Okay.  You do recall telling them that.

9   A    I do.

10  Q    All right.  Now you mentioned last week, and I'm sure it

11  seems some time ago now, you mentioned that Dr. Simmons made

12  you a medical assistant.  Do you remember that?

13  A    Yes.

14  Q    All right.  Now you actually -- I don't intend any

15  connection at all by this question, but you've actually

16  received some medical certification in a particular field, and

17  I can't pronounce it.

18  A    Phlebotomy.

19  Q    Phlebotomy.

20  A    I took the course, I was certified in the course, but I

21  have never gotten a certificate or -- or used it, yes.

22  Q    You took a six-week course.

23  A    Yes.

24  Q    Unlike what's required for that skill, you're aware,

25  aren't you, that being a medical assistant in an office

1    requires absolutely no training or certification, correct?

2    A    I was not aware of that until I was told so by

3    Dr. Simmons; no.

4    Q    All right.  And that is basically what he made you aware

5    of at the time; right?

6    A    He made me a medical assistant at the time.

7    Q    Well, he -- But he also advised you, did he not, that it

8    required no certification or training?

9    A    He stated that most jobs do on-the-job training.

10   Q    All right.  And is -- Does your recollection include the

11   fact that he was discussing the Kareo system with you?

12   A    At the time he was not discussing the Kareo system.

13   Q    You said at the outset of your testimony last week that

14   the Kareo system for CMGRx was established by Dr. Elder.

15   A    Correct.  We didn't have the system before.  He utilized

16   the system and asked us to utilize the system.

17   Q    If Mr. Cesario said it was Dr. Simmons who initiated the

18   electronic medical system, are you saying you disagree with

19   that?

20   A    I don't know what Mr. Cesario said about that.

21   Q    Well, do you disagree that Dr. Simmons initiated it

22   before Dr. Elder -- before he even recommended Dr. Elder to

23   CMGRx?

24   A    Can you repeat that one more time?  I'm sorry.

25   Q    Is it -- Is it possible that the system was in place, as

1    Mr. Cesario has said, thanks to Dr. Simmons at the time you

2    first started using Kareo?

3    A    I'm not sure when it was implemented or who it was

4    implemented by.

5    Q    All right.  So it may have been Dr. Simmons.

6    A    It may have been, but we did not use it until Dr. Elder

7    came on.

8    Q    But it was in Dr. Simmons' name.

9    A    I'm unaware of that.

10   Q    Okay.  You frequently utilized Kareo, did you not?

11   A    To put in patients in the beginning, yes.

12   Q    Okay.  Nothing sinister about that at all.

13   A    No.

14   Q    All right.  So when you did it, did you not use

15   Dr. Simmons' account to do so?

16   A    I honestly do not remember it being in his name.  It may

17   very well have been but I do not remember that.

18   Q    That's fine.  No one is fussing at you.  We're just

19   trying to get it clear.

20   A    Right.

21   Q    You can understand why, I'm sure.

22   A    I can.

23   Q    Okay.  Now when we broke last week, I had asked you some

24   questions about -- and you may not recall, but I had asked you

25   some questions about Medical Health Questionnaires.  Do you

```
 1   recall that?

 2   A     I do.

 3   Q     All right.  And I'm going to ---

 4         MS. LOBEL:  May I -- Oh, sorry, Judge.

 5   Q     (By Ms. Lobel) I'm going to show you a couple of exhibits

 6   and ask you to just look at them very carefully -- take your

 7   time -- and ask you if those are forms that were used for

 8   medical history at CMGRx?

 9   A     They are, yes.

10   Q     Okay.  They're a little different but recording a lot of

11   the same information?

12   A     Correct.

13   Q     Okay.

14         MS. LOBEL:  Your Honor, we offer Defendant Simmons

15   268 and 269.

16         THE COURT:  Any objection?

17         MR. BRASHER:  No, Your Honor.

18         THE COURT:  Admitted.

19         MS. LOBEL:  Mr. Slyter, would you show 268, please,

20   sir.  And has that been redacted?

21         Excuse me, Your Honor.  I want to be clear of the

22   Court's expectation.  Do you want them redacted at this time

23   or only at the end?

24         THE COURT:  Now.

25         MS. LOBEL:  Now, yes.
```

```
 1              (Pause)

 2         MS. LOBEL:  This is not on?  That's utterly beyond my

 3    capacity, Your Honor.

 4         Ms. Knox, we need the system to work.

 5         MS. NICOLE KNOX:  I'm Elmo only.

 6         MS. LOBEL:  We have no feed apparently.

 7         THE COURT:  All right.  We'll have to call the

 8    calvary, the Court's calvary.  All right.  Go on to something

 9    else --

10         MS. LOBEL:  Sure.

11         THE COURT:  -- and we'll come back to that in a

12    minute.

13         MS. LOBEL:  I'll -- Let me -- We'll use the Elmo.

14    Q    (By Ms. Lobel) Can you see that?

15    A    Yes, ma'am.

16    Q    Okay.  And that's one of the medical history --

17    A    It is.

18    Q    -- documents that CMGRx used while you were there?

19    A    Yes, in the beginning.

20    Q    And it was used, was it not, -- It or the other one I'm

21    about to show you, those were used in each and every time a

22    participant -- a person went online to sign up to participate.

23    Is that correct?

24    A    Yes and no.  They didn't always go online themselves.  A

25    lot of them were entered by the representative.
```

1   Q    Okay.  But a form was, nevertheless, filled out for the

2   individual, the beneficiary.  Is that correct?

3   A    Yes.  Either by them or someone else, yes.

4   Q    Okay.  And this asks a series of questions about the

5   condition and the reason they're seeking the compounds.  Is

6   that right?

7   A    Yes, ma'am.

8   Q    And then it gives details about medical history.

9   A    Yes, ma'am.

10  Q    Okay.  And then I'm going to show you 268 which I hope

11  will -- And that's a multi-page document, and it has some of

12  the same information, does it not?

13  A    Yes.

14  Q    Okay.  Let's look at -- And that's the second page,

15  correct?

16  A    Yes.

17  Q    I don't want to look at that.  That's just a driver's

18  license and it hasn't been redacted, so we won't show that at

19  this time.

20        Now you also mentioned last week, and I'd like to

21  discuss with you, if we may, a little bit more about the Kareo

22  system.  And you at least during the initial phase of your

23  employment and maybe for some time had the responsibility of

24  entering data into the -- into the Kareo system.

25  A    Yes.  I entered the patients' names and addresses and

1    things of that nature --

2    Q    Okay.

3    A    -- but nothing else.

4    Q    Yeah; no.  I -- I didn't think you were making any kind

5    of medical decisions.

6    A    Okay.

7    Q    You were performing what an uncertified medical assistant

8    does for a business.  Is that correct?

9    A    Yes.

10   Q    Okay.

11            THE COURT:  Do you want to take a pause for a minute

12   and get the system working?

13            MS. LOBEL:  I hope so.  Thank you, Your Honor.

14            THE COURT:  Ladies and Gentlemen, you can stand up or

15   talk to each other.  This is like watching paint dry, so.

16   Paint dry is actually more interesting.  So feel free to visit

17   with each other or stand up or whatever.

18            (Pause)

19            MS. LOBEL:  Thank you.

20            THE COURT:  Thank you.

21            (Applause for the IT technician.)

22            THE COURT:  That's positive and negative, so just

23   stand by for future problems as they arise.  Thank you.

24            IT TECHNICIAN:  Yes.

25   Q    (By Ms. Lobel) I'm going to show you what's been marked

1    as Defendant's 264, 265 and 266.  They're all the same type of

2    form with respect to different folks.  Would you take a moment

3    and look at each of those?

4    A    I know what they are.

5    Q    Okay.  And do you recognize your ---

6    A    Yes, I do.

7         MS. LOBEL:  Your Honor, we would offer Defendant's

8    264, 265 and 266.

9         THE COURT:  Any objection?

10        MR. BRASHER:  No, Your Honor.

11        THE COURT:  Admitted.

12        MS. LOBEL:  Mr. Slyter, may we have 264, please?

13   Q    (By Ms. Lobel) Can you see that, Ms. Stevens, --

14   A    Yes.

15   Q    -- okay on your screen?  And you'll see that that is a

16   "Refill Authorization Request"?

17   A    Yes.

18   Q    Okay.  And it's for Trilogy Pharmacy, and the patient

19   information is Nonie Ross, --

20   A    Yes.

21   Q    -- correct?  And it is for what substance?  The pain

22   cream?

23   A    Yes.

24   Q    Okay.  And underneath the prescription information it

25   indicates that "0" is allow, "1" is not allow, and there is a

1    -- over on the side it says the prescription included five

2    refills.  Is that correct?

3    A    Yes.

4    Q    And if we go down further on April 9th of 2015, that is

5    your signature?

6    A    Yes.

7    Q    Okay.  And that indicates that you have spoken with the

8    patient who wishes to continue with the medication.

9    A    Correct.

10   Q    Okay.  And is there more than one page to this?  Are we

11   authorizing -- Are you sending also for -- on the next page

12   also for Ms. Ross for the scar cream?

13   A    Yes.

14   Q    Okay.  And that, too, had authorized five refills.

15   A    Yes.

16   Q    Is that correct?  It was typical for you any -- anytime a

17   patient called or you checked with a patient to prepare one of

18   these authorization requests?

19   A    No.  That was actually sent from Trilogy Pharmacy, and

20   this was after Mr. Cesario and Dr. Simmons were in that

21   conference room where he made me the medical assistant.

22   That's when they decided that I was allowed to call under

23   Dr. Elder's -- whatever group.  I can't even remember the name

24   of it.  That's when they authorized us to do that.

25   Q    But was that not early on in the -- in your work at

```
 1    CMGRx?

 2    A    This was in April.  So, no, it was not early on.

 3    Q    On this one, yes, you're right about that, it was, but

 4    was -- was -- did you not start using these --

 5    A    No.

 6    Q    -- early in your tenure?

 7    A    We did not do that then.

 8    Q    You said that the Refill Authorization Request came from

 9    Trilogy?

10    A    It did.

11    Q    Okay.  And then it -- But it -- But you are -- Are you

12    initiating the contact with the patient or is the patient

13    calling you?

14    A    We called the patient after Trilogy couldn't get a hold

15    of them.  They had us call.

16    Q    So first, Trilogy tried to do that and then you did --

17    A    Correct.

18    Q    -- if they failed.

19    A    Yes.

20    Q    I'll show you also Defendant's 265.  And you'll see that

21    that's an authorization in the name of Dr. Simmons in Phoenix;

22    correct?

23    A    Correct.

24    Q    And it's for Daniel McCants?

25    A    Yes.
```

1    Q    Okay.  And if we go down, it also authorizes refills,

2    does it not?

3    A    Yes.

4    Q    And if we scroll down, again, that is you having spoken

5    with the patient who has requested the refills.  Is that

6    correct?

7    A    Yes.

8    Q    All right.  Now the refills are being authorized by

9    Dr. Elder, not by Dr. Simmons; correct?

10   A    Correct.

11   Q    All right.  And this would be consistent with what you

12   told us earlier; that early on Dr. Simmons did consult with

13   some patients and late -- and then subsequently it was

14   Dr. Elder whom he had recommended.  Is that correct?

15   A    Yes, ma'am.

16   Q    Okay.  And are -- Is -- Is he refilling -- Is Mr. McCants

17   refilling more than just the scar cream?  If you'll scroll to

18   the next couple of pages.

19   A    Yes.

20   Q    He also wants a refill of the pain cream?

21   A    Yes.

22   Q    Okay.

23          MS. LOBEL:  And if you'll keep scrolling down, Mr.

24   Slyter.

25   Q    (By Ms. Lobel) He also is requesting the migraine cream.

1    A    Yes.

2    Q    All right.

3         MS. LOBEL:  And, again, if you'll scroll down

4    further, Mr. Slyter.

5    Q    (By Ms. Lobel) Again, with respect to each of those,

6    you're verifying that the request for a refill has been made

7    by the beneficiary, the participant; correct?

8    A    Yes.

9    Q    All right.  Thank you.  If you will -- So with respect to

10   Ms. Ross, there were two items that were being refilled?

11   A    Yes.

12   Q    Mr. McCants was refilling all of his --

13   A    Yes.

14   Q    -- prescriptions, correct?

15        Let's look at 266.  And who is the patient -- Again,

16   it's Trilogy Pharmacy, and who is the patient?

17   A    Claire Joseph.

18   Q    All right.  And it's for topical pain cream, correct?

19   A    Yes.

20   Q    And, again, the refills have been authorized?

21   A    Yes.

22   Q    All right.  And if we scroll down, again, this is you

23   verifying that she did want to still receive the medications.

24   Is that correct?

25   A    Yes.

1    Q    And this is only for one item, and that's the pain cream;

2    correct?

3    A    It looks that way, yes.

4    Q    Okay.  Thank you.

5         MS. LOBEL:  That's fine, Mr. Slyter.

6    Q    (By Ms. Lobel) Going back to, again, almost four years

7    ago, necessarily, and I know it's a long time ago, but one of

8    the other things you discussed with the folks who wanted to

9    talk to you at that time from the Government was that your --

10   your impression of how CMGRx was being operated from all you

11   were involved in and could see and observe, it was being

12   operated lawfully in consultation with legal help and lawyers,

13   and you told them that actually several times back then in

14   February of 2016, didn't you?

15   A    Yes.

16   Q    At some point in dealing with -- And -- And you dealt

17   frequently with Trilogy Pharmacy, did you not?  You spoke to

18   Ms. Valdez.  You spoke to Mr. Baumiller.  Is that correct?

19   A    Yes.

20   Q    Okay.  At some point you did online HIPAA training?  Do

21   you recall that?

22   A    Well, we signed the forms, but Robert Cesario actually

23   did all of our -- We didn't actually take the courses.  He

24   took the courses for us and we signed them.

25   Q    Really.

1    A    Yes.

2    Q    Okay.  You didn't -- You weren't interested in taking the

3    course?

4    A    I've taken the course since then, but at the time ---

5    Q    Was it a difficult course?

6    A    I don't know.  I didn't take it at the time.

7    Q    But you've taken it since.

8    A    Correct.

9    Q    You wouldn't -- You wouldn't consider it difficult.

10   A    We were told that Robert would do all the courses and we

11   would sign them.  That's what we were told.

12   Q    Okay.

13        MS. LOBEL:  May I approach, Your Honor?

14        THE COURT:  Yes.

15   Q    (By Ms. Lobel) I'll show you what's been marked as

16   Defendant's 911.

17   A    Okay.

18   Q    Do you recognize that?

19   A    I don't recognize it, but that doesn't mean that I didn't

20   get it.  I mean it's just a top of an e-mail, so I got a lot

21   of those.

22   Q    Well, is it an e-mail from you to Andrew Baumiller of

23   Trilogy Pharmacy?

24   A    Yes.

25   Q    And are -- And does it concern "Miranda HIPAA"?

1    A    It does.

2    Q    Okay.  Would that be a reference to your having completed

3    your HIPAA training?

4    A    If there was an attachment with it, I'm sure there was.

5    Q    Ms. Stevens, CMGRx had various groups it dealt with which

6    were part of CMGRx, right?  One of which was IFG?

7    A    Oh, yes, ma'am.  Yes.

8    Q    Okay, yeah.  But there were others, and IFG did

9    principally -- and correct me if I'm wrong; I'm not at all

10    sure I'm right about this -- but IFG did principally

11    private --

12    A    Yes.

13    Q    -- or -- or private pay or private insurance.

14    A    Correct.

15    Q    And there was a decent amount of even private pay for

16    different compounded formulations.  Is that correct?

17    A    For them?  Yes.

18    Q    Okay.  That's what I'm asking about, for them.

19         MS. LOBEL:  May I approach, Your Honor?

20         THE COURT:  Yes, you may.

21    Q    (By Ms. Lobel) I don't know if you're able to recognize

22    this or not.  It's Defendant's 307.  If you are, ---

23    A    Yes, I recognize this.

24    Q    Okay.

25    A    That's not IFG, though.  Is that why you're asking?

1   Q    Yes.  Which group is this?

2   A    They were a group up north but it's not IFG.

3   Q    But it is a group with which CMGRx dealt.  Is that

4   correct?

5   A    Yes.

6        MS. LOBEL:  Your Honor, we would offer Defendant's

7   307.

8        MR. BRASHER:  Relevance.  Also a lack of foundation.

9        THE COURT:  Sustained.

10       MS. LOBEL:  Sustained as to foundation or relevance,

11  Your Honor?

12       THE COURT:  Both.

13       MS. LOBEL:  Okay.

14  Q    (By Ms. Lobel) Ms. Stevens, I'm going to ask you to take

15  a look at 914 and 915, if you would, and take your time.

16  A    Okay.

17  Q    I just want to ask you if those are generally the type of

18  communications you would have with folks at the pharmacy,

19  Trilogy.

20  A    Yes, but it doesn't look like -- that I ever responded

21  until the end which I didn't get a response from the patients.

22  Q    But these -- This is a communication between yourself and

23  Ms. Veronica Valdez.

24  A    Yes.

25  Q    And there was more than one Ms. Valdez at Trilogy, --

```
 1   A     Yes.

 2   Q     -- was there not?

 3   A     Yes, there was.

 4   Q     Veronica and Liz?

 5   A     Yes.

 6         MS. LOBEL:  We would offer 914 and 915, Your Honor.

 7         MR. BRASHER:  As to 914, object as to hearsay.  915,

 8   I object because it's not impeachment.  This was a newly-added

 9   exhibit.  I don't believe it's being offered for impeachment

10   purposes.

11         THE COURT:  914 and 15?

12         MR. BRASHER:  Correct.

13         THE COURT:  The objections are overruled.  914 and

14   915 are admitted.

15         MS. LOBEL:  Thank you.

16         If you would, Mr. Slyter, show 915, first page.

17   Q     (By Ms. Lobel) And this is your -- It's late April of

18   2015, correct?

19   A     Yes.

20   Q     And you're communicating with Liz Valdez.

21   A     Yes.

22   Q     And you -- you are -- We'll scroll down in a minute and

23   see specifically what you're addressing, but basically at that

24   time -- And you are still considered a manager there at CMGRx,

25   correct?
```

```
 1   A    That was the title, yes.

 2   Q    Well, it's a fair title, isn't it?

 3   A    No.

 4   Q    You're not worried about having that role, are you?

 5   You're not worried that that's -- that what you thought was

 6   perfectly legitimate at the time, that by saying you're

 7   conceding you're a manager, that you're somehow jeopardizing

 8   yourself, are you?

 9   A    No.

10   Q    Good.

11   A    That was my title.  That doesn't mean I have any more

12   authority than anybody else did in that office.  Rich gave me

13   that title because I threw a fit because I didn't have a

14   title.  That's why I got the title.

15   Q    All right.

16   A    It didn't give me any more authority over anybody else in

17   that office.  I had no -- no authority.

18   Q    But in terms of your own view of your contributions, you

19   characterize yourself as the only one who gets anything done.

20   A    Yes.

21   Q    And that would be a fair description of -- I mean you're

22   a worker, right?

23   A    Yes.

24   Q    You were conscientious, weren't you?

25   A    Somewhat.
```

```
 1   Q    All right.  But you meant that when you said it, didn't
 2   you?
 3   A    When I said what?
 4   Q    The yellow part up there on the screen.  "I'm the only
 5   one who gets anything done."
 6   A    I'm sure I did at the time, yes.
 7   Q    All right.  I'm going to show you the -- I previously
 8   asked to see the attachment to 911.
 9   A    Yes.
10   Q    And I'm going to ask you to look at that.
11   A    Yes.
12   Q    What is that?
13   A    That is the -- It states that we got a Trilogy Handbook
14   which we never did, but I did sign it.
15   Q    Okay.  You -- Let's put that -- I'll do the Elmo.
16            MS. WATTLEY:  It's not in yet, Shirley.
17            MS. LOBEL:  911 is not in?  Oh, I'm sorry.
18   Your Honor, we offer 911.
19            MR. BRASHER:  No objection.
20            THE COURT:  Admitted.
21            MS. LOBEL:  I'm sorry.
22   Q    (By Ms. Lobel) Okay.  I don't know what's blocking it,
23   but can you see -- You can see that you have signed this in
24   December of 2014?
25   A    Yes.
```

1    Q    And that is -- And that is the attachment to your e-mail

2    to Andrew Baumiller regarding HIPAA, correct?

3    A    Is there something that says that that's the attachment?

4    Like is that connected with the e-mail?  I'm just wondering.

5    Q    It is at least part of the attachment.  We're able to

6    know that from these numbers at the bottom.

7    A    Okay.

8    Q    But that is your signature, and you did provide that?

9    A    Yes.

10   Q    Are you saying that it is not true what you sent to

11   Mr. Baumiller?

12   A    Is what not true?

13   Q    What you signed in this acknowledgment.

14   A    That I got a handbook?

15   Q    Well, let's look and kind of read the whole thing.

16   A    Can you lower it so I can read the whole thing?

17   Q    I'm so sorry.  You cannot see that?

18   A    The top was blocked off.  So, no, I could not.

19   Q    I beg your pardon; my bad.

20   A    That's just the handbook.

21   Q    But my question is:  Are you telling -- Are you signing

22   this acknowledgment and agreement and sending it to

23   Mr. Baumiller and it's not true what you said?

24   A    He was there when we signed it.  So we got -- We didn't

25   get a copy of the handbook.  There was a handbook when he was

 1    there, and then we were asked to send in the attachments.  But

 2    Mr. Baumiller was there when we signed them.

 3    Q    Okay.  Perhaps my question wasn't clear.

 4         In stating what you state here, acknowledging receipt

 5    of the handbook and having read it and understood its subject

 6    matter, are you saying that that was not true?

 7    A    We didn't read the handbook.  Mr. Baumiller was there.

 8    He was the -- one of the head people at Trilogy, so I don't

 9    know ---

10    Q    What -- Where -- Where was "there"?

11    A    He came to the office at CMGRx to do this.

12    Q    Okay.

13    A    We didn't go to Trilogy.

14    Q    So he came there for the purpose of visiting with you

15    about that subject matter?

16    A    There was a bunch -- There was a lot of people there.

17    That wasn't just me.  He did a whole -- brought the handbook

18    over.  We signed for the handbook, but we never physically got

19    copies of the handbooks.

20    Q    Was this a -- What did -- He brought a copy of the

21    handbook.

22    A    Yes.

23    Q    He discussed -- Did he discuss with you its contents?

24    A    Somewhat but not verbatim; not word for word.

25    Q    Well, I understand what you're saying.  But -- So several

1    people met with him.  He went over a number of items, I take

2    it.

3    A    Yes.

4    Q    One of which was the handbook?

5    A    Yes.

6    Q    Okay.  Do you recall whether or not other subjects -- And

7    only if you recall.  No one is going to fuss at you for not

8    remembering something that happened a long time ago.  But do

9    you recall at this time other matters that were discussed with

10   Mr. Baumiller?

11   A    I don't know what all would have been discussed at that

12   time, no.

13   Q    Okay.  But it was several things?  It was a big meeting;

14   it had purposes, correct?

15   A    Yes.

16   Q    Okay.  You just don't specifically recall everything that

17   was covered at that time.

18   A    Correct.  It was five years ago, so.

19   Q    I completely understand.  Would it be fair to say that he

20   was there to discuss with you compliance generally?

21   A    If I don't remember what he discussed, then I can't say

22   he was generally there to discuss compliance.  I don't

23   remember what all he was there to discuss.

24   Q    Point well taken.  It's the -- It's the transmission of

25   -- of your acknowledgment by e-mail that says "HIPAA" that

1    made me think it might have related to that.

2    A    Right.  But that attachment to that was not the HIPAA

3    signature.

4    Q    That's right.

5    A    That was strictly for the handbook.

6    Q    But if he's there -- And, again, I do not wish to quarrel

7    with you at all.  But if he's there and you're filling out a

8    form at the time and he's just handing them out and

9    everybody's signing it, why did you have to e-mail it to him

10   if you've already signed it there?

11   A    I don't remember.

12   Q    Okay.  This is in evidence as Defendant Kiselak's

13   Exhibit 10.  Do you recognize that as the Trilogy Employee

14   Handbook?

15   A    It looks like it, yes.

16   Q    Okay.

17   A    Yes, it's their handbook.

18   Q    All right.  Thank you.  I'm going to show you 916 and 917

19   and ask you if you're able to identify those.

20   A    This wasn't sent to me.  This was sent to someone else.

21   My name is on there, but it was not sent to me, for 916.  And

22   the same with this one.

23   Q    Okay.  So I'm simply asking as to the CMGRx e-mails,

24   whether you're able to authenticate these.

25   A    As far as being from -- to CMGRx?  Yes, that's from Matt

1    from IFG, yes.

2    Q    Okay.  So this is from IFG, and you're able to recognize

3    those.  They mention you, but you are not a recipient of the

4    e-mail.

5    A    Correct.  Kat Pfaff dealt with IFG accounts mainly.

6    Q    All right.

7              MS. LOBEL:  Your Honor, we offer 916 and 917.

8              MR. BRASHER:  Relevance, hearsay and lack of

9    foundation.

10             THE COURT:  What was the last thing?

11             MR. BRASHER:  Lack of foundation of this witness.

12             THE COURT:  Objection is sustained; hearsay.

13   Q    (By Ms. Lobel) Now as you stated, although we're not

14   getting into those, IFG was a group that you handled there at

15   CMGRx; right?

16   A    I just stated I did not handle them.

17   Q    But CMGRx did.

18   A    Correct, but I did not, yes.

19   Q    Okay.  Who -- Who did?

20   A    Katherine Pfaff that I just stated a second ago.

21   Q    Now you mentioned that there came a time when at CMGRx,

22   as the company grew, other people became employees of the

23   organization.  An accountant was brought in.  The lawyer

24   became more involved, and the lawyer was on the same floor.

25   Is that correct as you ---

```
 1   A     Yes, the lawyer was on the same floor.

 2   Q     And Mr. Hollingsworth?

 3   A     Yes.

 4   Q     All right.  And I'll show you 920 and just ask you if you

 5   regularly had communications with Mr. Hollingsworth about

 6   matters that occurred at CMGRx.

 7   A     Yes.

 8   Q     Okay.  Do you recognize 920?

 9   A     It's from me.  I don't necessarily recognize it.  I sent

10   a lot of e-mails.

11   Q     Did you send quite a few to Mr. Hollingsworth?

12   A     There were some, yes.

13   Q     Okay.

14         MS. LOBEL:  We would offer 920, Your Honor.

15         MR. BRASHER:  Again, this was just added in the last

16   couple of days, and it's not being offered for impeachment.

17   Otherwise, no objection.

18         THE COURT:  Admitted, 920.

19   Q     (By Ms. Lobel) And 920 is -- Mr. Hollingsworth has a

20   concern, does he not, about someone having advertised on

21   Craig's List?

22   A     It looks that way.

23   Q     Yes.  And why would that have, if you recall, why would

24   that have been a concern?

25   A     I don't recall that.
```

1    Q    But do you recall assuring him that you had already taken

2    care of the matter?

3    A    Yes.  I -- It -- It states that I said that, yes.

4    Q    Okay.  That would not surprise you and that would not be

5    outside the ordinary course of business, correct?

6    A    For what?

7    Q    For you to take care of matters at CMGRx that arose from

8    time to time.

9    A    Sometimes, yes.

10    Q    Do you recall, Ms. Stevens, that in May of 2015 you were

11    still considered a manager there at CMGRx, correct?  I mean

12    you were so designated.

13    A    I -- I don't -- I don't remember what time in May that I

14    was not there, so possibly.

15    Q    Okay.  But -- But do you remember that Ms. Pfaff, who you

16    referred to earlier, was not at that time?

17    A    No.  We were all gone at the same time, so that's

18    inaccurate.  We all got let go at the same time.

19    Q    I'm sorry.  My question was not clear.

20          In -- in May, you were considered a manager;

21    Ms. Pfaff was not, correct?

22    A    Correct.

23    Q    Okay.  Thank you.  I'm going to show you what's been

24    marked as Defendant's 260.  You saw part of this document

25    previously, and I'm going to ask you if you're able to

1    identify that.

2    A    No.  Again, I've never -- I've never seen that.

3    Q    Okay.  Thank you.  Do you recall last week having

4    discussed, not at great length but to a certain extent,

5    vitamins that were provided to some of the -- not all but some

6    of the participants?

7    A    Yes.

8    Q    Okay.  And with respect to that, do you recall that, with

9    respect to the multiple doctors in the part of CMGRx that

10   dealt with private insurance, that numerous of those doctors

11   or at least some of those doctors said you didn't even need a

12   prescription for vitamins?  Do you recall that coming up?

13            MR. BRASHER:  Objection; hearsay.

14            THE COURT:  Overruled.

15            MS. LOBEL:  Yeah.

16   Q    (By Ms. Lobel) Do you recall that?

17   A    Recall what?

18   Q    That some of -- There were several doctors, multiple

19   doctors who were -- who had patients on the -- that CMGRx

20   provided compounded medications to; correct?

21   A    Yes.

22   Q    And when it came to the vitamins, there were several of

23   those doctors who said you did not need a prescription to

24   provide those.

25   A    I don't remember that.

1    Q    You do not?

2    A    No.

3    Q    Okay.

4         MS. LOBEL:  Your Honor, I'm going to offer

5    Defendant's 398.  It's related to a subject the Court has

6    ruled on.

7         THE COURT:  Is there any objection to this exhibit?

8         MR. BRASHER:  Yes, Your Honor, relevance, and I

9    believe the Court previously denied admission of it.

10        THE COURT:  I'm sorry; I can't hear you this morning.

11        MR. BRASHER:  I'm sorry; yes, relevance, and I

12   believe the Court previously denied admission of this exhibit.

13        THE COURT:  Yes, same ruling; denied.

14        MS. LOBEL:  Did you say "same ruling," Your Honor?

15        THE COURT:  Yes; yes.

16   Q    (By Ms. Lobel) One last thing I would like to talk to you

17   about, Ms. Stevens, is Mr. Arellano.

18   A    Juan, yes.

19   Q    Yes.  Is it easier if I just refer to "Juan"?

20   A    No.  I know who he is; either way.

21   Q    Okay, yeah.

22   A    That's fine.

23   Q    You had mentioned, I believe, in your testimony that he

24   had -- and please correct me if I'm wrong because I honestly

25   don't know whether if I'm talking about a statement or

1    something you said last week -- but that he had erased some

2    things on computers in the CMGRx office?  Is that correct?

3    A    Yes, and had removed the computers themselves, yes.

4    Q    Okay.  And was this after CMGRx was ending its business

5    in compounded medications?

6    A    It was towards the end of April, if I recall correctly.

7    Q    It could have been May?

8    A    Could have been.

9    Q    Okay.

10   A    I would say end of April, but yes.

11   Q    Well, you made an interesting remark last week about

12   something he said.  And do you know -- When I say

13   "diversionary tactic," do you know, more or less, what I mean?

14   A    I don't recall saying that he said anything; that Juan

15   said any -- anything.

16   Q    I thought you said that he said don't talk to Dr. Simmons

17   because he could be ---

18   A    That was Mr. Cooper, not Juan.

19   Q    Oh, okay.

20        THE COURT:  Mr. Cooper with a "C"?

21        THE WITNESS:  Yes.

22        THE COURT:  There's two Mr. Cooper/Kupers.  That's

23   why I'm asking.

24        THE WITNESS:  I apologize.

25        MS. LOBEL:  Your Honor, may I have a moment?

```
 1              THE COURT:  Yes.

 2              (Pause)

 3    Q    (By Ms. Lobel) Do you have any idea -- And if you don't

 4    know and if you -- this was not something you were familiar

 5    with, please say so.  But are you aware that Mr. Arellano was

 6    a source of numerous false rumors out there at CMGRx during

 7    this period of time?

 8    A    I don't know.

 9    Q    Well, there came a point in time when investigators, even

10    back then, began to speak with folks, right?  Do you recall

11    that?

12    A    Yes.

13    Q    And you would agree with me, would you not, that that

14    injects a certain amount of paranoia and suspicion of others

15    into the mix?

16    A    Yes.

17    Q    Okay.  And do you think that that occurred at CMGRx once

18    they were under that kind of scrutiny?

19    A    That what occurred?

20    Q    That a level of suspicion of others and paranoia ensued.

21    A    I wouldn't necessarily say that, no.  I'm sure some did

22    but I didn't really feel that way.

23    Q    Well, that was clear from your statement almost a year

24    later when you said what had happened, but did you witness

25    that in the behavior of others?
```

1    A     Yes.

2            MS. LOBEL:  Okay.  Thank you very much.

3            THE WITNESS:  You're welcome.  Thank you.

4            THE COURT:  Ms. Stillinger?

5                      CROSS EXAMINATION

6    QUESTIONS BY MS. STILLINGER:

7    Q     Good morning, Ms. Stevens.

8    A     Good morning.

9    Q     My name is Mary Stillinger.  I represent Dr. Elder.

10   A     Okay.

11   Q     And I know ---

12   A     Sorry. (Witness coughing)

13   Q     That's okay.  I know last week you were asked if you

14   could identify Dr. Elder and you were not able to.

15   A     Yes.

16   Q     You might be able to tell now, because I got up sitting

17   next to him, that that's Dr. Elder.

18   A     Yes, ma'am, it is.

19   Q     Okay.  Did you just meet him one time in your life?

20   A     I believe it was twice.

21   Q     Okay.  And do you know when that was?

22   A     I would say January, February, but I can't exactly recall

23   the dates, no.

24   Q     Okay.  Sure.  Let me -- Let me go back and kind of go

25   over a little bit about your history with CMGRx.

```
1    A    Okay.

2    Q    I know you were telling us last week that you felt like

3    Mr. Cooper was giving you an opportunity to -- for a good job

4    there; correct?

5    A    Yes.

6    Q    Okay.  And that he saw something in you.  Is that right?

7    A    That's how I felt in the beginning, yes.

8    Q    Okay.  And -- And I mean really you -- you have a lot of

9    skills, don't you?

10   A    Now, yes.

11   Q    Well -- Okay.  So this was -- this was five years ago,

12   right?

13   A    Correct.

14   Q    Okay.  You're good with people, right?

15   A    I am.

16   Q    You have a lot of people skills, right?

17   A    I do.

18   Q    You speak very well, don't you?

19   A    Yes.

20   Q    You have a lot of -- I guess we'd say a lot of snap?

21   A    I do.

22   Q    Good at thinking on your feet?

23   A    Sometimes, yes.

24   Q    Okay.  And you have a good business sense, do you think?

25   A    Yes and no.
```

1  Q    Okay.

2  A    I think I'm naive about some things.

3  Q    Okay.  Well, you -- I mean you did well at CMGRx, didn't

4  you?  You were successful?

5  A    Yes.

6  Q    Okay.  I know you just told Ms. Lobel a minute ago that

7  you threw a fit to get the title of manager, but -- but they

8  gave you that title because you deserved it, right?

9  A    I don't think so, no.

10  Q    Well, why were you throwing a fit to get that title?

11  A    That was after Mr. Cooper had told me I would never -- I

12  didn't have the education or the experience to be in a

13  position like Mr. Hollingsworth, and I threatened to quit, and

14  Rich told me that he would make me Office Manager.  That's how

15  I got the title.

16  Q    Okay.  And that was about December-ish?

17  A    Or January, yeah, somewhere around there.  One of those

18  two, I believe, yes.

19  Q    Okay.  Even before the title, do you think that they gave

20  you -- they at CMGRx -- they gave you a lot of

21  responsibilities?

22  A    I think they did, yes.

23  Q    Okay.  And you handled those responsibilities, right?

24  A    I tried to, yes.

25  Q    Okay.  And you know -- I know you talked about not having

1    a college education, but -- but you don't always need that to

2    succeed in business, do you?

3    A    Depending on what it is, no, not always, but it does help

4    if you're knowledgeable in a field, yes.

5    Q    Sure.  I mean to be a lawyer, you have to have certain

6    educational requirements, right?

7    A    Yes.

8    Q    Or to be a doctor.  But to succeed in business, you don't

9    necessarily need those things, do you?

10   A    Not necessarily but it helps.

11   Q    Sure.  You were compensated commensurate with an

12   executive salary, weren't you?

13   A    We all made the same salary pretty much.

14   Q    Okay.  You knew what everybody made?

15   A    Yes.

16   Q    And why did you know that?

17   A    It was not a secret.

18   Q    But specifically, why would you know that?  I mean ---

19   A    Because we all talked about it.

20   Q    Okay.  So you didn't see payroll records?

21   A    I have seen payroll records, yes.

22   Q    Okay.  So really I'm asking you, though, right now about

23   your income.  Do you think you were compensated commensurate

24   with an executive salary?

25   A    More so, yes.

1    Q    Okay.  And I know you talked a little bit about bonuses,

2    et cetera.  Do you know -- I think you said you filed your

3    taxes.  Do you remember how much money you made?  And I'm

4    going to say CMGRx, but then also Trilogy paid you some

5    income; correct?

6    A    Yes.  All the income was still under Trilogy.  Even

7    though in the beginning we were paid by Mr. Cooper by a

8    handwritten check, all the taxes that were filed were through

9    Trilogy Pharmacy, not through CMGRx.

10    Q    Okay.  And I believe you said you filed an income tax

11    return in 2014, right?

12    A    I did.

13    Q    Okay.  Do you remember what your wages were from Trilogy

14    that year?

15    A    I want to say around 60,000, and that included the

16    $15,000 car that they had bought me.

17    Q    Okay.  Trilogy bought you a car?

18    A    No.

19    Q    Okay.

20    A    Mr. Cooper and Mr. Cesario bought me a car.

21    Q    Well, your W-2 form, would that reflect the actual gross

22    wages on your paychecks?

23    A    Those -- Those taxes also include -- included the vehicle

24    that they purchased.  That was in the -- That was in the

25    wages.

1    Q    Okay.  What you're saying is the W-2 form included the --

2    A    The Mercedes.

3    Q    -- the income they paid you.

4    A    Yes.

5    Q    Which -- Was that by direct deposit?

6    A    It was.

7    Q    Okay.  And then they added into that an amount for the

8    vehicle?

9    A    Correct.

10   Q    Okay.  It did not include the amounts that CMGRx had paid

11   you, though, did it?

12   A    No, but they did take taxes out from previous wages they

13   had stated.

14   Q    Okay.  And so ---

15          MS. STILLINGER:  May I approach the witness,

16   Your Honor?

17          THE COURT:  You may.

18   Q    (By Ms. Stillinger) I want to show you what was marked as

19   part of Kiselak Exhibit 107.  I'm going to show you Page 66 of

20   that and ask you if you recognize that?

21   A    Yes.

22   Q    Okay.  And is that your W-2 form?

23   A    It is.

24   Q    For what year?

25   A    I'm sorry.  2014.

1   Q    Okay.  And does that -- Do you believe that accurately

2   reflects your income that you're just talking about from

3   Trilogy?

4   A    I believe so, yes.

5   Q    Okay.  And does that refresh your memory about the exact

6   amount?

7   A    Yeah.  Around 60,000, like I had stated.

8   Q    Okay.  Could you tell us what the exact amount was?

9   A    $62,647.10.

10  Q    Okay.  And, yes, you were very close at 60.

11  A    Yes.

12  Q    Okay.  So -- but a little closer to 63.  And do you

13  recall that you made about $16,000 from CMGRx that year, also?

14  A    I was informed that that income was included with

15  Trilogy.  That's why they took out more taxes.  So I was not

16  aware that -- I never filed a W-4 or W-2 with them because

17  they stated that all of our income and the back taxes were

18  through Trilogy Pharmacy, not CMGRx.

19  Q    Okay.  And I think you said you started in September of

20  '14, correct?

21  A    Yes, ma'am.

22  Q    Was it about mid-September?

23  A    I would say so, yes.

24  Q    Okay.  So -- So that's about three-and-a-half months for

25  2014?

1    A    Correct.

2    Q    Okay.  So even -- even if it's all included in this, the

3    62, we can round up to 63, we're talking about -- well, I

4    won't do the math.  We'll figure that out some other time.

5    But you would agree that that's somewhere between 15 and

6    20,000 a month.  Is that right?

7    A    Without the vehicle included.  The vehicle was included

8    in that, and that was between 15 and 17,000 which -- from what

9    I recall.

10   Q    Okay.

11   A    So deduct that.  So I would say a little less than what

12   you're saying.

13   Q    Okay.  And do you recall -- So that was for the

14   three-and-a-half months you were making average wages,

15   correct?

16   A    Correct.

17   Q    Because at the beginning, September, October, it wasn't

18   nearly that high; correct?

19   A    You're absolutely correct.

20   Q    Okay.  And November, December maybe it shot up?

21   A    I would say so, yes.

22   Q    Okay.  And do you recall your wages for 2015?

23   A    I -- I don't.  Maybe ---

24   Q    If I showed you a W-2 form, would that refresh your

25   memory?

```
 1   A     Sure.

 2   Q     So I'm going to show you Page 60 -- no, no, no.  It's

 3   Page 36 -- no -- Page 37; I'm sorry; Page 37 of Kiselak

 4   Exhibit 109, and I'll just tell you there's a number of W-2s

 5   on this one page, but I believe you're the bottom --

 6   A     Okay.

 7   Q     -- one on that page.  If you could review that and see if

 8   you believe that it's yours.

 9   A     Yes, ma'am, I believe so.

10   Q     Okay.  And what does that show your wages as?

11   A     54,500.

12   Q     Okay.  Thank you.

13   A     You're welcome.

14   Q     And that would have been for about five months in 2015?

15   A     Around there, yes, ma'am.

16   Q     And I guess there was -- You mentioned the other day --

17   You also mentioned that Mr. Cesario sometimes gave you cash.

18   Is that right?

19   A     He did a couple of times, yes.

20   Q     Okay.  And do you remember how much cash he gave you?

21   A     A couple hundred one time and I think around 2000 one

22   time.

23   Q     And, of course, cash, any cash that he gave you, there

24   wouldn't be any documents reflecting that.  Is that right?

25   A     Absolutely; you're right.
```

```
 1   Q    And so you would agree if -- if you're making -- let's
 2   say -- it sounds like -- Well, let me ask you this because I
 3   was kind of confused.  It seems like you made a lot more money
 4   in 2014 per month than you did in 2015; correct?
 5   A    Again, probably with the car.
 6   Q    Okay.  Well, the car, you said they allocated about
 7   17,000?
 8   A    I think it was around there, yes, ma'am.
 9   Q    But you ended up selling it for less than that.  Is that
10   correct?
11   A    Oh, yeah; yeah.
12   Q    Okay.  And, of course, you got the use of it, though, for
13   the time you had it, right?
14   A    I did.
15   Q    Okay.  But -- But even the car aside, if we took the car
16   out of the 60, you made a lot more in 2014 per month than you
17   did in '15, right?
18   A    It looks that way, yes.
19   Q    Okay.  But you were much busier in 2015, weren't you?
20   A    We were, but it was right in the -- I think that was
21   right when we started getting a lot more representatives, and
22   they offered bigger bonuses in the beginning.
23   Q    Okay.  Okay.  And you're sure there weren't any cash
24   bonuses in any of this.
25   A    No.
```

1  Q    Okay.  So I want to talk a little bit about the -- Well,

2  I guess I'd like to ask -- Oh, no.  We'll get there later.

3  I'm sorry.  The things you did for CMGRx; okay?

4  A    Okay.

5  Q    So I think one of the things you did at the beginning,

6  you said you handled financial matters.  I think you said you

7  kept track of -- of payments to some people.  Is that right?

8  A    Yes.  I would receive a spreadsheet from Trilogy Pharmacy

9  that showed the amounts that were -- basically the creams that

10 the patients had got, and then I would basically tally those

11 up to see who -- which representatives they were.

12 Q    Sure.

13 A    And then they would get paid that way.

14 Q    Sure.  Would you agree with me that you were from the

15 beginning in a position of trust with Mr. Cesario and

16 Mr. Cooper?

17 A    Not with Rich so much in the beginning but with

18 Mr. Cooper, yes.

19 Q    Okay.  And that you had access to pretty much everything;

20 at the beginning you had access to pretty much everything that

21 was going on there?

22 A    I wouldn't say everything.  I would definitely say that

23 spreadsheet, but they weren't in the office a lot of the time

24 in the very beginning.  So I -- There wasn't a whole lot to

25 have access to, I would say, except for that spreadsheet.

1    Q    Okay.  Well, you sat in on some meetings with lawyers;

2    right?

3    A    I sat in meetings, yes.  The lawyers were not at the

4    table with us.  They were in the -- Well, Scott Meyer was in

5    the corner, but, yes, I was there.

6    Q    Okay.  You sat in on some meetings with the people from

7    Trilogy.  Is that right?

8    A    I did, yes.

9    Q    Okay.  I guess I'm just asking:  It seems to me that you

10   -- your role was a role of management; that you're in a

11   position of authority and being let in on meetings with

12   important people.

13   A    I caught a big error.  That was the meeting I was -- why

14   I was in the meeting with Trilogy, and I did not have any

15   authority whatsoever.

16   Q    Okay.  What was the error that you caught?

17   A    Trilogy had mispaid Robert and Richard -- I mean John and

18   Rich.  They had actually given their, I guess, scripts to a

19   different doctor that was not with us, and I caught the error,

20   and they took me down to Trilogy to show them the error.

21   Q    Okay.  So Trilogy had underpaid?

22   A    Correct.

23   Q    Okay.  And how did you catch that error?

24   A    Just by looking at what we had sent out to them because

25   at the time I was still able to do that.  It wasn't so

```
 1   overwhelming, and that the pay back that we got was not the

 2   same as what we had sent out.

 3   Q    Okay.  So you kind of kept track of those things, right?

 4   A    In the beginning, yes, --

 5   Q    Okay.

 6   A    -- with one group.

 7   Q    Okay.  And which group was that?

 8   A    And that was with Joe Straw.

 9   Q    Okay.  And did you become friendly with Adam -- I'm

10   sorry -- Andrew Baumiller?

11   A    We were -- I mean, yes, we were pleasant to each other,

12   sure.

13   Q    Okay.  I know you talked last week.  You said one time

14   that you took him candles.

15   A    Yes.

16   Q    Okay.  So -- And that was a gesture of friendship,

17   correct?

18   A    It was.  It was right before I was going to have some

19   microdermabrasion done on my face, and he was actually the one

20   that set it up.  So, yes, it was a thank you.

21   Q    Okay.  And this is something you and he were doing

22   together, right?

23   A    Andrew and I?

24   Q    (Affirmative gesture).

25   A    No.  He had already -- Him and John had already done
```

```
 1    that.  I was -- I was on my own.  He just set it up.

 2    Q    Oh, okay.  He set it up for you.

 3    A    Yes.

 4    Q    And was he treating?

 5    A    Was he -- No.

 6    Q    No, okay.  So he just made the appointment for you?

 7    A    Yes.  The surgeon worked, I guess, in the same building

 8    as them, so they were -- they were friendly.

 9    Q    Okay.  And you were giving him candles to thank him for

10    making you an appointment?

11    A    Yes.

12    Q    Okay.  And did you sometimes communicate directly with --

13    Well, do you remember that he got the treatment, I guess, on

14    the same day, didn't he?

15    A    Andrew did not get any treatment that day.

16    Q    Okay.  Let me show you what I've marked as Defendant

17    Elder's Exhibit 87 and ask you to review that.

18    A    Okay.  We didn't actually do it this way, so that's --

19    that's probably why -- It does state that we would all be

20    getting it the same day but that, in fact, did not happen,

21    unfortunately.

22    Q    Okay.  Let me ask you about this first.

23    A    Sure.

24    Q    You remember this exchange?

25    A    I do.
```

1   Q    And that's an e-mail exchange between you and

2   Mr. Baumiller?

3   A    Yes.

4        MS. STILLINGER:  Your Honor, we would move for the

5   admission of Exhibit 87.  Defendant Elder's 87, that is.

6        MR. BRASHER:  No objection.

7        THE COURT:  Admitted.

8   Q   (By Ms. Stillinger) I'm just going to ask you about the

9   -- his -- his -- what he wrote you towards the top on February

10  the 11th.  You agree he does say, "I'm planning this for the

11  two of you"?

12  A    Yes.

13  Q    He was talking about you and Mr. Cooper?

14  A    Correct.

15  Q    Okay.  And he said he was doing it at the same time,

16  correct?

17  A    Correct.  And I think they had it at the same time, but I

18  was not -- I did not go that day.

19  Q    Okay.  It sounds like it's going to be a very friendly,

20  fun activity for you, though; right?

21  A    It was not fun --

22  Q    Oh, okay.

23  A    -- at all.  But, yes, I mean it was -- Yes, I can see

24  where, yes, it looked fun.

25  Q    And I know that he's joking about this; saying, "I'll be

1    doing the same procedure or similar procedure.  We can hold

2    hands and sing "Kumbaya."

3    A    Right.

4    Q    I know he's joking, but you would agree with me that

5    that's -- that shows a very friendly, personal relationship;

6    correct?

7    A    Yes.

8    Q    Okay.  Thank you.  And did Mr. Baumiller sometimes

9    address business issues with you?  Directly with you?

10   A    Limited things, but yes.

11   Q    Let me show you what I've marked as Defendant's Exhibit

12   86 and see if you recognize that exchange.

13   A    Okay.

14   Q    And before you tell us what it says, if you could just

15   let me know if you recognize it and if you think it's an

16   e-mail exchange that you had.

17   A    Sure.

18        (Pause)

19   A    I do remember this, yes.

20   Q    Okay.

21        MS. STILLINGER:  And, Your Honor, I'm going to move

22   for the admission of Defendant Elder's 86.

23        MR. BRASHER:  No objection.

24        THE COURT:  Admitted.

25        MS. STILLINGER:  Can we pull that up?

1    Q    (By Ms. Stillinger) So the lower part of this is

2    Mr. Baumiller e-mailing you.  Is that right?

3    A    Yes.

4    Q    So last week you talked a little bit about having to

5    change scripts.  Is that right?

6    A    Script pads, yes.

7    Q    Okay.  And is that one of the things that Mister -- or

8    actually that is the topic of what Mr. Baumiller's talking to

9    you about.  Is that right?

10   A    Yes, it is.

11   Q    Okay.  Would it be fair to say, and if you need a minute

12   to look at it, but is it fair to say that what he's really

13   talking here about is -- is sort of legibility, the

14   practicality of using the old script pad?  Is that right?

15   A    Yes.

16   Q    Okay.  And Mr. Baumiller's directing this to you, not --

17   not to anybody else at CMGRx.  Is that right?

18   A    That's right.

19   Q    Okay.  And -- And is it fair to say in your response

20   you're telling him, "I'll deal with this"?

21   A    Yes.  So I would have either relayed it to Kat or there

22   are sometimes I did -- I spoke with them a couple of times.

23   So it's very well possible that I would have sent them over

24   something new, yes, or had her do it.

25   Q    Okay.  But you're telling Mr. Baumiller you'll take care

1    of it; correct?

2    A    Correct.

3    Q    Now you might have had Kat Pfaff do ---

4    A    Either way.  I took care of it.

5    Q    Sure.  Because Kat Pfaff -- At this point in time you're

6    the manager and she's working under you; right?

7    A    No.  That was her group.  IFG was the group that Kat

8    dealt with the most.

9    Q    Oh, okay.  And Kat Pfaff was in your section of CMGRx.

10   Is that right?

11   A    She was.

12   Q    Okay.  And this was really a problem with the IFG

13   doctors, is that right, using messy scripts?

14   A    It looks that way, yes.

15   Q    Okay.  And I understand you don't actually have a memory

16   of this from four-and-a-half years ago, right?

17   A    Correct.

18   Q    Okay.  But what you're representing to Mr. Baumiller is

19   that you'll take care of it, right?

20   A    It looks that way.

21   Q    Sure.  Would it be fair to say that ---

22        MS. STILLINGER:  And thank you.  You can take that

23   down.

24   Q    (By Ms. Stillinger) Would it be fair to say that you

25   always presented yourself as a professional person when you

```
 1   worked for CMGRx?

 2   A    I wouldn't always say that, no.

 3   Q    Okay.  To Mr. Baumiller?

 4   A    Yes.

 5   Q    Okay.  And I guess I don't mean always to everybody every

 6   minute of the day, but was that something that you strived

 7   for, to live up to the responsibilities in the position that

 8   you had there?

 9   A    I think I strived, yes, to make them feel maybe that I

10   had more under control than I possibly did; absolutely.

11   Q    Okay.  And that's -- And that's actually exactly what I

12   was asking you.  You had a lot of things going on there,

13   right?

14   A    Yes.

15   Q    And -- And there were big dollar amounts coming through

16   that office, right?

17   A    Yes.

18   Q    And a lot of responsibility that goes along with big

19   dollar amounts going through there, correct?

20   A    In the -- Well, I never really had responsibility over

21   the financial part except for that spreadsheet, so -- But,

22   yes, there were large dollar amounts coming in for sure.

23   Q    And you never wrote checks there, right?  You never

24   directed bank deposits?

25   A    I did not.
```

1   Q    Okay.  But I guess that's what I was asking.  You always

2   held yourself out.  I mean you always tried to be as

3   professional, present yourself as being in control of things

4   that were going on there.  Is that right?

5   A    Yes.  Whether I had control over it or not, I would

6   definitely try to at least try to fix the problem, yes,

7   absolutely.

8   Q    Okay.  And you've talked, I think last week probably a

9   lot more, about the fact that you were actually on Trilogy's

10  payroll as of maybe December.  Is that right?

11  A    That's right.

12  Q    Okay.  And you did not actually consider yourself an

13  employee of Trilogy, though?

14  A    I don't feel like that, no.

15  Q    Okay.  Did you represent to other people that you were an

16  employee of Trilogy?

17  A    I don't know that I would have or not.  I think at that

18  time we were still with CMGRx.  I don't ever -- And, again, I

19  may have, but I don't feel like I ever said I worked for

20  Trilogy Pharmacy, but it's possible.  I -- I don't really

21  recall.

22  Q    Let me -- And I'm not trying to trip you up.  I have to

23  ask you the questions before I show you documents.

24  A    You're fine.

25  Q    I'm going to ask you to look at Defendant Elder's Exhibit

1   84.  And, again, before you read it, do you recognize that?

2   A    I know exactly what this is from, yes.  That's when I

3   traded in the Mercedes and bought a Tahoe.  So he ---

4   Q    Okay.  Let me -- Let me just ask you first before you say

5   what it is.

6   A    Sure.

7        MS. STILLINGER:  I'm going to move for the admission

8   of Defendant Elder's 84.

9        MR. BRASHER:  No objection.

10        THE COURT:  Admitted.

11        MS. STILLINGER:  So we can put that up on the screen.

12   Thank you.

13   Q    (By Ms. Stillinger) So, first of all, this is an e-mail

14   between Andrew Baumiller and yourself.  Is that right?

15   A    It is.

16   Q    Okay.  And then you were starting to tell us what it is,

17   if you could.

18   A    Yes.  I didn't have a -- like a paystub because

19   everything was direct deposited.  I don't recall really ever

20   getting any paystubs ever, and I needed him to verify

21   employment with Eldorado Chevrolet because that was when I

22   traded in the Mercedes and got a Chevrolet Tahoe.

23   Q    Okay.

24   A    So he was verifying that.

25   Q    Okay.  So I guess when you traded it in and got a new

1    vehicle, you were financing that vehicle?

2    A    Yes.

3    Q    Okay.  And when you were financing the vehicle, you had

4    to fill out certain forms to get the credit.  Is that right?

5    A    I did.

6    Q    Okay.  And you told them that you worked for Trilogy

7    Pharmacy.  Is that right?

8    A    I don't recall that I put that.  I could have put

9    CMGRx/Trilogy Pharmacy, but at some point I'm sure I would

10   have had to have listed them as -- somewhere as such.  But I

11   think -- I'm pretty sure I put both.

12   Q    Okay.  And -- And -- So this is just sort of documenting

13   the fact that Andrew Baumiller then verified that you worked

14   for him or worked for Trilogy, I imagine; right?

15   A    Correct.  He stated since September which was inaccurate,

16   but yes.

17   Q    Sure.  And you say, "Thanks, punkin," to him; right?

18   A    Yes.

19   Q    Is that -- Would you agree that's a term of endearment in

20   that relationship?

21   A    Sure.

22   Q    Okay.  Let me ask you about how long you worked for

23   CMGRx.  Was there a time that Trilogy closed or that you

24   stopped working for Trilogy but kept working for CMGRx?

25   A    We were all let go from Trilogy Pharmacy, and we were

1    given the option to go work for a credit card company,

2    processing company that Rich and John had offered or there was

3    something else, and I can't remember.  They were -- There was

4    something else they were starting as far as medical testing or

5    something like that.  I don't recall working for them after

6    that with CMGRx after Trilogy let us go.  I -- I don't recall

7    that.

8    Q    Okay.  After you were no longer paid by Trilogy, do you

9    recall -- Well, no.  Let me ask you first.

10   A    Okay.

11   Q    Let me ask you a couple of questions.  I'm going to show

12   you what I've marked as Defendant Elder's 77 and 78.  I'll

13   show them to you together.

14   A    Okay.

15   Q    If you could look at those and then tell me if you

16   recognize those.

17   A    Sure.

18        (Pause)

19   A    Okay, yes.  I don't recall this one so much.  I do recall

20   this one but, obviously, this was sent to me.

21   Q    Okay.

22   A    It doesn't look like I have replied, though.

23   Q    Okay.  Those are sent to your work e-mail.  Is that

24   right?

25   A    That is correct.

1          MS. STILLINGER:  Your Honor, I'm going to move for

2     the admission of Defendant Elder's Exhibit 77 and 78.

3          MR. BRASHER:  No objection.

4          THE COURT:  Admitted.

5     Q    (By Ms. Stillinger) Let's look at Exhibit 77 first, and

6     this is from you at your CMGRx -- or the top of it is from

7     you.  You're responding, but it's from you at your CMGRx

8     e-mail.  Is that right?

9     A    Yes.

10    Q    And -- And what date was that sent out?

11    A    June the 9th.

12    Q    Okay.  So I know last week you testified you thought you

13    quit working for CMGRx -- I think first you said you thought

14    maybe late April and then you said maybe early May or mid-May

15    but you thought probably early May.

16    A    Correct.

17    Q    Does this -- Seeing this e-mail, does that change your

18    opinion about how long you might have worked for CMGRx?

19    A    Yeah.  I mean it's still around the same area, I would

20    say.  I don't recall being there that long but it is possible.

21    Again, it was five years ago, so exact dates are a little, --

22    Q    Sure.

23    A    -- you know.

24    Q    Sure.

25    A    But it looks that way, yes.

1  Q    Okay.  Let's go down a little bit to see what Liz Valdez

2  is asking you.  Well, she's not really asking you.  No, I

3  guess she is.  So -- And let me ask you:  Liz Valdez is who?

4  A    She was over at Trilogy Pharmacy.  I don't really know

5  what her title was.

6  Q    Okay.  And her question to you on June the 3rd is, "Any

7  updates or reloads for today?"  Is that right?

8  A    Yes.

9  Q    Okay.  And your response?

10  A    "I authorized 12 verbal refills.  So that's a 'yes.'  Is

11  that all you needed for that?"

12  Q    What are you -- What are you talking about?  Do you

13  recall?

14  A    No.

15  Q    Okay.  But I guess in June -- on June 9th you had

16  authority to authorize refills of something?

17  A    You're asking what now?

18  Q    Did you have authority to authorize refills of something

19  on June the 9th?

20  A    I -- If I was still operating under the medical assistant

21  that I was told that I had, then, yes, I would have.

22  Q    Okay.  You know on June the 9th, Dr. Elder hasn't had any

23  contact with CMGRx for some time, correct?

24  A    I would not have known that.  I didn't know he didn't

25  have contact with them.

1   Q    Okay.  Well, contact with you.  I mean you -- you were

2   his point of contact at CMGRx, right.

3   A    At one point, but then we -- I wasn't in that much

4   communication with him.  And I don't -- I mean I recall this

5   e-mail to a point, but I mean you have to understand how many

6   people were in the office that could have access to your

7   e-mail as well.

8   Q    Can I ask you -- I'm sorry.

9        MS. STILLINGER:  Mr. Slyter, can we have that up

10  there?  Yeah.

11  Q    (By Ms. Stillinger) Let me ask you:  The subject line

12  says "PPO Business," and I know you've talked about PPO a

13  couple of times in your testimony.  What is "PPO"?

14  A    It's private party insurance, I believe, basically

15  through an employer or -- yes, through an employer.

16  Q    Okay.  So is it like -- I mean maybe -- maybe this had

17  nothing to do with what Dr. Elder had worked on in the past.

18  Is that right?

19  A    It is possible; for sure.

20  Q    Okay.  Let me ---

21  A    We did have PPO insurance, though, that wasn't just -- He

22  -- I mean there were other patients that were in the study

23  that weren't all TRICARE.  So there could have been a time

24  when he had seen them, yes.

25  Q    Okay.  Okay.

1   A    Possibly.

2   Q    You knew Dr. Elder saw or consulted with study

3   participants, mostly TRICARE; correct?

4   A    Mostly, yes.

5   Q    Okay.  But he could have had some PPO --

6   A    Possibly.

7   Q    -- participants as well?

8   A    Yes.  From the beginning, yes.

9   Q    Okay.  So if you're authorizing.  Let's just say this:

10  If you're authorizing verbal refills on June the 9th, you're

11  not sure right now ---

12  A    Who they would have been for, what group, yes.

13  Q    Okay.  Thank you.

14       MS. STILLINGER:  Then if we could go to Defense

15  Exhibit 78.  It's been admitted.

16  Q    (By Ms. Stillinger) And if we could start with Liz

17  Valdez, and it's there on Tuesday, June 9th.  And if you could

18  take a minute, it's kind of a long e-mail that she's writing

19  you there, but can you take a minute and read that and see if

20  you can tell me what you think you all were talking about?

21  A    I'm not sure what "reloads" means, honestly.

22  Q    Okay.  Do you know what you meant -- I'm sorry -- what

23  she meant when she says, "Income at risk of loss for May"?

24  A    Yes.

25  Q    And what was she talking about?

```
 1   A    The payouts for the pain and scar, migraine, vitamin

 2   creams, if they weren't filled.  That's the -- what they could

 3   be losing if those 12 patients weren't filled.

 4   Q    Okay.  And I guess would it be fair to say that she's

 5   trying to get your assistance to get those things ---

 6   A    It looks that way, yes.

 7   Q    Okay.  To get those things paid?

 8   A    (Affirmative gesture).

 9            THE COURT:  Say "yes" or "no."

10            THE WITNESS:  Oh, I'm sorry.  Yes.  I'm sorry.

11   Q    (By Ms. Stillinger) Does it seem that -- There is a

12   doctor's name mentioned in this e-mail.  Is that right?

13   A    Yes, there is.

14   Q    And who is that?

15   A    Dr. Bornstein.

16   Q    Do you remember what Dr. Bornstein had to do with CMGRx?

17   A    Not really, no.

18   Q    Okay.  Do you know if he was consulting with study

19   participants?

20   A    I believe he was, yes, but I don't know which -- which

21   group.

22   Q    Okay.  Whether it was IFG or some other group?

23   A    Correct.

24   Q    Okay.  He didn't have anything to do with Dr. Elder.  You

25   knew that, correct?
```

1    A    I -- Correct.

2    Q    Okay.  Then the line right under the one that's

3    highlighted that says Bornstein talks about 15 maxi cards

4    still need reloads, what -- what is that?

5    A    Can I see the -- Oh, the date?

6    Q    Sure.  The date's at the top of the screen.

7    A    I don't know if -- We weren't paying people for their

8    assessments with cards anymore, so I don't know if she was not

9    aware of that or I don't know what that is.

10   Q    Okay.  But -- But -- So I understand what you're saying,

11   but just so the rest of us can follow along, --

12   A    Okay.

13   Q    -- what -- what did that mean, "maxi cards"?

14   A    So in the very beginning Rich and John would load prepaid

15   cards and send that to the participants who had done their

16   assessments, had done their studies, and at a point they

17   stopped doing that.  They were not funded that way anymore.

18   So I don't know if that's what that was or ---

19   Q    Okay.

20   A    I don't know why that would have been in there because we

21   weren't -- we were not doing that anymore.

22   Q    And then if we could go up to the -- the response to the

23   e-mail.  The first thing you tell her is, "Most of those have

24   been reloaded."

25   A    Correct.

1    Q    It seems like you're talking about the maxi cards.

2    A    Okay.  Okay, hold on.  Well, I read, "The guy from the

3    site we load to was having problems."  Okay.  So they actually

4    loaded cards for the TRICARE copays.  I believe that's what

5    that is.

6    Q    Okay.  What was -- I'm sorry.

7    A    I believe so.  I don't -- I don't know for sure.  That's

8    what I think it is.

9    Q    Okay.  Well, in June, this is June 9th of 2015, --

10   A    Correct.

11   Q    -- you're not doing the TRICARE business right then, are

12   you?

13   A    I don't recall.  I don't remember when TRICARE stopped.

14   Q    Okay.  Were you -- Sometimes were amounts loaded on cards

15   for Trilogy to use to pay the copays?

16   A    I believe so, yes.

17   Q    Okay.  They weren't always -- Those cards weren't always

18   sent to participants.  Sometimes they were just used at

19   Trilogy, right?

20   A    I -- I assume so.  Yes, I do know that they were -- they

21   did use them sometimes for copays; absolutely.

22   Q    Okay.  Do you remember that the TRICARE copays were

23   actually very, very low compared to private insurance copays?

24   A    Not necessarily.  Some of the copays, they didn't have a

25   copay with PPO insurance.  So that's not -- that's not true.

1    Q    Sure.  But do you recall that the TRICARE copays were

2    never very high?

3    A    Correct, yes.

4    Q    Okay.  But you believe that -- that CMGRx was paying

5    those copays?

6    A    I believe so, yes.  That's what I was told so.  Did I

7    ever see it?  No.

8    Q    Okay.  So this e-mail is June the 9th, and it looks like

9    you are still actively involved in CMGRx business, dealing

10   with Trilogy.  Is that right?

11   A    It looks that way, yes.

12   Q    Okay.  So we've -- we've changed the timeline a little

13   bit.  So having looked at this and kind of refreshing your

14   memory about what was going on back then, do you think you

15   have -- you can think of some other date or refresh your

16   memory about when it would be that you left CMGRx?

17   A    I still feel like it was in May but, obviously, it

18   wasn't.  Again, this is a long time ago.  A lot's happened

19   and, obviously, we're here at this point, so.

20   Q    Sure.

21   A    So I cannot tell you an exact date in all honesty.

22   Q    Sure.  When you -- I know -- I'm not going to dwell on

23   this, but I'm just -- I'm trying to find date references.  For

24   me, sometimes I try to remember, you know, important events in

25   my life and did it happen before that or after that.  You

```
 1   married Robert Cesario in July of that year?

 2   A    Yes.

 3   Q    Okay.  Were you still working at CMGRx when you did that?

 4   A    No.

 5   Q    Okay.

 6   A    No, no.  I was -- No, we were not, no.

 7   Q    Okay.  So ---

 8   A    It was right around this time.  I would -- Right around

 9   this time, I'm guessing, that I was no longer there.

10   Q    Do you recall ever getting a notice from Juan Arellano to

11   CMGRx employees telling employees to clear information off of

12   their computers?

13   A    I don't recall getting an e-mail from that -- from him

14   saying that.  I remember it being said.  I don't recall an

15   e-mail.

16   Q    Okay.

17   A    That doesn't mean that I didn't get one but I don't

18   recall one.

19   Q    I'm going to show you what I've marked as Defendant's

20   Exhibit 57.

21         THE COURT:  All right.  Let's finish this one and

22   then we'll take our break.

23         MS. STILLINGER:  Sure.

24   Q    (By Ms. Stillinger) And not to read out loud, but if

25   could you just look at it for a minute and tell me whether you
```

1    recognize that, whether you think you've seen that.

2    A    Okay.  I do not recall ever having seen this.

3    Q    Okay.  It's addressed to all CMGRx employees, but you

4    don't think you got that.  Is that right?

5    A    Correct.  There was a time when Robert and I went to

6    Las Vegas.  We weren't there, and that's about the time they

7    were clearing out the office.  So it could have been possible

8    that that's when this happened.

9    Q    Okay.

10   A    I don't recall ever seeing this.

11   Q    Okay.  Let me just ask you this:  There's a date of June

12   the 12th towards the bottom of that.  Do you think that might

13   be when CMGRx was shutting down?  Does that -- would that

14   refresh your recollection?  And I know you didn't see this

15   document.

16   A    It could have been.  Again, we were in Vegas when

17   actually they -- they shut it down.  Everything was cleared

18   out of the offices.  And we came -- There was nothing there

19   when we came back.  So it's -- it's possible it was around

20   that time.

21   Q    And did you not know that was happening when you were in

22   Vegas?

23   A    Not -- Not really, no.  We -- We weren't talking to

24   anyone at that point about work.

25   Q    Okay.

```
 1              MS. STILLINGER:  Your Honor, did you want to stop

 2    after this document?

 3              THE COURT:  Yes.

 4              MS. STILLINGER:  I'm done with this document.

 5              THE COURT:  All right.  Ladies and Gentlemen, we'll

 6    be in recess for 15 minutes.

 7              All rise for the jury.

 8              (Jury escorted to the Jury Room by the Court Security

 9    Officer.)

10              THE COURT:  All right.  Be seated; 15 minutes.

11              (Court recessed from 9:55 AM until 10:10 AM.)

12              THE COURT:  We have a juror who's not feeling well

13    and I said she can sit in the back so she can stand up.  She's

14    feeling kind of drowsy, and I said she can sit in the back and

15    stand up.  So if you see her, she'll maybe be moving.  All

16    right?  Okay.

17              COURT SECURITY OFFICER:  All rise for the jury.

18              (Jury seated in the jury box.)

19              THE COURT:  All right.  Be seated, please.  All

20    right.  Thank you.  Proceed.

21              MS. STILLINGER:  Thank you.

22                      CONTINUED CROSS EXAMINATION

23    QUESTIONS BY MS. STILLINGER:

24    Q    Ms. Stevens, I just want to follow up on one thing that

25    we were talking about before we took a break which was:  You
```

1    said that you were in Las Vegas when CMGRx actually closed

2    down.  Is that right?

3    A    We were there when the offices were cleaned out.  I can't

4    guarantee that we were there when it was closed down, but when

5    we came back, there was nothing in the offices and they had

6    moved to the Irving --

7    Q    Okay.

8    A    -- an office in Irving, I believe.

9    Q    Okay.  And did you ever work in the office in Irving?

10   A    We went there -- I went there one day and then I never

11   went back there.

12   Q    Okay.  And why is that?

13   A    John and Rich didn't want me there anymore, I guess.

14   They gave me the opportunity to go work for the credit card

15   company.  I went there once for an orientation and didn't go

16   back.

17   Q    Okay.  It's because you -- Excuse me.  You didn't want to

18   work for this other company.  Is that right?

19   A    Correct.

20   Q    Okay.  And when you were talking about "we" and talking

21   about "Robert and I," that's Robert Cesario, right?

22   A    Correct.

23   Q    Okay.  "Cesario" I guess is correct, right?

24   A    Yes.

25   Q    Okay.  Thank you.  I wanted to ask you then about a

1  couple of other things that you did at CMGRx, --

2  A    Okay.

3  Q    -- some of your other responsibilities.  I put a few

4  exhibits in front of you.  So if you could take the top one,

5  what's marked as Defendant Elder's Exhibit 80, and if you

6  could look at that first and tell me whether you recognize

7  that as being an e-mail exchange that you were a part of.

8  A    Yes, and I do remember the cards, a list.

9  Q    Okay.  I'm sorry.  Let me just ---

10  A    I'm sorry.  Go ahead.  Sorry.

11  Q    That's okay.  I just wanted to stop you after -- You

12  recognize it.

13  A    Correct.  Yes, I do.

14  Q    Okay.

15        MS. STILLINGER:  Your Honor, I'm going to move for

16  the admission of Defendant Elder's Exhibit 80.

17        MR. BRASHER:  No objection.

18        THE COURT:  Admitted.

19        MS. STILLINGER:  Okay.  Then if we could pull that

20  up, please.

21  Q    (By Ms. Stillinger) And then let me -- let me ask you

22  first before I ask you about the specific of this, but this is

23  an exchange between you and Liz Valdez.  Is that right?

24  A    Correct.

25  Q    Okay.  And would it be fair to say that you were the

1    point of contact for Liz Valdez at Trilogy?

2    A    A lot of the times, yes.  If she couldn't get answers

3    from someone, then she knew I would probably find an answer

4    for her, especially where Paul was concerned.

5    Q    Okay.  And who is "Paul" that you're talking about?

6    A    Paul Hollingsworth.  He came in as a -- I don't exactly

7    know what his title was either but, more or less, of an

8    overall manager, per se, over everyone.

9    Q    Okay.

10   A    I don't really know what he did.

11   Q    Okay.  And then you were starting to say that you

12   remembered about the cards.  Is that right?

13   A    Yes.

14   Q    Okay.  Is that the subject of this exchange?

15   A    It looks that way, yes.

16   Q    Okay.

17   A    There was a list of cards that were loaded for copays,

18   and Robert Cesario and a Brian Gray were actually in charge of

19   loading them when Paul left.  I think at this point during the

20   conversation Paul was still loading them, but I think after

21   that, the next time I believe Robert and Brian were loading

22   them.

23   Q    Okay.  So this is April 28th?  Is that right?

24   A    It looks that way, yes.

25   Q    Okay.  That's very close to the time -- Well, actually

1    it's almost exactly the time that TRICARE -- Well, you said

2    you didn't remember when TRICARE quit paying.  Is that right?

3    A    I don't, but I don't remember Paul being there at that

4    time either.

5    Q    Okay.

6    A    So I believe Paul left before that as well.  So I don't

7    -- I don't believe he was there at that time.

8    Q    Okay.  But would there be any other "Paul" that you're

9    talking about there?

10   A    No.

11   Q    Okay.  So -- And it looks like -- or would you agree it

12   looks like you're -- maybe you just said that -- that you're

13   the point of contact.  Liz is trying to get information from

14   Paul, and you're the one going to check on Paul to see if he's

15   done what he's supposed to do?

16   A    Correct.

17   Q    Okay.  If you could look at Defendant Exhibit 81, the

18   paper copy then that's in front of you.

19   A    Okay.

20   Q    And just tell me if you recognize that as another e-mail

21   exchange with you and Liz Valdez?

22   A    I don't recognize the e-mail, but I -- I mean my name's

23   on it.  So at some point I'm sure I received it.

24   Q    Okay.  And -- And responded to it, right?

25   A    Correct.

1    Q    Okay.

2          MS. STILLINGER:  Your Honor, I'm going to move for

3    the admission of Defendant Elder's 81.

4          MR. BRASHER:  No objection.

5          THE COURT:  Admitted.

6          MS. STILLINGER:  If we could put that up.

7    Q    (By Ms. Stillinger) And I know you said you don't

8    recognize or you don't remember this exchange, correct?

9    A    Correct.

10    Q    Okay.

11    A    I e-mailed a million people all the time.

12    Q    Sure.

13    A    So I'm not going to remember every one of them.

14    Q    Sure.  But this is -- These are the same e-mail addresses

15    on the other e-mails --

16    A    It is.

17    Q    -- we've looked at, correct?

18    A    Yes.

19    Q    So this is an exchange between you and Liz Valdez?

20    A    Yes.

21    Q    And looking at what she's saying, does this refresh your

22    memory about whether or not you were doing the copays for --

23    actually I'm going to ask you to look at what Liz Valdez

24    says -- about -- about patients other than TRICARE?

25    A    Yes.

1  Q    Okay.

2  A    That is -- I guess we were still doing the cards --

3  Q    Okay.

4  A    -- for nonpatient.

5  Q    For non-TRICARE; is that right?

6  A    It looks that way.

7  Q    Okay.  And that's in -- It's just barely into the latter

8  half of May.  Is that right?

9  A    Yes.

10  Q    Okay.  And you're talking about the owner of the site is

11  a moron.  Who are -- Who are you talking about?

12  A    I don't even know who the guy is.

13  Q    Okay.

14  A    And I never dealt with him.  I have no idea who he was,

15  but he could never get things corrected --

16  Q    Okay.

17  A    -- from what I understood.

18  Q    Was that somebody at the -- the maxi card site?  Is that

19  what you're talking about?

20  A    Yes.

21  Q    Okay.  So you were dealing with them and trying to get

22  them ---

23  A    I wasn't dealing with them.

24  Q    Okay.

25  A    Robert was dealing with them.  I was the middle man in

1    all of that.

2    Q    Okay.

3    A    So I never dealt with him directly, no.

4    Q    Okay.  You're the point of contact that's giving

5    Liz Valdez the information that your people are finding out.

6    Is that fair?

7    A    Yes.  In this instance, yes.

8    Q    Sure.  If you could look at the paper Exhibit 82 in front

9    of you, please.  And just let me know if you recognize that as

10   another e-mail exchange between you and Liz Valdez.

11   A    I don't recognize it but, again, I've had a thousand

12   e-mails.

13   Q    Okay.  You agree it is an e-mail exchange between you and

14   Liz Valdez?

15   A    I agree, yes.

16   Q    Okay.

17         MS. STILLINGER:  Your Honor, I'm going to move for

18   the admission of Defendant Elder's 82.

19         MR. BRASHER:  No objection.

20         THE COURT:  Admitted.

21   Q    (By Ms. Stillinger) And then this is in January of '15,

22   correct?

23   A    Yes.

24   Q    So now we're going back -- We were looking at things in

25   June and May, and now we're going back to an earlier time.

1    A    Yes.

2    Q    Can you tell us what -- what Liz Valdez, what her issue

3    is that she's addressing with you here?

4    A    She's stating that the payout for the PCN.1 cream is only

5    paying out a certain amount and her copay is 197.88.  "Only

6    pain cream covered completely is PCN.19.  Do you want to

7    continue her refill scripts at this rate or give her a new

8    script?"  And then we said we would give her a new script.

9    Q    Okay.  So is that a kind of decision that you would make

10    in January of 2015?

11    A    I'm sure I asked someone beforehand.

12    Q    Okay.

13    A    I wouldn't have made that decision on my own, and I don't

14    know whose patients these are.  I don't know if they're IFG's.

15    I don't know whose patients they were, so I can't directly

16    say.

17    Q    Sure.

18    A    I would never have made that decision on my own, though.

19    Q    Okay.  Who would you go to for that kind of decision?

20    A    Rich or John or it depended on the group.

21    Q    Okay.

22    A    If it was IFG, Kat would have dealt with it.  I wouldn't

23    have.

24    Q    Okay.  Would this be another example, though, of how

25    you're the point of contact for Liz Valdez and you're going to

1  go get the information and back to her?

2  A    I wasn't always the point of contact for Liz.  It was

3  usually if she couldn't get someone.  So if you're trying to

4  keep a rhythm going that I was a point of contact for

5  everybody, that's not -- that's not entirely true, no.  If she

6  couldn't get an answer, then, yes, she would e-mail me

7  directly --

8  Q    Okay.

9  A    -- but so did a thousand other people.

10  Q    Sure; sure.  You knew how much the compounded creams

11  cost.  Is that right?

12  A    No.

13  Q    Okay.

14  A    There were some that I knew in the beginning.  Later on I

15  had no idea how much the creams were.  I was not privy to that

16  information.

17  Q    Okay.  When you say "in the beginning" and then

18  distinguish that from later on, can you give us an idea of

19  what you mean time-wise?

20  A    I would say the latter end of maybe January I -- I didn't

21  know what the payouts -- Whenever Adam came in, I didn't know

22  any more about the creams or how much they adjudicated for.

23  Q    Okay.  At the bottom of this screen, is Liz Valdez

24  telling you what the vitamins are paying out?

25  A    Yes.

1    Q    Okay.  And how much is that?

2    A    $9,086.43.

3    Q    Okay.  So January 19th, I guess at least, you were still

4    in the loop on how much the compounded creams were paying?

5    A    If she would have just sent this.  I wouldn't have known

6    other than that, though.

7    Q    Okay.  Can you think of a reason that she thought it was

8    important enough to put it in her e-mail to you?

9    A    She was just letting me know the cost, I guess, to relay

10    the message or whatever it was, especially about the copay if

11    we were covering the copay because the whole thing was about

12    the -- "The copay in the beginning was 197.88, a drastic

13    change from last year and the payout."  So she would have sent

14    it to me, I guess, to let them know how much it was and how

15    much the copay was.

16    Q    Okay.  Why would she be letting you know that?

17    A    I don't know.  You would have to ask her.

18    Q    Okay.

19    A    I have no idea why she was letting me know that --

20    Q    Okay.

21    A    -- except to get a new script like it said when I

22    replied, "We'll get her a new script."

23    Q    Sure.

24    A    So that was my response.  That's what she was looking

25    for.

1    Q    Sure.  But you would agree -- I'm just giving you this

2    example, but you would agree that that would not be unusual

3    that you would have information about costs of products in

4    e-mails, would you?

5    A    It is unusual, yes.  I was not given this.  I don't know

6    how many e-mails you have about this, but this is not common

7    that I would receive those amounts, no.

8    Q    Okay.  If you knew about the costs in the beginning or

9    let's say in 2014, in that time period -- You knew about the

10   costs of the creams, right?

11   A    I knew how much they were adjudicating for as far as when

12   TRICARE started, and PPO insurance was always different.  So I

13   never had --

14   Q    Sure.

15   A    -- an exact price payout for every cream for every

16   insurance, no.

17   Q    Sure.  And when you use the word "adjudicating," it's not

18   -- it's not a common word.  I mean it's not -- it's not ---

19   A    Right.  We've been over it before, though, but go ahead.

20   Q    Okay.  Well, and I'm sorry if I don't remember, but does

21   it mean what the insurance was paying?

22   A    That's the amount that I believe, yes, that the insurance

23   was going to pay for that cream, yes.

24   Q    Okay.

25   A    I didn't do the adjudicating, so.

1    Q    Understood.  But you -- But what you're saying, just so

2    we're clear, you're saying that in 2014 you were aware of the

3    very high prices that TRICARE was paying for these creams.  Is

4    that right?

5    A    In the beginning, it was PPO.  If it was towards the

6    December, yes, I knew that the creams were expensive.  How

7    expensive all of them were, no.  I knew the scar cream was the

8    priciest one.

9    Q    Sure.  And I'm not even asking if you remember.  I'm not

10   going to ask you to call up numbers from memory or whether you

11   kept track of them.  I'm just saying:  In general, you knew

12   how much they cost.  So when you see this in an e-mail that

13   vitamins are $9,000, that's not shocking to you at that point

14   in time, is it?

15   A    Yes, the vitamins were shocking.  That was a new item.

16   So, yes, it was shocking.

17   Q    Okay.  Did you ask anybody why in the world vitamins

18   would be costing so much?

19   A    No.  That wasn't my place to ask --

20   Q    Okay.

21   A    -- why they were costing so much.

22   Q    Okay.  You said the -- you knew the scar was very

23   expensive, also; right?

24   A    Correct.

25   Q    And you knew that before this time period.  Is that

1    right?

2    A    Yes.

3    Q    Okay.  Let me ask you if you could look at the paper

4    Exhibit 83 that's in front of you.

5    A    Okay.

6    Q    And do you recognize that as an e-mail -- the top of it

7    is an e-mail exchange between you and Liz Valdez?

8    A    I'd agree that, yes, it was an exchange between Liz and

9    I.  I don't remember the e-mail, but I'm not surprised at the

10   e-mail.

11   Q    Okay.

12         MS. STILLINGER:  Your Honor, I'm going to move for

13   the admission of Defendant Elder's Exhibit 83.

14         MR. BRASHER:  No objection.

15         THE COURT:  Admitted.

16   Q    (By Ms. Stillinger) Now is Liz Valdez forwarding you an

17   exchange that she's had with Brian Gray?

18   A    It looks like that, yes.

19   Q    Okay.  So if we go down further, we see the exchange with

20   Brian Gray, and if you can just kind of look through it.  Does

21   it seem like Brian Gray and Liz are not communicating very

22   well?

23   A    That wasn't uncommon with Brian, yes.

24   Q    Okay.  And Brian was one of the ones you said worked in

25   your group.  Is that right?

1    A    He did until he went to the Foundation.

2    Q    Okay.  December of 2014 he's still there with you,

3    correct?

4    A    Correct.

5    Q    Okay.  Then let's -- let me go back up to what Liz is

6    telling you about this.  Is she asking for your assistance

7    with Brian?

8              MS. STILLINGER:  Go up a little further.

9    Q    (By Ms. Stillinger) Here where we have, "Hi, Miranda."

10   Is she -- Is she asking for your help with Brian?

11   A    Yes.

12   Q    Okay.  In fact, she's kind of complaining about him

13   because he's -- he's got a bad tone with her; right?

14   A    Yes.

15   Q    Okay.  It was not unusual, right?

16   A    No, it was not unusual.

17   Q    Okay.  And Liz is coming to you, asking for you to help

18   her with Brian; right?

19   A    Again, the rhythm with me being the one to go to, sure.

20   Q    Sure.

21   A    Yes, she's asking for my assistance.

22   Q    Sure.  And I'm -- Also, it sounds to me like you're

23   supervising Brian.  Would that ---

24   A    No.  It just means that she couldn't get what she needed

25   done with Brian, so she came to me.  That doesn't mean that I

1    -- It doesn't say I was supervising him.  I don't even --

2    There's no way to supervise Brian.

3    Q    Okay.  Okay.  But would you agree he was in the group

4    that you were the manager of?

5    A    He was in the group.  Did he follow any kind of

6    instruction?  No.

7    Q    Okay.  But that's why she's reaching out to you because

8    she knows you're ---

9    A    She's reaching out to me because she didn't get a

10   response from Brian, not because I'm supervising Brian;

11   because she didn't get the answer she wanted from Brian.

12   Q    Okay.  Let me ask you:  Is there -- I mean we looked at a

13   couple of e-mails where it looks like you're the contact

14   person, and it seems likes you're reluctant to say that.

15   A    I'm not reluctant to say I was the contact person.  I

16   just feel like the line of questioning keeps going to me being

17   a contact person for whatever it is.  I was a contact person,

18   yes.  There was a lot of other contact people for different

19   things.  So, yes, we were all as a point of contact in one

20   way, shape or form with someone; absolutely.

21   Q    Sure.  Well, let me -- let me ask you because we saw -- A

22   little bit ago we saw when you said you were the manager --

23   You got the title of Manager, right?

24   A    Right.

25   Q    And, in fact, Andrew Baumiller said he confirmed your

1    employment.  We saw that document a little bit ago where he

2    confirmed you were a manager there, right?

3    A    Correct; probably as a friendly thing, but yes.

4    Q    Okay.  But -- And that's what we have on paper, but

5    you're telling us that you didn't really act as a manager,

6    right?

7    A    I did not act as a manager, no.

8    Q    Okay.  Would you agree ---

9    A    I could not fire somebody.  I could not hire somebody.  I

10   could not make decisions for the business.  So, no, in no way,

11   shape or form was I actually a real manager.  It was a title

12   given to me because I threw a fit.  That's the truth.

13   Q    And you think to be a manager you have to have the

14   ability to hire and fire?

15   A    I believe as a manager you should have some kind of

16   say-so what goes on in your office.  If people don't show up,

17   yes, you should have the ability to do things.  Could I -- Did

18   I have that?  No, absolutely not.

19   Q    Okay.  You didn't have the control that you wanted to

20   have over people ---

21   A    I didn't have any control, period.

22   Q    Okay.  Let me just finish my question, please.

23   A    Okay.

24   Q    You didn't have the control you wanted to have over the

25   people that were in your group that you were supposedly the

1   manager of.  Is that how you would say it?

2   A    I didn't have control over anything, period.

3   Q    Okay.  Okay.  Who is "Nate Lones"?

4   A    I have no idea who Nate Lones is.

5   Q    Really?  Okay.

6   A    I think I knew a "Nate Lyons" maybe.  I don't recall

7   "Nate Lones," and I still don't even know what he -- what

8   he -- what he did there.

9   Q    Okay.  I'm going to show you what I marked as Defendant

10  Elder's Exhibit 22 -- I'm going to get these out of your

11  way -- 22 and 23.  And what I want to ask you about those

12  first is if you see your e-mail address on those.

13  A    I do.

14  Q    Okay.  And do you believe because your e-mail address is

15  on there that these are e-mails that you would have received?

16  A    Sure.

17  Q    At CMGRx, correct?

18  A    Correct.

19  Q    Okay.  And before I ask for them to be admitted, they're

20  both e-mails to somebody named "Nate."  Is that right?

21  A    Yes, and there was a Nate there.  I will agree to that.

22  I don't know who he was, where he was, what his purpose was.

23  There was a ton of people in and out.  So I don't -- I don't

24  know what his title was.  I'm sorry, but I don't.  I do know

25  there was a Nate there.

```
 1   Q    Okay.  Okay.  Well, let me ask you then just to spend a

 2   minute looking at Exhibit 22 --

 3   A    Okay.

 4   Q    -- and kind of review that to yourself.

 5        (Pause)

 6   A    Okay.

 7   Q    Would you agree that this talks, in part, about your role

 8   in sort of keeping track of study participants and keeping

 9   track of medical records?

10        MR. BRASHER:  Objection as to what the document

11   states.

12        MS. STILLINGER:  I could -- Let me ask first,

13   Your Honor.  I'm going to move for the admission of Defendant

14   Elder's Exhibit 22.

15        MR. BRASHER:  Hearsay.

16        THE COURT:  Sustained.

17   Q    (By Ms. Stillinger) So then let me just ask you -- I'm

18   not going to ask you to read from the document.  I'm not going

19   to -- because it's not admitted into evidence.  But having

20   reviewed it, does it refresh your memory about any role that

21   Nate would have played, along with you, in keeping track of

22   medical documentation?

23   A    I don't remember Nate's job, so I can't answer that

24   question of saying what Nate did and what his purpose was

25   because I -- I don't remember him.  There was a Nate there for
```

1    a short amount of time.  I don't know what his role was

2    because everybody had a different role.  So, no, I can't -- I

3    can't say that.

4    Q    Okay.  Let me ask you:  Again, I'm not going to ask you

5    about the content of this, but is this an e-mail that it looks

6    like you received February the 24th of 2015?

7    A    I received it.  It does not look like I replied.

8    Q    Sure, not on -- not on this page.  It's -- It's ---

9    A    So, yes, I possibly received it, but I -- it doesn't look

10   like I replied to it, at least on this part.

11   Q    Sure.  And you don't recall a "Nate Lones" that worked at

12   CMGRx when you started?

13   A    No.  There was not a Nate when I first started in that

14   building, in that office, no, there was not.

15   Q    Okay.  Well, let's just assume for a moment -- Well, and

16   let's -- I'm going to ask you to look at Exhibit 23 before we

17   assume for a moment.  I'm going to ask you to review that for

18   a moment.  It's kind of a long e-mail.  And, first, let me ask

19   you:  That's an e-mail that you were one of the recipients of,

20   correct?

21   A    Correct.

22   Q    Okay.  If you could just review it for a minute for the

23   content, not -- not reading any of it out loud.

24              (Pause)

25   A    Okay.

1    Q    Okay.  Do you recall having gotten that e-mail?

2    A    I don't recall having gotten -- No.

3    Q    Okay.

4    A    That doesn't mean it didn't happen, but I didn't reply to

5    it here and I don't -- I don't recall the e-mail, no.

6    Q    Okay.  And the body of it is with both of these

7    e-mails -- and I'm going to ask you about both of them -- the

8    body is actually addressed to -- they're addressed to "Nate."

9    Is that right?

10   A    Correct.

11   Q    And you're copied in on them, correct?

12   A    Correct.

13   Q    Okay.  Would you agree with me that both of these

14   e-mails, in part, discuss you and your role in keeping medical

15   documentation?

16        MR. BRASHER:  Objection as to what the document

17   states.

18        MS. STILLINGER:  And, Your Honor, it's not for the

19   truth of the matter asserted because I'm not going to get into

20   what it asserts, just the subject matter and whether she's on

21   notice about that.

22        THE COURT:  All right.  Rephrase your question.

23        MS. STILLINGER:  Sure.

24   Q    (By Ms. Stillinger) Would you agree that the subject

25   matter -- I'm not asking you to read from it, but the subject

1    matter, in part, talks about you and your role in keeping

2    track of medical documentation?

3              MR. BRASHER:  Same objection, Your Honor.

4              THE COURT:  Okay.  Don't ask her about the document

5    but you may inquire about the subject matter without reference

6    to the document.

7              MS. STILLINGER:  Sure.

8    Q    (By Ms. Stillinger) So I'm not asking to -- to -- Well,

9    do you remember that in this time period -- Let me ask you

10   this:  Do you remember in late February, early March of 2015

11   that Dr. Elder was concerned about keeping track of medical

12   documentation in the CMGRx system?

13   A    Yes, I was aware of that.

14   Q    Okay.  And is that something that you all communicated

15   about sometimes?  You -- And I'm sorry.  When I say "you all,"

16   I mean you and Dr. Elder sometimes communicated about that.

17   A    About the medical records not being inputted?  Is that

18   what you're asking?

19   Q    Yes.

20   A    Yes, it was a concern.

21   Q    Okay.  Would you agree that Dr. Elder more than once

22   mentioned that, "We have to keep accurate medical records in

23   the medical system"?

24   A    I don't know how many times he mentioned that.

25   Q    Okay.  And when you say you don't know how many

```
 1    times, ---

 2    A    I don't know if it was once or more than once.

 3    Q    Okay.  Okay.  And you do not remember somebody named

 4    "Nate Lones" working for CMGRx?

 5    A    I cannot relay this enough:  I remember a man named

 6    "Nate" there.  I have no idea his last name.  I have no idea

 7    what he did for the company, and I know he was not there for a

 8    long period of time.  That's -- I do not know -- You can ask

 9    it a million different ways.  I do not know who this man is,

10    what his function was, what his last name was, or why he would

11    have been copied on this e-mail.

12    Q    Okay.  Well, it's actually -- Again, we're not going to

13    get into the content of it, but would you agree that this Nate

14    has a CMGRx e-mail address, correct?

15    A    I'll agree that he has that.

16    Q    Okay.  Do you remember anyone, whether his name was

17    "Nate" or something else, do you remember anyone being

18    involved in helping set up processes to keep track of medical

19    records?

20    A    There was a lot of people in and out of that office.  I

21    have no idea who all was doing the medical records or what

22    they were implementing, our policies or procedures.  I have no

23    idea.

24    Q    Okay.  And just to be clear, was there more than one -- I

25    mean we've got a "Nate" with a CMGRx e-mail address.  Was
```

1    there more than -- I mean do you know of any other "Nate"

2    besides Nate Lones?

3    A    Again, I knew a Nate that worked there.  I don't know if

4    there was five "Nates" or one "Nate."  I don't know Nate's

5    last name.  I don't know Nate's role.  I know there was

6    another girl working with Kareo and the medical records named

7    Marisol, I believe is her name, or Marcella.  But anybody else

8    or his job function, I -- I don't know how more clear I can be

9    about not knowing him --

10   Q    Okay.

11   A    -- or what his function was.

12   Q    Sure.  But what I'm specifically asking here is:  I mean

13   you say there could be one or five.

14   A    There could be.

15   Q    Did you know of more than one?

16   A    Not that I'm aware of, --

17   Q    Okay.

18   A    -- but I did not know everybody in the -- in the CMGRx

19   flame, per se, either.

20   Q    Sure.  I'm going to show you what I've marked as

21   Defendant Elder's Exhibit 66, and I know the printing is

22   small, if it would be easier to see on the screen.  But do you

23   recognize this text conversation with Dr. Elder?

24   A    I do remember this, yes.

25   Q    Okay.

1          MS. STILLINGER:  Your Honor, I'm going to move for

2    the admission of Defendant Elder's 66.

3          MR. BRASHER:  Authentication and hearsay, Your Honor.

4          THE COURT:  Objection overruled; admitted.

5          MS. STILLINGER:  Okay.  Can we get that on the

6    screen?  And then if you can make it -- There we go.  That

7    makes it easier.

8    Q    (By Ms. Stillinger) So let me -- Before I ask you

9    specifics about this, because you just -- you just brought

10   this up about getting records into the Kareo; Kareo, again,

11   since we talked about it last week, but that's the electronic

12   medical records system, right?

13   A    That he used, yes.

14   Q    Okay.  And you've never worked with Kareo in any other

15   setting other than CMGRx.  Is that correct?

16   A    Correct.

17   Q    Okay.  So you couldn't tell us about the functions of the

18   system.  Is that right?

19   A    I couldn't tell you about the functions now.

20   Q    Okay.  I think what you were saying right before I

21   brought this document up is that one of the things Dr. Elder

22   had been asking you is, "Can we get documents loaded into the

23   system," right?

24   A    Correct.

25   Q    Okay.  And one of the things you did and you were doing

1    for a long time was that you would load the Medical Health

2    Questionnaires into the Kareo system.

3    A    That's not true.

4    Q    Okay.

5    A    I was not the one who did that.  During this time, I was

6    not the one uploading these into the system.  That would have

7    been Marisol or Marcella, whatever her name is.

8    Q    Okay, during this time.  And are you talking about

9    this -- This text exchange is March 4th of 2015, correct?

10   A    Correct.

11   Q    Okay.  So you weren't doing it then.  Had you been doing

12   it in the past?

13   A    I had uploaded a few, yes, but not consistently.  I

14   wasn't the one that was -- In the beginning we didn't do that,

15   so it was not until, I would say, mid-February to March that

16   this actually started to be a bigger process.

17   Q    Okay.  When you say you weren't doing that, are you

18   talking about loading the Medical Health Questionnaire into

19   the Kareo?

20   A    I don't recall loading the medical questionnaire.  I do

21   and I don't.  Again, this has been a long time ago, and I did

22   it for a very short amount of time.  There was a specific

23   person designated to Kareo and that was Marcella.

24   Q    Okay.  And -- And -- And I appreciate you clarifying what

25   you remember and what you don't because it is -- I mean we're

1   kind of asking you to do something nearly impossible which is

2   remember details from five years ago.  So I appreciate you

3   saying you're not sure about that.

4   A    Yeah, I'm not.

5   Q    I mean it's really important that we be as accurate as

6   possible here.  So I'm going to ask questions --

7   A    Okay.

8   Q    -- and I know it's -- I know it's annoying because you

9   may not remember, but do you think when Doctor -- You had said

10  you started use Kareo when Dr. Elder started working with the

11  study, correct?

12  A    Yes, that is true.

13  Q    Okay.  And do you remember if that was October of '14?

14  A    I'd -- I'd have no idea what dates.

15  Q    Okay.

16  A    I don't -- I don't remember it being that soon but,

17  again, this is a lot of information in a short amount of time.

18  Q    Okay.

19  A    So dates are not -- It was a fast track, so I can't be

20  certain.

21  Q    Okay.  You loaded -- In some time period you loaded the

22  Medical Health Questionnaires.

23  A    I did, yes.  I will admit to that, yes.

24  Q    Okay.  And Marcella or Marisol did it after you did it?

25  A    Yes.  She did it the majority of the time.

1    Q    Okay.  Would you agree that there was -- that that was

2    part of, though -- What happened is that somebody in Dallas

3    was always loading that in there so that Dr. Elder in El Paso

4    would be able to open up Kareo and see that Medical Health

5    Questionnaire?

6    A    That's how it was supposed to be done, yes.

7    Q    Okay.  Then let me ask you about the conversation that's

8    taking place in March of 2015 that's in Exhibit 66 in front of

9    us.  Do you recall -- Dr. Elder sent you a picture of this

10   box.  Is that right?

11   A    Yes.

12   Q    And do you know what that is a box of?

13   A    I don't know.  I can barely see it.  It looks like health

14   questionnaires maybe.  I don't know.

15   Q    Okay.

16        MS. STILLINGER:  Is it possible to make that larger?

17   We still can't really read it.  Okay.  Thank you.

18   Q    (By Ms. Stillinger) Do you recall about the conversation?

19   He's telling you that whatever is in this box needs to be

20   loaded into the patients' charts.  Is that right?

21   A    It looks that way, yes.

22   Q    Okay.  Do you know whether you discussed the fact that he

23   wanted the prescriptions themselves to be loaded into the

24   Kareo?

25   A    It doesn't state that.  It looks like my response isn't

1    there, so.

2    Q    Okay.  Well, do you see your response on the -- on the

3    left side there where you say, "Okay"?

4    A    Correct, but it doesn't say "prescriptions" in there.

5    Q    No.  I realize that.

6    A    Okay.

7    Q    So I was really just asking if you had any recollection

8    of that or what it was.

9    A    I don't recall.  I know that he brought several, several,

10   several boxes to the office.

11   Q    Okay.  Do you recall that he shipped this one to you or

12   was ---

13   A    I don't remember him shipping it.  He could -- I don't

14   recall him shipping it.  I recall him bringing several boxes

15   when he came to visit before the Super Bowl to the office.

16   Q    Well, this is after the Super Bowl, right?

17   A    I don't know when the Super Bowl is.

18   Q    Okay.

19   A    That's when I -- You're asking me to recall records.

20   That's about boxes and records.  That's what I can recall,

21   that he brought several boxes to the office of medical

22   records.  This box, I don't recall if he shipped it, brought

23   it.  I -- I don't recall ever seeing the box in person.

24   Q    Okay.  Okay.  After the box got to the office here in

25   Dallas, did you do anything with the box?

1   A    I don't recall seeing this box in the office.  I don't

2   know if that's one of the boxes that he brought with him.

3   This box I don't recall seeing in the office.

4   Q    Okay.

5   A    And, again, it could have been something that was

6   uploaded when I wasn't there.  I don't recall the box.

7   Q    Okay.  You agree in this conversation that Dr. Elder,

8   going down to his next comment, that he's concerned about how

9   to ship it so that it's not too expensive for you?

10  A    Yes.

11  Q    Okay.  And your memory is that he ended up bringing it

12  with him.  Is that right?

13  A    That's my memory, yes; several boxes.

14  Q    Okay.  And the boxes are some kind of medical record but

15  you don't remember what.  Is that right?

16  A    Correct.

17  Q    Okay.  Do you remember Dr. Elder asking for a sample of

18  the pain cream?

19  A    Yes, I do.

20  Q    Let me ask you to look at Defendant's Exhibit 63.  I'll

21  get this one out of your way.  And, again, I know it's hard to

22  read because it's so small.  But can you look at that and see

23  if you recognize that as a conversation between you and

24  Dr. Elder?

25  A    It looks like a conversation between us.

1   Q    Okay.  Did you and Dr. Elder sometimes communicate by

2   text?

3   A    Yes, we did.

4   Q    Okay.

5        MS. STILLINGER:  Your Honor, I'm going to ask for --

6   move for the admission of Defendant Elder's Exhibit 63.

7        THE COURT:  Objection?

8        MR. BRASHER:  No objection, Your Honor.

9        THE COURT:  Admitted.

10  Q    (By Ms. Stillinger) Is this a conversation with Dr. Elder

11  asking for a sample of the pain cream?

12  A    Yes.

13  Q    And can you see the date on that?

14  A    November 13th, 2014.

15  Q    Okay.  And you told him you would take care of it.  Is

16  that right?

17  A    I stated, "I'll ask Rich or John to get you some."  So,

18  yes, by that, I would have asked them to take care of it.

19  Q    Well, sure.  I mean you're taking care of it -- By taking

20  care of it, you're asking ---

21  A    I know, but we keep going back to the same thing --

22  Q    Okay.

23  A    -- about me taking care of things.  So if that's what

24  you're asking, yes, I asked Rich or John to take care of it.

25  Q    Okay.  I'm asking what you said here actually.  You said,

1    "I'll take care of that for you," right?

2    A    I'll ask -- Yes.  And then I stated, "I'll ask Rich or

3    John to get you some."

4    Q    Okay.  Would you agree in this time period you're the

5    go-between between Dr. Elder and Rich and John?

6    A    For this instance, yes.

7    Q    Okay.  Not in general?

8    A    I don't know about in general.  If you're asking about

9    this conversation, I'm the go-between.  I can't say for future

10   or past things.  For this one, yes, I was the go-between.

11   Q    Okay.  You don't recall in general whether you were the

12   point of contact for Dr. Elder?

13   A    You would -- You would have to be more specific on the

14   instance.  I don't know if I was the go-between about -- You

15   know, I was the go-between between a million things, so I

16   could have been, but I would have to see an instance to make

17   sure that I was that person.

18   Q    Sure.  And I'm actually just asking in general right now

19   whether you were the point of contact.  And this is not ---

20   A    I was a point of contact.

21   Q    Okay.

22   A    I was not necessarily a go-between all the time.

23   Q    Understood.  Did you tell Dr. Elder that the creams were

24   amazing because that was your opinion?

25   A    It would have been more of a hearsay but, yes, I had

1    heard that they were actually quite -- quite good.

2    Q    Okay.  I mean you believed it when you said that.

3    A    I believed it, yes.  I wouldn't have just -- Especially

4    at this juncture, I would not have lied to him about that.

5    Q    Okay.  I think one of the things that you testified about

6    last week, Mr. Brasher was asking you questions, and asked why

7    you would prefill a prescription before you sent it to

8    Dr. Elder; correct?

9    A    Correct.

10   Q    And I think you said, "I don't know; I'm not the doctor,"

11   right?

12   A    Right.  I don't know why they had it prefilled.

13   Q    Okay.  Well, ---

14   A    I didn't know; sorry.

15   Q    Your understanding was there was a study, right?

16   A    Yes.

17   Q    Okay.  And would it make sense to you that the people

18   running the study would decide what the thing is being

19   studied?

20   A    I agree with that, yes.

21   Q    Okay.

22        MS. STILLINGER:  And I know I'm a little out of

23   sequence, but I'd like to look at -- this is previously

24   admitted -- Government's Exhibit 227, if we could pull that

25   up.

1    Q    (By Ms. Stillinger) And Dr. Elder -- In fact, this is an

2    e-mail that he sent you, correct?

3    A    It is.

4    Q    Okay.  And you've been -- I guess he's been working with

5    the study for a few months at this point in time, correct?

6    A    It looks that way, yes.

7    Q    Okay.  The third sentence, I guess, "I cannot complete

8    the calls without knowing which scripts I am to review with

9    them."  Would you agree that Dr. Elder's being very clear that

10   that's what he does?  He expects to get the scripts prefilled.

11   Would you agree?

12   A    I would agree with that.

13   Q    Okay.  Did you ever respond to him like, "Why in the

14   world would you expect me to fill out a script for you"?

15   A    No.

16   Q    Of course.  Because that's the way it was done, right?

17   A    Correct, yes.

18   Q    Okay.  And I'm just asking because -- because last week

19   you said, "I -- I don't know why I was filling out the

20   scripts," but wasn't that part of the job?

21   A    To fill out the scripts in the beginning, yes, it was.

22   Q    Okay.  And if you weren't doing it, somebody else was;

23   right?

24   A    All of us were, yes.

25   Q    Sure.  That was part of what you understood was the

1    study, isn't it?  That -- That you at CMGRx are filling out

2    what the prescriptions are so that the doctor can review the

3    prescriptions with the study participants, right?

4    A    Say that one more time.

5    Q    Sure.  Did you understand that's the way that it worked

6    there, that the people working the study at CMGRx filled out

7    the prescriptions before they sent them to the doctor because

8    the doctor's role was to review the prescription with the

9    study participant?

10   A    I'll agree with that, yes, that they had a certain cream

11   in the beginning, but then the creams changed depending upon

12   the price of the adjudication.  So that's where ---

13   Q    Sure.  But you never talked to Dr. Elder about the price

14   of the adjudication, did you?

15   A    No, I never did, no.

16   Q    Okay.  So that's something that's happening in the CMGRx

17   office.

18   A    Correct; yes, ma'am.

19   Q    Okay.  But -- But still, your understanding is the study

20   is studying these certain formulations.  So CMGRx is going to

21   decide what formulations those are, correct?

22   A    Yes.

23   Q    Okay.  I'm going to show you what I've marked as

24   Defendant's Exhibit 76 and ask you to look at that.

25   A    Okay.

1    Q    And do you recognize that as an e-mail that you received

2    from Dr. Elder?

3    A    It was an e-mail sent to my e-mail address, yes.

4    Q    Sure.  And then I think that last week -- Well, no; I'm

5    sorry.  Let me ask you if this would be an example of

6    discussions that you had with Dr. Elder about -- or

7    communications between you and Dr. Elder about the medical

8    recordkeeping?

9    A    Again, this was a point in time where Marcella would have

10   actually been doing the records.  So I was a point of contact

11   for Marcella to get the records updated.  Like if he sent me

12   an e-mail about this, then I would have given it to her to

13   take care of because she was actually the one doing them.

14   Q    Okay.  And is Marcella on the e-mail?

15   A    I don't know what her e-mail address is.

16   Q    Okay.  Do you see copies of the e-mail to Dr. Simmons --

17   A    Yes.

18   Q    -- and Dr. Woo?

19   A    Yes.

20   Q    And then Cynthia, I don't know if you -- Do you know

21   Cynthia Moreno?

22   A    I -- I've heard of her.  I think I've spoken with her

23   maybe once but I don't -- I don't know her.

24   Q    Okay.

25        MS. STILLINGER:  Your Honor, I'm going to move for

1    the admission of Defendant's Exhibit 76.

2            MR. BRASHER:  Hearsay, Your Honor.

3            THE COURT:  Ask some additional questions about the

4    document, please.

5            MS. STILLINGER:  Sure.

6    Q    (By Ms. Stillinger) Was it a function of people, either

7    you or someone in your office, to input patients or study

8    participants into the Kareo system?

9    A    Yes.

10   Q    Okay.  And when we talk about loading up Medical Health

11   Questionnaires, that was part of that process?

12   A    I believe so, yes.

13   Q    And there was other demographic information that went

14   into the Kareo to sort of open a new medical record for a new

15   participant?

16   A    Yes.

17   Q    Sometimes when the study participants -- maybe the

18   physician wasn't able to contact the study participant, were

19   those people taken out of the Kareo medical system?

20   A    I am not certain.

21   Q    Okay.

22   A    By the -- I'm not certain if they -- Again, I was not

23   inputting or removing people from Kareo at this point.  So I

24   cannot tell you for certain what was -- if they were being

25   removed at that point.  They weren't by me.

1    Q    Okay.  And -- And then I'm not asking whether you ended

2    up doing it or not, but do you remember Dr. Elder asking you

3    about that and asking you to do certain things with the Kareo,

4    such as remove people that were not able to be contacted?

5    A    I don't recall that, but I'm not -- I can't say that it

6    was never brought up either.  Again, I've had countless

7    conversations with a million different people, so I can't

8    recall every conversation.

9    Q    Okay.  Do you remember that Dr. Elder would let you know

10   when he was not able to contact somebody?  A study

11   participant, that is.

12   A    Sometimes he did and sometimes he did not.

13   Q    You mean you think sometimes he was not able to contact

14   somebody and he did not tell you?  Or -- I'm sorry.  Or you

15   mean he was informing ---

16   A    I don't believe he contacted me over every little thing.

17   No, I do not believe that.

18   Q    Okay.  Or -- And I'm just trying to understand what

19   you're saying.  Or you're saying you think he told someone

20   else at CMGRx?

21   A    I'm saying I can't say for certain that everything that

22   happened, that he told me about.

23   Q    Sure.

24   A    I have no clue.

25   Q    Sure.  And I think I was asking:  Did he sometimes tell

1   you or -- when he was not able to contact ---

2   A    And I believe that I said that I am unsure if he

3   contacted me every time.  There were times, yes, when he had

4   concerns.  Obviously, I was a contact.  But for every concern,

5   I don't -- I don't know that he contacted me every time.

6   Q    Okay.  Ms. Stevens, this e-mail that is Defendant's

7   Exhibit 76, do you agree that that's an e-mail you would have

8   received when you were working at CMGRx?

9   A    It's sent to my e-mail.

10  Q    Okay.

11  A    It does not show my response, but it does show it was

12  sent to me, if that's what you're asking.

13  Q    This is the kind of e-mail that you would receive from

14  Dr. Elder, isn't it?

15  A    I would receive that, yes.

16  Q    Okay.

17       MS. STILLINGER:  Your Honor, I'm not offering it for

18  the truth of the statements in there; just ---

19       THE COURT:  All right.  For that purpose, the

20  document is received into evidence; admitted.

21  Q    (By Ms. Stillinger) So let me ask you a few questions

22  about this.  March 30th is the date on this, correct?

23  A    Correct.

24  Q    Okay.  At this point in time do you know whether or not

25  you'd met Dr. Elder?

```
 1    A    I believe that I had --

 2    Q    Okay.

 3    A    -- but, again, I -- I met a lot of people and I don't

 4    know exactly when I met them.

 5    Q    Okay.  Reviewing this, does it refresh your memory about

 6    whether you or somebody in your group would remove what we

 7    would call "no answer patients" from the system?

 8    A    It was a concern of his.  He's asking us to do that.  I

 9    am uncertain that that was done.  I did not deal with Kareo at

10    this point in time.  I cannot guarantee you that things were

11    removed.  I did not do them.

12    Q    Okay.  Would you agree that Dr. Elder would -- Well, in

13    this -- in this e-mail he's advising you that there was some

14    study participants he was not able to contact, correct?

15    A    Correct.

16    Q    And is he also advising you that there's some that he

17    actually discovered had wrong numbers?  He's telling you that,

18    correct?

19    A    Yes, he is.

20    Q    Okay.  And is he telling you there were some patients

21    that did not require intervention?

22    A    Yes.

23    Q    Okay.  And meaning that they didn't need the medication,

24    correct?

25    A    I don't know what he meant by that.
```

1    Q    Sure.  Okay.  I think ---

2         MS. STILLINGER:  Thank you.  You can take that down.

3    I'm going to ask -- This is a little out of sequence again,

4    I'm sorry, but Government's Exhibit 188, if you could pull

5    that up.  This was admitted last week, I believe.

6    Q    (By Ms. Stillinger) An e-mail from Dr. Elder to you.  Is

7    that right?

8    A    Yes.

9    Q    And I think Mr. Brasher asked you some questions about

10   it.  Is that right?

11   A    Yes.

12   Q    He's -- Dr. Elder's letting you know again that there's

13   completed calls and some uncompleted -- incomplete calls,

14   correct?

15   A    Correct.

16   Q    Okay.  Specifically Mr. Brasher asked you about further

17   down where it says "Lake Cheyenne."  I guess we could take out

18   the phone numbers there, but that it was about a pregnant

19   study participant, correct?

20   A    Correct.

21   Q    And you testified last week you didn't know why Dr. Elder

22   would be asking you or mentioning to you that there's a

23   pregnant study participant, correct?

24   A    Correct.

25   Q    You don't think that he viewed you as a point of contact

1    to get that information from the study?

2    A    If he had the study, he, obviously, knew that she was

3    pregnant.

4    Q    Well, he does know that she's pregnant, right?

5    A    Okay.

6    Q    He's telling you that, correct?

7    A    So what is your question?

8    Q    Okay.  And maybe I'm not using the word "study" the same

9    way you do.

10   A    Okay.

11   Q    But Dr. Elder is not the one that is conducting the

12   study, correct?

13   A    Correct.

14   Q    Okay.  That's being done here in Dallas, right?

15   A    Correct.

16   Q    Would it make sense to you then that he's asking you,

17   "Could you -- at the study -- get me some information about

18   how these topical creams affect pregnant people?"

19   A    It's not asking me that.

20   Q    Okay.  Do you remember having a follow-up conversation

21   with him about that?

22   A    Again, I've had a million conversations with a million

23   people, so I -- I -- possibly; I don't know for sure.

24   Q    Let me -- Let me show you what I've marked as Defendant

25   Elder's Exhibit 64.  Again, I know it's difficult to read, but

1    if you could read it and see if that refreshes your memory.

2    Well, first, read it and see if you recognize that as a text

3    conversation between you and Dr. Elder.

4    A    Yes, he did ask me.

5    Q    Okay.  And then before we lose the Government exhibit

6    that's on the screen, the date on that is January the 8th,

7    correct?

8    A    Yes.

9    Q    The one on the screen?

10   A    It is, yes.

11   Q    Okay.  Is the date on this text conversation also January

12   the 8th?

13   A    It is.

14        MS. STILLINGER:  Your Honor, I'm going to move for

15   the admission of Defendant's Exhibit 64.

16        MR. BRASHER:  No objection.

17        THE COURT:  Admitted.

18        MS. STILLINGER:  Okay.  So could we put Defendant's

19   Exhibit 64 up there, please?

20   Q    (By Ms. Stillinger) Okay.  Does it appear that

21   Dr. Elder's asking you the specific question, the same as the

22   e-mail that we just looked at?

23   A    Yes.

24   Q    Okay.  And what do you tell him?

25   A    That we have a pregnancy cream.

1    Q    Okay.  And you have a pregnancy cream but you also tell

2    him you'll find out more information, --

3    A    Yes.

4    Q    -- correct?

5    A    Correct.

6    Q    Okay.  So -- And I'm not trying to trip you up on things

7    that you don't remember from five years ago.  I'm really not.

8    But would you agree that having looked at this, you now agree

9    that, yes, he did ask for you to find that information from

10   people at the study?

11   A    Yes.  He asked me to find out if there were medications

12   for pregnancy.

13   Q    Sure.  I mean he's not asking you for your medical

14   opinion, right?

15   A    No.

16   Q    I mean he knows you're not a doctor, right?

17   A    Right.

18   Q    Right.  So he's asking you, "Can you find out what the

19   people handling the study know about creams for pregnant

20   people," correct?

21   A    He's asking me if we have a pregnancy cream, yes.

22   Q    Sure.  Okay.  Thank you.  I want to ask you a few

23   questions then about how Dr. Elder was paid.  You testified

24   last week that -- and I think you said -- Mr. Brasher asked

25   how Dr. Elder was paid, and you said he was paid by Trilogy.

1    A    Yes.

2    Q    Okay.  What did you mean by that?

3    A    Well, we were all employees of Trilogy.

4    Q    Okay.

5    A    So he was paid with a direct deposit or paycheck.  I

6    don't know how he was paid, per se, but that's -- he would

7    have gotten his money from them, --

8    Q    Okay.

9    A    -- from Trilogy.

10    Q    You believe that he was paid with money that came

11    directly from Trilogy to him.

12    A    I believe that, yes.

13    Q    Okay.  And why do you believe that?

14    A    We were all paid by Trilogy.

15    Q    Okay.

16    A    I would assume that.

17    Q    Okay.

18    A    I can't say for certain he was; obviously, apparently,

19    but that's how we were paid.  I would assume he was paid the

20    same way.

21    Q    Okay.  But you don't have actually any information about

22    what direct deposits went, whether it was from CMGRx or

23    Trilogy or anybody else.  Is that right?

24    A    That is correct.

25    Q    Okay.  So I'm going to ask you not to make assumptions

1    anymore --

2    A    Okay.

3    Q    -- because some of these questions are really, really

4    important.  Okay?

5    A    Well, he was on a payout sheet from Trilogy.  So in that

6    spreadsheet that I was privy to for a little while, his name

7    was on there.

8    Q    Okay.  Well, I -- I don't know what spreadsheet you're

9    talking about, so.

10    A    Oh, okay.

11    Q    And I think that you said he was paid by the

12    prescription.  Is that right?

13    A    Yes.

14    Q    Okay.  And I think you even said that you would tally the

15    prescriptions and count the prescriptions and then give that

16    information to somebody to write a check.  Is that right?

17    A    In the beginning, yes, until Adam came along and Paul.

18    Q    Okay.

19         MS. STILLINGER:  Could we look at Government's

20    Exhibit 131, please?  And this was admitted last week.

21    Q    (By Ms. Stillinger) I don't think you looked at this

22    exhibit, so I'm going to ask you to look first at the bottom

23    half of that.  Do you see that that's from you, sending

24    Dr. Elder a patient list.  Is that right?

25    A    Correct.

1    Q    Okay.  Then if we could turn to the second page of that

2    exhibit.  Now first off, let me ask you:  Is that your

3    handwriting up at the top?

4    A    "Paid 10-24" is not my handwriting.

5    Q    Okay.  "79 patients"?

6    A    That could be my handwriting but the "Paid 10-24" is not

7    my handwriting.

8    Q    Okay.  On the "79 patients," you said it could be.

9    How ---

10   A    I believe that -- I'm 80 percent sure it's mine, but the

11   other one, I'm a hundred percent sure that's not my writing.

12   Q    Okay.  Then do you also recognize this as something that

13   would be printed out of the Kareo system?

14   A    Again, I only dealt with it a short period of time, so I

15   can't with a hundred percent certainty say that that's

16   something I would have printed out.  I'm not saying I did not

17   but I don't recall.  Again, it was a very short time that I

18   was in this system.

19   Q    Okay.  Do you see there's sort of small lettering there,

20   but it says "Patient List Report Run" --

21   A    Yes.

22   Q    -- the date and time; it says, "By Miranda Stevens."

23   A    Correct.

24   Q    Okay.  I guess -- Did you have your own sign-in for

25   Kareo?

1    A    Yes, I did.

2    Q    Okay.  But what you're saying, you don't -- you don't --

3    Well, let me ask you this because this -- this looks like a

4    report run from some kind of system, right?

5    A    Correct, and I'm not denying that it wasn't ran from

6    there.

7    Q    Sure.

8    A    I'm just saying I don't recall running it and I don't

9    recall the sheet.  But, again, I dealt with it a very short

10   time.

11   Q    Okay.  I'm not going to ask you to go through and count

12   all the patients on this, --

13   A    Okay.

14   Q    -- but if it says 79 patients there and Dr. Elder

15   received a check for 79 consults, would you agree that he was

16   paid by patient consult rather than by prescription?

17   A    I don't see anything saying he was paid 79 patients.

18   Q    Correct.  I'm asking -- I am asking you to assume that

19   because I know you didn't write the checks, so I can't ask you

20   that.

21   A    No, I would not assume that because I knew that he was

22   paid by script, not by patient.

23   Q    Okay.  You believe he was paid by --

24   A    I believe he was paid by script, not by patient.

25   Q    Okay.  Why do you believe that?

1  A    Well, there was an e-mail that we just saw a minute ago

2  stating that -- how many vitamins scripts he had done and how

3  many pain scripts he had done.

4  Q    Okay.  Well, do you -- Let's go back and look at that for

5  just a moment then.

6  A    Okay.

7  Q    I'm going to try to see which Government exhibit that

8  was.

9  A    There were consult fees and there were scripts fees.  So

10  this could have been a consult fee of 79 patients but they

11  were paid by script as well.

12  Q    Okay.  Well, let me -- let me keep going.  We got some

13  more documents on this, so.

14  A    Okay.

15        MR. WHALEN:  It's on the screen.

16        MS. STILLINGER:  Thank you.  Thank you.  I'm sorry;

17  which exhibit is this?

18        MR. WHALEN:  188.

19        MS. STILLINGER:  188, okay.

20  Q    (By Ms. Stillinger) So we got Government's Exhibit 188 up

21  here.  So would -- You're saying that where he says,

22  "Completed notes and scripts:  136 x 60," you're saying that

23  you believe that was 136 individual prescriptions?

24  A    Yes, because the one at the top says "V scripts"

25  specifically.  That is per script.  That is a vitamin script.

1    That is not an individual.

2    Q    Well, on the vitamins, I mean we looked at it a little

3    while ago.  There was an e-mail where -- where the doctors --

4    Dr. Elder was telling you, "On the vitamin scripts that we're

5    adding to patients I already consulted with, I'm understanding

6    I don't need to call them; right"?

7    A    Well, you're asking me if they're getting paid per

8    consult or per script, and they're getting paid per script,

9    and I think they had a consult fee as well.

10    Q    Okay.  I'm actually asking you a different question right

11    now.  I'm asking you about an exhibit.  I can pull it up if

12    you'd like to see it, but do you remember seeing an e-mail

13    just a little while ago, I think Mr. Brasher asked you about

14    it last week and I think Ms. Lobel asked you about it, where

15    Dr. Elder is saying, "I've talked to Dr. Simmons and we

16    understand we do not or I do not need to consult with the

17    patient to add the vitamins prescription."

18    A    Correct.

19    Q    Do you remember seeing that?

20    A    So that's adding to the validity that he's getting paid

21    by the script.

22    Q    Okay.  I'm not asking you to argue with me.

23    A    Okay.

24    Q    I'm just asking:  Do you remember that?

25    A    I remember it.

1    Q    Okay.  So it makes sense to you then on the vitamin

2    prescriptions for patients that were already in the system,

3    that he already consulted with, he's not doing a new

4    consultation.  Is that right?

5    A    That's accurate.

6    Q    Okay.  So he's doing the paperwork to do a vitamin

7    prescription, correct?

8    A    What paperwork?

9    Q    Well, a prescription; right?

10   A    I would assume so, yes.

11   Q    Sure.  And so that's why on -- on this e-mail, for

12   instance, it would say he's charging for that work and he's

13   not doing -- he's not charging for a consult; he's just

14   charging for having done the vitamin prescription; correct?

15   A    Correct.

16   Q    Okay.  Now would you agree with me that with respect to

17   the other things being prescribed, the pain and scar cream,

18   et cetera, that there were consultations with those, correct?

19   A    There were consultations with the majority of those, yes.

20   Q    Okay.  And would you agree with me that in this e-mail he

21   doesn't say he's just charging for prescriptions.  He's saying

22   he's charging for completed notes; correct?

23   A    Completed notes and scripts, yes.

24   Q    Sure.  Prescription is something that comes out of the

25   consultation, correct?  Or that's how it's supposed to be

1    done; is that right?

2    A    Well, the prescription was sent to him prefilled.  So I

3    don't ---

4    Q    Right.  It comes from the study to him.

5    A    Correct.

6    Q    Dr. Elder is to review that with the study participant;

7    in consultation with the study participant, correct?

8    A    Correct.

9    Q    Okay.  And isn't it pretty clear that he is making those

10   calls to the study participants?  Is that pretty clear?

11   A    To the majority of them, yes.

12   Q    Okay.  Why are you qualifying it that way?

13   A    Because not all of them were answered.

14   Q    Sure, not all the calls were.  He didn't get through to

15   everybody, correct?

16   A    Correct.

17   Q    Okay.  But the ones he is billing for, would you agree he

18   bills for completed calls where he has completed notes?  Is

19   that right?

20   A    Yes.  If he turned it in, then he would have had a

21   completed note and script for it.

22   Q    Sure.

23   A    Yes.

24   Q    Okay.  So do you not see a distinction with the way the

25   vitamin prescriptions are handled and the other prescription?

1    A    They were all handled the exact same way.

2    Q    Okay.

3    A    Each one was paid.  They were paid by script.

4    Q    Okay.  Do you see that there's a different charge for

5    them?

6    A    There are several other e-mails, I'm sure, in the

7    thousands of e-mails where they were told how much they were

8    getting paid per script.  So --

9    Q    Okay.

10   A    -- this may not be the exact e-mail, but I know for a

11   fact they were paid by script and consult.

12   Q    Okay.  So you're saying if Dr. Elder consulted with the

13   study participant and ended up prescribing two medications to

14   that one participant, that he would get paid $120 for that

15   patient, not 60?

16   A    I believe so, yes.

17   Q    Okay.  Okay.  Then let's go back, if we could, to

18   Government's Exhibit 131 and the second page of that, please.

19   In looking at this page, do you agree with me that this list

20   of patients does not list how many prescriptions, if any, were

21   prescribed for these patients?

22   A    Correct.

23   Q    Okay.  And you would expect then that if he were going to

24   be paid by script -- by prescription, that is -- that there

25   would be some document that calculates how many prescriptions

1    rather than how many patients, correct?

2    A    That would be the Trilogy spreadsheet.

3    Q    Okay.  I'm going to ask you to look at a series of

4    exhibits.  They're Elder Exhibits 68 through 73.  And I think

5    the best way to do this -- and I'm sorry; I don't have them

6    stapled, but I have them paper-clipped separately.

7    A    Okay.

8    Q    And I think the best way is if you could, without reading

9    from them or anything like that, look through or look at the

10   top page or spend as much time looking at them as you like but

11   look through at least the top page and see if you can identify

12   that those are e-mails that you received from Dr. Elder.

13             MR. BRASHER:  We have no objection to 68 through 73.

14             MS. STILLINGER:  Okay.

15             THE COURT:  Are you requesting to admit those?

16             MS. STILLINGER:  I would like to admit those.  Yes,

17   Your Honor.  Thank you.

18             THE COURT:  Admitted.

19   Q    (By Ms. Stillinger) Okay.  So actually I'm going to go

20   through them on the screen then --

21   A    Okay.

22   Q    -- because the Government has agreed to admit them in.

23   A    Okay.

24             MS. STILLINGER:  Let's pull up first Defendant

25   Elder's Exhibit 68.

1  Q    (By Ms. Stillinger) And you see that that is an e-mail

2  that Dr. Elder sent to you?

3  A    Yes, ma'am.

4  Q    Okay.  In December of 2014, correct?

5  A    Correct.

6  Q    Okay.

7         MS. STILLINGER:  And can we turn to the second page

8  of that?

9  Q    (By Ms. Stillinger) And what is that -- What is your

10 understanding of what it is that he's sending you?

11 A    A list of completed patients.  I don't know what

12 completed for, but he spoke with them, I'm assuming, --

13 Q    Okay.

14 A    -- even though I'm not supposed to assume.

15 Q    Sure.

16 A    Sorry.

17 Q    That's okay.  I'm actually -- I mean I know this has been

18 almost exactly five years ago and so you may not remember, but

19 if you remember, do you know what he means by "completed"?

20 A    I believe that he spoke with them, but I can't say in all

21 certainty that's exactly true.

22 Q    Okay.

23 A    I believe that it would have meant that he spoke with

24 them and sent the scripts possibly but, again, I can't -- I

25 can't say for certain that that's what he meant.

1    Q    Okay.

2         MS. STILLINGER:  And let's go to the third page of

3    that exhibit, please.

4    Q    (By Ms. Stillinger) And that's also the same date,

5    December 4th.  Is that right?

6    A    Yes.

7    Q    Okay.

8         MS. STILLINGER:  And can we go to the second page of

9    that?  I mean -- I'm sorry; the next page.

10   Q    (By Ms. Stillinger) And do you know what that means when

11   he writes "completed notes" or what it meant to you?  I know

12   that you're on the receiving end of this.

13   A    Again, I don't.  I would assume that he was done with a

14   patient.  I don't ---

15   Q    Okay.  And you don't know if Dr. Elder is sending this to

16   you for the purpose of you calculating payment?

17   A    I would have forwarded it, yes.

18   Q    Okay.  And to whom would you have forwarded this?

19   A    Rich, John or Trilogy or all three.  I probably would

20   have CC'd all of them.

21   Q    Okay.  And do you recall whether or not this would be for

22   the purpose of letting you know -- letting you or Rich and

23   John through you, but letting CMGRx know the work he had done

24   that he should be paid for?

25   A    Correct, but there were arguments between John, Rich and

VOLUME 12                 130

1   Dr. Elder about discrepancies in payment and how he was to get

2   paid.

3   Q    Okay.  Well, if you're not part of that conversation --

4   or I mean are you saying that you were there when they had

5   those discussions?

6   A    Dr. Elder specifically e-mailed me something saying that

7   his ---

8   Q    I'm sorry.  First of all, let me ask you:  Who e-mailed

9   you something?

10  A    Dr. Elder e-mailed me about a discrepancy in his pay --

11  Q    Sure.

12  A    -- which I would have forwarded to John and Rich.

13  Q    Okay.

14  A    So I know there was discrepancies in pay.  Maybe that's

15  what that was as far as the patient and the script.  Again, I

16  didn't have privy after ---

17  Q    Okay.

18  A    So he thought I was a point of contact.  That wasn't

19  necessarily true anymore.  I couldn't do anything.

20  Q    Okay.  These -- And let me go -- If you can keep going

21  through the pages of this exhibit.  There's another e-mail.

22  This is a compilation; this one exhibit is a compilation of

23  several e-mails December 4th.

24       MS. STILLINGER:  And can you go to the next page

25  after that?

1  Q    (By Ms. Stillinger) And do you see that's another list of

2  patients?  Correct?

3  A    Yes.

4  Q    Okay.

5         MS. STILLINGER:  And can we keep going to the next

6  page?

7  Q    (By Ms. Stillinger) And another e-mail that same day.

8         MS. STILLINGER:  Can we see the attachment there?

9  Q    (By Ms. Stillinger) Okay.  And you agree that he's

10  setting out completed notes on certain days.  Is that right?

11  A    Which exhibit is this?  I'm sorry.

12  Q    This is Exhibit 68.  But it's in the one that's up on the

13  screen.

14  A    I know.  I just want to see something.

15  Q    Okay, sure.

16  A    Go ahead.

17  Q    Well, would you agree that he's -- The information that

18  he is sending to you is the information of notes that he has

19  completed and he tallies them, in fact; doesn't he?

20  A    Yes.  He's saying that he completed 79 patients in one

21  day, yes.

22  Q    Okay.  Would you agree, having reviewed this, that he's

23  sending you a list of patients whose notes he's completed

24  rather than a list of prescriptions?

25  A    He's sending me completed notes, yes.

1    Q    Okay.  Okay.  You do not recall that that was for

2    purposes of calculating payment to him?

3    A    Well, their names could be on there.  But on Trilogy's

4    spreadsheet, which you haven't seen, of course, they had

5    different prescriptions for that patient.  So there could be a

6    name but they would have three different prescriptions for

7    that.  So, yes, he could have completed notes for the

8    patients.  I still do not agree that that's how he was paid.

9    Q    Okay.  And that's based on your belief but not based on

10   having reviewed any records, correct?

11   A    That's from seeing the Trilogy spreadsheet with payout

12   amounts.  But, yes, I had -- did never -- I never saw a check

13   go to him, no.

14        MS. STILLINGER:  Can we look at Defendant Elder's

15   Exhibit 69 which has been admitted now?

16   Q    (By Ms. Stillinger) Okay.  This is another e-mail from

17   you about a week later.  Is that right?

18   A    Yes, ma'am.

19   Q    And would you agree that Dr. Elder is here sending you

20   completed calls, notes and faxed scripts?

21   A    Yes.

22   Q    Is that how he describes it?

23   A    Yes.

24   Q    Okay.

25        MS. STILLINGER:  And can we look at the next page of

1    that exhibit?

2    Q    (By Ms. Stillinger) Does, in fact -- Does Dr. Elder tally

3    up the total?

4    A    Yes.  So some of these could have been people he had

5    already spoken to, and there could have been a refill.  I

6    don't exactly know what his "completed notes," again, stands

7    for.

8    Q    Okay.  Would you ---

9    A    I see the tally, yes.

10   Q    Sure.  Would you agree that it appears that he's adding

11   them up by patient rather than by prescription?

12   A    Again, yes, I realize he's adding it up by patient,

13   but ---

14   Q    I know you think there's another document out there that

15   says something else, but I'm just asking you about this one.

16   A    There is but, yes, this document is just stating patient

17   --

18   Q    Sure.

19   A    -- 11 patients in one day and so forth, yes.

20   Q    Sure.  And he's adding them up, correct?

21   A    Correct.

22   Q    Okay.  So my specific question is:  You agree he's adding

23   them up by patient, not by prescription.

24   A    I will agree to that, yes.

25   Q    Because you know from your familiarity with this that

1    patients almost always had more than one prescription.  Is

2    that right?

3    A    Yes, more -- Eighty percent of the time, sure.

4    Q    Okay.  And would you also -- I guess what you're saying,

5    though, you don't know why he's adding up the number of

6    patients?  You don't know why he's sending that tally to you?

7    A    We're just going to have to agree to disagree because he

8    sent the patients, yes.  That does not count for how many

9    scripts those patients got and what I believe he was paid out

10   on.

11   Q    Okay.

12   A    It's going to be the same response.  I'm sorry.

13   Q    Well, just actually try to listen because what the

14   question was:  Are you saying you don't know why he was

15   sending you this tally of patients?

16   A    He was sending the tally of patients so he could get paid

17   for his work.

18   Q    Okay.

19        MS. STILLINGER:  Can we look at Page 3 of that

20   exhibit?

21   Q    (By Ms. Stillinger) Is this another e-mail where he's

22   sending to you completed notes?  He calls it "notes, calls and

23   faxed scripts"?

24   A    Yes.  What exhibit is this, though?

25   Q    This is still Exhibit 69.

1   A    Okay, sorry.  Yes.

2   Q    Okay.  And if you look at the next page after that, would

3   you agree that he is, again, making the tally by the number of

4   patients, not by the number of prescriptions?

5   A    Yes.  He was making a tally of how many patients he had

6   spoken to that day.

7   Q    Okay.

8         MS. STILLINGER:  Could we look at Exhibit No. 70,

9   Defendant Elder Exhibit No. 70 that's been admitted?

10  Q    (By Ms. Stillinger) And this is December 19th, and could

11  you look at the second page of that?  And if you've got it in

12  paper there, you could go ahead and flip through to the third

13  page.  Would you agree that this is another example where

14  Dr. Elder is sending you the list of patients that he has

15  completed?

16  A    Yes, 50 patients in one day; right?  Yes.

17  Q    Well, on that particular day, yes.

18  A    Yes, I see that.

19  Q    Okay.  And you agree that this is another example; he's

20  counting the patients; he's not counting the scripts.  Is that

21  correct?

22  A    I'll agree to that.

23  Q    Okay.  And this is another example.  You don't know why

24  he's doing that.  Is that fair to say?

25  A    I think I've stated this very clearly that he was sending

1     that so he could be paid for his work.

2     Q    Okay.  Well, if he's getting paid by the prescription and

3     not by the patient, why is he counting up the number of

4     patients for you?

5     A    So we know how many patients he saw, so we could verify

6     the patients with the prescriptions.

7     Q    Okay.  But there would be no relevance to the number of

8     patients, would there, if he's ---

9     A    There is a relevant amount.  If he saw 50 patients in one

10    day he said, that is kind of relevant.  He said he spoke to 50

11    patients in one day --

12    Q    Yes.

13    A    -- while working at an ER practice.  And there's no

14    relevance there?  That's relevant.

15    Q    To how you pay him?

16    A    It's just relevant in general.

17    Q    Okay.  I'm asking about how you paid him.

18    A    And I've stated how we've paid him from my ---

19    Q    How you believe you paid him.

20    A    Okay, but you're asking me.

21          MR. CHRIS KNOX:  Judge, I'm going to object as

22    nonresponsive to the question.

23          THE COURT:  Overruled.

24          MR. BRASHER:  I'm going to object to asked and

25    answered.

```
 1              THE COURT:  Sustained.  Move on, please.

 2   Q    (By Ms. Stillinger) Okay.  I get the sense that it

 3   bothers you that he made 50 phone calls in one day?  Is that

 4   right?

 5   A    I don't know how it's plausible, so -- but I'm not a

 6   doctor.  So it's not really ---

 7   Q    Okay.

 8   A    I don't have any relevance to that.

 9   Q    Did you know that Dr. Elder worked one week on and had an

10   entire week off of work?

11   A    I don't know anything about his personal life other than

12   that he was an ER physician.  So, no, I didn't know his

13   schedule.

14   Q    Well, you were assuming that he worked full-time every

15   week, weren't you?

16   A    I wasn't making that assumption, but I know he worked as

17   an ER doctor as well.

18   Q    Okay.  Well, you just said a few minutes ago that how can

19   he make 50 calls when he's working full-time as an ER

20   physician, right?

21   A    I said, "How can he make 50 calls in one day?"  That's

22   what I asked.

23   Q    Well, while he was working is what you said, isn't it?

24   A    Correct.  I didn't say he was working that day when he

25   made the 50 calls.  I said in general working as an ER
```

```
 1    physician.

 2    Q    Well, if he's not working, it's not that hard to make 50

 3    phone calls in a day, is it?

 4    A    If -- I mean I'm not a doctor, so I don't know how long

 5    it takes to go over a questionnaire with a patient.  So I

 6    don't know how plausible that is, no.

 7    Q    Okay.  Well, what is it about 50 calls in one day that

 8    bothered you then?

 9    A    It seemed like a lot of calls.  You asked me if I saw the

10    numbers.  I tallied the numbers like he tallied the numbers

11    and that's what I went off of.  Fifty jumped out.  That's all.

12    It seemed like a lot.

13    Q    Okay.

14         MS. STILLINGER:  Let's look at Elder Exhibit 72

15    that's been admitted.

16    Q    (By Ms. Stillinger) Okay.  Is Dr. Elder asking you to

17    check with Accounting on his payments?

18    A    He is, yes.

19    Q    Okay.  And can you give us the date of this e-mail?

20    A    This is February the 6th.

21    Q    Okay.  So in February of 2015, did you play a role in

22    checking his payments?

23    A    I probably would have sent that off and Adam would have

24    dealt with it.  I do not believe at this time that I was, but

25    Dr. Elder still thought of me as a point of contact, and I
```

1    still tried to get things done for him, yes.

2    Q    Okay.  And I'm not going to ask you to actually count the

3    names here, --

4    A    Okay.

5    Q    -- but if there is a tally -- I guess I need to ask you

6    to just sort of flip through and tell me, if like the other

7    sheets that we just looked at, the several other sheets, --

8    A    Correct.

9    Q    -- are the pages attached a tally of patients rather than

10   a tally of individual prescriptions?

11   A    It says on the front that they are scripts.

12   Q    Okay.  Maybe you didn't understand the question.  I said:

13   Do the pages attached tally patients rather than individual

14   prescriptions?

15   A    I don't know if they tally the patients because on the

16   front it says the number of scripts.  So I don't know if -- I

17   would have to physically count to see if they're patients or

18   if they're scripts.

19   Q    Okay.  Can we look at Page 2 of that exhibit?

20   A    Okay.

21   Q    And you can flip through the paper copy as much as you

22   want, but do you see anywhere where it lists how many

23   prescriptions each patient had?

24   A    It does not, no.

25   Q    Okay.  And let's just look at that first section there.

1    It's not very long, so I think I will ask you to tally that.

2    Can you tell me whether or not there's 14 patients listed

3    there?

4    A    Yes, ma'am, there is.

5    Q    Okay.  Are you comfortable you've looked at this document

6    enough then to feel like this -- just like all the other ones

7    that I've just showed you, that he's counting patients rather

8    than prescriptions?

9    A    No, because it says, "Attached are new invoices," and

10   it's scripts.  So I would have to go through and see if

11   there's duplicate patients.  I mean I can do that, but I don't

12   feel comfortable saying that that's patients, especially when

13   the first part of his e-mail states, "Attached are also new

14   invoices, V-scripts and scripts."

15   Q    Okay.

16   A    So I'm counting by script.

17   Q    Okay.  Okay.  So what you're saying, you're not

18   comfortable that he just listed patients instead of

19   prescriptions?

20   A    Especially not -- No, I'm not, not with his e-mail

21   stating that attached is scripts.

22   Q    Okay.

23   A    So, no, I can't say that.  I'm sorry.

24   Q    You don't need to apologize.

25   A    Okay.

1    Q    And this idea that he charged by the prescription rather

2    than by the patient, that's an understanding you have.  Is

3    that something that any Government agent might have suggested

4    to you?

5    A    No, that's not anything that they would have suggested to

6    me.

7    Q    Okay.  So you would be very surprised, I guess, if you

8    saw invoices where the money correlated to patient rather than

9    prescription?

10   A    It would depend on the invoice because I believe every

11   invoice could have been different.  There could have been that

12   one patient and the next invoice had another patient with a

13   different script.  So if you see where I'm saying, yes, one

14   script might have been filled one moment but then another

15   script filled another moment, and they would have gotten paid

16   that way.

17   Q    Okay.  Okay.  Let's look at one more exhibit.

18            MS. STILLINGER:  Defendant's Exhibit 73, if we could

19   have that up.

20   Q    (By Ms. Stillinger) We've just gone through these

21   chronologically.  So this is the last of the series, but would

22   you agree that he's again sending you an e-mail with an

23   attachment of completed scripts and vitamin scripts?  Is that

24   right?

25   A    Yes, ma'am.

1    Q    Okay.  On February 20th of 2015, why -- if you recall,

2    why is Dr. Elder sending that to you?

3    A    Again, he would have sent it to me so he could have

4    gotten paid.

5    Q    Okay.  And how would sending it to you have resulted in

6    him getting paid?

7    A    I would have sent it off to Adam, I believe, at that

8    point.  He was taking care of it.

9    Q    Okay.  And that's Adam Still?

10   A    Yes, ma'am.

11   Q    Okay.  And you haven't done any, I guess, not then in

12   2015 and not since then have you ever done any review to see

13   if, in fact, he was paid by the prescription or by the

14   patient?

15   A    I wouldn't have had that information to review that, no.

16   Q    Okay.  So when you tell us you're sure he was getting

17   paid by prescription, would you agree then that you're making

18   an assumption based on some words in an e-mail?

19   A    No, I would not agree to that.

20   Q    Okay.  Do you remember testifying last week that you said

21   it was not unusual for a patient to get a prescription without

22   having spoken to a physician?

23   A    I have seen it, yes.

24   Q    Okay.

25   A    Or I have heard it, yes.

```
 1    Q    I think your words last week were that that was normal,
 2    right?
 3    A    I mean it was normal to have seen that, yes.
 4    Q    Okay.  That -- That wasn't the way the system was set up,
 5    was it?
 6    A    It was not the way the system was set up, no.
 7    Q    Okay.  You did not approve or know of any approval within
 8    CMGRx that that was fine; the study participants don't have to
 9    see a doctor.
10    A    Correct.  That was not how it was supposed to be, no,
11    ma'am.
12    Q    Okay.  And I'm going to show you what I've marked as
13    Defendant Elder's Exhibit 67.  If you could look at that and
14    see if you recall that communication between yourself and
15    Dr. Elder.
16    A    Okay.  Yes, ma'am, I remember this.
17    Q    Okay.  And this was a text conversation between you and
18    Dr. Elder?
19    A    It was.
20         MS. STILLINGER:  Your Honor, I'm going to move for
21    the admission of Defendant Elder's Exhibit 67.
22         MR. BRASHER:  No objection.
23         THE COURT:  Admitted.
24    Q    (By Ms. Stillinger) Okay.  Let me ask you:  Dr. Elder's
25    part of the conversation is in green.  Is that right?
```

1    A    Yes, ma'am, it is.

2    Q    Okay.  And what's the topic here?

3    A    A signed prescription for a "Sterling" for pain and scar

4    cream.

5    Q    Sure, with a complicated last name.

6    A    Yes.

7    Q    Okay.  Is Dr. Elder alerting you that this patient says

8    he received medication without talking to a doctor?

9    A    He is, yes.

10   Q    Okay.  And is he asking to you find out what happened?

11   A    Yes, ma'am, he is.

12   Q    Okay.  So you would agree not only did you not think that

13   that was appropriate that people get medications without

14   speaking to a doctor, you would agree that that was

15   Dr. Elder's position as well; correct?

16   A    In this instance, yes.

17   Q    Okay.  Do you think it was only in this instance?

18   A    I don't know about other instances.  You asked me about

19   this one.  So in this instance, yes, he was concerned about

20   it.

21   Q    Okay.

22        MS. STILLINGER:  Well, if we can go down to the next

23   comment from Dr. Elder.

24   Q    (By Ms. Stillinger) "I will complete the encounter."

25   Doesn't Dr. Elder say, "Patients should clearly not be

VOLUME 12                145

1    receiving their medications"?

2    A    Yes, he does.

3    Q    Okay.  Would you agree it doesn't seem like he's talking

4    about just this one patient but he's speaking generally,

5    right?

6    A    Correct.

7    Q    Okay.  I mean do you have any idea that it was okay with

8    Dr. Elder that -- that people could just get prescriptions

9    without talking to doctors?

10   A    After the initial consult or before the initial consult?

11   Q    Well, the consult is talking to the doctor; correct?

12   A    Correct.  So as long as they've talked to the doctor,

13   that's what you're asking?  Not refills or anything of that

14   nature?

15   Q    What I'm asking is:  Did you ever think that, either in

16   conversations or anything with Dr. Elder, that he thought it

17   was okay to write prescriptions for participants without

18   consulting with them?

19   A    I didn't have that conversation with him.  In this

20   instance he's, obviously, not okay with patients not being

21   talked to before a script is sent out.

22   Q    Okay.  Did you have other doctors that were okay with

23   that?

24   A    Not that I recall, no.

25   Q    Okay.  And I'm just going to ask you to look at your

1    response to Dr. Elder here --

2    A    Okay.

3    Q    -- when you say, "There's another group who sends scripts

4    with the enrollment."

5    A    Correct.

6    Q    Who -- Who were you talking about?

7    A    IFG had their own doctors and their own prescriptions

8    that they had -- Their doctors talk to their own patients and

9    sent the scripts over.

10   Q    Okay.  And is that what you're saying, that they would go

11   ahead and write the prescription without -- just upon

12   enrollment in the study?

13   A    That's not what that's saying.

14   Q    Okay.

15   A    It's saying that it should never have been sent over to

16   him.  He had two enrollments and "one came to me another way."

17   So IFG's scripts, they specifically spoke to their patients;

18   their doctors and their patients and their script pads.

19   Q    Okay.  So when you said last week that it was normal that

20   patients would get prescriptions without having spoken to a

21   doctor -- And I think there were three patients that we

22   reviewed last week.

23   A    Correct.

24   Q    Two men on one e-mail and then there was an

25   Allison Bradley.

```
 1   A    Correct.

 2   Q    That's three.  Do you know of others?

 3   A    Not that I can recount.  I don't -- Not off the top of my

 4   head, no.

 5   Q    Okay.  Let me show you what I've marked as Defendant

 6   Elder's Exhibit 88, and do you recognize that as an e-mail --

 7   as an e-mail sent to you by Dr. Elder?

 8   A    Yes.

 9   Q    Okay.  And actually I think I'm going to ask -- Well, let

10   me ask you:  Do you recall getting that e-mail?

11   A    It was sent to me.  I don't recall every e-mail I've

12   every gotten.

13   Q    Okay.

14         MS. STILLINGER:  If I could have just a moment,

15   Your Honor.

16         THE COURT:  Yes.

17         (Pause)

18   Q    (By Ms. Stillinger) I'm going to show you what I've

19   marked as Defendant's 89 and see if you recognize that as your

20   response to the e-mail that's Defendant's 88.  And I'm not

21   asking about content here.  I'm just ---

22   A    So what are you asking me then?

23   Q    I'm asking if you recognize the e-mail in 89 as a

24   response to the e-mail that you received in -- in 88.

25   A    Yes, there is a response to this e-mail.
```

1   Q    Sure.  So what I'm asking is:  So having seen your

2   response, do you agree that you received the e-mail?

3   A    I acknowledge I received the e-mail, yes.

4   Q    Okay.

5          MS. STILLINGER:  Your Honor, I'm going to move for

6   the admission of Defendant Elder's 88.

7          MR. BRASHER:  88, Your Honor, we object as hearsay.

8   As to 89, which I assume will be offered next, ---

9          THE COURT:  I'm sorry.  I can't hear you.

10          MR. BRASHER:  Sorry.  I object to 88 as hearsay.

11          MS. STILLINGER:  And actually I'm not going to offer

12   89, Your Honor.  I -- I had not marked that.  I just was using

13   that to show her that she responded to 88.

14          MR. BRASHER:  To the extent there was a response, I'm

15   not opposed to the response.  And to the underlying e-mail,

16   only the portion to which she responded but not the entire

17   thing.  It would be hearsay.

18          THE COURT:  All right.  Objection overruled;

19   admitted.

20          Ladies and Gentlemen, all of these statements that

21   are being admitted that are out-of-court statements of this

22   type are admitted just for purposes of the course of dealing

23   and notice, not for the truth of the underlying matter.

24   Q    (By Ms. Stillinger) Okay.  So let's look at Defendant's

25   88.  Would you agree with me that this is an e-mail that

1    Dr. Elder sent you February 26th of 2015?

2    A    Yes.

3    Q    And does it appear to you that he's sort of giving you

4    some information about patients that he wasn't able to get in

5    contact with?

6    A    Yes.

7    Q    Okay.  And would you agree that he is talking to you

8    about how to make this system better and function better for

9    communicating with patients?

10   A    Yes.

11   Q    Okay.  And if we could go to the second page of this

12   exhibit, do you see the name "Allison Bradley" on that list?

13   A    Oh, yes.  I'm sorry.

14   Q    Okay.  That's fine.  And am I correct that your

15   understanding of this then is he's telling you, "I tried

16   calling Allison Bradley.  I tried three times and I was not

17   able to get a hold of her"?

18   A    That's what it looks like, yes.

19   Q    Okay.  So if you go back to the front page of that

20   exhibit then, the end of the first paragraph, is he asking you

21   to -- "We can't get a hold of these people; please remove them

22   from the Kareo list"?  The end of that first paragraph.

23        "If the no answer patients call back, I'll forward

24   scripts.  Otherwise, please remove them."

25   A    Yes, ma'am.

1    Q    Okay.  So -- And the date on this is February the 22nd.

2    Is that right?

3    A    Yes.

4    Q    Okay.  So you would agree with me that if you had seen

5    this -- and I'm not criticizing you for this because there

6    were a lot -- a lot of things going on.  But you would agree

7    that if a prescription was sent to somebody on this list of

8    people "I have not been able to reach," that that would be a

9    mistake; correct?

10   A    Absolutely.

11   Q    Okay.

12        MS. STILLINGER:  And could we look at Government's

13   Exhibit 565?  Okay.  And this was admitted in evidence.

14   Q    (By Ms. Stillinger) I think -- I think Mr. Brasher asked

15   you to look at it last week.  If we could go to the second

16   page, do you see this is the prescription to -- for

17   Allison Bradley?  Is that right?

18   A    Yes.

19   Q    Okay.

20        MS. STILLINGER:  And could we go down to the bottom

21   and look at the date the prescription is issued?

22   Q    (By Ms. Stillinger) Okay.  And you see that's February

23   22nd?

24   A    Yes.

25   Q    Okay.  Yet, he's telling you on the 26th that he never

1    spoke to Allison Bradley.  Is that right?

2    A    Correct.

3    Q    Okay.  Do you agree this was a mistake?

4    A    Not necessarily.

5    Q    Okay.  You think that he was purposely sending you a

6    prescription while at the same time, four days later, saying,

7    "I never spoke to this person"?  Is that what you're saying?

8    A    I believe that in that time he could have spoken with

9    her.  That wasn't out of the realm of impossibility.  It did

10   happen where we would get an e-mail and then he would talk to

11   them later on.  I mean just because it's in that e-mail on

12   that date doesn't mean that it wasn't -- Maybe; I don't know.

13   It -- It happened more than not.  I mean it happened.

14   Q    Okay.  You agree we've got a prescription February 22nd

15   and we've got him telling you on the 26th, "I never spoke to

16   this person," correct?

17   A    Correct.

18   Q    Okay.  You agree that's not the way it was supposed to

19   function, correct?

20   A    That's absolutely not the way it's supposed to function.

21   Q    Okay.  And would you be surprised to know that he never

22   billed for having consulted with Allison Bradley?

23   A    I wouldn't know if he billed for her or not.

24   Q    Okay.  Would you agree that it looks like a mistake was

25   made there?

1    A    It looks like a mistake was made.

2    Q    Okay.  I'm going to ask you a few questions about

3    signature stamps.  Okay?  You stated that you got a signature

4    stamp with Dr. Elder's signature; correct?

5    A    Correct.

6    Q    From Rich Cesario?

7    A    Yes.

8    Q    And when was that?

9    A    I have no idea.

10   Q    Okay.  Can you give us a rough estimate of when it was?

11   I mean we're dealing with a period of ---

12   A    Maybe the beginning of January.  I have -- I have no idea

13   when we got the stamps.

14   Q    Okay.

15        MS. STILLINGER:  Could we look at Government's

16   Exhibit 3 -- I'm sorry -- 319 and which was previously

17   admitted?

18   Q    (By Ms. Stillinger) And I know this -- you're not on this

19   e-mail, but I want to ---

20        MS. STILLINGER:  Can we go to the second page of this

21   e-mail?  Well, let's see.  Page -- Yes, we can go to the

22   second page of this.

23   Q    (By Ms. Stillinger) If you look down at the bottom there,

24   is that an example of when you used that signature stamp?

25   A    I wouldn't know.

1    Q    Okay.

2    A    I don't know if that's the stamp or not.

3    Q    Okay.  And I'm sorry.  I thought that you had testified

4    about that last week, but ---

5         MS. STILLINGER:  I'm sorry.  Let's go back to the

6    first page of the e-mail there because I think I went over

7    that too quickly.  If we can go back to the first page.

8    Q    (By Ms. Stillinger) I saw the top of it, that it's

9    between Dr. Elder and somebody else.  But there's a forwarded

10   e-mail there, correct?

11   A    Correct.

12   Q    Okay.  It's from you to Dr. Elder, correct?

13   A    Correct.

14   Q    And do you remember what you meant when you told him that

15   these scripts that you signed off on had to be redone?

16   A    Yes.  So when the script pad changed, we were under

17   direction of Dr. Elder that we would fill out the new script,

18   the new formula.  We would stamp his name and then we would

19   send them back to him once they were completed, the new ones.

20   Q    Okay.  So just to be clear, these are prescriptions that

21   you had already received a signed prescription from Dr. Elder

22   and you were just putting them on a different pad.  Is that

23   right?

24   A    A different form.

25   Q    A different form.

1   A    Yes.

2   Q    Okay.  And I thought Mr. Brasher had you look through and

3   see if these were stamped signatures.  But did you actually

4   use the stamp?

5   A    Yes, I used the stamp.

6   Q    Okay.  And this is an example of when you used it,

7   correct?

8   A    Possibly.  I don't know that I was the exact one.  All of

9   us in that office stamped them, so I can't tell you that I was

10  the one that stamped that or not.

11  Q    Okay.  You're the one sending it back to Dr. Elder.

12  A    Correct.

13  Q    Okay.  And I think you testified -- Mr. Brasher asked you

14  were there any limits to the usage of the stamp, and I think

15  you said, "Well, we could stamp it if we sent Dr. Elder back

16  the copy of it;" correct?

17  A    Correct.

18  Q    And that's what you're doing here, right?

19  A    Yes.

20  Q    For prescriptions that he had already signed; correct?

21  A    Correct.

22  Q    Do you think that you had the stamp -- you thought maybe

23  January but you're not sure, correct?

24  A    I have no idea.

25  Q    Okay.  I'm going to show you what I've marked as

1    Defendant Elder's Exhibits 74 and 75.  If you would take a

2    look at those.  And do you recognize those as e-mails that you

3    sent to Dr. Elder?

4    A    Yes, they were sent to him.

5    Q    Okay.  And I think I numbered them not chronologically.

6    So ---

7            MS. STILLINGER:  Well, first, let me -- let me move

8    for the admission of Defendant Elder's Exhibits 74 and 75,

9    Your Honor.

10           MR. BRASHER:  No objection.

11           THE COURT:  Admitted.

12   Q    (By Ms. Stillinger) Let's look at 75 first, please.

13   We're doing it chronologically.  This exchange you had with

14   Dr. Elder, the first -- I guess at the bottom you're first

15   e-mailing him and this is a back and forth; correct?  So

16   first, you e-mail him on April 1st?

17   A    It looks that way, yes.

18   Q    Okay.  And you said you got a prescription that's stamped

19   but not signed.  Was there a stamp that -- that Dr. Elder

20   would use that had his name and address and that kind of

21   thing?

22   A    I don't believe so.  I think it was only the stamp of his

23   signature.

24   Q    Okay.  Well, in any event, on this day, are you telling

25   him he sent a prescription that he neglected to sign?

1    A    Yes.  I don't ---

2    Q    I mean it turns out it was a mistake, correct?

3    A    It looks that way, yes.

4    Q    Okay.  It looks like you actually did have a signed one,

5    correct?

6    A    Correct.

7    Q    But would you agree then on April the 1st you thought you

8    had one that wasn't signed and you were going to send that

9    back to Dr. Elder and ask him to sign it?  Is that right?

10   A    Yes.

11   Q    Okay.  Because you weren't going to just use the

12   signature stamp to stamp a prescription if he hadn't signed

13   one, correct?

14   A    Correct.

15   Q    Then let's look at Exhibit 74, please.  I'm sorry -- Yes.

16   Exhibit 74, yes.  That's a few days later on April the 6th.

17   And are you asking Dr. Elder to redo prescriptions on that

18   day?

19   A    Yes.

20   Q    Okay.  And I don't know if it -- I think you've got the

21   stack up there, the whole paper exhibits, so you could flip

22   through it, if you'd like.

23   A    Yes.

24   Q    But do you recognize that you sent him exhibits he had

25   signed and then blank exhibits on a different form?  I mean

1    I'm sorry; blank prescriptions on a different form?

2    A    Yes, it looks that way; yes, ma'am.

3    Q    Okay.  And you could have more time to look at it, if

4    you'd like, but ---

5    A    No.  The last pages are just blank scripts, so.

6    Q    Sure.  Sure.  Well, blank but they have patient names,

7    don't they?

8    A    No, not the blank ones.  Oh, yes it does.  I apologize.

9    You are correct.  They do have patient names.  I'm sorry.

10   Q    Okay.  So would you agree -- And if you need more time to

11   look at it, you could take that, but do you agree you're

12   sending him back prescriptions that he had actually signed and

13   then along with that you're sending him a new format, a new

14   prescription form that has the patient information but is not

15   signed?

16   A    Correct.

17   Q    And what are you asking him to do with these?

18   A    To redo the script on the new script pad.

19   Q    Okay.  You're basically asking him to redo the

20   prescriptions that he signed that you're sending to him and

21   put them all on the other script pad.  Is that right?

22   A    Correct.

23   Q    Okay.  And do you think at that point in time you had the

24   signature stamp for him?

25   A    Again, I -- I don't know.  This was in April, so.  I

1    don't know when we got the stamp.  I do not remember the time

2    that we got it, so I -- I don't know.

3    Q    Okay.  In any event, with this batch at least, you're not

4    doing it.  You're not redoing the prescriptions and stamping

5    them.  You're saying, "Dr. Elder, could you do that?  Please

6    redo them and please resign them;" right?

7    A    Yes, ma'am, I agree to that; absolutely.

8    Q    Okay.

9            MS. STILLINGER:  Can I have just a moment,

10   Your Honor?

11           THE COURT:  Yes.

12           MS. STILLINGER:  Thank you.

13           (Pause)

14   Q    (By Ms. Stillinger) Ms. Stevens, I wanted to ask you a

15   couple of questions about meeting with the agents in this case

16   because you've been asked about when you met with them in

17   2016, right?

18   A    Yes.

19   Q    Okay.  And then I think you said you met with them kind

20   of recently in the last few months.  Is that right?

21   A    Yes.

22   Q    Okay.  In the last few months it was with some of the

23   prosecutors as well.  Is that right?

24   A    Correct.

25   Q    Okay.  How about in between that time?  In between Spring

```
 1   of '16 and the Summer of '19.
 2   A    No.
 3   Q    You haven't had any contact with them?
 4   A    No.
 5   Q    Okay.  And you said that -- I think one of the things you
 6   said last week is that you've been living with this for five
 7   years.
 8   A    Yes.  It's been lingering for five years, I should say.
 9   Q    Okay.  You never got charged, did you, with any criminal
10   conduct?
11   A    No.
12   Q    Okay.  And, Ms. Stevens, you -- you believed the study
13   was a real study, didn't you?
14   A    I did.
15   Q    Okay.  You wouldn't have told patients that you were
16   enrolling them in a study if you didn't think you were
17   enrolling them in a study.  Is that right?
18   A    Correct.  In the beginning I really sincerely thought --
19   wholeheartedly I believed in Rich and the study.
20   Q    Okay.  And you're saying "in the beginning."  Did there
21   come a time when you didn't believe that there was a study any
22   longer?
23   A    I mean, obviously, you know, when the FBI's knocking on
24   your door, you realize that we -- the study probably wasn't
25   real.
```

1    Q    Okay.  Well, I mean let me ask you about that because

2    they knocked on your door after Mr. Cooper and Mr. Cesario had

3    been arrested.  Is that right?

4    A    They did, yes.

5    Q    Okay.  So -- So when they knock on your door, you know

6    that at least somebody thinks something bad has gone on,

7    correct?

8    A    Yes, ma'am.

9    Q    Okay.  And I imagine that's very scary to you.

10   A    Very, yes.

11   Q    Okay.  Because you were -- I'm not saying this in an

12   accusatory way, but you were right there with them in the

13   middle of all this, right?

14   A    I was.

15   Q    Okay.  But you thought it was a real study, right?

16   A    I did.

17   Q    You thought patients were being paid for their time in

18   participating in a study, right?

19   A    I thought they were being paid -- Okay.  Let me

20   backtrack.  I thought the study was about getting people off

21   opiates and drugs --

22   Q    Right.

23   A    -- and this was a way to do that.

24   Q    Okay.

25   A    I believed in that, yes.

1    Q    Sure, okay.  And I know you're saying in the Spring of

2    '16, after people had been arrested and the FBI's at your

3    door, then you thought otherwise.  But in the time period that

4    you're working there at CMGRx, you didn't think there was

5    anything illegal going on, right?

6    A    There were some red flags, yes.

7    Q    Okay.  Well, red flags is different than "I think I'm

8    committing a crime."

9    A    Yes, true.

10   Q    Okay.  You didn't think you were participating in

11   criminal conduct, did you?

12   A    I did not, no.

13   Q    Okay.  Because if you thought it was criminal conduct and

14   you're the one passing information and being involved with it,

15   you would be participating in criminal conduct, --

16   A    Correct.

17   Q    -- right?  And you weren't, were you?

18   A    I don't believe so because I had licensed doctors and my

19   bosses and pharmacies saying that everything we were doing was

20   legitimate.  So absolutely not.  I did not believe I was

21   involved --

22   Q    And you certainly never told Doctor ---

23   A    -- in any misconduct.

24   Q    I'm sorry.  I didn't mean to interrupt you.

25   A    No; you're good.

1    Q    You never told Dr. Elder, "Hey, by the way, I don't think

2    this is a real study;" right?

3    A    No.  I would have never told him that.

4    Q    Of course not.  You knew his role was to consult with

5    study participants that were getting prescriptions that were

6    the subject of the study, right?

7    A    Yes.

8    Q    Okay.  Have you been worried over the last five years

9    whether they would decide to press charges against you?

10   A    I mean it's always a worry.  Why wouldn't it be a worry,

11   you know?

12   Q    Sure.  Have they ever told you -- and when I say "they,"

13   I mean the Government -- have they ever told you, "Don't

14   worry; we're not going to charge you with anything"?

15   A    No, they've never said that.

16   Q    Okay.  Do you feel some concern that you need to be

17   agreeable with them and -- and cooperative with them so that

18   they won't charge you with anything?

19   A    No.  I need to tell the truth, and that's what I've done

20   here.

21   Q    Okay.  Ms. Stevens, I know you said you feel like you

22   were used.  Is that right?

23   A    Yes.

24   Q    Okay.  But you made pretty good money in this, didn't

25   you?

1    A    That doesn't mean I wasn't used.

2    Q    Okay.  You didn't get charged with anything, did you?

3    A    I have not been charged with anything, no.

4    Q    Okay.  You don't expect to be charged with anything, do

5    you?

6    A    I don't know.  I don't expect to be but I don't know.

7    Q    Okay.  I mean as you sit here today, you're not worried

8    that they're going to change their mind and bring charges

9    against you, are you?

10   A    I don't know.  Am I worried?  I mean this is a huge

11   trial.  Who wouldn't be worried about everything?

12   Q    Because you know you could be charged even if you didn't

13   know that there was anything wrong, right?

14   A    I could be charged.

15   Q    Sure.  Ms. Stevens, you said that you had difficulty

16   getting a job after this because you didn't know how to

17   describe to anybody what you had done at CMGRx.

18   A    Absolutely.

19   Q    Okay.  Was it a bigger obstacle to getting a job that you

20   have felony convictions?

21   A    No.  It's been past ten years, so that should be

22   irrelevant.

23   Q    Okay.

24   A    It's been 15 years since I've ever had a felony

25   conviction.

1    Q    Okay.  And that's not something you advertise to people,

2    is it?

3    A    Who would advertise that?  I'm a changed person.

4    Q    Of course.  Of course.  You present yourself very well to

5    people because that's your past, correct?

6    A    Absolutely.

7    Q    Okay.

8         MS. STILLINGER:  Thank you.  I'll pass the witness,

9    Your Honor.

10        THE COURT:  All right.  This is a convenient time to

11   take our lunch break, Ladies and Gentlemen.  We will be in

12   recess until 1:25.

13        All rise for the jury.

14        MR. SANDEL:  Excuse me, Your Honor.  None of us are

15   going to have any questions for this witness.

16        THE COURT:  Oh, all right.  Okay.  Ladies and

17   Gentlemen, have a seat for just a moment.

18        Is that true that no other Defendants have any

19   questions?

20        MR. BUCKLEY:  It is.

21        MR. ANSLEY:  That's correct.

22        MS. NICOLE KNOX:  Correct, Your Honor.

23        THE COURT:  Will the Government have additional

24   questions?

25        MR. BRASHER:  I can do it in less than five minutes.

1          THE COURT:  All right.  Ladies and Gentlemen, let's

2    go ahead and finish that.  That will be a better place for us

3    to break.

4          Okay.  And, Ms. Stevens, then I can send you on your

5    way.

6          MR. BRASHER:  Thank you, Your Honor.

7                         REDIRECT EXAMINATION

8    QUESTIONS BY MR. BRASHER:

9    Q    Some of these are going to appear random, but I just want

10   to follow up on some questions that you received last week and

11   then again today.

12         You mentioned that you were instructed to never let

13   Mike Quarders on the floor again?

14   A    Yes, sir.

15   Q    Why was that?

16   A    I don't -- I believe that he was ---

17         MS. LOBEL:  Excuse me, Your Honor.  I believe that's

18   beyond the scope of the Cross Examination.

19         THE COURT:  Denied.

20   Q    (By Mr. Brasher) Go ahead.

21   A    I believe he was trying to start a similar business.  I

22   think he was going to be in the business with John and Rich in

23   the beginning and then I -- They had a falling out of some

24   sort, and then we were told, "Do not let him on the floor."

25   Q    Okay.  The bonuses that you received, what were they

1    based on?

2    A    How many prescriptions we got filled.

3    Q    And other than payroll coming from Trilogy, did you feel

4    like you were a real employee of Trilogy?

5    A    Other than being paid by them, no, I did not feel like I

6    was an employee of Trilogy.

7    Q    And you mentioned when you became a medical assistant,

8    that you were instructed that most of the time that training

9    happens on the job.  Is that correct?

10   A    Correct.

11   Q    What on-the-job training were you given to become a

12   medical assistant?

13   A    I wasn't given any training.

14   Q    If you recall some of the questions from last week, you

15   were asked several questions about -- about your testimony

16   changing over the lunch break.  Do you recall those questions?

17   A    Correct.

18   Q    Did any of the agents talk to you about this case during

19   the lunch break?

20   A    No.

21   Q    Did any of the prosecutors talk to you about this case

22   over the lunch break?

23   A    No.

24   Q    Has anyone from the prosecution or the agents talked to

25   you about your testimony since you took the stand?

```
 1   A    Absolutely not, no.

 2   Q    Who told -- Let's see.  You said -- I think you mentioned

 3   today that you were told that Robert would do the HIPAA course

 4   for you?

 5   A    Yes, sir.

 6   Q    Who told you that?

 7   A    I believe it was Rich.

 8   Q    And a question -- Let's see.  You were just recently

 9   asked a question about the stamp that you used for scripts

10   that were redone.

11   A    Yes.

12   Q    Was that -- I just want to -- I wasn't sure if I heard

13   your answer correctly.  Was that because the form was

14   different or because the formula was different?

15   A    We would stamp them when a formula changed.

16   Q    Okay.  And then just notify ---

17   A    And then notify Dr. Elder after we had stamped it on the

18   new formula pad.

19   Q    Okay.  And ---

20        MR. BRASHER:  May I approach, Your Honor?

21        THE COURT:  Yes.

22   Q    (By Mr. Brasher) I hand you what's been marked as

23   Government's Exhibit 247.  That's not an e-mail that you

24   received.  Is that correct?

25   A    Correct.  I'm not on here.
```

1   Q    Okay.  But you recall being asked some questions by

2   Ms. Stillinger about an Allison Bradley.  Do you remember

3   that?

4   A    Yes.

5   Q    And were you shown an e-mail or a communication where

6   Dr. Elder said there were three no answers for her?

7   A    Correct.

8   Q    Then a few days later there was a signed prescription?

9   A    Yes, sir.

10  Q    And then -- What is the date of this e-mail?

11  A    This is March the 9th.

12  Q    Okay.  And you were asked by Ms. Stillinger some question

13  about were you aware of the fact that Dr. Elder never billed

14  for Allison Bradley.

15  A    Yes, I was asked that.

16  Q    Okay.  Can you look at Page 29 of that exhibit and tell

17  me if you see doctor or -- sorry -- tell me if you see

18  Allison Bradley's name about two-thirds of the way down the

19  page?

20  A    Yes, sir; 2-22-2015, Allison Bradley.

21  Q    And does that appear to be an invoice from Dr. Elder to

22  CMGRx?

23  A    Yes, it does.

24           MR. BRASHER:  We offer Government's Exhibit 247.

25           THE COURT:  Any objection?

1          MR. ANSLEY:  Objection; lack of foundation,

2    Your Honor.

3          THE COURT:  Overruled; admitted.

4          MS. STILLINGER:  Your Honor, may we approach on this

5    exhibit?

6          THE COURT:  Yes.  Did you make an objection?

7          MS. STILLINGER:  Yes, I would like to object;

8    foundation.  And I think there's some confusion about this

9    document.

10         THE COURT:  Okay.  Come on up.

11         All right.  Ladies and Gentlemen, if we're not done

12   at 12:15, I'm going to let you go to lunch.

13         (Bench conference on the record with counsel and the

14   Court:)

15         MS. STILLINGER:  I'm sorry.  Your Honor, I'm

16   approaching because I know you don't like Redirect, but this

17   is -- she's not on this.  This is about vitamin prescriptions

18   which was separate than billing for the initial consultation.

19   So it's sort of apples and oranges, but I'm thinking I won't

20   get to recross her on it, so I think it's misleading to the

21   jury to admit it through this witness.

22         MR. BRASHER:  I mean I'm not opposed to a Redirect on

23   that, but I think it directly contradicts the question that

24   she was asked.

25         THE COURT:  All right.  We're just going to take a

```
 1   break now.

 2            MR. BRASHER:  That was my last question, but ---

 3            MS. STILLINGER:  I would like a break to ---

 4            THE COURT:  Why do you need a break to examine her on

 5   this?

 6            MS. STILLINGER:  No.  I can.  If he's done, I can do

 7   it right now.

 8            THE COURT:  That's the only thing I'm going to allow.

 9                 (End of discussion at sidebar.)

10            THE COURT:  All right.  Objection overruled.  247 is

11   admitted.

12            MR. BRASHER:  Thank you, Your Honor.  I have no

13   further questions.

14            THE COURT:  All right.  Thank you.

15            Ms. Stillinger, I said I would let you examine about

16   Exhibit 247, the last document I admitted, and then we're

17   going to release the jurors.

18            MS. STILLINGER:  Thank you, Your Honor.  May I have

19   just a moment, Your Honor?

20                      RECROSS EXAMINATION

21   QUESTIONS BY MS. STILLINGER:

22   Q    Ms. Stevens, the Exhibit 247 that was shown to you right

23   now, I have a couple of questions about it first.

24   A    Okay.

25   Q    Is this something that was sent to you?
```

```
 1   A     No, ma'am.

 2   Q     Okay.  Is it something that you're copied on?

 3   A     No, ma'am.

 4   Q     Okay.  Does it appear to be an invoice?

 5   A     It does appear to be an invoice.

 6   Q     Okay.  Would you agree, looking at the document, that it

 7   appears that Dr. Elder is invoicing by patient, not by

 8   individual script?

 9   A     Yes.

10   Q     Okay.  And would you also know that his billing for

11   Allison Bradley is for a vitamin prescription and not for the

12   prescription that I just showed you a little while ago?

13   A     It doesn't say.  I wouldn't know that.

14   Q     Okay.

15   A     Oh, it does -- it does say "Completed Vitamin Encounters"

16   at the top; yes, ma'am.

17   Q     Okay.  Okay.  So would you agree then that this does not

18   show that Dr. Elder billed for the prescription that we were

19   talking about previously for the pain and scar cream?

20   A     Well, it says "Completed Encounters" and "Completed

21   Vitamin Encounters."  So I can't differentiate which one she

22   was.

23   Q     Okay.

24   A     I don't know it she was "Vitamin" or a "Completed

25   Encounter".
```

1          MS. STILLINGER:  If I may just have a moment,

2    Your Honor.  I want to see if there's a heading here.

3          (Pause)

4          MS. STILLINGER:  I'm sorry, Your Honor.

5    Q    (By Ms. Stillinger) Let me ask you, Ms. Stevens, while

6    I'm looking through this:  Do you see on the cover sheet to

7    that ---

8          MS. STILLINGER:  I guess could we have Government's

9    Exhibit 247?

10   Q    (By Ms. Stillinger) And do you see that it appears that

11   there are multiple documents attached?  Correct?

12   A    Yes.

13   Q    Okay.  Do you see that one of them is "Completed Vitamin

14   Encounters"?

15   A    One of them, yes.

16   Q    Okay.  And I'm not going to have you go through this long

17   document to try to figure out which is which, but do you agree

18   that if she is -- if Allison Bradley is on this list of

19   "Completed Vitamin Encounters," then do you agree that we

20   don't have any proof that Dr. Elder ever billed for his

21   initial encounter where he prescribed the pain and scar

22   creams?

23   A    I don't know that she does have a vitamin script.  I

24   don't what she was billed for here.

25   Q    Right.

1    A    Is that what you're asking?

2    Q    No, that's not what I'm asking.

3    A    What are you asking then?

4    Q    I was asking if she is on the list of people that got the

5    vitamin -- the list of vitamin encounters, and I'm not asking

6    you to spend, because I think it might take a good ten minutes

7    to do this, but if she's on that list -- we can look at it

8    later -- but if she's on that list of vitamin encounters,

9    would you agree that that was a different -- that she is --

10   that Dr. Elder is not billing, by this document, for the

11   consult that led to the pain and scar cream?

12   A    I can't say what he was billing for.  There's not a good

13   answer for that.  I can't say, "Yes, he was billing for

14   vitamins," or, "No, he wasn't."  I don't know what he was

15   billing for here.

16   Q    Okay.  You do know that they were billed -- or maybe you

17   don't know that they were billed differently; that vitamin

18   encounters were billed differently than the consultations that

19   resulted in pain and scar creams.

20   A    Right, but these are not differentiated on the paper that

21   way.

22   Q    Oh, I understand.  I'm not asking you to go through and

23   spend the time figuring that out.  I'm just asking:  If she is

24   billed on the list of vitamin encounters, do you agree that

25   the vitamin encounter list does not encompass billing for the

1    pain and scar cream?

2    A    I don't know.

3         MS. STILLINGER:  Okay.  I'll pass the witness,

4    Your Honor.

5         MR. BRASHER:  That's all, Your Honor.

6         THE COURT:  All right.  Thank you.

7         All right.  Ms. Stevens, you may be excused.  Thank

8    you very much.

9         All right, Ladies and Gentlemen.  I'm sorry to make

10   you get up and sit you back down.  We'll be in recess for an

11   hour and 15 minutes.

12        All rise, please.

13        COURT SECURITY OFFICER:  All rise for the jury.

14        (Jury escorted to the Jury Room by the Court Security

15   Officer for the lunch break.)

16        THE COURT:  Any objection to the witness being

17   excused?

18        MR. BRASHER:  No, Your Honor.

19        MR. WHALEN:  No, Your Honor.

20        MS. STILLINGER:  No, Your Honor.

21        THE COURT:  All right.  Thank you very much.  You're

22   excused.  I appreciate it.

23        All right.  We'll be in recess for an hour an 15

24   minutes.

25        MR. BRASHER:  Your Honor, there's one simple matter

```
 1    that I would like to bring up.

 2              THE COURT:  All right.

 3              MR. BRASHER:  We have a PSR.

 4              THE COURT:  Be seated, please.

 5              Yes.  You have a PSR you want to be able to divulge?

 6              MR. BRASHER:  To show, yes, for Joe Straw.

 7              THE COURT:  No objection from the Court.  You may do

 8    so.

 9              MR. BRASHER:  Thank you.

10              THE COURT:  Anything else?

11              All right.  An hour and 15.

12              (Court recessed from 12:19 PM until 1:30 PM.)

13              THE COURT:  Okay.

14              COURT SECURITY OFFICER:  All rise for the jury.

15              (Jury seated in the jury box.)

16              THE COURT:  All right.  Be seated, please.  Thank

17    you.

18              All right.  You may call your next witness.

19              MR. RAYBOULD:  Thank you, Your Honor.  The

20    United States calls Victoria Carter to the stand.

21              THE COURT:  Ms. Carter, come on up to the front of

22    the room, please.  You can stand right here in front of this

23    lady, please.

24              Raise your right hand and state your full name and

25    spell your first name and your last name.
```

```
 1                THE WITNESS:  Victoria Suzette Carter; first name is
 2     V-I-C-T-O-R-I-A, last name is C-A-R-T-E-R.
 3                     (The Witness, VICTORIA CARTER, Is Sworn.)
 4                THE COURT:  All right.  Thank you.  Be seated there.
 5     When you're comfortable, I want to hear you talk directly into
 6     the microphone to be sure that we can hear you.
 7                MR. RAYBOULD:  May I proceed, Your Honor?
 8                THE COURT:  Just a minute.
 9                Go ahead and state your name, please.
10                THE WITNESS:  Victoria Carter.
11                THE COURT:  Okay.  Bring the microphone base a little
12     bit closer to you.
13                THE WITNESS:  Okay.
14                          DIRECT EXAMINATION
15     QUESTIONS BY MR. RAYBOULD:
16     Q    Good afternoon, Ms. Carter.
17     A    Hi.
18     Q    Are you nervous?
19     A    Yes.
20     Q    Have you ever testified in federal court before?
21     A    No.
22     Q    So this is a new experience?
23     A    Yes.
24     Q    Okay.  Now, Ms. Carter, do you know someone by the name
25     of "Jeff Cockerell"?
```

```
 1   A    Yes.

 2   Q    Okay.  Did you work for Jeff Cockerell at some point?

 3   A    Yes.

 4   Q    And do you see Mr. Cockerell in the courtroom here today?

 5   A    Yes.

 6   Q    Okay.

 7        MR. RAYBOULD:  May the record reflect in-court

 8   identification, Your Honor?

 9        THE COURT:  Yes.

10   Q    (By Mr. Raybould) Now, Ms. Carter, let's talk a little

11   about your work history.  Okay?

12   A    Okay.

13   Q    In what capacity have you worked for Mr. Cockerell?

14   A    As receptionist or Shipping & Receiving.

15   Q    Have you worked for more than two companies for

16   Mr. Cockerell?

17   A    Yes.

18   Q    Okay.  Which companies are those?

19   A    Dominion Pharmacy Services and 360 Pharmacy.

20   Q    Now before getting there, you obtained your GED.  Is that

21   right?

22   A    Yes.

23   Q    And you obtained that in about 1998?

24   A    Yes.

25   Q    Now you said "Dominion Pharmacy."  Is that right?
```

1    A    Yes.

2    Q    Okay.  What -- When did you work for Mr. Cockerell at

3    Dominion Pharmacy?

4    A    I don't know the years.  I worked for him for about six

5    years, starting about twelve years ago.

6    Q    Okay.

7    A    Or -- Yeah.

8    Q    And then after Dominion Pharmacy, where did you go?

9    A    To AHI Supply.

10   Q    And AHI didn't have anything to do with prescriptions,

11   correct?

12   A    No.

13   Q    Okay.  Now at what point did you circle back with

14   Mr. Cockerell to work for him again?

15   A    He called and said that he had started up -- He didn't

16   tell me what it was at first, but he had started up a company

17   and if I'd like to come and work for him.

18   Q    And do you recall that company name?

19   A    The 360 Pharmacy.

20   Q    Okay.  And approximately when did he call you to approach

21   you about a new position with 360?

22   A    It was just about the 1st of December.  It would be 2014.

23   Q    Okay.  And did you start right then and there?

24   A    No.

25   Q    Okay.  Why not?

VOLUME 12                    179

1    A    Because where I worked, I was told that if I put in a

2    two-weeks' notice, that they would just walk me out of the

3    building.  And then it was Christmastime coming up and there

4    were two girls who had vacations to be with their family and I

5    didn't want to do that to them.

6    Q    Okay.  And so when did you start for 360?

7    A    Right around maybe the 2nd, 3rd, 4th of January, 2015.

8    Q    Now going back to -- you said Dominion Pharmacy, you

9    worked there for about six years; correct?

10   A    Yes.

11   Q    Okay.  What kind of pharmacy was that?

12   A    It was a warehouse; Dominion Pharmacy Services.

13   Q    Okay.  And what was your job duty there?

14   A    Answer the phones and do shipping and receiving.

15   Q    And where did you -- What kind of drugs, if you recall,

16   did you all ship?

17   A    There was contrast from Mallinckrodt and Amersham, which

18   is now GE, and the only other one I can actually remember is

19   Prevacid.

20   Q    Okay.  And is that for stomach issues?

21   A    Yes.

22   Q    Now Dominion did not ship any type of compound cream,

23   correct?

24   A    No.

25   Q    Okay.  Now fast forwarding to 360 Pharmacy, you said you

```
 1   started working there in January of 2015.

 2   A     Yes.

 3   Q     Where was 360 Pharmacy located?

 4   A     In Webster, Texas.

 5   Q     All right.  And who was the owner of 360 Pharmacy?

 6   A     Jeff Cockerell.

 7   Q     Okay.  Who else worked there at 360 Pharmacy, if anyone?

 8   A     Bernard Price was our pharmacist.

 9   Q     Okay.  Anyone else you're aware of?

10   A     There was a Shelby or -- yeah, Shelby Harrington but I

11   didn't see her.  If she did work, it was either evenings or

12   weekends.

13   Q     So you had a pharmacist who was Bernard, right?

14   A     (Affirmative gesture).

15   Q     I'm sorry.  It's "yes" or "no."

16   A     Yes.

17   Q     And that's for the court reporter.  And you said

18   "Shelby"?

19   A     Yes.

20   Q     And you didn't interact with Shelby?

21   A     No.

22   Q     Okay.  What was Shelby's role, if you're aware?

23   A     She was a pharmacy technician.

24   Q     Okay.  Now what was your job at 360 Pharmacy?

25   A     Answer phones and do shipping and receiving.
```

1   Q    Now you said shipping and receiving.  Explain to the jury

2   what you did in shipping and receiving, kind of the process,

3   your process.

4   A    You wrap the -- whatever the prescription was, and we had

5   mostly all bottles because there were creams in them, and we

6   wrapped them in bubble wrap and then we put in the information

7   that was supposed to go with it, and then we did a FedEx label

8   and shipped them out.

9   Q    You said creams.  What kind of creams, if you know, were

10  these creams?

11  A    There was a scar cream.  There was a pain cream.  I think

12  there were two pain creams.  There was a fungus cream and

13  there was a migraine cream.  Those are the ones I remember.  I

14  don't think there was anything else.

15  Q    Did you also do vitamins?

16  A    Yes, there were vitamins.

17  Q    Okay.  But at some point the vitamins stopped.

18  A    Yes.

19  Q    Okay.  Why is that?

20  A    I don't think they could get the product.

21  Q    Now you said -- The various compound creams, was someone

22  in 360 Pharmacy mixing those compound creams --

23  A    Yes.

24  Q    -- that you're aware of?

25  A    Yes.

1   Q    Who would that have been?

2   A    Bernard.

3   Q    Okay.  And Mr. Cockerell, did he mix the creams?

4   A    No.

5   Q    Are you aware of Mr. Cockerell's education level?

6   A    He's a doctor.

7   Q    Okay.  Do you know what kind?

8   A    Chiropractor.

9   Q    And I think we discussed this, but is it fair to say he's

10  a good chiropractor?

11  A    In my opinion, yes.

12  Q    You had an issue once and he fixed it.

13  A    Yes.

14  Q    Okay.  And you haven't been able to find a chiropractor

15  as good as him; fair to say?

16  A    Fair, yes.

17  Q    And with respect to your compensation, how were you

18  compensated at 360?

19  A    I was paid $14 an hour.

20  Q    Okay.  You said a moment ago about shipping that you

21  primarily shipped through FedEx?

22  A    Yes.

23  Q    Okay.  Do you recall where these packages were generally

24  going?  A location?

25  A    In the Killeen area.

1    Q    Okay.  And did you know who, if anyone, was getting these

2    types of compound creams?

3    A    The people calling in were something to do with the Army,

4    the soldiers.

5    Q    Okay.  And when you were shipping out these compound

6    creams, at some point did FedEx start coming to your office?

7    A    Yes.

8    Q    Okay.  Do you know why that is?

9    A    Because there became such a volume that you really

10   couldn't take them there and carry them all in.

11   Q    You said you started in January of 2015 with 360.  Was

12   360 up and running before you started?

13   A    I believe so.  I don't know that for an actual fact

14   because I wasn't in there before that.

15   Q    When you arrived in January of 2015, were there other --

16   was -- were there other -- was Bernard there?

17   A    Yes.

18   Q    Okay.  And were there computers set up?

19   A    Yes.

20   Q    Were there mixing kits already there?

21   A    I think the hood was there and I think that the mixers

22   were there.

23   Q    Okay.  Was there also a pill press there at some point?

24   A    Yes.

25   Q    Okay.  You said that the volume increased over time.  Is

1   that fair?

2   A    Yes.

3   Q    Can you tell the Jury what you witnessed with the volume

4   increasing?

5   A    Well, it was increasing quite fast which, if you're in a

6   pharmacy, I guess you're happy about.  But to me, not being in

7   that, it was like too fast.  And, yes, I do understand that

8   there were -- now we had refills on top of the next month's

9   refills.  And so, yeah, there would be more.  It just seemed

10  like an awful lot.

11  Q    Was Bernard working pretty hard to try to fill those

12  orders?

13  A    Yes.

14  Q    Can you explain that to the jury?

15  A    Well, sometimes he worked overnight; he worked weekends;

16  sometimes he was there 24 hours a day.

17  Q    Now going back to Mr. Cockerell for a moment, what --

18  what was Mr. Cockerell's role in the pharmacy?

19  A    Well, Bernard might ask him to do some things.  I do

20  remember he dispensed or not dispensed.  It's so hard to

21  explain.  There's canisters with the product in it, and then

22  you would put it in this other machine and you would take the

23  bottle and you would put it on the scale and then you would

24  fill it to how many ounces it was supposed to be.  And so I

25  seen Jeff do that --

```
 1   Q    Okay.

 2   A    -- but Bernard was there.

 3   Q    Okay.  Separate and apart from filling the bottles, as

 4   far as the administrative functions, are you aware of whether

 5   or not Mr. Cockerell helped with the admin?

 6   A    I -- I guess he did.  I mean I answered phones, and so

 7   whatever else needed to be done, I didn't do any of the other.

 8   So he must have had to take care of that.

 9   Q    And where -- where were you working when you were at 360?

10   A    You mean in the front office?

11   Q    Is that where you worked?

12   A    Sometimes I was in the front office.  Sometimes I was

13   back in the shipping.  I had -- He had a room built perfect

14   for, you know, packaging and getting things ready to ship.

15   Q    You said "he."  Are you referring to Mr. Cockerell?

16   A    Yes, Jeff did.

17   Q    Okay.  When you were at 360, was Mr. Cockerell there?

18   A    Yes.

19   Q    Did you ever see him doing ordering?

20   A    Ordering product, yes.

21   Q    Okay.  Can you tell the jury what you witnessed?

22   A    Well, just that he would look it up on the computer

23   and -- After Bernard would tell him what they needed, then he

24   would go in there, he'd look it up, and then he would call and

25   place an order.
```

1    Q    Okay.  How often was Mr. Cockerell there?  You said you

2    started in January of 2015, and you worked there for how long?

3    A    I worked there for a year.

4    Q    Okay.  Now let's go from January of 2015 to May of 2015.

5    How frequently was Mr. Cockerell there, if you can recall?

6    A    Not -- Not all the time.  Let's just say 80 percent.  He

7    was there, he did work, and then sometimes he wasn't.

8    Q    And you said one of your jobs was filling the boxes to be

9    sent out to FedEx.  Is that right?

10    A    Yes.

11    Q    Did Mr. Cockerell assist you at some point?

12    A    Yes, he did.

13    Q    Okay.  All right.  Now did you receive calls from

14    patients?

15    A    Yes.

16    Q    Can you just describe the general nature of these calls?

17    A    It could be anywhere from "Where is my product" to they

18    were unhappy with the product; wanted to be -- you know, their

19    prescription canceled to calling us a scam and they didn't

20    want to be a part of it anymore.

21    Q    Okay.  And to be fair, patients -- some patients actually

22    called and said that they liked the product.

23    A    Yes.

24    Q    Okay.  Now when you got these calls, did you ever report

25    any of these calls to Mr. Cockerell?

```
 1    A    A couple of them.

 2    Q    Okay.  And what would you tell -- Specifically what would

 3    you tell Mr. Cockerell about the calls?

 4    A    Just generally what the call was.  You know, "I just got

 5    a call; the guy said such and such," and then that would be

 6    about it.

 7    Q    Would anything change when you would report the call?

 8    A    Not necessarily.

 9    Q    Okay.  Now I want to refer you to Exhibit 214 which is in

10    front of you and take a moment to review that.  Is that an

11    e-mail that you sent regarding a patient named

12    "James Sweeney"?

13    A    Yes.

14    Q    And you are familiar with Mr. Sweeney, aren't you?

15    A    Yes.

16    Q    How are you familiar with Mr. Sweeney?

17    A    He called continuously.

18    Q    Okay.

19    A    He called for his prescriptions.  He called for his

20    girlfriend's prescription.  He called continuously.

21    Q    And did you discuss Mr. Sweeney with Mr. Cockerell at

22    some point?

23    A    The day he called.

24    Q    Okay.

25              MR. RAYBOULD:  We move for the admission of
```

1    Exhibit 214 into evidence.

2              THE COURT:  Any objection?

3              MR. BUCKLEY:  No objection, Your Honor.

4              THE COURT:  Admitted.

5              MR. RAYBOULD:  Now if we could highlight on

6    Exhibit 214.

7    Q    (By Mr. Raybould) If you would just start reading from,

8    "He also wants a phone call," Ms. Carter.

9    A    Yes.  "He also wants a phone call when that has been

10   completed."

11   Q    And please continue.

12   A    Okay.  "I will do that when I see that his name has been

13   changed.  He is also worried about his check coming with the

14   correct spelling of his name."

15   Q    Now let me stop you there.  Did you discuss the payment

16   of patients with Mr. Cockerell?

17   A    Nothing more than just telling him --

18   Q    Okay.

19   A    -- that, you know, someone had called about a payment.

20   Q    And what was his reaction when you told him in February

21   of 2015 that a patient, Mr. Sweeney, was calling about his

22   check?

23   A    He looked puzzled and he told me, "Go call Liz.  Go ask

24   Liz."

25   Q    Okay.  And so what did you do?

1   A    I called Liz and she didn't answer me.

2   Q    Okay.  Did you keep getting calls from patients talking

3   about their checks?

4   A    On and off, yes; yes.

5   Q    Okay.  And did you see the volume increase from February,

6   2015?

7   A    Yes.

8   Q    Okay.  Did you keep talking about these payments with

9   Mr. Cockerell?

10  A    No.

11  Q    Okay.  Why not?

12  A    Because once I knew what I was supposed to do with that

13  information, then I did it.

14  Q    And what did Mr. Cockerell direct you to do, if anything?

15  A    Well, get a hold of Liz.

16  Q    So every time a patient would call in, would you do

17  something?

18  A    I would get a hold of Liz or Amber.

19  Q    Did anything change?

20  A    No.  I figured that it was being taken care of.

21  Q    Okay.  Now did you reference -- Did you hear about what's

22  called a "Freedom From Pain Foundation study"?

23  A    Yes.

24  Q    Okay.  Tell the jury how you heard about that.

25  A    Okay.  I heard there was a study from a phone call, and

```
 1    that's when I had said to Jeff that there was a -- there was a

 2    study.  I didn't know about a study.  I wasn't happy I didn't

 3    know about a study, and he had said, "Get with Liz."  And then

 4    she didn't answer, and so I wrote that e-mail.  A few days

 5    later, not just immediately, a few days later Jeff came in

 6    with the name "Freedom From Pain" on a sticky note.  And I was

 7    sitting at my desk, and he put it on my desk and he said,

 8    "Victoria, there is a study.  This is the name of it," and

 9    left.  And so I just thought it was odd because why didn't he

10    -- if he knew about the study, Freedom From Pain, why didn't

11    he just come in and say, "Hey, Victoria, there is a study; I

12    didn't tell you," and then tell me the name of it.  So the way

13    it happened made me uneasy, and so I looked it up on the

14    computer immediately as soon as he walked out of the office.

15    Q    Let's break that down.  You said that you -- you were

16    kind of surprised, for lack of a better term, that you were

17    just finding out this information from a patient?

18    A    Yes.

19    Q    Okay.  And explain to the jury why that is?

20    A    Because I thought we were working under a contract with

21    the Government.

22    Q    Okay.  You said a -- I'm sorry.  I didn't mean to cut you

23    off.

24    A    Oh, that we were working under a contract with the

25    Government.
```

1    Q    Who would have told you that you were working under a

2    contract with the Federal Government?

3    A    Jeff did when I first hired in.

4    Q    Okay.  What did he say about that contract with the

5    Federal Government?

6    A    That these were creams that were going to help the

7    soldiers because if they're in pain, they can't necessarily

8    take medicine, and this wouldn't get into their bloodstream

9    the same way.

10   Q    And so your understanding was that 360 Pharmacy had a

11   contract with the Federal Government.

12   A    Yes.

13   Q    Now you said that Mr. Cockerell gave you a -- kind of a

14   yellow sticky note?

15   A    Yes.

16   Q    Okay.  And it had the words "Freedom From Pain

17   Foundation" on it?

18   A    Yes.

19   Q    And you did some digging on your own.  Is that right?

20   A    Just looked it up and the website was there.

21   Q    You said "website was there."  Do you know where that

22   website was directed to or who was involved in this study?

23   A    No, I couldn't get into it.  I think there was a code but

24   it also said "Under Construction."

25   Q    Okay.  Did you redirect any callers back to the study

VOLUME 12                192

1    when they would make a phone call to complain?

2    A    Yes.

3    Q    Okay.  Now did you work with folks at CMGRx?

4    A    Yes.

5    Q    Explain the nature of that work to the jury.

6    A    Okay.  Liz and Amber were the ones who did the billing

7    and all of the troubleshooting, the co-payments and all of

8    that, and so I had to stay in contact with them over any of

9    the prescriptions that were returned or, you know, any

10   problems that came up, the phone calls that came up; that they

11   would be the ones who would deal with it.  Then I had to deal

12   with them.

13   Q    What was your understanding of what CMGRx did with

14   respect to billing, if you know?

15   A    Okay.  I thought CMGRx was like an accounting firm and

16   that they did billing for pharmacies.

17   Q    Okay.  And your -- What is your understanding based on?

18   A    That they were going to do the billing for our pharmacy.

19   Q    What would that -- Who would have told you that?  Do you

20   know?

21   A    Yes.  Jeff said I didn't have to worry about doing the

22   billing; that that was taken care of.

23   Q    And did you ever hear the names "John" and "Rich"?

24   A    Yes.

25   Q    What was your understanding of what John and Rich did?

```
 1  A    They were helping Jeff like consultants or helping him

 2  get things started in a new business.

 3  Q    Did you ever meet John and Rich?

 4  A    No.

 5  Q    You just heard their names?

 6  A    Yes.

 7  Q    Okay.  John and Rich, as you recall, did they ever come

 8  to 360 that you're aware of?

 9  A    Not that I'm aware of.

10  Q    You're not saying it never happened; you're just

11  saying ---

12  A    Right; correct; correct.

13  Q    And you said "consultants."  Did Mr. Cockerell discuss

14  what John and Rich did?

15  A    No.

16  Q    If he had a problem, did he call John and Rich?

17  A    He did.

18  Q    Okay.  Did you?

19  A    No.

20  Q    Okay.  You would reach out to Liz or Amber?

21  A    Yes; yes.

22  Q    Now you talked a moment ago about seeing the volume

23  increase.  Is that right?

24  A    Yes.

25  Q    Did you bring this concern up to Mr. Cockerell?
```

VOLUME 12                194

1   A    I might have said it in passing but not like it was a

2   concern so much.

3   Q    Okay.

4   A    Because, again, you're -- you're grateful that the

5   pharmacy is doing a good business, and so you don't want to be

6   the "Debbie Downer" who comes and says we're sending out too

7   many, but I had that inside me that there was an awful lot

8   going out.

9   Q    Did you notice that it was being -- these prescriptions

10  were being written by one or two doctors?

11  A    Yes.

12  Q    Did that give you cause for alarm?

13  A    Yes.

14  Q    Why is that?

15  A    It was a large volume for one doctor and then just two,

16  but the other one didn't do very many.

17  Q    And do you know who this doctor -- his or her name?

18  A    His name was William Elder and her name -- I just -- I

19  think it was a woman.  I'm sorry.  It was Woo, Dr. Woo.

20  Q    Now with respect to Dr. William -- You said "Elder"?

21  A    Yes.

22  Q    Okay.  Did you refer to that doctor as "Dr. Williams"?

23  A    I did.

24  Q    Okay.  Did your memory get refreshed that it's

25  "William Elder"?

1   A    Yes.  I knew it was "William Elder" when I was there

2   working.

3   Q    Okay.

4   A    And then when I was questioned later, all I could think

5   of was "William," and so.

6   Q    Okay.  I just want to be clear so that ---

7   A    It is "William Elder," yes.

8   Q    Okay.  You don't know who William Elder is.

9   A    No.

10  Q    Never met William Elder?

11  A    No.

12  Q    You said "Dr. Woo"?

13  A    Yes.

14  Q    Have you ever met Dr. Woo?

15  A    No.

16  Q    What about the percentage-wise difference between

17  Dr. Elder and Dr. Woo?

18  A    Most everything was from Dr. Elder and there were just a

19  few -- there could be more than I know but only a very, very

20  few from Dr. Woo because I didn't check every prescription

21  label to see, you know, who it was.

22  Q    And these were for the compound creams.

23  A    Yes.

24  Q    Now you said that you all were an open door ---

25        THE COURT:  Counsel, I need you to clarify something.

1    Maybe you used the wrong terminology about Dr. William or

2    Dr. Elder.  Ask those questions again.

3            MR. RAYBOULD:  Yes.  I apologize, Your Honor.

4    Q   (By Mr. Raybould) The percentage between Dr. Woo and

5    Dr. Elder was what?

6            THE COURT:  You're not fixing what I'm asking you to

7    do.  There was confusion in the record about whether you're

8    talking about someone by the name of "Williams" or "Elder."

9            MR. RAYBOULD:  Oh, got you.

10   Q   (By Mr. Raybould) You said previously -- you referred

11   when you talked to agents as the doctor named "Dr. Williams."

12   A   Correct.

13   Q   And at the time did you know that "Dr. Williams" was

14   actually "Dr. Elder"?

15   A   I had only remembered the "Williams" until later, and

16   then I remembered it's "William Elder."

17   Q   Okay.  And so when you refer to "Dr. Williams," you're

18   referring to Dr. Elder as well?

19   A   Yes.

20           MR. RAYBOULD:  Is that okay, Your Honor?

21           THE COURT:  Yes.

22           MR. RAYBOULD:  Okay.

23   Q   (By Mr. Raybould) And you said Dr. Woo was another

24   doctor.

25   A   Yes.

1   Q    Okay.  Now I want you to look at what in front of you is

2   Exhibit 310.  Take a moment to review that.  Do you recognize

3   Exhibit 310?

4   A    I remember this, yes.

5   Q    And you're on that e-mail?

6   A    Yes.

7   Q    And that's an e-mail from Amber at CMGRx?

8   A    Yes.

9   Q    And this is in reference to filling prescriptions --

10  A    Yes.

11  Q    -- which is part of your daily tasks.

12  A    Yes.

13       MR. RAYBOULD:  We move for the admission of 310 into

14  evidence?

15       THE COURT:  Any objection?

16       MR. BUCKLEY:  No objection, Your Honor.

17       THE COURT:  Admitted.

18       MR. RAYBOULD:  Now if we can just go down to the

19  bottom of the first page and stop there.

20  Q    (By Mr. Raybould) When you receive Exhibit 310 or when

21  you receive this e-mail, what do you do then as a result of

22  receiving this?  Take us through your process.

23  A    I check my shipping records and see if these have -- any

24  of these have been shipped because they could have been

25  shipped like the day before.  You know, they may have written

1    this on one day and actually sent, you know, sent it to me

2    another day, because I think this was a spreadsheet, and they

3    have just filled it up and so I would check the shipping

4    records to see which ones had been shipped, which ones hadn't

5    yet, and also any -- if they were returns.

6    Q    When you would get -- Would you get -- How would you get

7    information or the prescriptions to ship?  How would you --

8    Where would that come from?  Would it come from Dallas?

9    A    For the labels that they came in?  I believe they did.

10   Q    Okay.  And then once you got those labels, what would do

11   you?

12   A    Well then, they would be matched up, I guess, with the

13   prescriptions that came in, and I did put them in alphabetical

14   order for Bernard, and then it was up to him to go through and

15   double check that everything was there and fill them.

16   Q    Now if you look at Exhibit 221 in front of you as well as

17   Exhibit 323, do you recognize Exhibit 221?

18   A    I don't believe I have that one --

19   Q    Oh.

20   A    -- unless it got put behind one of these.  It could be

21   behind this.

22   Q    Yes.

23   A    Oh, it's behind there?

24   Q    There it is.  Do you recognize Exhibit 221?

25   A    Yes.

1    Q    Is that an e-mail from Liz Arlotta to you?

2    A    Yes.

3    Q    Okay.

4         MR. RAYBOULD:  We move for the admission of

5    Exhibit 221 into evidence?

6         THE COURT:  Any objection.

7         MR. BUCKLEY:  Your Honor, no objection to 221.  Based

8    on her prior testimony, I do have an objection to 223 and I

9    request a voir dire on this.

10        THE COURT:  Did you offer 223 yet?

11        MR. RAYBOULD:  Not yet, Your Honor, but ---

12        MR. BUCKLEY:  Pardon me.  I was premature.

13        THE COURT:  What is the objection to 221, please?

14        MR. BUCKLEY:  No objection to 221, Your Honor.  The

15   objection to 223 at this point is relevance and lack of ---

16        THE COURT:  I'm just asking about 221.

17        MR. BUCKLEY:  Yes, Judge.  No objection.

18        THE COURT:  Admitted.

19        MR. RAYBOULD:  Okay.  Exhibit 221 there, if we would

20   highlight that "Jeff wanted to know what Rich -- what did Rich

21   say about the courier."

22   Q    (By Mr. Raybould) Do you see that?

23   A    Yes.

24   Q    Explain to the jury your understanding of what Jeff had

25   communicated.

```
 1   A    We had an out-of-state prescription that can't go unless

 2   it's done in a special way, and so we needed to know how --

 3   what the special way would be.

 4   Q    And "Rich," do you know which "Rich" you're referring to?

 5   A    I'm assuming John and Rich; that Rich.

 6   Q    Well, you can't assume.

 7   A    That's what I think.

 8   Q    Do you know which Rich or not?

 9   A    Yes.  It's the Rich that would have had the answers.

10   Q    Okay.  Is that the Rich with the Dallas ---

11   A    Yes.

12   Q    Okay.  CMGRx?

13   A    Yes.

14   Q    Okay.  Now if you would look at Exhibit 3 or -- excuse

15   me -- 223 and 323, let's start with 223.

16   A    Okay.

17   Q    Do you recognize Exhibit 223?

18   A    Yes.

19   Q    It references a "Lisa Williams"?

20   A    Yes.

21   Q    Are you familiar with that patient?

22   A    Yes.

23   Q    Okay.  How are you familiar with that patient?

24   A    Because she called and was all upset and didn't want the

25   product anymore and she wanted her prescription canceled.
```

1    Q    Do you know why she didn't want the product?

2    A    Well, she said that ---

3    Q    Without reading from the document, yes.

4    A    Oh.  She said that it was ---

5         MR. SANDEL:  Your Honor, I object to any hearsay

6    responses from her.

7         THE COURT:  Response?

8         MR. RAYBOULD:  Well, proof of effect on her and what

9    she did.

10        THE COURT:  Objection sustained.  You can discuss

11   that what she did, but that doesn't mean she can repeat what

12   was said.

13        MR. RAYBOULD:  Okay.

14   Q    (By Mr. Raybould) Just the general nature, did you get

15   calls from folks that -- What kind of complaints did you get?

16   A    I got complaints that either they didn't get their

17   product or complaints that they didn't get a check.

18   Q    Okay.  And what would you do when you got these

19   complaints?

20   A    Well, if they didn't get the product, then I looked

21   through the shipping records to see if I had sent it.  And

22   then if it was something to do with a check, I would just very

23   politely told them that we didn't have anything to do with the

24   study and they'd have to contact whoever was the people that

25   were taking care of the study.

1    Q    How did you know to say, "We have nothing to do with the

2    study"?

3    A    Well, Jeff said we have nothing to do with the study.

4    Q    Okay.  Now I want to take you to May of 2015.  Okay?

5    A    Okay.

6    Q    Do you recall that period as a time when business slowed

7    down?

8    A    Yes.

9    Q    Okay.  Explain that to the jury.

10   A    I believe that the insurance company was no longer

11   covering some of the product and so everything just came to a

12   standstill.

13   Q    Did you continue to work at 360?

14   A    Yes.

15   Q    All right.  And how many months, if any, ---

16   A    I stayed -- I'm sorry.  I stayed till the end of the

17   year.

18   Q    Okay.  So that would have been December of 2015?

19   A    Yes; yes.

20   Q    Okay.  And if you could give the jury a sense for the

21   type of business that came in between May of 2015 and December

22   of 2015.

23   A    We had just a couple of prescriptions that were for

24   cosmetic surgeons, and it was just a couple, and that's all we

25   had.

1    Q    What did you do during the day?

2    A    Nothing.  After I packed and cleaned and -- Nothing.

3    Q    Okay.  And did Mr. Cockerell communicate to you at some

4    point why prescriptions had slowed down?

5         MR. ANSLEY:  Objection, Your Honor; leading.

6         THE COURT:  Overruled.

7    Q    (By Mr. Raybould) You can answer.

8    A    Oh, I can answer?  Okay.  Just that the insurance company

9    was no longer covering the products.

10   Q    Okay.

11        MR. RAYBOULD:  Court's indulgence, Your Honor.

12        (Pause)

13        MR. RAYBOULD:  We pass the witness, Your Honor.

14        THE COURT:  Cross Examination?

15        MR. BUCKLEY:  We have agreed to do it out of order,

16   if that's acceptable with the Court.

17        THE COURT:  Whatever order you all -- Whoever comes

18   up is first.

19        MR. BUCKLEY:  Thank you, Your Honor.

20                    CROSS EXAMINATION

21   QUESTIONS BY MR. BUCKLEY:

22   Q    Good afternoon, Ms. Carter.

23   A    Hello.

24   Q    You mentioned some concern you had early on when working

25   with Mr. Cockerell when you learned about this -- the presence

1    of a study, I think, and you had expressed a concern that you

2    understood that this was a government contract and now you

3    were learning that this was a study instead; right?

4    A    Correct.

5    Q    Understanding now more than you knew at that point, it's

6    realistic now to look back and say, "Okay, well there is a

7    study that exists that may have been part of a larger

8    government contract that was going on;" right?

9    A    Correct.

10   Q    Okay.

11   A    Yes.

12   Q    And by "government contract," you understood that to be

13   in a pretty broad sense some kind of contractual arrangement

14   where the pharmacy was going to be doing something for the

15   Government or government employees.

16   A    Yes.

17   Q    All right.  In other words, not that he had been -- the

18   pharmacy had been hired to build a Lockheed airplane or

19   something with the Government.

20   A    No.

21   Q    In more of a broad sense than that, right?

22   A    Yes.

23   Q    Okay.  So that initial hesitation that you had when

24   learning about this study, now that you have gained some

25   additional perspective, makes a little more sense to you;

1    right?

2    A    Yes.

3    Q    Okay.  Now going back to your discussion about receiving

4    this first call from a patient, I believe it was Mister --

5    Pardon me.

6          MR. BUCKLEY:  May I have a moment, Your Honor?

7          THE COURT:  Yes.

8          (Pause)

9          MR. BUCKLEY:  May I have, Mr. Slyter, Exhibit --

10    Government's 214, please?  Thank you.

11    Q    (By Mr. Buckley) Ms. Carter, you spoke just a few minutes

12    ago about this Exhibit 214, and this was the e-mail from a

13    "Mr. Sweeney" who is at that point the first person who is

14    raising any kind of complaint with you about not receiving his

15    check; right?

16    A    Correct.

17    Q    And so this is in early February of 2015.  That was the

18    first that you had received any kind of indication that

19    patients were expecting to be compensated; right?

20    A    Correct.

21    Q    And -- So naturally that was something that did not fit

22    with your understanding of what was going on, so you brought

23    it to Jeff Cockerell's attention; right?

24    A    Correct.

25    Q    And I think you described his -- his reaction as he just

1    didn't know what you were talking about.  Is that fair?

2    A    That's how I felt because if he had known, I think he

3    would have told me right then.

4    Q    And you've known him for a while --

5    A    Yes.

6    Q    -- as you mentioned.  So if -- you feel that if he had

7    known something that he was not telling you, that you would

8    have observed a different type of reaction.

9    A    Correct.

10   Q    But it -- And at that time when you raised this issue

11   with Mr. Cockerell, he said, you know, "A study?  Call Liz,"

12   right?

13   A    Yes.

14   Q    And by "Liz," you understood that to mean Liz Arlotta --

15   A    Yes.

16   Q    -- at the time.  And so did you then reach out to Liz and

17   follow up about this?

18   A    Yes.

19   Q    And following that contact with Liz or during that

20   contact with Liz, she then responded to you in a way that

21   confirmed that there was, in fact, a study going on.

22   A    Yes.

23   Q    And then at some point, within days of that,

24   Mr. Cockerell provided you with a phone number to Freedom From

25   Pain Foundation.  Is that right?

```
 1    A     Just the name of it.  I didn't have a phone number.

 2    Q     Okay.  Was there a point -- a later point in time when

 3    Mr. Cockerell did provide you with a phone number for Freedom

 4    From Pain?  Well, ---

 5    A     I honestly don't remember.

 6    Q     That's okay.  Let me -- You kept a binder, a spiral

 7    notebook by your desk, didn't you?

 8    A     Yes.

 9    Q     Would it refresh your recollection to look through that?

10    A     Yes.

11          MR. BUCKLEY:  May I have a moment, Your Honor?

12          THE COURT:  Yes.

13    Q     (By Mr. Buckley) And just for reference, is this the ---

14    A     That looks like it, yes.

15    Q     It's photocopied.  If you would look here at this page,

16    ma'am.

17    A     You'd be able to tell by my penmanship who wrote it.

18    Q     And don't read what's in there but just use it to refresh

19    your recollection.  You might look down near the bottom.

20    A     Yeah.  And what I'm trying to see is context.

21    Q     Yes, ma'am.

22    A     It's my handwriting.  It's a phone number, yes.

23    Q     Okay.  And does that -- Now that you've refreshed your

24    recollection, is that a phone number that was for an

25    organization called "Freedom From Pain" as you understood it?
```

1    A    Yes.

2    Q    And there was also another individual named there,

3    "Brian Gray"?

4    A    Yes.

5    Q    Do you recall Mr. Gray as being someone who was somehow

6    associated at that time with Freedom From Pain?

7    A    Yes.

8    Q    And so I think what I understood from your earlier

9    testimony is that once you had reported that one call that you

10   received from Mr. Sweeney to Jeff Cockerell in early February

11   of 2015, your understanding of your instructions from him

12   were, "Call Liz on this subject matter;" right?

13   A    Yes.

14   Q    And so from that point forward, any further

15   communications you received from patients or study

16   participants addressing any complaints that they had, you just

17   followed that same protocol; right?

18   A    Yes.

19   Q    And so you did not go back to Mr. Cockerell and continue

20   to report the types of communications that you've described.

21   A    No, I wouldn't have.  I'm sure I must have at one point

22   said something because I'm kind of a "Chatty Kathy," so I'm

23   sure I might have said something, but I have no recollection

24   -- I don't have a memory of actually ever saying it to him

25   again.

1    Q    And in any event, at no time did Mr. Cockerell ever

2    display any kind of reaction that would suggest to you he was

3    trying to hide this you from; right?

4    A    No.

5    Q    In fact, he was, instead of saying, you know, "Don't mess

6    with this; this is my issue," he -- he asked you to go deal

7    with Liz Arlotta; right?

8    A    Yes.

9    Q    I'd like to talk to you briefly about Government's

10   Exhibit 310 which you discussed just a few moments ago with

11   the prosecution.  Looking up at that top paragraph, and I

12   think that you explained that this is an e-mail from

13   Amber Washington to you regarding some medications that

14   they're making sure have been shipped; right?

15   A    Correct.

16   Q    And I want to draw your attention to the last sentence in

17   that first paragraph.  "It is causing a serious issue when it

18   comes to reversing and refunding on our end."  And

19   specifically, was it your understanding that if a medication

20   was not delivered to the patient, that it needed to be somehow

21   reversed or backed out of the system?

22   A    Not in the first month but from there on, yes.

23   Q    So in other words, this is not a situation where you can

24   just, once the prescription hits the FedEx, then you can bill

25   and nobody ever has to ask any more questions.  You actually

1    have to make sure that the patients are getting the

2    prescriptions.

3    A    Yes.

4    Q    And that if it turns out that somebody did not get the

5    prescription, that it needs to be reversed or somehow

6    corrected so that the insurance company is not billed for it.

7    A    Yes.

8         MR. BUCKLEY:  If I may look, Mr. Slyter, at

9    Government Exhibit 221.

10   Q    (By Mr. Buckley) Ms. Carter, you discussed this

11   previously with the prosecution.  And as I recall, this

12   related to a discussion about what was the proper method to

13   deliver prescriptions out of state.  Is that correct?

14   A    Yes.

15   Q    And the point of this conversation was that Mr. Cockerell

16   understood, as far as you knew, that there were certain

17   requirements that had to be present when you're shipping

18   prescriptions out of state; right?

19   A    Yes.

20   Q    And that he wanted to make sure that the pharmacy was in

21   compliance with those; right?

22   A    Yes.

23   Q    All right.  So this was not an e-mail in any way designed

24   to try to avoid compliance but rather to be in compliance.

25   A    Yes.

1    Q    And was that a typical type of discussion that you might

2    have with Mr. Cockerell about how to be in compliance and how

3    to do things the right way when it came to this pharmacy?

4    A    Yes.

5    Q    And you also had contact, I think you mentioned, with the

6    pharmacist, Bernard Price.

7    A    Yes.

8    Q    And was he the pharmacist in charge?

9    A    Yes.

10   Q    Were there any other pharmacists other than Bernard?

11   A    No.

12   Q    And -- So the pharmacy then and the controls on how the

13   pharmacy operated and the rules about who can come in and out,

14   were those all things that Mr. Price controlled as far as you

15   understood?

16   A    Yes.

17   Q    And how would you describe Bernard's level of exactness

18   or -- or attention?

19   A    He was -- He was meticulous.

20   Q    All right.  And was there ever a time when he would get

21   on to you about, say, where you were walking, for example?

22   A    Yes.

23   Q    Describe that, please, if you would.

24   A    I had to walk -- His pharmacy was on the one side, and I

25   had to walk back to the packing area, and he didn't even like

1    that.

2    Q   And what was your understanding of why he didn't like

3    that?

4    A   I think those are the rules.

5    Q   In other words, that -- if I understand what you're

6    saying is that within certain boundaries of a pharmacy, only

7    certain types of personnel can be admitted.  And since you

8    were not licensed or certified, that that was the issue?

9    A   Yes.

10    Q   Okay.  Would you say that he was a stickler for the

11    rules?

12    A   Yes.

13    Q   All right.  So between Mr. Cockerell and his pharmacist

14    in charge at 360, Bernard Price, you never got the impression

15    that there was some effort under way to try to figure out how

16    to violate the rules; right?

17    A   No.

18    Q   In fact, having worked with Mr. Cockerell in the past and

19    then agreeing to come and work with him again in 360, you

20    would not have come back to work with him if you believed that

21    he was somebody who would do that kind of thing.

22    A   No, I would not have.

23    Q   And that continued to be your belief throughout the time

24    that you spent at 360; right?

25    A   Yes.

1    Q    You also mentioned -- We talked a little bit about the

2    study.  Aside from your surprise in learning that there --

3    there is a study that is part of whatever this arrangement is,

4    the fact that there's a study in and of itself was not a

5    concern to you; right?

6    A    Correct.

7    Q    And you had learned about studies, I guess, just

8    generally by watching TV; right?

9    A    Yes.

10    Q    What kinds of things did you see on TV about studies?

11    A    Well, if you have severe heartburn, that's one of my

12    favorite ones, then you could be involved in a study and you

13    would be reimbursed for -- it said time, travel, expenses.

14    Q    And so you were generally familiar with the idea during

15    this time period that people who participate in medical

16    studies can be in some manner compensated; right?

17    A    Correct.

18    Q    So by the time you're receiving a call about a study

19    participant who is wanting their check, that is not something

20    that concerns you alone; right?

21    A    Not all by itself.

22    Q    Right.

23    A    It -- It did concern me because I felt like those that

24    were doing the study were not doing their job properly, and

25    then that reflects on us because our phone number is what's on

1    the bottle.

2    Q    Yeah.  And I want to talk to you a little bit closer

3    about that issue.  You developed a concern because you had

4    received some communications or calls from some study

5    participants that alleged that there was a scam of some kind;

6    right?

7    A    Yes.

8    Q    Particularly that, "Hey, this study is a scam," that

9    would be what they were communicating to you; right?

10   A    Yes.

11   Q    And then you, based on the communications that you

12   received from them and based on the work that you were doing

13   and everything else you knew, you formed your own opinion

14   about what the scam -- what the problem could be that they

15   were complaining about; right?

16   A    Yes.

17   Q    And in your view, the problem was that it appeared to you

18   that these people were being led or invited into participating

19   in a study with a promise of compensation; they were doing so,

20   and then they were maybe being stiffed by the people who were

21   conducting the study.

22   A    Either that or they were just slow getting the checks

23   out.  That's -- At first, I just figured they're slow and they

24   just need to stay on top of it and get the checks out.

25   Q    So as you understood the problem with the study that

1  these people were complaining about was not that they were

2  being paid, it's that they weren't being paid or they weren't

3  being paid on time; right?

4  A    Yes.

5  Q    All right.  Also understanding that as you came into the

6  understanding that a study existed, I don't know -- Do you

7  know anything about medical studies?

8  A    No.

9  Q    It's reasonable to assume that a medical study is aimed

10  at studying something of a medical nature; right?

11  A    Yes.

12        MR. RAYBOULD:  Objection; outside of her personal

13  knowledge.

14        THE COURT:  Overruled.  You may answer.

15  A    Yes.

16  Q    (By Mr. Buckley) Just -- I'm just going to what your

17  thought process was at the time and also looking back.  I

18  don't want to ask you about any specialized medical knowledge

19  because I understand you're not a doctor.  Understanding that

20  a study exists, is it reasonable for you to assume then and

21  now that doctors might be running a study or helping to run a

22  study; right?

23  A    Correct.

24  Q    And so now looking back on what you've expressed was one

25  concern, which was that a lot of prescriptions were coming

1    from one or two doctors, and also putting that together with

2    the idea that there appears to be a study going on, looking

3    back on that, that is not unusual that if there is a study

4    with this type of volume, that there could be one or two

5    doctors who are administering the study.

6    A    Correct.

7    Q    Right.  So what I think I gather from each of these

8    discussions with you is that at the time these individual

9    matters were coming to your attention, they caused you some

10   hesitation or concern at the time; right?

11   A    Yes.

12   Q    But now as you have learned more of the pieces and you

13   have looked at the broader picture of what you now understand

14   was happening, these are not necessarily things that don't go

15   together; right?

16   A    Correct.

17   Q    All right.  What was your understanding of Liz Arlotta's

18   role in all of this?

19   A    I thought she did the billing --

20   Q    Okay.

21   A    -- and adjudication.

22   Q    And so her -- And specifically, Liz Arlotta and

23   Amber Washington worked together as you understood; right?

24   A    Yes.

25   Q    And so they did, I think as you said earlier, billing,

1    troubleshooting and handling copays; right?

2    A    Yes.

3    Q    Did you have an understanding of whether handling copays

4    is a pharmacy's responsibility?  Did you know that one way or

5    another?

6    A    No.

7    Q    Regardless of whose responsibility it was, it was your

8    understanding then that they were handling copays; right?

9    A    Yes.

10   Q    And so there wasn't anyone in the offices of 360, whether

11   it was you or Shelby or Bernard Price, whose job it was to

12   process copays.

13   A    Correct.

14   Q    But there was also a belief that the copays were being

15   handled by somebody; right?

16   A    Yes.

17   Q    And when handling the type of volume that started to

18   arise as this took off, there were some glitches in the -- in

19   the system, weren't there?

20   A    Yes.

21   Q    And was it your view that there was just a little bit of

22   trouble up in CMGRx with keeping up with the business end of

23   this?

24   A    Yes.

25   Q    You never perceived that there was anything unlawful

1    going on at the time, did you?

2    A    No.

3    Q    Of course.  And you would not have remained working for

4    Jeff Cockerell and his pharmacy if you had, --

5    A    Correct.

6    Q    -- right?  But in the course of doing this volume of

7    prescriptions, handling this volume of copays and this volume

8    of billing, did that appear to you to be a substantial amount

9    of work that was being done by the people in Dallas on behalf

10   of 360?

11   A    Yes.

12   Q    And particularly with the troubleshooting at some point;

13   right?

14   A    Yes.

15   Q    How often would you rely on Liz or Amber to troubleshoot

16   something?

17   A    It became almost every day.

18   Q    And it would be something that was in some way technical,

19   beyond your knowledge or expertise; right?  Typically?

20   A    Or if I had to give them some of my knowledge to get it

21   settled, then I did that.

22   Q    Okay.  But you -- you had a direct line to them and they

23   had a direct line to you.

24   A    Yes.

25   Q    Is that fair to say?

1    A    Yes.

2    Q    And you came to the conclusion with regard to the study

3    and with regard to why 360 Pharmacy was getting these

4    prescriptions that the study or the people running the study

5    must have recommended some pharmacies and that 360 was one of

6    the pharmacies that was recommended.  Is that a fair ---

7    A    That's what I thought, yes.

8    Q    All right.  So by this point, as all those pieces are

9    coming together, again, even though these questions have

10   arisen to you during this time period, you had full confidence

11   that this was a legitimate business doing lawful work; right?

12   A    I began to question a little bit more and a little bit

13   more.

14   Q    I understand.  Now during that time -- And this is

15   important.  I understand that you had some internal concerns,

16   but as you've mentioned earlier, the one time you expressed a

17   concern or a question to Jeff Cockerell about the patients

18   calling was early February of 2015; right?

19   A    Correct.

20   Q    And that you did not continue to relay those reports or

21   concerns to him after that point; right?

22   A    Not a specific account that I did because when you work

23   for Jeff, you do your job.  You don't have to run back to him

24   after you know what you're supposed to be doing.

25   Q    And nothing -- Even though you may have had your own

1    questions about things, nothing set off an alarm well in your

2    mind to the degree that you needed to immediately go report

3    something to Jeff and confront him about what was going on.

4    That's a fair statement, right?

5    A    Yes, at the time.

6    Q    Okay.  Now -- And, of course, this is -- we're at

7    three-and-a-half years or maybe five years -- I'm bad at

8    math -- but this has been a while ago; right?

9    A    Yes.

10   Q    And you remember most of the generalities of this but

11   some of the details have maybe faded away?

12   A    I'm old now, yes.

13   Q    Some of the calls -- And I'm not asking you to repeat

14   what somebody said specifically but I'm asking you more

15   broadly about subject matters.

16          Some of the calls that you received were not all bad

17   but some of the subjects were that people generally expressed

18   that they liked the product or they wanted to receive the

19   product.

20   A    Yes.

21   Q    And, in fact, if I could draw your attention specifically

22   to an incident where a mother wanted to receive a refill of a

23   product for her little boy who had been burned, --

24   A    Yes.

25   Q    -- that -- that happened you recall.

1    A    Yes.

2    Q    And at that time the problem was that the insurance

3    company had stopped paying for the product at that point.

4    A    Yes.

5    Q    And is it your recollection that at that point

6    Jeff Cockerell indicated to ship the product, anyway, even

7    though the insurance wasn't going to cover it?  If you recall.

8    A    I don't recall that.

9    Q    Okay.  That's -- That's the type of thing that he may

10   have done --

11   A    Yes.

12   Q    -- based on how you -- the Jeff Cockerell that you know.

13   A    Yes.

14   Q    All right.

15        MR. BUCKLEY:  May I have a moment, Your Honor?

16        THE COURT:  Yes.

17        (Pause)

18   Q    (By Mr. Buckley) Understanding that this pharmacy was

19   getting up to speed in early 2015, and I think I understood

20   your testimony that you came to work there somewhere between

21   the second and fourth month of -- pardon me -- second and

22   fourth week of January, 2015; is that accurate?

23   A    On the first week --

24   Q    Or the first ---

25   A    -- of January, yeah.

1    Q    Somewhere in January, right?

2    A    Yes.

3    Q    And you came to understand at some point and observe that

4    Jeff Cockerell was struggling with the fact that his elderly

5    mother was very sick.

6    A    Yes.

7    Q    And ultimately then, right at the end of February, you

8    understood that his mother passed away.

9    A    Yes.

10   Q    And how was it that you knew that this was going on?

11   A    I knew she was sick.  I did not know that she was that

12   sick.  Jeff is not a chatty person, doesn't talk about

13   personal things.  He did leave the office a couple of times, I

14   know, to see her and I knew that she wasn't well, and so he

15   went and he seen her a few times.

16   Q    Knowing Jeff Cockerell as long as you have and

17   understanding that he was contending with helping his sick

18   mother, did you observe that that caused a distraction or a

19   preoccupation with him during this time period?

20   A    I can't say if it did business-wise but I could see it in

21   him personally, but I can't say for his business.

22   Q    And what else do you recall about that?  And you

23   understood that, of course, that his mother passed away right

24   at the end of February.  And how did you learn that?

25   A    I came to work and he wasn't there, and Bernard told me

1   that his mother had died.

2   Q    And then he at some point during this time period paid

3   you a $2500 bonus because basically you're holding down the

4   fort while he's at the hospital.

5   A    When he got back -- He was gone a few days, not very long

6   but he was gone a few days and when he got back, he wrote me a

7   check to say "thank you" for holding -- he didn't have to

8   worry about, you know, whether I was there or it was opened in

9   the morning and I stayed until -- I would have done that,

10  anyways, and so I was really shocked.

11  Q    And this would have occurring during a time period

12  when -- when business and volume were spiking up.  Was that

13  your recollection or did it not happen yet?

14  A    It was right about the middle.  Yeah, it was going.

15  Q    So it was blowing and going at that time.

16  A    Yes.

17  Q    Okay.

18       MR. BUCKLEY:  And may I have a moment, Your Honor?

19       THE COURT:  Yes.

20       (Pause)

21       MR. BUCKLEY:  I can't read my own writing.  I should

22  have been a doctor.  Pardon me.  Thank you, ma'am.

23       I'll pass the witness.

24       MR. SANDEL:  No questions, Your Honor.

25       MS. WATTLEY:  No questions, Your Honor.

```
 1              MR. ANSLEY:  No questions, Judge.

 2              MS. NICOLE KNOX:  No questions.

 3              THE COURT:  All right.  No questions?

 4              MS. STILLINGER:  No questions.

 5              THE COURT:  Redirect limited to Cross.

 6                        REDIRECT EXAMINATION

 7    QUESTIONS BY MR. RAYBOULD:

 8    Q    Ms. Carter, you were asked about Bernard Price.  Do you

 9    recall that?

10    A    Yes.

11    Q    Did Bernard Price answer calls from patients?

12    A    No.

13    Q    Okay.  Did you receive any training from Mr. Cockerell on

14    the Anti-Kickback Statute?

15    A    Repeat the last part.

16    Q    Did Mr. Cockerell give you any training on the

17    Anti-Kickback Statute?

18    A    No.

19              MR. RAYBOULD:  No further questions.

20              THE COURT:  All right.

21              MR. BUCKLEY:  Nothing further.

22              THE COURT:  All right.  Thank you.

23              Ma'am, you may step down.

24              THE WITNESS:  Okay.

25              THE COURT:  Any objection to the witness being
```

1    excused?

2            All right.  Thank you, ma'am.  Thanks so much.

3            Call your next witness, please.

4            MS. HUNTER:  The United States calls Joe Straw.

5            THE COURT:  Mr. Straw, come on up to the front,

6    please.  Stand right here in front of this lady, the court

7    reporter.

8            Raise your right hand, please.  State your full name

9    and spell your last name.

10           THE WITNESS:  Joe Larry Straw, Jr.; S-T-R-A-W.

11               (The Witness, JOE L. STRAW, JR., Is Sworn.)

12           THE COURT:  All right.  Be seated there.  When you're

13   comfortable, speak into the microphone so we can make sure we

14   can hear you.  You can bend the base closer to you.

15           THE WITNESS:  I'm good.

16           THE COURT:  Okay.

17           MS. HUNTER:  May I proceed, Your Honor?

18           THE COURT:  Yes.

19           MS. HUNTER:  Thank you.

20                      DIRECT EXAMINATION

21   QUESTIONS BY MS. HUNTER:

22   Q    Good afternoon, Mr. Straw.

23   A    Good afternoon.

24   Q    Could you please tell the jury why you're here today?

25   A    I am here to testify in regards to the pain and scar

1    cream charge that was led against me.

2    Q    Were you involved in a conspiracy related to pain and

3    scar cream?

4    A    Yes, I was.

5    Q    And what was your role in that conspiracy?

6    A    Yes.  My role was I assisted in bringing on marketers

7    that would go out and tell other people about the system, the

8    program, and recruit patients to go out and use their

9    insurance to -- to get the pain and scar cream, and then other

10   marketers would come on board and then they would go show

11   people how to do the same thing.

12   Q    And are you familiar with the company called "CMGRx"?

13   A    Yes, I am.

14   Q    Okay.  Let's start by telling the jury, if you could,

15   just a little bit about your background and what led up to

16   your involvement with CMGRx.

17   A    Yes.  So I've got a military background.  I was in the

18   military for ten years; field artillery; went overseas; Desert

19   storm, went to Korea; went in, enlisted; went to OCS, got

20   commissioned as a Field Artillery Officer.  So I got to see a

21   lot of people get out of the military; myself being one.  I

22   got out a disabled veteran.  So, you know, I had to take

23   medications.  And so that was really important for me because,

24   you know, I was a vet, a disabled vet, and it just -- When I

25   met with Richard Cesario, when he told me about the program,

```
1   it -- it caught my attention.
2   Q    Okay.  So your first meeting with regard to CMGRx is with
3   Richard Cesario.  Is that right?
4   A    Yes.
5   Q    And what happened at that meeting?
6   A    We met at a Starbucks.  It was a Saturday, and a good
7   friend of ours that had just passed away, Toddereck McIntosh,
8   and we were trying to figure out what we were going to do as
9   far as the plans for his funeral.  So I hadn't seen him in a
10  long time since high school, and so we started talking, you
11  know, "What do you do?"  "What do you do?"  And then he told
12  me about the pain and scar study that they were about to --
13  well, they had started or was in the process of doing, and it
14  just -- that's where it started.
15  Q    And when did that meeting take place?
16  A    About the August timeframe.
17  Q    And did you know Mr. Cesario briefly?
18  A    I did.  We went -- We went to the same high school,
19  Berkner High School.
20  Q    And what did Mr. Cesario tell you about the study?
21  A    He told me that he was primarily starting it because
22  his -- his wife had been on pain pills and she had passed away
23  and that they were in the process of getting it together and
24  going to be taking a trip to Costa Rica so they could kind of
25  put all the pieces in place to get the study started.
```

1    Q    Did he tell you who would be joining him in Costa Rica?

2    A    He did.

3    Q    Who would that be?

4    A    John Cooper and he also said that Dr. Simmons, the Chief

5    Medical Officer, was going to be going there as well.

6    Q    And what did you understand John Cooper's role to be?

7    A    The President, and he was kind of in charge of the money,

8    the finances for the most part.

9    Q    And you stated that Walter Simmons was the Chief Medical

10   Officer?

11   A    Yes.

12   Q    What did that mean to you?

13   A    In my opinion, that meant that he was going to oversee

14   and really direct everything that was involved in it from

15   start to finish.

16   Q    And did you understand what the purpose of the study was?

17   A    Yes.

18   Q    What was the purpose?

19   A    Explained by Richard at the time, it was to help people

20   get off of pain medication and use the pain and scar cream as

21   an alternative.

22   Q    Was there any discussion about patients getting

23   compensated at your initial meeting with Mr. Cesario?

24   A    Not that I can remember -- Actually, yes.  Yes, at the

25   initial meeting, yes.

1    Q    And what was that discussion about?

2    A    That if -- Once they come on board, because we tell them

3    about how it works and then if they participate, they would

4    get a compensation each time they used one of the pain or scar

5    creams.

6    Q    And besides Dr. Simmons and John Cooper and

7    Richard Cesario, did you know of anybody else who was involved

8    with CMGRx at that time?

9    A    Not at that time.

10   Q    And did you do any research into the company after

11   meeting with Mr. Cesario?

12   A    I did.  I went and took a look at opioids and kind of how

13   they affect people as far as addiction is concerned because

14   when I heard the story about his wife, it was -- you know,

15   like I said, I knew him from high school, not very well but,

16   you know, it was -- it was a very compelling story.  And so I

17   wanted to find out if people were really getting addicted like

18   that and having situations where they -- where they actually

19   died and, yeah, they did.

20   Q    And at what stage was the business when you first had

21   this initial meeting, if you know?

22   A    I believe it was just kind of getting started.  From what

23   I understood, they had a few people that had already started

24   getting people involved with taking the creams.  And as far as

25   I can remember, that's about it.

1   Q    Did you yourself try to participate in the study?

2   A    I did.  I submitted my paperwork but I'm with the VA, so

3   they didn't approve it.

4   Q    So was it your understanding that it was dependent upon

5   your insurance as to whether you were actually approved for

6   the study?

7   A    Yes.

8   Q    And in your initial discussions, was there any discussion

9   with regard to how you would be used in connection with the

10   study aside from participating in that study?

11   A    Oh, absolutely.  My background is sales, and at the time

12   I had a health and wellness company and we had salespeople.  I

13   had leaders that were out selling and talking about the

14   products that we did with our company.  And so my main

15   position was to bring other people on board and help those

16   individuals tell other people about the study.

17   Q    And did you expect to be compensated for those efforts?

18   A    Yes, I did.

19   Q    And what were the discussions involving compensation?

20   A    Well, the way it worked is when someone was introduced to

21   the study as a patient, for every prescription that was

22   filled, they got paid anywhere from 250 to 500 dollars, so --

23   so that was the patient's part.  And then as a marketer, if I

24   go out and introduce a patient to the -- to the program,

25   anytime they got a prescription filled, then I would get

1   compensated at the same time.

2   Q    And was your compensation based on the prescriptions?

3   A    Yes.

4   Q    When did you begin marketing for CMGRx?

5   A    Probably -- Not too far after that first meeting.  I'd

6   probably say about maybe three or four weeks -- about three

7   weeks after that.

8   Q    And who was going to be responsible for compensating you

9   for your marketing efforts?

10  A    CMGRx.

11  Q    Did you enter into any type of agreement with CMGRx?

12  A    Yes, I did.

13  Q    If you could take a look at 547.  It should be to your

14  right.

15          MS. HUNTER:  May I have permission to approach?

16          THE COURT:  Yes.

17  A    Oh, I see it.

18  Q    (By Ms. Hunter) Do you recognize that document?

19  A    Yes, I do.

20  Q    What is it?

21  A    My Independent Marketing Organization Agreement that I

22  signed with CMGRx.

23          MS. HUNTER:  Your Honor, the Government moves to

24  admit Government's Exhibit 547.

25          MS. WATTLEY:  No objection.

```
 1              MS. NICOLE KNOX:  No objection.

 2              THE COURT:  All right, admitted.

 3              MS. HUNTER:  Thank you.

 4  Q    (By Ms. Hunter) And looking at the top of Page 1 of

 5  Exhibit 547, this agreement is signed or appears to be made on

 6  November 6th, 2014.  Is that correct?

 7  A    Yes, it is.

 8  Q    And it's between Smart RX, Inc., and CMGRx.  Is that

 9  correct?

10  A    Yes.

11  Q    What is "Smart Rx, Inc."?

12  A    Smart Rx, Inc., was a company that I owned prior to

13  meeting with Rich.

14  Q    Do you recall entering into any other agreements before

15  this one?

16  A    Not that I can remember.

17  Q    And how was your business arrangement structured under

18  this particular agreement?

19  A    Under this agreement, I was set up as an independent

20  contractor, and I was going to be compensated based on

21  individuals participating and also other individuals marketing

22  to people about this study.

23              MS. HUNTER:  And if we could take a look at Page 17

24  of Exhibit 547 and Clause 7.8.

25  Q    (By Ms. Hunter) This clause states, "CMG and IMO shall
```

1    have no power to control the activities and operations of the

2    other and their status is, and at all times will continue to

3    be, that of independent contractor with respect to the other."

4        Was that an accurate description of your business

5    relationship at the time that you entered into this contract?

6    A    Yes, it is.

7    Q    And did that -- Did the dynamics of that relationship

8    ever change?

9    A    No, it didn't.

10   Q    Did you at the time understand the difference between an

11   "independent contractor" and an "employee"?

12   A    Yes.

13   Q    And how were they different to you?

14   A    Well, I used to be in the military.  I was in there for

15   ten years and, you know, I was an employee of the Government.

16   You know, we showed up at 6:00 for PT.  We left at 16:30 when

17   the day was over.  But, you know, that -- in my opinion,

18   that's an employee.  Independent contractor, I'm able to kind

19   of do things more independently with autonomy and without as

20   much control.

21   Q    So was anybody at CMGRx setting your work hours?

22   A    No.

23   Q    Were they telling you where you had to work?

24   A    No.

25        MS. HUNTER:  If we could turn to Page 7 of

1    Government's Exhibit 547, focusing in on Section 3.11.

2    Q    (By Ms. Hunter) This section is entitled "Compliance with

3    Policies and Rules."  Do you recall seeing this section when

4    you first signed this contract?

5    A    Yes, I do.

6    Q    And Section B makes reference to federal and state

7    healthcare laws, including, but not limited to, the False

8    Claims Act and the "Fraud and Abuse" sections.

9              MS. NICOLE KNOX:  Objection, Your Honor, to leading.

10             THE COURT:  I haven't heard -- I haven't heard a

11   question yet.

12   Q    (By Ms. Hunter) Do you recall specifically looking at

13   Section B?

14   A    I do.

15   Q    And what is that section about?

16   A    Well, my opinion, it was, you know, something that could

17   possibly, you know, carry some -- some problems with it, you

18   know, and I remember asking about that to John and Rich when I

19   first started.

20   Q    Was that section concerning to you?

21   A    It was.

22   Q    Why so?

23   A    Well, because it has some legal jargon and especially

24   about fraud and, you know, so it just -- it was.

25   Q    Did you have any medical training at the time that you

1    entered into this contract?

2    A    No, I hadn't.

3    Q    And you raised those concerns to John Cooper and

4    Richard Cesario?

5    A    I don't remember telling them that I hadn't had any, but

6    I did not have any prior medical background.

7    Q    I'm sorry.  Let me rephrase my question.

8    A    Okay.

9    Q    Do you recall addressing this particular section in the

10   contract with John Cooper and Richard Cesario?

11   A    Yes, I do.

12   Q    Okay.  And why did you raise that section to them?

13   A    Simply because I did not know what it meant and I just

14   wanted to get some clarity on it.

15   Q    And what was their response?

16   A    That I should be okay, simply because this agreement

17   itself is the reason that it's there, and I'm going to sign it

18   and so it should cover me.

19   Q    Did you take any further action with respect to your

20   concerns about that section after speaking to John Cooper and

21   Richard Cesario?

22   A    No, I didn't.

23   Q    Okay.

24        MS. HUNTER:  If we could go to Page 19, Exhibit A.

25   Q    (By Ms. Hunter) Does Exhibit A outline your compensation?

1    A    Yes, it does.

2    Q    And what was your compensation under this particular

3    agreement?

4    A    It was $900 per prescription, for each prescription.

5    Q    For up to 12 months; is that right?

6    A    Correct.

7    Q    And up to two assessment studies at a time.

8    A    Right.

9    Q    Do you know why this contract was only for 12 months?

10   A    No, I don't, but the way it worked, when someone got on

11   the cream, be it pain or scar or vitamin, they -- they would

12   receive it for 12 months, and so that meant that I got paid

13   for 12 months.

14   Q    Did you get paid for each refill of the prescriptions?

15   A    Yes, I did.

16   Q    And did your compensation change over time during the

17   duration of your relationship with CMGRx?

18   A    It did.

19   Q    What did it start out as?

20   A    I want to say it started out at 400 -- maybe about 400

21   dollars per prescription, and then it went up to -- eventually

22   went up to about 900.

23   Q    Is this the highest amount you received per prescription?

24   A    It is.

25         MS. HUNTER:  And if we could go to Page 18 of Exhibit

1    547; to the bottom.

2    Q    (By Ms. Hunter) This shows that you're a signatory to the

3    contract, and it was signed on November 6th, 2014.  Is that

4    right?

5    A    That's correct.

6    Q    And who's the other signatory for the contract?

7    A    John Cooper.

8    Q    And he's signing on behalf of which entity?

9    A    CMGRx.

10   Q    I want to talk to you now about your recruiting efforts.

11   A    Okay.

12   Q    After you met with Mr. Cesario, what was the first thing

13   that you did to begin marketing the creams?

14   A    I had a phone call with some of my leaders.  We used to

15   do a leadership call on Friday mornings at 7:00, early before

16   everybody got to work and the day got going.  And I kind of

17   wanted to talk to them about it and just kind of bounce it off

18   of them, and these were guys I've known for a while and I just

19   told them about kind of what my conversation with Rich was and

20   how they could use the product themselves because most of them

21   were older and, you know, retired guys.  And they were all

22   networkers, so they knew a lot of people.

23   Q    And approximately how many people were in this group that

24   you talked to?

25   A    About six to seven.

1    Q    And how did you know these people?

2    A    Stationed with them.  And like I said, they were also

3    leaders in my network marketing company.

4    Q    Were they also in the military?

5    A    Most of them were retired.

6    Q    Retired veterans?

7    A    Retired, yes, military; Army.

8    Q    And what information did you provide to them about the

9    study?

10   A    I told them about, you know, once again, my conversation

11   with Rich that Saturday morning; the fact that his -- I shared

12   the story about his wife, you know, dying, passing away

13   because of the pills and, you know, just what I saw was -- was

14   a way to -- to really be able to maybe help some veterans out

15   because, like I said, I was a disabled veteran and I've seen,

16   you know, what opioids and pills can do to people.  So that

17   was kind of the main subject of this conversation.

18   Q    So did you think that these particular folks could

19   benefit from this type of study where it's dealing with pain

20   creams specifically?

21   A    Oh, absolutely.

22   Q    Did you discuss compensation with them?

23   A    We did.  It was -- Once again, it was our Friday sales

24   call.  So I remember one of the guys saying, "Okay.  So -- So

25   how do we -- you know, how does it work?"  And so that's when

```
 1   I went into the money and, once again, if they introduced
 2   someone that tries it and uses the pain and scar cream, the
 3   patient, they get paid, they make money.  And then because of
 4   the introduction coming from them, they're going to receive a
 5   payment as well.
 6   Q    So were people excited about the money?
 7   A    They were.
 8   Q    And did any of those individuals that you spoke with in
 9   that group become participants in the study?
10   A    Just about all of them did.
11   Q    And how did they become participants in the study?
12   A    They actually filled out a Medical Health Questionnaire.
13   We had the paper ones at the time, and got it back to me and
14   then I turned it in, and they were able to start on the study
15   and they received the creams themselves.
16   Q    Who did you turn their paperwork in to?
17   A    CMGRx.
18   Q    And were you compensated for the participation of those
19   individuals?
20   A    I was because that's kind of the first process is to have
21   individuals try the pain and scar cream.  So because those
22   guys got on the -- on the pain and scar cream, then I was paid
23   for that.
24   Q    Were those the first round of people that you brought
25   into the study?
```

1   A    It was.

2   Q    Do you recall any discussions with Richard Cesario or

3   John Cooper about when you brought in those individuals into

4   the study?

5   A    Yes, I did.

6   Q    What were those discussions?

7   A    You mean after they came on?

8   Q    (Affirmative gesture).

9   A    Well, we -- we met at -- at a restaurant and, you know,

10  they had basically just gotten back from Costa Rica.  And they

11  said, you know, "You did pretty good."  And I said, "Well,

12  what do you mean?"  And he said, "Well, just about everybody

13  that -- that you turned in on that first round of people got

14  approved."  And so that was good news.

15  Q    And did the people that you brought in have TRICARE

16  insurance?

17  A    Most of them did because they were soldiers or

18  ex-military.

19  Q    Did you know at the time whether TRICARE would compensate

20  for -- would reimburse for those creams?

21  A    I didn't know.  It was explained to me that they needed

22  to have PPO insurance.

23  Q    Okay.  And did you know whether CMGRx, before you came

24  in, had any TRICARE patients?

25  A    I did not.

```
 1    Q    Okay.  How were you compensated for the initial round of

 2    people that you brought in?

 3    A    I received a check for $20,000.

 4    Q    And who took you that check?

 5    A    John Cooper did.

 6    Q    What was your reaction?

 7    A    You know, I was -- I was shocked.  I mean -- First of

 8    all, you know, they said that we would make money and it would

 9    work, but it's a little bit different when you have a $20,000

10    check with your name on it.

11    Q    And tell the Jury, if you could, exactly what you did to

12    get that compensation.

13    A    Well, I -- I had that conference call with the group of

14    leaders that I knew prior, and they -- they filled out the

15    paperwork, sent it back to me with a copy of their driver's

16    license, their military ID.  I sent that to CMGRx.  They got

17    approved, and then I -- you know, I got a check for 20 grand.

18    Q    I mean you're making $20,000.  Are you going to the

19    office and spending eight hours a day there?

20    A    No.

21    Q    Are you working outdoors for a couple of hours in the

22    heat?

23              MS. WATTLEY:  Your Honor, I'm going to object to the

24    leading.

25              THE COURT:  Overruled.  You may answer.
```

VOLUME 12                    242

1              MS. NICOLE KNOX:  Your Honor, objection to relevancy.

2              THE COURT:  Overruled.

3    A    No.

4    Q    (By Ms. Hunter) I mean really what it came down to, were

5    you facilitating any relationships over the long term in order

6    to earn that compensation?

7    A    No.  I just simply had to get those individuals on the --

8    on the pain and scar cream.  That's it.

9    Q    So is it fair to say it wasn't that difficult to get that

10   $20,000?

11             MS. WATTLEY:  Your Honor, I object to the leading.

12             THE COURT:  Sustained.

13   Q    (By Ms. Hunter) Did any of the people that you spoke with

14   about the study in your initial group become marketers

15   themselves?

16   A    Just about all of them did.

17   Q    And do you know why they decided to market the product?

18   A    Yes.  It was -- You know, they got approved and it was --

19   it was fairly simple, you know.  And once again, we were

20   already in sales and marketing, so it just -- it made sense to

21   them.

22   Q    Do you know whether the compensation was a factor in them

23   deciding to become marketers?

24   A    Absolutely, because with Lifestyle 700, you had to do a

25   lot more work to make $900 or even $100 or $150.  You know,

1    with this, you just get somebody on the pain and scar cream

2    and you get paid.

3    Q    And you've mentioned Lifestyle 700 a couple of times.  If

4    you could, tell the Jury what "Lifestyle 700" was.

5    A    Yes.  It was a health and wellness company.  In 2008 I

6    got diagnosed with congestive heart failure, and so it was one

7    of those things where my doctor told me if I don't change the

8    way I eat and live, that I'm not going to see very many

9    birthdays.  And so I took it serious and just started to lose

10   weight.  And before you know it, I've lost, you know, 40, 50,

11   60 pounds.  And I started telling everybody about it on

12   Facebook, and everybody was asking me what did I do and I

13   said, "Well, I just, you know, started drinking shakes."  And

14   before you know it, that was one of the main reasons that we

15   started the company.

16   Q    So that involved marketing products as well.

17   A    It did.

18   Q    And did you have a tier of marketers in that company?

19   A    Yes.  It was different ---

20   Q    Go ahead.

21   A    It was different levels.  So someone could come in and

22   just be a customer and then use the -- use the products, but

23   you could also get in and sell the products as well and

24   recruit other people.  If you recruited other people, they

25   could also come on and use the products and sell it as well.

1   Q    And with respect to be CMGRx, did you develop a similar

2   tier of marketers initially?

3   A    For the most part, yes.

4   Q    So you had the marketers directly underneath you.

5   A    Right.

6   Q    And did those folks find people to become marketers

7   underneath them?

8   A    A couple of them did.

9   Q    And who did those individuals market to primarily, if you

10  know?

11  A    Well, once again, my -- my core group of individuals that

12  first heard about it from me, you know, these are all retirees

13  and they all -- most of them lived on Fort Hood, Killeen,

14  Texas.  So they're just naturally talking to people that live

15  in the same area and kind of work where they do.

16  Q    So were they primarily marketing to folks in the

17  military?

18  A    Right; in and around, you know, Fort Hood in Killeen,

19  Texas.

20  Q    And do you know whether the marketers who were underneath

21  the people who were underneath you were also marketing

22  primarily to the military?

23  A    I would have to say "yes."

24  Q    And did the fact than TRICARE reimbursed for these creams

25  have anything to do with them marketing primarily to the

1   military?

2   A    I would -- I'm not -- I don't know if it was the main

3   reason but, to me, inadvertently they were there and if -- if

4   you are military or ex-military, then your -- your insurance

5   is TRICARE, so.

6   Q    So is it fair to say that this happened kind of

7   organically to begin with?

8   A    It did.

9   Q    And then as the process continued, TRICARE continuously

10  reimbursed for the creams.  Is that right?

11         MS. WATTLEY:  I'm going to object, Your Honor;

12  leading.

13         THE COURT:  Sustained.  Don't lead.

14  Q    (By Ms. Hunter) Do you know whether TRICARE continued to

15  reimburse for these creams?

16  A    They did.

17  Q    Okay.  How did your marketers go about getting others

18  signed up for this study?

19  A    Well, eventually we got a -- I put a website together to

20  make it just kind of easier to submit the Medical Health

21  Questionnaire, and so they could do it online.

22  Q    Did you receive any guidance from anyone at CMGRx with

23  respect to how you should market the study?

24  A    I did.

25  Q    And who did you receive guidance from?

1    A    John Cooper had given me some -- some wording because I

2    created the site myself but I kind of looked at theirs and

3    then I created my own.  And once -- once I got the website up,

4    he looked at it and some of the wording wasn't exactly the way

5    it should be, and he told me about it and I fixed it.

6    Q    If you could look at Government's Exhibit 116.  It should

7    be to your right.  Do you recognize that document?

8    A    I do.

9    Q    And what is it?

10   A    It's an e-mail from John with ---

11   Q    Just don't read from it.  I'm sorry.  It's an e-mail

12   between you and John Cooper?  Is that correct?

13          MR. CHRIS KNOX:  We have no objection to this.

14          MS. HUNTER:  The Government moves to admit 116.

15          THE COURT:  Admitted.

16          MS. HUNTER:  Thank you, Your Honor.

17   Q    (By Ms. Hunter) At the top the document states the

18   "Subject" is "Changes Made to PSI4U.com."  Was that the

19   website that you created?

20   A    Yes, it was.

21   Q    Did you give the website that name?

22   A    Yes, I did.

23   Q    Where did you get that name?

24   A    From CMGRx's website and just the theme of the -- of the

25   study.

1    Q    So at the time did CMGRx have its own website?

2    A    They did.

3    Q    That people could go to to enroll in the study?

4    A    Yes, I believe so.

5    Q    Why did you set up your own?

6    A    Well, once again, I was already a business owner and I

7    had websites with my company, and I just really wanted to have

8    something that belonged to us that our individuals, that our

9    team brought on board could go through and be able to submit

10   their information.

11   Q    And Mr. Cooper is giving you some guidance on language to

12   incorporate into your website?

13   A    Yes.

14   Q    And did you, in fact, incorporate that language?

15   A    I did.

16   Q    What happened when a person would visit the "PSI4U.com"

17   website?

18   A    They would -- They could fill out the MHQ online instead

19   of on the paper version and submit it, and they could also

20   submit their driver's license and their military ID.

21   Q    And when you say "MHQ," what does that stand for?

22   A    Medical Health Questionnaire.

23   Q    And after the individual filled out the forms, did you

24   get copies of the forms?

25   A    I did.  I got a copy and at the same time an identical

1    copy was sent to CMGRx.

2    Q    And after those forms were submitted, what happens next?

3    A    Excuse me.  Next, it would go to the pharmacy to see if

4    the insurance was going to approve the pain or scar cream.

5    And then after that, it would go to the doctor, and they would

6    call the individual and go through the MHQ.  And then at that

7    point the pharmacy would ship the prescription to the

8    customer.  And then after that, the customer would use it.

9    They would go back to the CMGRx website, fill out the

10   assessment.  And then short after that, they would get

11   compensated.

12   Q    Okay.

13   A    And then, of course, we would get compensated, whoever

14   sent that individual to the website.

15   Q    Okay.  So let me just break this down.  The first step is

16   after the forms are submitted, the pharmacy calls.

17   A    Yes.

18   Q    Do you know which pharmacy?

19   A    Trilogy.

20   Q    Okay.  And the purpose of that call was to confirm

21   information?

22        MS. WATTLEY:  Your Honor, I'm going to object to the

23   leading.

24        THE COURT:  Sustained.

25   Q    (By Ms. Hunter) What was the purpose of that call from

1    the pharmacy?

2    A    Wait.  Can you -- I want to back up.  So they would turn

3    the form in.  A copy would go to both of us, and then CMGRx

4    would send that to Trilogy.  At that point Trilogy would run

5    the insurance.

6    Q    Do you know why they would run the insurance?

7    A    Right; to -- to determine if the individual would get

8    approved or not approved.

9    Q    Okay.  And then after the individual was approved or not

10   approved, what happened from there?  What's immediately the

11   next step?

12   A    Well, if they weren't approved, they would tell me and

13   then it would just end.  But if they were approved, then at

14   that point the doctor would call and go through the MHQ with

15   the patient.

16   Q    Okay.

17   A    And once that happens, then it would go back to Trilogy,

18   and then Trilogy would ship the cream to the patient.

19   Q    Okay.  Do you know which doctors were completing the

20   consults with the patients?

21   A    I know there's a few of them.  I do remember Dr. Elder's

22   name.

23   Q    Did you ever meet Dr. Elder?

24   A    I had not.  I did not meet him.

25   Q    Do you recall ever speaking with him?

```
 1   A     No, I didn't.

 2         THE COURT:  Ms. Hunter, I have a conference call I

 3   have to take on a court matter, so we need to recess right at

 4   3:00.

 5         So we'll be in recess for 15 minutes, Ladies and

 6   Gentlemen.

 7         All rise for the jury.

 8         COURT SECURITY OFFICER:  All rise for the jury.

 9         (Jury escorted to the Jury Room by the Court Security

10   Officer.)

11         (Court recessed from 3:00 PM until 3:20 PM.)

12         COURT SECURITY OFFICER:  All rise for the jury.

13         (Jury seated in the jury box.)

14         THE COURT:  Be seated, please.  Thank you.

15         MS. HUNTER:  Thank you, Your Honor.

16                    CONTINUED DIRECT EXAMINATION

17   QUESTIONS BY MS. HUNTER:

18   Q    Mr. Straw, before the break we were talking about after

19   an individual got enrolled in the study and they received a

20   call from the doctor.

21   A     Yes.

22   Q    And can you remind me which doctors you understood to be

23   affiliated with the study?

24   A     Dr. Simmons, Dr. Elders, and I know some of the other

25   ones but I don't recall their names specifically.
```

1    Q    Is there a reason why Dr. Elder's name is one that you

2    can recall?

3    A    Well, I remember we used to get commission statements

4    that would give us a breakdown on who received the pain or

5    scar cream.  And then it would -- Next to their name would be

6    the doctor's name and then the dollar amount that was paid to

7    me.

8    Q    And how often would you see Dr. Elder's name?

9    A    It was quite a bit; quite often.

10   Q    What percentage of the prescriptions would you say were

11   affiliated with Dr. Elder that you saw?

12   A    Maybe 50, 60 percent of them.

13   Q    And with respect to Dr. Simmons, did he remain the Chief

14   Medical Officer during the time that you worked with CMGRx?

15        MS. WATTLEY:  I'm going to object to leading,

16   Your Honor.

17        THE COURT:  Overruled as to that question.

18   A    As far as I knew, he was -- he was always on board as the

19   CMO.

20   Q    (By Ms. Hunter) And were there ever any issues with the

21   phone calls that people were receiving from the physicians?

22   A    I think at one point -- one time they got behind on the

23   calls.  Some of my guys started complaining about that they

24   had turned people in for the study on the website and no one

25   had called them.  And so if no one ever calls them, you know,

```
 1   they just -- they're kind of in limbo and then they can't get
 2   paid for it.  So that was it.  That was the complaint.
 3   Q    Did you do anything to address those concerns?
 4   A    I did.  I called the CMGRx office and just told them
 5   about what was going on, and they said they'd look into it and
 6   make sure that no one actually -- None of our people were to
 7   call the doctors; that the doctors would eventually follow up
 8   and get in touch with the patients.
 9   Q    Who was it that told you not to call the doctors?
10   A    It was John and Rich that did.
11   Q    Anybody else that you can recall?
12   A    Some of the people at the office.  I know I used to work
13   with Miranda a lot, so her and Kat.
14   Q    And to your knowledge, were any of the doctors seeing any
15   of the study participants in person?
16   A    No.  It was all over the phone.
17   Q    And with respect to Lifestyle 700, were any doctors
18   writing prescriptions for those products?
19   A    No.  Those were all just herbal supplements.
20   Q    Do you know of anybody who was not qualified to
21   participate in the study after they spoke with the doctor?
22   A    No, not that I know of for the most part.
23   Q    What was your impression of the telephone calls with the
24   doctors?
25   A    Well, they were going over the MHQ with the patient.
```

```
 1  Q    That's what you understood that to be?

 2        MS. STILLINGER:  Your Honor, I'm going to object

 3  unless there's a foundation for this.

 4        THE COURT:  All right.  Establish a foundation,

 5  please.

 6  Q    (By Ms. Hunter) Did you have an understanding of what was

 7  supposed to happen during the doctor phone calls?

 8  A    Yes, I did.

 9        MS. WATTLEY:  Your Honor, excuse me.  I'm going to

10  object unless we develop a basis for that understanding.

11        THE COURT:  Okay.  Overruled.  You may answer.

12  Q    (By Ms. Hunter) Did you have an understanding as to what

13  was supposed to take place on the phone calls with the

14  patients between the doctors and the patients?

15  A    Yes, I did.

16  Q    And what was your understanding?

17  A    That they were to basically go over -- Everything that

18  the patient put on the MHQ was just a valid kind of complaint

19  because on there you could put whether you had pain, where the

20  pain was, if you had scarring, where the scarring was,

21  stretchmarks, and so that was the purpose of the call.

22  Q    And do you recall, in addition to whether the person had

23  pain or scarring, what else was on -- contained on the MHQ?

24  A    Can you repeat that question one more time?

25  Q    Was a person's date of birth on the MHQ?
```

1    A    It was.

2    Q    Their name?

3    A    Yes.

4    Q    Their general ailments?  Their complaints?

5    A    Correct.

6    Q    Okay.  And you mentioned with Lifestyle 700 you did

7    advertising on Facebook.  Is that right?

8    A    We did it everywhere.

9    Q    With respect to social media, was social media an

10   effective way to market your product?

11   A    Yes.

12   Q    In which other ways did you market your Lifestyle 700

13   products?

14   A    Word of mouth, fliers, e-mails, phone calls.

15   Q    And how did you market the study for CMGRx?

16   A    It was word of mouth.  Once again, the marketers went out

17   and told people about it, called people.  We did conference

18   calls.

19   Q    Did you do any advertising on social media?

20   A    No, I didn't.

21   Q    Why not?

22   A    Someone had tried that and we were told not to -- not to

23   market on social media.

24   Q    Who told you that?

25   A    The CMGRx did.

1    Q    More specifically, who at CMGRx told you not to?

2    A    John and Rich.

3    Q    Did you understand why you couldn't market on a platform

4    that you had otherwise been successful in marketing a product?

5    A    I didn't really understand it.  It just didn't make

6    sense.

7    Q    Did it strike you as strange?

8    A    It did.

9    Q    Now prior to enrolling in the study, were people informed

10   that they were being compensated?

11   A    Yes.

12   Q    And what part of the compensation -- With respect to your

13   pitch, what part of your pitch would you discuss the

14   compensation?  Let me rephrase that.  That's a bad question.

15        How would you bring up compensation to people who

16   were enrolling in the study?

17   A    Well, when we first talked to someone, we would just say,

18   "Listen, we've got a study going on.  You know, if you

19   participate, you know, as long as you have pain or any kind of

20   scarring on you, you're going to make 250 to 500 dollars, you

21   know, for each -- each prescription."

22   Q    Would you bring the compensation up early on in your

23   pitch?

24   A    Yes, absolutely; right off the bat.

25   Q    And why did you do that?

1    A    Well, because that's -- that was a big part of it.  You

2    know, it got people's attention.

3    Q    Did you ever get any instruction on what you could or

4    couldn't say about your sales pitch?

5    A    Well, one that really sticks out is they said, "Don't say

6    the word 'prescription.'"

7    Q    Who said, "Don't say the word 'prescription'"?

8    A    John and Rich.

9    Q    Okay.  Tell me about how that discussion came up.

10   A    Well, I just remember -- I'm like, you know, "Give me

11   some of the do's and don'ts," once again, because I had never

12   really done anything like this before.  And that was one of

13   the big "don'ts" is, "Don't -- Don't say the word

14   'prescription.'"

15   Q    And did you understand why you couldn't say that people

16   were getting paid for prescriptions?

17   A    I didn't really understand it.  They just said, "Say that

18   they're getting paid to participate, for their participation."

19   Q    Did they elaborate on any of the reasons as to why you

20   had to say they're getting paid for their participation as

21   opposed to getting paid for prescriptions?

22   A    Something along the lines, "It's just, you know, we want

23   to just make sure that we are able to continue to do the

24   study, and just stay away from that word 'prescription.'"

25   Q    Why would they not be able to continue to do the study if

```
 1    people were told that they were getting paid for

 2    prescriptions?

 3            MS. WATTLEY:  I'm going to object to speculation

 4    unless there's a basis for knowledge.

 5            THE COURT:  You may answer if you know.  Don't guess,

 6    though.

 7    A    What do I do?

 8    Q    (By Ms. Hunter) If you know, ---

 9            THE COURT:  Answer if you know.

10    A    Oh, yes.  Simply because, you know, you got people out

11    going and telling other people, "Hey, go get a prescription;

12    you're going to make 250 to 500 dollars."  That's going to

13    bring up some big red flags real quick.

14    Q    Why would that bring up red flags?

15    A    It just does because it's wrong.  You just can't do that.

16    Q    Well, what did you understand that patients were getting

17    paid for?

18    A    For their participation.

19    Q    Is that what your understanding was at that time?

20    A    Right; the very beginning, yes.

21    Q    Was there any basis that they were getting paid for

22    prescriptions?

23    A    Wait.  Can you rephrase that?

24    Q    What did you understand that patients were actually

25    getting paid for?
```

1   A    Oh.  I knew they were getting paid for -- Whenever they

2   get a prescription approved, that triggered the money.  That's

3   how we got paid.

4   Q    So the $250, what -- to your knowledge, what was that

5   for?

6   A    That was to pay the patient --

7   Q    Okay.  Was that --

8   A    -- for participating.

9   Q    -- per prescription?

10  A    For each prescription that they received.

11  Q    Okay.  So was it your understanding that patients were,

12  in fact, getting paid for prescriptions?

13  A    Yes.

14  Q    Okay.  But you were instructed by John Cooper and

15  Richard Cesario to not tell them that they were getting paid

16  for prescriptions.

17  A    "Do not say the word 'prescription.'"

18  Q    Because that would, in your words, cause there to be some

19  red flags; right?

20         MS. STILLINGER:  I'm going to object to leading,

21  Your Honor.

22         THE COURT:  That's leading.  Sustained.

23  Q    (By Ms. Hunter) Based on your observations, what impact

24  did the compensation to the patients have on your recruiting

25  efforts?

1   A    Well, it was almost like a hundred percent because when

2   you talked to anyone, especially if they live around Killeen

3   or Fort Hood, they get paid on the 1st and the 15th.  So

4   there's, you know, not a whole lot of extra.  And then when

5   you introduce a program like this and they don't really have

6   to do very much, it's very appealing.

7   Q    Do you know who set the amount of compensation for the

8   study participants?

9   A    CMGRx did.

10  Q    And do you know how people got paid?

11  A    Yes, through Freedom From Pain.

12  Q    What was your understanding of Freedom From Pain

13  Foundation?

14  A    It was a nonprofit organization that was set up so that

15  they could legally pay the people for the -- for their -- for

16  their -- for getting the prescriptions.

17  Q    So who could legally pay the people?

18  A    CMGRx.

19  Q    And did you have an understanding as to how Freedom From

20  Pain Foundation was funded?

21  A    I knew the money came from John and Rich.  That's about

22  it.

23  Q    How did you know that?

24  A    Well, I remember one day Rich complaining about just --

25  it was taking a long time and a ton of money to get it set up,

1    so.

2    Q    Did you ever see the assessments that people had to fill

3    out?

4    A    I did.

5    Q    And what were your thoughts on the assessments?

6    A    It was just -- It was really simple; just -- it was a --

7    just a simple quick assessment.

8    Q    Do you know approximately how long it would have taken to

9    fill out the assessment?

10   A    Maybe five, seven minutes.

11   Q    If you could, tell the Jury how the assessment on your

12   website -- Did you have the assessment on your website?

13   A    No.  On my website they could just turn in the

14   questionnaire.

15   Q    Okay.  Did you go to the CMGRx website and view the

16   assessment?

17   A    Yes.

18   Q    And do you recall whether the answers to the questions

19   were drop-down questions or whether you had to type in the

20   answers?

21   A    I can't remember.

22   Q    Do you recall approximately how many people, your group,

23   the marketers underneath you and the marketers underneath

24   them, enrolled in the study?

25   A    It was just thousands.

1    Q    And were those people primarily military?

2    A    The majority of them were.

3    Q    And were you getting paid for the people the marketers

4    who are underneath you brought in?

5    A    Yes.

6    Q    And who was compensating you for those folks?

7    A    CMGRx.

8    Q    And did you pay the marketers who were underneath you?

9    A    I did.

10   Q    What was your arrangement with those marketers?

11   A    It was that for every individual that they referred to

12   the study, I would pay them anywhere from 100 to 150 to 200

13   dollars, just depending on who it was.

14   Q    And did you take a cut out of what you were getting

15   compensated from CMGRx?

16   A    Yes.

17   Q    Who was the highest volume representative underneath you?

18   A    Probably Luis Rios.

19   Q    What kind of volume was Mr. Rios doing?

20   A    Sometimes 7, 10, 11 people a day coming into the study.

21   Q    How did Mr. Rios come on board your group?

22   A    How did he what?

23   Q    Come on board with your group.

24   A    Oh.  One of my key leaders that was on that first initial

25   phone call introduced him to the program.

1    Q    And did you know what Mr. Rios' job was at the time?

2    A    I really didn't.  I really didn't know him.

3    Q    How did you know what type of volume that Mr. Rios was

4    doing?

5    A    Well, once again, when they go to "PSI4U" and they --

6    they submit a -- their questionnaire, on my side I can see who

7    submitted it and where it came from.

8    Q    And did you have any response to the type of volume that

9    Mr. Rios was doing?

10   A    One day I just -- I kind of looked really closely at it,

11   and I noticed that all of the submissions were coming from

12   just the same IP address.  And so I looked the IP address up,

13   and it was coming straight from Fort Hood, actually on Fort

14   Hood and -- and that kind of -- that was alarming for me.

15   Q    Was there anything else that was alarming to you?

16   A    Well, yes.  So I could click on the entry and actually

17   see the information, who it is.  I could see their -- their

18   military ID.  I could see their driver's license.  And some of

19   these -- some of these individuals were privates, you know,

20   maybe PV-1.  So, you know, once you graduate Basic, you don't

21   have any rank and your first rank is PV-1 and then PV-2, and

22   many of those individuals were privates, 17, 18, 19, 20 years

23   old; you know, living in the barracks.  So I -- To me, that

24   was -- that was a huge red flag.

25   Q    Why was that a red flag to you?

1    A    Because those guys, they don't have any pain.  They may

2    not want to get out of bed in the morning but that's about it,

3    you know.  They're young.  They don't -- They don't have any

4    pain or scarring.

5    Q    And why would it be concerning to you if they didn't have

6    any pain?

7    A    Well, because I just don't think it's right for them to

8    be going into the study and participating when there's no way

9    that those -- those individuals have pain or scarring.

10   Q    What do you think those people were motivated by?

11   A    The money.

12   Q    Did you raise your concerns to anybody?

13   A    I did.

14   Q    Who did you raise those concerns to?

15   A    To John and Rich.

16   Q    And what was their reaction?

17   A    That they would take care of it and kind of look into it.

18   Q    And what did John Cooper and Richard Cesario do about

19   your concerns?

20   A    Well, the next thing I knew, there was a -- there was a

21   meeting down in Fort Hood in Killeen and -- with all the

22   people that -- that I initially introduced to the program, the

23   core marketers, and they met with John and Rich.  And then

24   after that meeting, those individuals were not to send any new

25   people to PSI4U and they were going to handle all the new

1    submissions, and basically I was -- I was cut out of the main

2    marketing part.

3    Q    Were there complaints at the time you're aware of that

4    you weren't paying people their monies that were owed to them?

5    A    Not until after that meeting.

6    Q    Why do you think that Richard Cesario and John Cooper

7    took those marketers away from you?

8            MS. WATTLEY:  Object; speculation.

9            THE COURT:  Don't guess.  If you know, then you may

10   say, but don't guess.

11   A    I know.  Once again, one of the things that we talked

12   about when I first started is they -- they asked me do I want

13   to pay my people or do I want them to pay them.  And once

14   again, I was -- I was a business owner.  So those individuals,

15   we had worked together.  Those were my key leaders.  So I said

16   I wanted to pay them and I wanted to be in charge of -- of

17   dealing with that part of the program.  And so by taking that

18   part away from me, now I couldn't see what was being submitted

19   because I also wanted to track the numbers.  Like I said, I

20   went to high school with Rich but I didn't know him know him.

21   You know, in a business you just want to see things and how

22   they move, and that was important to me.  And I believe taking

23   that away, now I couldn't see what was coming in, so I

24   wouldn't know what to get compensated on.  And at the same

25   time it just took a big part of the control away from me, and

1    it turned it over into their court.

2    Q    How were the marketers paid after they partnered up with

3    John Cooper and Richard Cesario?

4    A    Shortly after that, they were paid by Trilogy.

5    Q    Okay.  Was there a point in time where they were paid by

6    CMGRx, if you know?

7    A    Yes; initially, yes.

8    Q    And were you also continuously paid by CMGRx up until

9    that point?

10    A    Yes.

11    Q    Was there a point in time where you stopped being paid by

12    CMGRx?

13    A    Yes, there was.

14    Q    Who else were you paid by?

15    A    Trilogy Pharmacy.

16    Q    And was this in connection with the marketing efforts

17    that you were continuing to do for CMGRx?

18    A    Yes, it was.

19    Q    And approximately, if you know, when did it change from

20    CMGRx paying you to Trilogy Pharmacy paying you?

21    A    Probably January-ish probably, you know, around that

22    timeframe, but I'm not -- I'm not certain for 100 percent.

23    Q    Were the marketers who were originally underneath you

24    also paid by Trilogy at some point?

25    A    Yes.  Everybody was eventually.

1    Q    And where were those marketers located that were

2    underneath you?

3    A    In Killeen, Texas.

4    Q    Were any of them that you know of here in the

5    Dallas/Fort Worth area?

6    A    There may have been one.  Most of them were in Killeen,

7    Texas.

8    Q    Do you recall submitting any documentation to become an

9    employee of Trilogy Pharmacy?

10   A    No.

11   Q    Do you recall submitting a W-4?

12   A    Yes.

13   Q    And why did you submit a W-4?

14   A    We submitted a W-4 -- I remember them contacting me and

15   saying that I needed to get this W-4 in because they needed to

16   have them and -- and it was just urgent that I got it in.  And

17   all of the other marketers, I reached out to them, and we got

18   all the W-4s in for everybody else.

19   Q    Okay.  Who informed you that they needed to have the W-4?

20   A    John and Rich did.

21   Q    Okay.  So you collected the W-4 for yourself and for the

22   people who were underneath you?

23   A    Correct.

24   Q    And to whom did you submit those forms?

25   A    I want to say I sent them over to Adam Still.  At the

```
 1   time Adam was there.

 2   Q    And where did Adam Still work?

 3   A    At CMGRx.

 4   Q    Okay.  Do you recall submitting any W-4 directly to

 5   Trilogy Pharmacy?

 6   A    I do not.

 7   Q    Do you know why you had to submit the forms?

 8   A    Well, at the time they just said we're about to become

 9   employees of Trilogy and, you know, I needed to get it in.

10   And if I didn't, I wasn't going to -- If we didn't get them in

11   by a certain date -- There was a date.  I can't remember what

12   day it was, but if we didn't get it in by that date, we

13   weren't going to get paid.  So, of course, everybody jumped

14   through the hoops and got the W-4 in.

15   Q    Who was telling you that you had to become employees of

16   Trilogy Pharmacy?

17   A    John and Rich.

18   Q    And did they explain why you had to become an employee of

19   Trilogy Pharmacy?

20   A    No.

21   Q    Did you question that?

22   A    I can't remember if I did.  I don't believe I did.

23   Q    At that point when you were becoming an employee of

24   Trilogy Pharmacy, had you ever been to the pharmacy?

25   A    No.
```

1   Q    Did you know where it was located?

2   A    I knew it was in Dallas.  That was about it.

3   Q    Had you met anybody from Trilogy Pharmacy?

4   A    No.

5   Q    Do you recall ever getting an Employee Handbook from the

6   pharmacy?

7   A    No.

8   Q    Did you receive any training from the pharmacy?

9   A    No.

10  Q    Did anyone from Trilogy Pharmacy at that point have

11  control over your work?

12  A    No.

13  Q    At any point in your marketing efforts did Trilogy

14  Pharmacy have any control over your work?

15  A    No.

16  Q    Were you supervised by anybody from Trilogy?

17  A    No, I wasn't.

18  Q    Were any of your former marketers who were underneath you

19  supervised by anyone from Trilogy Pharmacy?

20  A    No.

21  Q    We looked at that independent contractor provision

22  earlier.  Do you recall that?

23  A    Yes, I do.

24  Q    Did anything change with respect to the way that you

25  conducted business with CMGRx after you became an employee of

```
1    Trilogy Pharmacy?

2    A    No, it didn't.

3    Q    Were you still operating in accordance with the clause

4    that we looked at in your marketing agreement earlier?

5    A    Say that one more time.

6    Q    Were you acting as an independent contractor in

7    accordance with your marketing agreement that we looked at

8    earlier?

9    A    Yes, I was.

10   Q    Did you expect anything to change after you were made an

11   employee of the pharmacy?

12   A    No, I didn't.

13   Q    Who did you go to when you had questions about

14   compensation?

15   A    For the most part Rich.

16   Q    Okay.  After you started -- After you became an employee

17   of Trilogy, did that change?

18   A    No.

19   Q    Did you ever go to John Cooper for questions about

20   compensation?

21   A    I did.

22   Q    Why did you go to John Cooper?

23   A    Well, I remember, you know, his title was the President

24   and in the very beginning, remember, he brought that first

25   check by to me.  And so for the most part he handled a lot of
```

1    the money part of -- of CMGRx.

2    Q    And do you know who the marketers who were underneath you

3    went to when they had questions about their compensation?

4    A    They would come to me.

5    Q    Okay.  Do you know if they ever went to John Cooper or

6    Richard Cesario?

7    A    No.

8    Q    What about after they began working directly with

9    John Cooper and Richard Cesario?

10   A    Then after that, yes, they dealt directly with John and

11   Rich.

12   Q    Now you are told that you're being made an employee of

13   Trilogy Pharmacy, and you didn't know why?  Is that right?

14   A    Right, I didn't.

15   Q    Okay.  Did you get paid by Trilogy Pharmacy?

16   A    I did.

17   Q    Were the prescriptions that you were referring to CMGRx

18   after you started getting paid to -- by Trilogy getting filled

19   by Trilogy?

20   A    They were.

21   Q    Were there any other pharmacies that were filling the

22   prescriptions you were referring to CMGRx?

23   A    Yes.

24   Q    What pharmacy was those pharmacies?

25   A    I remember 360 and I know that there was maybe another

1    pharmacy but I can't recall the name.

2    Q    Were you getting compensated by 360 or any other pharmacy

3    besides Trilogy for any of the prescriptions that you filled

4    for those pharmacies --

5    A    No.

6    Q    -- or referred?  Excuse me; any of those prescriptions

7    that you referred to CMGRx for those pharmacies.

8    A    No; just Trilogy.

9    Q    Okay.  Did you question why, if you're an employee of

10   Trilogy and prescriptions you're referring are getting filled

11   by other pharmacies, you're not getting paid by those other

12   pharmacies as well?

13   A    Yes, it seemed kind of strange but that was about it.  I

14   mean I really didn't question it much.

15   Q    Do you know why now that you were paid by Trilogy

16   Pharmacy and instead of CMGRx?

17   A    Yes.

18   Q    Why is that?

19   A    Well, because ---

20        MS. WATTLEY:  Your Honor, I'm going to object unless

21   we have a timeframe when he learned because learning it now

22   versus then is different.

23        THE COURT:  Clarify the question.

24   Q    (By Ms. Hunter) Was there a point where you learned why

25   you were made an employee of Trilogy Pharmacy?

1   A    Yes; so that ---

2          MS. WATTLEY:  Excuse me, Your Honor.  I still object.

3          THE COURT:  Just when?  When?  That's all she asked

4   you.

5   A    Oh.  It was around that January timeframe.

6   Q    (By Ms. Hunter) January of?

7   A    2015.

8   Q    Okay.  And did you understand why in January of 2015 you

9   were being made an employee of Trilogy Pharmacy?

10  A    Not initially when it first happened but shortly

11  afterwards, in my opinion, it seemed that it was done

12  because ---

13         MS. WATTLEY:  I'm going to object as nonresponsive.

14         THE COURT:  Just listen to the question.  We'll get

15  to the other things for you to talk about.

16  Q    (By Ms. Hunter) Okay.  So when is it that you learned why

17  you were being made an employee of Trilogy Pharmacy?

18  A    You said what?  Wait; rephrase that question for me.

19  Q    When did you learn -- When did you figure out why you had

20  been made an employee of Trilogy Pharmacy?

21  A    It was probably around February.

22  Q    Okay.  And what was your understanding as to why you were

23  being made an employee of Trilogy Pharmacy in February?

24  A    So that we could legally or keep making the money that we

25  were making and just nothing would happen to the study because

1   we needed to appear to be employees.

2   Q    And what -- what was that understanding based upon?

3   A    Well, some other people were starting to get in trouble

4   about it, 1099 individuals that were with other organizations,

5   not ours but some other ones.  And so with us being W-2, you

6   know, employees, that just looks a lot better.

7   Q    Okay.  You said looks a lot better, but were you actually

8   an employee of Trilogy Pharmacy?

9   A    I was never an employee of Trilogy.

10  Q    Do you recall when you first met with the Government

11  about this case?

12  A    Yes, I do.

13  Q    And approximately when was that?

14  A    I want to say March, 2017 -- wait -- 2016; 2016.

15  Q    Were you truthful during your initial meeting with the

16  Government?

17  A    I was not.

18  Q    How were you not truthful?

19  A    I stated that I was an employee with Trilogy Pharmacy.

20  Q    Why did you state you were an employee with Trilogy

21  Pharmacy?

22  A    There's two reasons.  First of all, I just saw my friend

23  get picked up and taken in by the FBI and, you know, there's

24  tape around his house.  His kids are living with his

25  grandpa -- with his dad and, you know, his -- it was just --

```
 1    it was scary.  It was one of the most scariest times in my

 2    life.  I never had to experience anything like that before.

 3    And I remember John and Rich just really driving home the fact

 4    that "If anybody ever asks you, you know, you work for

 5    Trilogy."

 6    Q    And when you said you were seeing your friend with tape

 7    around his house, who are you referring to?

 8    A    Richard Cesario.

 9    Q    So were you scared at that point?

10    A    I was terrified.

11    Q    And you haven't been prosecuted for --

12    A    No.

13    Q    -- being untruthful with the Government.

14    A    No.

15    Q    You understand it's a crime to lie.

16    A    I do understand it's a crime to lie to the Government.

17    Q    Did you ultimately come clean about whether you were an

18    employee of Trilogy?

19    A    Yes, I did.

20    Q    And approximately, if you can recall, when was that?

21    A    Well, at the second meeting.  I don't remember the

22    timeframe exactly.

23    Q    Do you know approximately how much you were compensated

24    during the time you were a marketer for CMGRx?

25    A    A little bit less than two million dollars.
```

1   Q    And do you know where CMGRx got the money to pay you?

2   A    Yes; from the pharmacy which is paid by the insurance

3   companies.

4   Q    Did you have any idea about how much TRICARE was getting

5   billed for these creams during the time that you were

6   marketing for CMGRx?

7   A    I did have an idea.

8   Q    And how much did you understand that the creams were

9   getting -- were billing for?

10  A    About 15,000 each.

11  Q    Is that concerning to you?

12  A    It was.

13  Q    Why?

14  A    Well, I remember one of my -- one of my people getting a

15  notice in the mail and they sent that notice to one of the

16  marketers which said, "Hey, do you -- do you know how much

17  that they're billing the patients?"  And I said, "Well, yeah;

18  I think there's, you know, a few thousand."  And then they

19  just -- they sent me a copy of it and I actually saw it one

20  time.

21  Q    And did you continue marketing for CMGRx after you saw

22  that?

23  A    I did.

24  Q    Why did you do that?

25  A    I was making about 50 to 60 thousand dollars a week, and

1    I just -- I didn't want the money to stop.

2    Q    If you could take a look at Government Exhibits 11 and

3    24.  If you could look at Page 4 of those exhibits, do you see

4    that bank account on Page 4?

5    A    I do.

6    Q    Does that bank account belong to you?

7    A    Yes, it does.

8    Q    And if you'll flip to Page 5, do you see the online

9    transaction that's highlighted.

10   A    Wait; Page 5?

11   Q    Excuse me; page 6.

12   A    6.  Yes, for $68,980.39.

13   Q    Does the bank account in which the funds that are

14   highlighted there belong to you?

15   A    Yes.

16          MS. HUNTER:  Your Honor, the Government moves to

17   admit Exhibits 11 and 24.

18          THE COURT:  Objection?

19          MS. WATTLEY:  I have no objection.

20          THE COURT:  Admitted.

21   Q    (By Ms. Hunter) Now we see on Page 1 of Exhibit 11 the

22   highlighted amount is, as you stated, $68,980.39.  And who is

23   that payment from?

24   A    Trilogy.

25   Q    And "Smart Rx," is that an account that belongs to you?

1    A    Yes.

2    Q    And is that just one of the payments that Trilogy

3    Pharmacy paid you?

4    A    Yes.

5    Q    And what was that payment for?

6    A    For individuals getting prescriptions from the study.

7    Q    Was this money paid as employee wages?

8    A    No.

9    Q    If you'll look on the document, it shows "Joe Straw W-2."

10   Did -- Did -- Was it made to appear that it was being paid as

11   employee wages?

12   A    Right; correct.

13   Q    Why was this particular payment paid as employee wages,

14   if you know?

15   A    Kind of like I said before.  We were making a lot of

16   money and you don't want something like that to stop.  It's a

17   lot of money for everybody.

18   Q    Now in the beginning when you first became involved with

19   CMGRx, did you think you were doing anything wrong?

20   A    No.

21   Q    Why not?

22   A    I mean his wife died from pain pills.  I mean and -- You

23   know, I was able to validate it.  It wasn't something just he

24   made up, you know.  And me being a veteran and I got a dis --

25   you know, I got out on disability myself, and so I've had to

1    deal personally with -- with pain and just -- At one time I

2    was on 11 medications, and it just -- it was horrible.  So I

3    mean I really -- I just -- For me, it seemed to be extremely

4    genuine.

5    Q    And when you say his wife died, are you referring to

6    Richard Cesario?

7    A    Richard's wife, yes.

8    Q    So did you believe in the study?

9    A    I did.

10   Q    Did you believe in the potential benefits of the study?

11   A    Absolutely.

12   Q    Did you want to help people?

13   A    Yes.

14   Q    Did you think that everything was legitimate?

15   A    I did.

16   Q    And what made you think everything about the study was

17   legitimate?

18   A    Just because of the CMO, Dr. Simmons and, you know, I

19   knew Rich was a pretty smart guy from high school.  So I --

20   Like I said, once again, I didn't see any red flags in the

21   very beginning.

22   Q    Were you comforted by the fact that you had an agreement

23   in place?

24   A    I was.

25   Q    Were you told about lawyers?

1   A    I was.

2   Q    Were you aware that CMGRx had a lawyer?

3   A    Yes.

4   Q    Did you ever talk to that lawyer that you recall?

5   A    Not initially; later on down the road I did once.

6   Q    Okay.  What did you talk about?

7   A    It was some issue involving a prescription that showed up

8   from another pharmacy, and it -- Yeah, it was just down the

9   road about some other stuff.

10  Q    Okay.  So at the beginning you thought everything was

11  legitimate based on your observations.

12  A    Correct.

13  Q    Was there a point when that changed?

14  A    Yes.

15  Q    When did that change?

16  A    Around that January 15th timeframe.

17  Q    And what made you think that there was something wrong in

18  January of 2015?

19  A    Well, when I approached John and Rich about Luis Rios and

20  those submissions that were coming in in huge numbers which,

21  you know, in my mind it looked like they were just -- just

22  went through the barracks and just started signing up people.

23  That was one red flag.  And then once there was a meeting that

24  I found out about in Killeen, Texas, you know, with my key

25  people that I brought on board, my personal leaders, and all

1    of a sudden all these guys just overnight are saying that I

2    wasn't paying them, you know, that was very alarming because

3    these are people -- these are friends of mine.  I know these

4    people, and I've been paying them before with Lifestyle 700.

5    I've never cheated them out of any kind of money before, and

6    all of a sudden I've cheated good friends of mine out of

7    money.  So that was very alarming.

8    Q    Now with respect to the young soldiers in the barracks

9    getting signed up for this study, you stated that was one of

10   your concerns.

11   A    That was a huge concern.  And I honestly believe that --

12   You know, I wanted to see something done about it.  And I

13   believe for them taking it away where I can't see if anything

14   goes on anymore, that's kind of a way for me to just, once

15   again, be out of the loop.

16   Q    And you made that observation based on their dates of

17   birth?

18   A    Right; physical -- I could see the picture of these guys.

19   They didn't even have facial hair, so I mean they were just

20   kids.

21   Q    Do you know whether the doctors would have seen those

22   dates of birth?

23   A    Oh, yes.

24        MS. WATTLEY:  Objection; calls for speculation as to

25   what someone else saw.

```
 1              THE COURT:  Don't guess about what someone else saw.
 2   A    Well, I can tell you this:  The protocol for how we
 3   submit someone to the study is they've got to fill out an MHQ,
 4   a Medical Health Questionnaire.  They must have a valid
 5   driver's license and a valid military ID if they're -- if they
 6   are military or retired military.  All those three submissions
 7   came to my computer anytime somebody entered the "PSI4U"
 8   website and that same identical information is sent
 9   simultaneously to CMGRx.  So we both saw it.  It was there.
10   And when you click on the link, it pulls up and you can see
11   all three threads.
12   Q    Now after your concerns arose in January of 2015, you
13   continued to work with CMGRx as a marketer?
14   A    I did.
15   Q    Why, if you had those concerns, did you continue to work
16   with CMGRx?
17   A    Well, once again, I think they kind of cooled me off to
18   the fact that I wasn't physically seeing it anymore every day,
19   and so I kind of just went focusing on Lifestyle 700 and kept
20   getting that check for 50, 60 thousand dollars a month.
21   Q    Did that 50 to 60 thousand dollars a month play a role in
22   your continuing to participate after you had these concerns?
23   A    Absolutely.  It was a lot of money.
24   Q    When did you cease working with CMGRx?
25   A    Once they got notification that one of the pain script --
```

1    one of the entities that pay out the Trilogy payment had froze

2    the payments going to the pharmacy which was right around that

3    May, 2015, timeframe.

4    Q    When you say "they," who are you referring to?

5    A    Oh.  CMGRx.

6    Q    And specifically who at CMGRx?

7    A    John and Rich.

8    Q    Okay.  And who froze the payments?

9    A    Express Scripts.

10   Q    Do you know why they froze the payments?

11   A    Yes, because they allocated around two billion dollars

12   for the year when it came to pain and scar cream.  And they

13   had already hit -- Now this is -- this is April.  By April and

14   May, they had already hit 75 percent of that allocated two

15   billion dollars.  So think about it.  The whole year, it was

16   two billion, and they hit it -- they almost hit that whole

17   entire allocation.

18          MS. STILLINGER:  Excuse me.  Your Honor, I'm going to

19   object to -- I think he's testifying about the amount -- about

20   TRICARE, so I'm going to object to a lack of foundation.

21          THE COURT:  Overruled.  You may proceed.

22   Q    (By Ms. Hunter) Go ahead.

23   A    Yeah.  And, yeah, that was -- that was the main reason

24   because, you know, in the Army, the military, I mean they keep

25   track of everything.  And then to see that allocation almost

 1    be used up in such a short timeframe, they stopped it.

 2    Q    And when you say "they" stopped it, you're referring to

 3    Express Scripts.

 4    A    Yeah, Express Scripts.

 5    Q    Have you accepted responsibility for your actions?

 6    A    I have.

 7    Q    How have you accepted responsibility?

 8    A    Well, first of all, I, you know, I'm ex-military.  I'm a

 9    patriot.  You know, I served for ten years and, you know, I

10    got out of the military as a -- as a disabled veteran, you

11    know, 20 percent disability.  And for me, to -- to see

12    something like this happen, you know, I remember being on

13    TRICARE, the active duty as a soldier.  You know, I just

14    looked at what happened, you know.  I told my wife.  I sat her

15    down and I explained to my family; I said, you know, my whole

16    life I've always raised my kids.  We've got eight kids.  We

17    have big family.  Just whatever you do, whether it's good, bad

18    or ugly, you got to own up to it, you know.  You got to be

19    responsible.  And so, you know, for me, you know, a big part

20    of being responsible, you know, for my kids is to, you know,

21    don't lie to me.  You know, treat others with respect and

22    just, you know, you got to be responsible for what you do.

23    And, you know, I'm not going to have my kids see me any other

24    way.  I don't care how much it hurts or how much I have to pay

25    for it.  That's just -- That's just the way I am.

1    Q    And can you tell the jury, Mr. Straw, how you

2    specifically accepted responsibility in this case?

3    A    Excuse me.  Can you repeat that?

4    Q    If you could, tell the Jury how have you specifically

5    accepted responsibility in this case?

6    A    Yes.  I'm here today under my own influence.  I wasn't

7    promised anything from anyone.  I made a hard call to do the

8    right thing and come and tell my story, and so that -- that's

9    how I'm being responsible.

10    Q    Did you -- Were you charged in the Indictment in this

11    case?

12    A    Yes, I was.

13    Q    And did you plead "guilty" to any counts in the

14    Indictment?

15    A    Yes, I did.

16    Q    What did you plead guilty to?

17    A    Conspiracy to commit healthcare fraud.

18    Q    And why did you decide to plead guilty to that count?

19    A    Because that's what -- that's what I did and that's what

20    it was, bottom line.

21    Q    And can you tell the jury how much time you're facing?

22    A    Yes; five to ten years in prison.

23    Q    Up to ten years; is that your understanding?

24    A    Up to ten years.

25    Q    And do you hope to gain anything by testifying here

 1    today?

 2    A    I mean I can't say.  You know, I've got a family, so

 3    anything would help.  But at the same time I mean it's -- it's

 4    not up to me.  It's not up to the outcome.  It's -- It's up to

 5    the Judge.

 6    Q    Is it fair to say you are hoping for a lesser sentence by

 7    testifying here today?

 8    A    I am.

 9    Q    Mr. Straw, do you have any idea how your actions and that

10    of your co-conspirators impacted TRICARE?

11    A    Yes, I do; almost over -- close to 100 million dollars.

12    Q    Do you have any regrets about participating in the

13    conspiracy?

14    A    I do.

15    Q    What are those regrets?

16    A    You know -- You know, I've always looked at, once again,

17    just, you know, I'm one of those people that's always

18    protected -- Excuse me.  I'm sorry.

19         I've always been one of those people that, you know,

20    looks at the military and just -- it's something that, you

21    know, I just really protect from the time I was a Sergeant,

22    had soldiers, and let me tell you what I mean by that.  You

23    know, I got out on a 20-percent disability, and every single

24    one of my friends, like all the guys I'm super, super close

25    with, ---

1          MR. CHRIS KNOX:  Your Honor, I'm going to object as

2   nonresponsive.

3          THE COURT:  Sustained.  Just listen to the question,

4   please.

5   A    Do I stop?

6   Q    (By Ms. Hunter) Yes.  I know this is difficult,

7   Mr. Straw, but if you could, just tell ---

8          MS. WATTLEY:  I'm going to object to the commentary.

9          THE COURT:  Overruled.

10  Q    (By Ms. Hunter) Tell the jury what makes you regretful

11  about participating in the conspiracy.

12  A     Point blank, I just -- It was abuse.  It was abuse to the

13  Government system, the TRICARE system, and it shouldn't have

14  happened, and I was a part of it and I wish I wasn't.

15         MS. HUNTER:  I'll pass the witness, Your Honor.

16         THE COURT:  Cross Examination?

17         MR. CHRIS KNOX:  Yes, ma'am, Judge.

18                    CROSS EXAMINATION

19  QUESTIONS BY MR. CHRIS KNOX:

20  Q    Mr. Straw, do you know the very first day that you met

21  with the Government?  Do you know the date?

22  A    Yes.  It was my birthday.

23  Q    Okay.  Which is what?

24  A    March 3rd.

25  Q    Okay.  And it was a pretty lengthy meeting, was it not?

```
 1    A    I believe it was.

 2    Q    You had information and knowledge at that specific time

 3    that Mr. Cesario and Mr. Cooper had been arrested?

 4    A    Yes.

 5    Q    And where did you meet with the Government?

 6    A    At the federal building.

 7    Q    Here?

 8    A    Yes.

 9    Q    How many people were in the room?

10    A    About six.

11    Q    Okay.  Can you tell me specifically how many federal

12    agents as far as law enforcement were in the room?

13    A    I want to say two.

14    Q    And prosecutors?

15    A    Two.

16    Q    Okay.  And do you know who the other -- So six people

17    total, does that include you?

18    A    Myself and Jeff King.

19    Q    Okay.  Your attorney?

20    A    Yes.

21    Q    And agents are taking notes while you're in there.

22    A    Yes.

23    Q    Okay.  Do you recall the second date that you met with

24    the Government?

25    A    I can't remember the date exactly.
```

1  Q    Was it sometime in June of 2016?

2  A    That probably sounds about right.

3  Q    Okay.  And you talked to the Government then, too, about

4  a lot of the same stuff that you talked with them about the

5  first time.

6  A    Yes.

7  Q    And they told you -- The first time that you met with

8  them, they didn't give you any kind of guarantees about

9  anything, did they?

10  A    No.

11  Q    And they told you if you lied to the Federal Government,

12  it's a crime; the federal agent.

13  A    Yes.

14  Q    Told you if you lied to a prosecutor, a federal

15  prosecutor, it's a crime.

16  A    Yes.

17  Q    And you had zero guarantees as to anything at all that

18  they could do with the information that was given to you,

19  right?

20  A    Correct.

21  Q    Or that you -- I'm sorry; that you gave to them.

22  A    Right.

23  Q    And you were represented at that meeting by counsel?

24  A    Yes.

25  Q    And so your understanding at that meeting was that the

```
 1   Government basically could just tee off on you and asked
 2   whatever they wanted.
 3   A    They could.
 4   Q    Whatever they saw fit.
 5   A    Right.
 6   Q    Okay.  And at that point in time your design is to answer
 7   truthfully, is it not?
 8   A    Right.
 9   Q    That's what you're there for, correct?
10   A    Yes.
11   Q    Okay.  You told the Government nothing about this
12   arrangement was illegal, did you not?
13   A    The first meeting?
14   Q    Yes, sir.
15   A    That's correct.
16   Q    Okay.  Now you told the Government exactly how you
17   understood everything to happen.
18   A    Right.
19   Q    And you went through -- Based on any question that these
20   prosecutors or these agents wanted to ask you, you answered it
21   based on your understanding.
22   A    Right.
23   Q    And you said that you first met Mr. Cesario -- well, in
24   high school.
25   A    Right.  I met him in high school.
```

```
1    Q    At Berkner.

2    A    Right.

3    Q    You played football.

4    A    Basketball.

5    Q    Okay.  Did Mr. Cesario play football?

6    A    He played football.

7    Q    And you all went your separate ways after that.

8    A    Right.

9    Q    And you had a mutual friend who had recently passed

10   away --

11   A    Right.

12   Q    -- in 2014.

13   A    Yes.

14   Q    So you guys kind of rekindled or met up again to talk

15   about possibly going to the funeral of your friend.

16   A    Right.

17   Q    And that was, in your words, July of 2014.

18   A    Right.

19   Q    Okay.  Mr. Cesario meets you at a Starbucks?

20   A    Yes.

21   Q    You all talk about his idea here.

22   A    Right.

23   Q    You talk about his wife.

24   A    Right.

25   Q    It is absolutely 100 percent safe to say that when
```

 1    Mr. Cesario is passionate about something, he is extremely

 2    convincing, isn't he?

 3    A    He is.

 4    Q    Extremely, right?

 5    A    Right.

 6    Q    He can tell you about the death of his wife based on an

 7    opioid addiction and you believed it to be sincere --

 8    A    Right.

 9    Q    -- he showed a lot of passion for you, didn't he?

10    A    Right.

11    Q    Okay.  Now you can hear it in his voice when he's

12    passionate about it and when he's trying to sell something,

13    can't you?

14    A    Correct.

15    Q    In fact, you've told the Government you didn't believe

16    Mr. Cesario to be a very good salesman, didn't you?

17    A    I don't remember saying that.

18    Q    Okay.  I'll -- I'll locate that.  We'll come back to

19    it --

20    A    Okay.

21    Q    -- because that's something -- Well, let me ask you this:

22    Do you think Mr. Cesario was a good salesman?

23    A    I think he is.

24    Q    Okay.  And you can tell the difference when he's

25    passionate about something and when he's just trying to sell

1   you, you know, snake oil.

2   A    Like I said, I knew him from high school but I didn't

3   know him know him.

4   Q    Okay.  You didn't know specifically what was in his soul.

5   A    Like I said, I -- I knew him from high school.  I didn't

6   know him personally.

7   Q    Mr. Cesario ever tell you that this was healthcare fraud

8   in his opinion?

9   A    He didn't.

10  Q    Okay.  Mr. Cooper ever tell you that?

11  A    He didn't.

12  Q    Did you ever tell Mr. Cooper that?

13  A    No.

14  Q    Did you ever tell Mr. Cesario that?

15  A    No.

16  Q    Did you ever tell any defendant in this room that you

17  thought this was healthcare fraud?

18  A    No.

19  Q    When you meet with Mr. Cesario there in July, were you

20  aware that Dr. Simmons very well may not have been aware that

21  Mr. Cesario is using his name at that time?

22  A    I had no idea.

23  Q    Are you aware that Mr. Cooper may not have been involved

24  at all in July of 2014 at the time that you met with

25  Mr. Cesario at Starbucks?

```
 1   A    I think I asked him -- I can't remember exactly, no.

 2   Q    So you have no way of knowing that, right?

 3   A    Not at that meeting at Starbucks.

 4   Q    Okay.  Nonetheless, you're told that, "We have this idea;

 5   we have this study; we have a Chief Medical Officer and we

 6   have backers," right?

 7   A    Correct.

 8   Q    Do you recall Mr. Cooper's -- this is John Cooper's --

 9   name being used at that meeting at all?

10   A    At the first meeting?

11   Q    Yes, sir.

12   A    Yes.

13   Q    You do.  You never met Mr. John Cooper in July of 2014?

14   A    I haven't met him.  I hadn't met him yet.

15   Q    But you specifically recall Mr. Cesario telling you

16   Mr. John Cooper is also in on this?

17   A    Right.

18   Q    A guy you don't have any frame of reference to know who

19   John Cooper is?

20   A    I asked him, you know, who all is involved, like how is

21   it -- who's all a part of it.

22   Q    Okay.

23   A    This is something I mean I just do.  People ask me the

24   same stuff.

25   Q    Sure, I understand.
```

```
 1   A    Yeah.

 2   Q    He didn't come in and say Mr. Bill Gates is a part of

 3   this.

 4   A    No.

 5   Q    You would remember that.

 6   A    I would remember that.

 7   Q    You would agree with me that the name "John Cooper" is

 8   pretty generic, right?

 9   A    Right.

10   Q    And you have a specific recollection of the July, 2014,

11   meeting of Mr. Cesario telling you John Cooper with a "C" is

12   involved with this.

13   A    Right.  I think that's kind of relevant because I never

14   met Bill Gates --

15   Q    Right; sure.

16   A    -- but I ended up meeting John Cooper, so.

17   Q    Later, right?

18   A    Right.

19   Q    Not -- At that point in time you had never met him.

20   A    No, not at that point in time.

21   Q    Did you ask Mr. John Cooper when you met him at what

22   point in time his involvement with Richard Cesario and CMGRx

23   started?

24   A    I did not ask John that.

25   Q    Okay.  Sometime later is when Mr. Cesario and Mr. Cooper
```

1    and, I believe you said, Dr. Simmons went to Costa Rica --

2    A    Yes.

3    Q    -- to kind of hash out the plan.

4    A    Right.

5    Q    Now you met with the Government, you've told us, in March

6    of 2016; correct?

7    A    Right.

8    Q    And you said it was your birthday which was March the

9    3rd; right?

10   A    Yes.

11   Q    Okay.  And in that meeting you told the Government

12   repeatedly that you were paid by Trilogy and that you were an

13   employee of Trilogy.

14   A    Right.

15   Q    And in that meeting you told the Government that -- you

16   described the entire process as you understood it to be all

17   the way from the Medical Health Questionnaire through your

18   payment from Trilogy; correct?

19   A    Right.

20   Q    And you told the Government that some things changed

21   around January as to who can track the -- the participants

22   entering the study or signing up for a prescription; correct?

23   A    Yes.

24   Q    And you told the Government that anytime you had a

25   question, you went to Mr. Cesario.  He first had to clear it

1    with Trilogy; right?

2    A    Can you rephrase that again?

3    Q    Sure.  You told the Government -- As you articulated why

4    you worked for Trilogy, you told the Government that you felt

5    you worked for Trilogy because anytime there was an issue,

6    Mr. Cesario had to clear it up with Trilogy.

7    A    I don't remember if I did say that.

8         MR. CHRIS KNOX:  May I approach the witness, Judge?

9         THE COURT:  Yes.

10         MR. CHRIS KNOX:  All right.

11   Q    It's in red; if you can just read that first sentence.

12   A    Okay.

13   Q    Does that refresh your memory?

14   A    Not really.  I mean I just don't remember saying it.

15   Q    Okay.  But that's something you certainly could have said

16   to the agents and the prosecutors.  "Mr. Cesario had to clear

17   it with Trilogy anytime there was a question."

18   A    I know for the most part Rich -- Rich ran -- ran

19   everything.

20   Q    Well, he was the person who called the shots in your

21   words.

22   A    Correct.

23   Q    Richard Cesario.

24   A    Yes.

25   Q    Okay.  And you haven't specifically met or spoke to a lot

```
 1   of the recruiters that were in Killeen, right?  Personally,

 2   have you met them all?

 3   A    Well, the main ones?

 4   Q    Yes, sir.

 5   A    Yes.  I knew them very well.

 6   Q    Well, your main three; correct?

 7   A    Correct.

 8   Q    And then there was others operating ---

 9   A    That branched off.

10   Q    Okay.  Under -- Under Smart ---

11   A    Smart Rx, right.

12   Q    Which was your company?

13   A    Correct.

14   Q    And you've met the main three but you haven't met the

15   next tier.

16   A    Oh, yeah.  I met a lot of those individuals, too.

17   Q    Okay.  All of them?

18   A    The majority of them.  The ones that were -- Put it this

19   way:  If they were submitting any, in my opinion, worthwhile

20   number of applicants to the study, I got to know who they were

21   for the most part.

22   Q    Okay.  Highlighted in the yellow -- red text, if you will

23   read that paragraph.

24        (Pause)

25        MS. HUNTER:  Your Honor, I'd object to the witness
```

```
 1    referencing -- I'd object to the improper questioning of the

 2    witness' memory.  As he testified, he can't remember.

 3              THE COURT:  Overruled.

 4    Q    (By Mr. Chris Knox) Is that your recollection as to what

 5    you told the Government about not meeting the other marketers?

 6    A    No.  I met -- I met some of -- I met the other marketers

 7    because we had an event that was radio advertised --

 8    Q    Okay.

 9    A    -- in Killeen.  And at that -- at that event, we had a

10    special meeting.

11    Q    Okay.  Let me ask you a question.

12    A    Okay.

13    Q    I don't want to move too far from my question.

14    A    I got you.

15    Q    You have no idea why that would have been written in this

16    report?

17    A    I can tell you for certain at that first meeting, I was

18    not truthful.

19    Q    Okay.  Well, we're going to get to that.  Okay?

20    A    Okay.

21    Q    Let me ask you a couple more questions.

22    A    Okay.

23    Q    When was the last time -- we're talking about today, not

24    the date of your meeting -- that you spoke with Mr. Cesario?

25    A    It's been a long time.
```

1    Q    Can you tell me how long?

2    A    February 14th, 15th, 2016.

3    Q    Okay.  So you met with the Government again in June of --

4    of 2016, right?

5    A    Right.

6    Q    And you went through an interview process then as well,

7    correct?

8    A    Yes.

9    Q    Where did you meet them that time?

10   A    The federal building.

11   Q    Here, this building.

12   A    Yes.

13   Q    But in a different room, correct?  Not in this courtroom.

14   A    No.

15   Q    Okay.  How many agents were there?  How many people total

16   in the room?

17   A    Pretty much about the same amount.

18   Q    Six or so, give or take.

19   A    Right.

20   Q    And you recall going over a lot of the same stuff.

21   A    Yes.

22   Q    Same questions, right?

23   A    Similar questions.

24   Q    Seemed a little repetitive.

25   A    Yes.

1    Q    Okay.  Did that confuse you?

2    A    Not really.

3    Q    You didn't wonder why, "Hey, we just did this three

4    months ago and you asked me that exact question and you're

5    asking me it again"?

6    A    Not necessarily.

7    Q    Okay.  How long was the first meeting?

8    A    I can't recall exactly how long it was but we were in

9    there for a little bit.

10    Q    A while, right?

11    A    (Affirmative gesture).

12    Q    I mean you're talking about at least a couple hours,

13    maybe more.

14    A    Right.

15    Q    Maybe more.

16    A    Right.

17    Q    Excuse me.  I'm getting over a cold, and I can't tell

18    when my voice stops projecting.  When was the second -- or how

19    long was the second meeting?

20    A    About the same; same amount of time.

21    Q    Okay.  And so you've told me they asked a lot of the same

22    questions.  They asked you about your employment at Trilogy?

23    A    Yes.

24    Q    And you told them, "I was an employee at Trilogy."

25    A    Right.

1    Q    And you told them you had a W-2 from Trilogy?

2    A    Correct.

3    Q    You told them that that's where your pay came from?

4    A    At the end but not in the beginning.

5    Q    I understand.  And that's called "chain of commerce."

6    That's business, right?

7    A    Yes.

8    Q    The payments get passed down the line; right?

9    A    I guess they do.

10   Q    Okay.  Now your pay as an employee came from Trilogy,

11   correct?

12   A    But I wasn't an employee of Trilogy.

13   Q    Okay.  Just -- Let me ask you this.

14   A    Okay.

15   Q    Did Trilogy withhold your taxes?

16   A    They took taxes out.

17   Q    Did they withhold a lot of them?

18   A    The percentage that was for the pay -- pay scale I was

19   in, yes, they did.

20   Q    Pretty high, wasn't it?

21   A    Yes.

22   Q    Higher than if you were a 1099.

23   A    Well, 1099, you don't hold any taxes.  So I mean a dollar

24   would be higher than a 1099.  I mean ---

25   Q    So the dollars that they withheld for your W-2 is higher

```
1    than they would have withheld if you were a 1099.

2    A    Yes, because there is no tax withheld on a 1099.

3    Q    So the answer is "yes," correct?  "Yes"?

4    A    To what question?  Because I know we've ---

5    Q    They withheld more on your W-2 than they would have

6    withheld if you were paid as a 1099.

7    A    Yes; yes.

8    Q    And you understand that that is absolutely without

9    question a factor in an analysis of employment, right?  Do you

10   understand that as you sit up there today?

11   A    Well, no, because I'm confused.  As an employee, you go

12   -- you physically go to that place.

13   Q    Well, okay.

14   A    I mean ---

15   Q    This is a sales job, isn't it?

16   A    It is.

17   Q    Okay.  And are you still selling for Trilogy?

18   A    No.

19   Q    Why not?

20   A    Because they stopped doing business.

21   Q    Because they fired you, right?  They let you go, correct?

22   A    Okay.

23   Q    Is that correct?

24   A    I didn't know I got fired.

25   Q    Well, did you get let go?  Did you get terminated?  Were
```

1    you told you don't need to do this any longer?

2    A    I had a conversation with Rich and he said, "We're

3    shutting it down."

4    Q    Okay.  And do you know whether or not Rich got that from

5    Trilogy?

6    A    I had no idea where he got it from.

7    Q    Okay.  And so if there's a termination letter to Rich,

8    would that surprise you?

9    A    I don't know.  I know I never got a termination letter.

10    Q    Did you sign a W-4 and submit it to Trilogy based on the

11    understanding that you needed to do this for employment?

12    A    Honestly, they told me if I didn't sign that W-4, I

13    wasn't going to get paid that Friday.

14    Q    Weren't going to get paid what?

15    A    I wasn't going to get my paycheck that Friday if I

16    didn't.

17    Q    Okay.  Did you sign a W-4 and submit it to Trilogy?

18    A    I submitted it to -- Well, I turned it in to CMGRx.

19    Q    And then you get paid from Trilogy, correct?

20    A    At the -- When I sent that in, I'm not sure if it was

21    Trilogy or CMGRx.

22    Q    Okay.  Let's -- Let's do this.

23    A    Okay.

24    Q    You've told the Government at two different meetings over

25    hours and hours and hours that you worked for Trilogy.

```
 1   A    Right.

 2   Q    Those meetings, so we're all clear, were in March of 2016

 3   and in June of 2016.

 4   A    Correct.

 5   Q    When were you indicted, Mr. Straw?

 6   A    October, 2016.

 7   Q    Okay.  And you told the Government you were shocked by

 8   that, right?

 9   A    Right.

10   Q    And today you're now telling them, it turns out, "I

11   wasn't an employee," right?

12   A    Right, I wasn't.

13   Q    Okay.  And between that, how many meetings did you have

14   with the Government after your indictment and today's

15   testimony?

16   A    Two.

17   Q    And you talked specifically -- Do you know when those

18   were?

19   A    I couldn't recall, not specifically.

20   Q    And you talked specifically with the Government about a

21   lot of the same topics?

22   A    Different topics.

23   Q    Different topics this time, right?

24   A    Right.

25   Q    They didn't ask you a lot to articulate specifically why
```

1    exactly you felt as though you were an employee of Trilogy

2    after you were indicted, did they?

3    A    Well, ---

4    Q    It's a simple question, Mr. Straw.

5    A    Yes.

6    Q    I'm not trying to beat you up.  I'm just asking:  They

7    didn't ask you to articulate why you thought you were an

8    employee of Trilogy after you were indicted, did they?

9    A    Well, they asked me and I told them.

10   Q    Told them?

11   A    That I wasn't an employee.

12   Q    After that, right?

13   A    Right.

14   Q    After the indictment.

15   A    Correct.

16   Q    Okay.  And they didn't ask you to articulate why you

17   thought you were the first time, did they?

18   A    Are you saying they asked me the first time or after I

19   went in and got indicted, did they ask me at that point?

20   Q    Again, after that, did they ask you ---

21   A    Yeah, they asked me.

22   Q    Yes.  They asked you to tell them why you thought you

23   were an employee of Trilogy?

24   A    Yeah, why I said I was before.

25   Q    Well, they asked you that today.  But have you read your

1   interview notes before testifying?

2   A    Yes.

3   Q    When?

4   A    Probably maybe a couple of months ago; about a month ago.

5   Q    What about yesterday?

6   A    I did not read them yesterday.

7   Q    Okay.  Did you meet with the Government yesterday?

8   A    Yes, I did.

9   Q    Pretty extensive period of time?

10  A    No.  It wasn't that long.

11  Q    Okay.  Now you testified that this is something that, you

12  know, you wanted to protect and you're a patriot; right?

13  A    Yes.

14  Q    And I have no doubt about the patriot part, but you were

15  a patriot in 2014 and 2015 as well.

16  A    I was.

17  Q    And you knew TRICARE was being billed.

18  A    Yes.

19  Q    In fact, TRICARE started to be billed primarily when you

20  became involved.  You know that, right?

21  A    It did.

22  Q    By CMGRx.

23  A    Right.

24  Q    In fact, it wasn't before that to the best of your

25  knowledge; right?

1   A    Right.

2   Q    Okay.  And so -- Specifically because you had some

3   contacts from the military, right?

4   A    Correct.

5   Q    Okay.  And you also testified specifically that you felt

6   as though you had to, you know -- you had family and you

7   wanted to do the right thing now, right?

8   A    Correct.

9   Q    During your meeting in -- in March of 2016 and June of

10  2016, did you have eight children also at that point in time?

11  A    I did.

12  Q    And you came down here, sat down with the Government in a

13  room with no protection whatsoever, contractually speaking,

14  and answered questions for three hours, repeatedly telling

15  them you were an employee of Trilogy.

16  A    Well, I had protection.  I had my attorney there.

17  Q    Is that "yes" or "no"?  Protection contractually by law

18  on a piece of paper, no guarantees whatsoever.  You sat in a

19  room for three hours, knowing you had eight children, knowing

20  you've been a patriot, and you told the Government you were an

21  employee of Trilogy.

22  A    Right.

23  Q    Knowing that if you lied to them, you could be prosecuted

24  for it.

25  A    That was a big chance.

VOLUME 12                                308

1    Q    Okay.  You're not being prosecuted for that now, are you?

2    A    No.

3    Q    Okay.  Now how many documents have you been shown as it

4    pertains to legal contracts from the Government in your

5    meetings?

6    A    A few.

7    Q    Can you -- And I'm not going to -- I promise you I'm not

8    going to hold you to a specific number, but can you guess?  Is

9    it 50 or more?

10   A    No, not that many.

11   Q    One or two?

12   A    Maybe 10 or 15.

13   Q    You recall being shown and -- and you answered questions

14   about the contract up on the projector today?

15   A    Yes.

16   Q    Do you recall how you received that contract?

17   A    I couldn't tell you.

18   Q    Okay.  If you'll glance at this e-mail with the

19   attachment, let me know if that refreshes your memory.

20   A    Yes.

21   Q    Okay.  Now I'm going to ask you again:  Do you recall

22   receiving that contract e-mailed to you from Mr. John Cooper?

23   A    I remember.

24   Q    Okay.  And do you recall him specifically telling you

25   that, "There are regulatory changes, and so just prior to a

1    W-2 agreement, you'll need to read and review this document"?

2    A    Yes.

3    Q    You recall him telling you that, right?

4    A    I don't remember him telling me that, but ---

5    Q    Okay.  But you ---

6    A    I see the -- the e-mail.

7    Q    Okay.

8        MS. HUNTER:  Object to the witness testifying about a

9    document that's not in evidence.

10        THE COURT:  Sustained.  Don't testify about the

11    document, please.

12    Q    (By Mr. Chris Knox) Does this refresh your memory as to

13    what had been told to you on November the 3rd, 2014?

14    A    I can't remember what -- what we talked about.

15    Q    And the specifics of the contract, I think we will have

16    to wait until tomorrow because there will be more discussion,

17    but, nonetheless, you had knowledge around the October,

18    November timeframe when you first came on that there was going

19    to be a change in the business structure, didn't you?

20    A    I couldn't remember anything about that, honestly.  I'm

21    just sorry; I can't.

22    Q    Okay.  Is there any document at all that I can pull that

23    I can show you that may very well help you remember what you

24    knew at that point in time?

25    A    I remember the agreement.

```
 1   Q    Well, you also remember becoming a W-2 employee of

 2   Trilogy.  "Yes"?

 3   A    Oh, I remember that because they took a lot of taxes from

 4   me.

 5   Q    And -- And that's -- that's an exercise of control by

 6   authority, isn't it?

 7   A    More or less, yes.

 8   Q    And if you didn't pay your taxes and they had -- your

 9   taxes weren't withheld and they had withheld it, the IRS had

10   came to your door, knocking on the door, what would you have

11   said?  "Talk to my employer"?

12   A    You said if they wouldn't have taken out the taxes?

13   Q    No; if they did and didn't pay them.

14   A    Oh, if they took them out but they didn't pay them?

15   Q    (Affirmative gesture).

16   A    Well, of course, because they took the taxes out.

17   Q    Yeah, okay.  So that's establishing a employer/employee

18   relationship, isn't it?

19        MS. HUNTER:  Objection.  It calls for a legal

20   conclusion.

21        THE COURT:  If you know, you may answer.  And this is

22   going to be the last question for the day.

23   A    I -- I just don't know.

24   Q    (By Mr. Chris Knox) Okay, fair enough.

25        THE COURT:  All right.  We're going to break for the
```

1    day, Mr. Straw.  We will resume tomorrow morning at 8:00.

2              All rise for the jury.

3              Have a niece evening, Ladies and Gentlemen.

4              THE JURY:  Same to you.

5              THE COURT:  Take your vitamins.

6              (Jury excused from the courtroom.)

7              THE COURT:  All right.  Mr. Straw, you may step down.

8    Don't talk to anyone about your testimony, please, unless you

9    have a personal lawyer.  You may talk to that person but don't

10   talk to anyone else about your testimony.

11             THE WITNESS:  Yes, Your Honor.

12             THE COURT:  All right.  Be seated, please.

13             I understood you all wanted to talk to me about the

14   -- I've seen this correspondence.  So is the issue whether

15   notes of meetings that have not resulted in a 302, whether

16   those are discoverable by the Defense?  Is that the issue?

17             MS. STILLINGER:  Your Honor, I think that was a

18   request that I had made, but Mr. Brasher responded that there

19   are no such notes.  So I think that -- that question, I

20   believe, is moot.

21             THE COURT:  Okay.  What is the other question?

22             MS. STILLINGER:  The issue that we wanted to put on

23   the record was the production of criminal records of witnesses

24   that have testified for the Government; that I think we were

25   advised -- was it last night -- and actually got copies this

1    morning of criminal records pertaining Government witnesses,

2    some of whom have already testified; specifically

3    Joseph Armstrong apparently has a criminal conviction that we

4    believe would have been -- we would have been able to use for

5    impeachment under Rule 609.  It's a conviction for?

6         MS. NICOLE KNOX:  Securing execution of a document by

7    deception, and it's within the timeframe.  I'm trying to find

8    my note on that.

9         MS. STILLINGER:  And honestly, Your Honor, I -- I

10   personally have not had time to -- because we just learned

11   that this morning, I haven't had time to process how we would

12   have used that exactly and if we would have.  We wanted to put

13   it on the record as soon as this came to light.

14        I understand Mr. Cesario also had some arrests.  I

15   think there's one that is of concern because it was a felony

16   arrest in Las Vegas, and it's not clear what the outcome of

17   that was.

18        MR. BRASHER:  First of all, it was an oversight on

19   our part for not giving these out sooner.

20        As to Mr. Armstrong's conviction or -- I'm sorry; not

21   conviction.  As to Mr. Armstrong's charge, it was reduced to a

22   misdemeanor, and he received deferred adjudication, and he

23   completed that in 2012.  So I don't think there's anything

24   that could be used to impeach him with, anyway.

25        As to Mr. Cesario, there were two -- This came up

1    because we just received his PSR, and I believe one of them

2    was a -- a recent one involved a shoplifting charge, and that

3    was -- and that was deferred.  Then the one from Las Vegas,

4    which is outside the ten years, was -- I think was dismissed

5    or discharged.  I'm not sure.

6          MS. NICOLE KNOX:  And, Your Honor, to that point, the

7    NCIC on Joseph Armstrong simply states that he received --

8    that he pled guilty to one-year probation on May 6th of 2011;

9    that he was discharged from probation on May 6th of 2012.  So

10   any records that he did, in fact, receive deferred would be

11   helpful for us.  We have not seen those.

12         And then regarding Mr. Cesario, it sounds like the

13   Government is looking up the information right now but, again,

14   the NCIC only shows that he was arrested on September 22nd of

15   2000 for felony embezzlement and theft.  And if the Government

16   is saying that they received this information from his PSR

17   regarding -- Mr. Cesario's criminal history in his PSR, then

18   we believe at this time we're entitled to redact a version of

19   his PSR.

20         MR. BRASHER:  And to be clear, the information -- We

21   didn't receive the PSR until after he had testified.  So

22   there's nothing we could have turned over before then.  I

23   believe the PSR has more information about ---

24         THE COURT:  When you say you didn't receive it, you

25   mean it wasn't prepared?

1          MR. BRASHER:  I believe it was prepared but it was

2    not filed on ECF.  I did not have a copy of it until after he

3    had testified.

4          THE COURT:  I don't -- I don't understand what you

5    mean by that.  Are you saying that the probation officer did

6    not give you a copy of the Presentence Report?

7          MR. BRASHER:  Correct.  I did not receive a copy

8    until it was filed on ECF.  I can look at the date on that;

9    November 7th.

10         THE COURT:  Okay.  I'm not sure what anyone is asking

11   me to do.  What is anyone asking me to do?

12         MS. NICOLE KNOX:  Your Honor, we're asking that if --

13   Your Honor, we're asking that you strike Mr. Armstrong's

14   testimony as a result of this new information and disclose

15   Mr. Cesario's.

16         THE COURT:  Well, if Mr. Lavine is feeding that to

17   you, you might want to be more sure before you ask me to do

18   that.

19         Really, Mr. Lavine?  Honestly.  Based on what you now

20   know is that actually you would like to get Ms. Knox to ask me

21   to do that?  Why don't you?

22         MR. LAVINE:  I will.  Thank you, Your Honor.

23         I will move to strike Mr. Armstrong's testimony.  We

24   have just learned, after Mr. Armstrong has testified,

25   information that the Government knows.  Whether they got a PSR

1    or not is irrelevant.  It's their job to find that out and

2    provide that information.  It is exculpatory to us.  They have

3    failed in that regard.  Since they failed in that regard, I

4    think the remedy that we're asking for is to strike

5    Mr. Armstrong's testimony.

6            THE COURT:  Well, I'm not going to do any such thing

7    until I know more about the matter that is the subject of the

8    inquiry.  So you'll furnish all the information to me.  Nobody

9    is going to rely on just standing up and telling me what

10   happened with this case.  So get the records, and we'll make a

11   record on the timing and then I'll decide what to do.  This is

12   certainly premature to ask for his testimony to be stricken,

13   so I'm not doing any such thing.  I'll take that matter under

14   advisement when I and counsel are advised about the facts.

15           MS. NICOLE KNOX:  I understand, Your Honor.

16           THE COURT:  So I have Mr. Armstrong -- Mr. Cesario

17   who's certainly available to be brought back.  Presumably

18   Mr. Armstrong is available to be brought back.

19           MR. BRASHER:  We can make those arrangements.

20           THE COURT:  Okay.  All right.  So counsel will decide

21   if you want him brought back once we know what the matter is

22   and whether it is a matter that should support bringing him

23   back.

24           What other matters?

25           MS. STILLINGER:  Your Honor, the only thing I would

1    ask, and I'm not sure if they've done this, but I assume that

2    they would run a criminal history report on every Government

3    witness.

4            THE COURT:  Yes.  So would I.

5            MS. STILLINGER:  And if they haven't done that, we

6    would request that.

7            THE COURT:  Yes.  Mr. Brasher, I'm astonished.

8            MR. BRASHER:  We did it, and it was run -- I believe

9    they were all run back in September.  I provided them all this

10   morning.  It was my fault for not bringing that file to court

11   earlier.  There's no excuse for it.

12           THE COURT:  Well, if there's no excuse for it, then

13   it shouldn't have happened, Mr. Brasher.  I'm getting a little

14   tired of repeating this kind of thing.  It's pretty basic

15   stuff.  There's a lot of lawyers over there.  There's a lot of

16   agents over there.  You know what you're duties are and I

17   expect you to honor them.

18           Anything else?

19           MS. STILLINGER:  Not at this time from us.

20           MS. NICOLE KNOX:  No, Your Honor.

21           THE COURT:  I'm not estopping you from making any

22   record.  I'm estopping you from making a motion when that is

23   not able to be fully informed when we don't know what the

24   facts are.

25           All right.  Class dismissed.  I think you all are now

 1    well advised who the witnesses are for the Government.

 2            Do I understand the Government is close to being

 3    done?

 4            MR. RAYBOULD:  Yes, Your Honor.

 5            THE COURT:  Okay.  So I'm expecting the Defendants to

 6    designate their exhibits, and that makes it a lot easier for

 7    me to find out what exhibits you're going to be using so I can

 8    pull those.

 9            (Court adjourned at 4:40 PM.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF OFFICIAL REPORTER

 

      I, Deborah A. Kriegshauser, Federal Official Realtime
Court Reporter, in and for the United States District Court
for the Northern District of Texas, do hereby certify that
pursuant to Section 753, Title 28, United States Code, that
the foregoing is a true and correct transcript of the
stenographically-reported proceedings held in the
above-entitled matter and that the transcript page format is
in conformance with the regulations of the Judicial Conference
of the United States.

      Dated this 20th day of May, 2020.


           /s/ Deborah A. Kriegshauser
           _____
           DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
           FEDERAL OFFICIAL COURT REPORTER