UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| VS. | ) No. 3:16-CR-00060-M |
| | ) |
| JOHN PAUL COOPER (02), WALTER NEIL | ) |
| SIMMONS (03), WILLIAM FRANK | ) |
| ELDER-QUINTANA (04), JEFFRY DOBBS | ) |
| COCKERELL (07), STEVEN BERNARD | ) |
| KUPER (08), and MICHAEL JOHN | ) |
| KISELAK (12), | ) |
| | ) |
| Defendants. | ) |

JURY TRIAL PROCEEDINGS -- VOLUME 13
BEFORE THE HONORABLE BARBARA M.G. LYNN
UNITED STATES DISTRICT COURT JUDGE
NOVEMBER 14, 2019
DALLAS, TEXAS

FOR THE PLAINTIFF:

    DOUGLAS B. BRASHER
    RYAN RAYBOULD
    RENEE M. HUNTER
    OFFICE OF U.S. ATTORNEY - NDTX
    1100 Commerce Street, Suite 300
    Dallas, TX  75242
    (214) 659-8600

FOR THE DEFENDANTS:

    JAMES P. WHALEN
    RYNE T. SANDEL
    WHALEN LAW OFFICE
    9300 John Hickman Parkway, Suite 501
    Frisco, TX  75035
    (214) 368-2560
    (John Paul Cooper)

    CHRISTOPHER M. KNOX
    LAW OFFICE OF CHRIS KNOX

900 Jackson Street, Suite 650
Dallas, TX  75202
(214) 741-7474
(John Paul Cooper)

SHIRLEY BACCUS-LOBEL
LAW OFFICES OF SHIRLEY BACCUS-LOBEL, PC
8350 Meadow Road, Suite 186
Dallas, TX  75231
(214) 220-8460
(Walter Neil Simmons)

CHERYL B. WATTLEY
LAW OFFICE OF CHERY B. WATTLEY
302 Windy Lane
Cedar Hill, TX  75104
(214) 882-0855
(Walter Neil Simmnons)

MARY STILLINGER
KATE GODINEZ
LAW OFFICE OF MARY STILLINGER
401 Boston Avenue
El Paso, TX  79902
(915) 775-0705
(William Frank Elder-Quintana)

SEAN RYAN BUCKLEY
SEAN BUCKLEY & ASSOCIATES
770 South Post Oak Lane, Suite 620
Houston, TX  77056
(713) 380-1220
(Jeffry Dobbs Cockerell)

JIM E. LAVINE
ZIMMERMAN, LAVIN & ZIMMERMANN, PC
770 S. Post Oak Lane, Suite 620
Houston, TX  77056
(713) 552-0300
(Jeffry Dobbs Cockerell)

JEFFREY J. ANSLEY
ARIANNA G. GOODMAN
BELL, NUNNALLY & MARTIN, LLP
2323 Ross Avenue, Suite 1900
Dallas, TX  75201
(214) 740-1408
(Steven Bernard Kuper)

NICOLE E. KNOX

LAW OFFICE OF NICOLE KNOX
3131 McKinney Avenue, Suite 800
Dallas, TX  75204
(214) 740-9955
(Michael John Kiselak)


     Proceedings reported by mechanical stenography;
transcript produced by computer-aided transcription.
_____


          DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
             Federal Official Court Reporter
            1100 Commerce Street, 15th Floor
                   Dallas, TX  75242
                   (214) 753-2325

```
1                           I N D E X

2
    Plaintiff's
3   Witnesses:           Direct      Cross     Redirect    Recross

4   JOE L. STRAW                   7, 49, 84    112
      (Cont'd.)                      90, 97
5
    CHELSEA KLUGE        122       137, 144     154
6
    SHARON WATTS         156       166, 177
7
    ANDREW BAUMILLER     182         288
8
```

**EXHIBITS**

GOVERNMENT EXHIBITS

| EXHIBIT NUMBER | INTRODUCED | ADMITTED |
|---|---|---|
| 6 | 256 | 257 |
| 7 | 259 | 262 |
| 8 | 259 | 262 |
| 9 | 259 | 262 |
| 10 | 260 | 262 |
| 11 | 260 | 262 |
| 12 | 260 | 262 |
| 13 | 260 | 262 |
| 19 | 260 | 262 |
| 20 | 260 | 262 |
| 21 | 260 | 262 |
| 22 | 260 | 262 |
| 25 | 260 | 262 |
| 26 | 260 | 262 |

| | | | |
|---|---|---|---|
| 1 | 127 | 213 | 214 |
| 2 | 143 | 219 | 220 |
| 3 | 144 | 227 | 227 |
| 4 | 145 | 230 | 230 |
| 5 | 148 | 223 | 223 |
| 6 | 161 | 228 | |
| 7 | 171 | 240 | 240 |
| 8 | 183 | 240 | 241 |
| 9 | 184 | 241 | 241 |
| 10 | 192 | 250 | 250 |
| 11 | 199 | 268 | 268 |
| 12 | 250 | 234 | 235 |
| 13 | 254 | 159 | 160 |
| 14 | 354 | 130 | 130 |
| 15 | 358 | 279 | 283 |
| 16 | 360 | 279 | 283 |
| 17 | 362 | 279 | 283 |
| 18 | 370 | 198 | 199 |

19                          COOPER EXHIBITS

| | | | |
|---|---|---|---|
| 20 | EXHIBIT NUMBER | INTRODUCED | ADMITTED |
| 21 | 203 | 330 | 331 |

22                          SIMMONS EXHIBITS

| | | | |
|---|---|---|---|
| 23 | EXHIBIT NUMBER | INTRODUCED | ADMITTED |
| 24 | 160 | 53 | 53 |
| 25 | 161 | 60 | 60 |

```
 1        263                                              69

 2

 3                         KISELAK EXHIBITS

 4    EXHIBIT NUMBER              INTRODUCED              ADMITTED

 5        199                        105                   105

 6        200                        105                   105

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    (PROCEEDINGS BEGAN AT 8:07 AM.)

 2              THE COURT:  All right.  Anything we need to talk

 3    about?  Okay.

 4              MR. LAVINE:  We have a witness in the courtroom.

 5              MR. BRASHER:  Oh, sorry.

 6              MR. LAVINE:  Your Honor, if we could put something on

 7    the record on a break.

 8              THE COURT:  Do you have the documents discussed

 9    yesterday that you were going to get, the individual cases?

10              MR. BRASHER:  We e-mailed those to Leo last night.

11              COURT SECURITY OFFICER:  All rise for the jury.

12              Hear ye!  Hear ye!  Hear ye!  The United States

13    District Court in and for the Northern District of Texas at

14    Dallas is now in session.  The Honorable United States Chief

15    Judge Barbara M.G. Lynn presiding.

16              THE COURT:  Be seated.  Good morning, Ladies and

17    Gentlemen.

18              THE JURY:  Good morning.

19              THE COURT:  All right.  You may proceed, Mr. Knox.

20              MR. CHRIS KNOX:  Thank you, Your Honor.

21                    CONTINUED CROSS EXAMINATION

22    QUESTIONS BY MR. CHRIS KNOX:

23    Q    Okay.  Mr. Straw, when we broke yesterday, I believe the

24    last question I had asked you was the fact that you had ceded

25    control specifically as it pertains to W-2s and withholding of
```

1    at least 40 percent of your income to Trilogy.  That could

2    certainly be taken as a sign of an employer/employee

3    relationship, correct?

4    A    It could.

5    Q    Okay.  And there are multiple examples of things that

6    could being taken as that between -- as it pertains to your

7    work and your employment with Trilogy, right?

8    A    Correct.

9    Q    Multiple factors, correct?

10   A    Correct.

11   Q    You had -- When you -- The very first time that you met

12   with Mr. Cesario in 2014 at that Starbucks, he told you he

13   worked for Trilogy, didn't he?

14   A    I can't remember.

15   Q    Okay.  Well, do you recall maybe specifically talking

16   about that with the -- with the prosecutors?

17   A    About when I first met at Starbucks?

18   Q    In your meeting.

19   A    Correct.

20   Q    Okay.  And at that point in time, that's when Mr. Cesario

21   first told you about his wife, correct?

22   A    Yes.

23   Q    Do you have knowledge of the fact that he gave that exact

24   same -- I'm grappling with the word because I don't believe it

25   to be a story in a negative context.

1    THE COURT:  Let's just not have running commentary; a

2  question, please.

3  Q    (By Mr. Chris Knox) Are you -- Do you have knowledge that

4  he said that to multiple people at the beginning of this?

5  A    I did not have knowledge of that.

6  Q    Okay.  You were unaware that he had said that to

7  Mr. John Cooper.

8  A    I did not, no.

9  Q    Did you ever have a conversation with Mr. John Cooper as

10  it pertained to Mr. Cesario's wife?

11  A    No, I didn't.

12  Q    But you told us yesterday that you believed it to be very

13  sincere.

14  A    Yes.

15  Q    Do you believe it was sincere now?

16  A    As far as I know, it is.

17  Q    Nothing that you saw that made you think that he wasn't

18  sincere in his desire to combat the opioid addiction in the

19  United States.

20  A    At the time I didn't.

21  Q    Okay.  I asked you as well how many documents do you

22  think you reviewed during your various meetings with the

23  federal agents and the prosecutors in this case.

24  A    Correct.

25  Q    Do you know roughly how many you think you reviewed?  Was

```
 1   it more than 20?

 2   A     Yes.

 3   Q     More than 50?

 4   A     Probably less than 50.

 5   Q     All right.  So somewhere in that gap of 20 to 50?

 6   A     Yes.

 7   Q     And this included e-mails?

 8   A     Right, on documents; correct.

 9   Q     So e-mails between and you other individuals?

10   A     Yes.

11   Q     As well as bank statements?

12   A     Yes.

13   Q     Financial information?

14   A     Yes.

15   Q     W-2?

16   A     Yes.

17   Q     From Trilogy to you?

18   A     Yes.

19   Q     And we covered yesterday at the conclusion, I think, of

20   my -- of the time that I was questioning you yesterday that

21   ultimately you were terminated from Trilogy, right?

22   A     I guess.  I don't really understand kind of how that

23   works, but I know I no longer received money.

24   Q     From Trilogy.

25   A     From Trilogy or CMGRx.
```

1    Q    There was a time, was there not, when you went to Trilogy

2    Pharmacy with Mr. Cesario?

3    A    No.

4    Q    That didn't occur?

5    A    I never went to Trilogy with Rich.

6    Q    Okay.  Was there a time when you spoke with

7    Andrew Baumiller by yourself?

8    A    Yes.

9    Q    Okay.  And lawyers were brought up in that meeting or

10   that discussion?

11   A    I can't remember if we talked about attorneys or not.

12   Q    Okay.  Certainly very possible that that happened?

13   A    Well, I was there to talk about something completely

14   different, so I don't remember.

15   Q    Okay.  You also at various times -- well -- had a meeting

16   with Scott Meyer, did you not?

17   A    Yes.

18   Q    Scott Meyer's the attorney specifically for CMGRx,

19   correct?

20   A    Correct.

21   Q    And that meeting involved an actual sit-down between you

22   and Mr. Meyer, didn't it?

23   A    Yes.

24   Q    And you discussed all things that were related to the

25   legality of your job and your work in the set-up that CMGRx

1    had with Trilogy.

2    A    Yes.

3    Q    And he advised you specifically that this was lawful.

4    A    Yes.

5    Q    He advised you specifically that he had spoken

6    extensively with Frier Levitt.

7    A    I don't remember that name coming up.

8    Q    Okay.  Did he tell you specifically that he had spoken

9    extensively with lawyers that -- for Trilogy?

10   A    No, we didn't talk about that.

11   Q    Okay.  Do you recall when that meeting occurred?

12   A    It was a while back.  Probably deep between December and

13   maybe February of 2015.

14   Q    Give me one brief minute.

15   A    Okay.

16          (Pause)

17   Q    Okay.  And you said that occurred in the middle of --

18   Well, did you say December?

19   A    Right.  I'm thinking maybe around that time.

20   Q    Okay.  December 9th maybe?  Could have -- Sounds like it

21   was certainly a possibility?

22   A    Maybe.

23   Q    And so that gave you reassurance, did it not?

24   A    To some degree.

25   Q    Well, you told us yesterday that you never had any

1    conversation with Mr. Cesario about this being illegal,

2    correct?

3    A    About it being illegal?

4    Q    Yes, sir.

5    A    No.

6    Q    You never had any conversation with John Cooper about

7    this being illegal.

8    A    No.

9    Q    You never had any conversation with any of the other

10   Defendants that are seated in this courtroom about this being

11   illegal.

12   A    No.

13   Q    You had a conversation with Scott Meyer who was the

14   attorney for CMGRx about it being perfectly lawful, right?

15   A    I did meet with Scott, yes.

16   Q    Okay.  And that gave you reassurance, did it not?

17   A    Yes.

18   Q    The prosecution asked you yesterday -- Let me ask you a

19   quick question first.

20         When you met with Cesario in July of 2014 at

21   Starbucks, you all discussed specifically what this study

22   entailed, correct?

23   A    Yes.

24   Q    And leaving there, you went home and tried to enroll, is

25   that right, in the study?

1   A    I can't remember if I tried to enroll that -- right after

2   we met on Saturday.  I can't remember.

3   Q    Well, okay; fair enough, and I appreciate that.  Sometime

4   in that -- in that general -- contemporaneous to your meeting

5   you tried to enroll in the study, right?

6   A    I believe I did.

7   Q    Okay.  Sometime thereafter.

8   A    Right.

9   Q    And it -- it -- You weren't successful, correct?

10  A    I wasn't.

11  Q    In fact, you weren't successful because your insurance

12  would not cover the prescriptions, right?

13  A    Correct.

14  Q    So there is a difference between a prescription and being

15  a participant in the marketing study, right?

16  A    Correct.

17  Q    I mean one can have a prescription to these and not be a

18  participant in the marketing study, correct?

19  A    I don't -- I don't really understand the difference.

20  Q    Okay.  Are you aware that not everybody, in fact --

21  Scratch that.  Let me start over.

22        Are you aware that the majority of individuals who

23  had prescriptions to these pain and scar creams or vitamins

24  were not enrolled in the marketing study?  Are you aware of

25  that as you sit on the witness stand right now?

```
 1    A    I just -- I thought they were one in the same.

 2    Q    Okay.  So -- So as you sit there right now, you have no

 3    specific knowledge that lots and lots of individuals had

 4    prescriptions that were not enrolled in the marketing study

 5    and never received compensation for completing the tasks of

 6    the marketing study.  You did not know that?

 7    A    I did not know that.

 8    Q    Okay, fair enough.  So when you tried to enroll and your

 9    insurance did not cover it, you were covered by VA insurance.

10    Is that correct?

11    A    Right.

12    Q    Okay.  And what does "VA" stand for?

13    A    Veteran Association.

14    Q    Okay.  And that's who specifically, because of your

15    service, was covering your health insurance.

16    A    Correct.

17    Q    And they declined to extend coverage for these creams.

18    A    Right.

19    Q    Now TRICARE is a separate health insurance.

20    A    Yes.

21    Q    And they cover active military and in some instances

22    retired military.

23    A    Yes.

24    Q    And they did, in fact, cover the creams.

25    A    They did.
```

```
 1   Q    Okay.  Did you ever call whoever's in charge of

 2   administering the plan with the VA and ask them why that was

 3   not covered?

 4   A    I don't remember calling.

 5   Q    You enrolled some friends or advised them or told them

 6   that they could enroll in the study later?

 7   A    Yeah.  I mean I -- Yes.  Those are only the people that I

 8   knew are the ones I told about the study.  So, yes, some were

 9   friends, yes.

10   Q    Okay.  And so yesterday on Direct Examination Ms. Hunter

11   asked you specifically when you were denied, you know, you

12   couldn't participate in the study -- I don't want to

13   mischaracterize her statements, but she indicated to you that

14   that was somewhat -- she was unsure as to why, right?  Do you

15   recall that?

16   A    I can't remember.  I remember her asking about it, --

17   Q    Okay.

18   A    -- if I tried to enroll.

19   Q    Okay.  So if your insurance would not cover the

20   prescription, would there be a purpose for you to enroll in

21   the study?

22   A    No.

23   Q    What feedback could you possibly give if your insurance

24   company declines to cover the prescription?

25   A    I couldn't give any feedback.
```

1    Q    Zero, right?

2    A    Right.

3    Q    And so any -- any idea that you can't be in the study if

4    insurance won't cover you is dependent on if the insurance

5    will or will not cover the prescription, correct?

6    A    Correct.

7    Q    And who makes the decision as to whether insurance will

8    cover the prescriptions?

9    A    The insurance companies.

10   Q    Okay.  Certainly not the sales reps.

11   A    Right.

12   Q    Certainly not the patients.

13   A    Correct.

14   Q    Okay.  Certainly not the participants in the marketing

15   study or even the doctors who write the prescriptions.

16   A    Yes.

17   Q    The insurance company solely makes that decision.

18   A    Correct.

19   Q    The VA says "no" and TRICARE says "yes," right?

20   A    Yes.

21   Q    Do you know if the VA ever paid any money out for pain or

22   scar creams?

23   A    I don't know.

24   Q    It would -- Logically, you would assume they did not,

25   correct?

1    A    Correct.

2    Q    Okay.  And you've been in sales before?

3    A    Yes.

4    Q    It is not uncommon at all, is it, for a salesperson to

5    operate on commissions?

6    A    Right.

7    Q    I mean to be paid on commissions.

8    A    Correct.

9    Q    That is the most common way to pay a sales force, is it

10   not?

11   A    A lot of times, yes.

12   Q    So this idea that marketers were paid based on

13   prescriptions actually literally translates to marketers were

14   paid based on performance.

15   A    Yes.

16        MR. CHRIS KNOX:  Mr. Slyter, can we get Government

17   Exhibit 547 and let's try Page 7 and 3.11(B), capital B.

18   Q    (By Mr. Chris Knox) And you discussed this for quite a

19   while or you discussed it on Direct Examination with the

20   prosecution, and you said that you had paid careful attention

21   to this and the anti-kickback law?

22   A    Yes.  I remember this part.

23   Q    Okay.  Do you know which one of those code sections cited

24   there is the anti-kickback law?

25   A    I'm not sure.

1    Q    And specifically, as you're going through all of this

2    documentation, that's when you decided you wanted to speak

3    with Scott Meyer about the arrangement.

4    A    I can't remember if I did or not.

5    Q    Okay.

6    A    I know I did ask John and Rich about it.

7    Q    Okay.

8         MR. CHRIS KNOX:  May I approach briefly, Judge?

9         THE COURT:  Yes.

10   Q    (By Mr. Chris Knox) I'm showing you -- Do you see what's

11   highlighted there and then it has a date right there?

12   A    Yes.

13   Q    Okay.  Does that refresh your memory as to maybe the date

14   you met with Mr. Meyer?

15   A    It doesn't.

16   Q    It does not?

17   A    I'm sorry.  No, it does not.

18   Q    All right, fair enough.  Well, you signed this agreement;

19   I believe it was on November the 6th or 7th.  Is that correct?

20   A    Yes.

21   Q    And this law is -- This series of laws here is in the

22   middle, right?

23   A    Right.

24   Q    Okay.  And you can't identify specifically which one of

25   these is -- is in reference to an anti-kickback.

1    A    Well, the Stark Anti-Referral ---

2    Q    Okay, fair enough.  And so when you read that, you

3    understand it's an extremely complex series of laws, body of

4    law; right?

5    A    Right.

6    Q    Okay.  And nothing tricky there, right?  I mean it's a

7    complex body of law.

8    A    I assume it is.

9         MR. CHRIS KNOX:  Can we go to -- let's try Page 8.

10   Give me one second, Mr. Slyter.  I'll tell you if I can narrow

11   down to where I'm trying to get you.

12        (Pause)

13        MR. CHRIS KNOX:  I apologize.  The copy is a little

14   bit difficult for me to read.

15   Q    (By Mr. Chris Knox) And you received a payment of 20,000,

16   I believe you said, shortly after you started working for

17   CMGRx?

18   A    Yes.

19   Q    And you spoke about that on Direct Examination and tell

20   me if I've mischaracterized you here, but you said, "It was

21   explained to me that that was for PPO insurance"?

22   A    Yes.

23   Q    What is "PPO insurance"?

24   A    Private insurance.

25   Q    Private pay, correct?

1   A    Yes.

2   Q    Has absolutely nothing to do with TRICARE or

3   federally-funded health insurance program.

4   A    I'm not sure.  I just know it's private pay.

5   Q    Okay.  And you know when you first started with CMGRx,

6   they were not specifically covering or sending meds to TRICARE

7   beneficiaries at all.

8   A    I wouldn't know.  I don't know for sure.

9   Q    Okay.  Well, to be more specific:  You were aware that

10  that started sometime as your employment commenced with CMGRx

11  in mass.  You grew.

12  A    Oh, yes.  We had a lot of military individuals.

13  Q    Okay.

14  A    Most of them.

15  Q    Most of that was due to your contacts, correct?

16  A    Yes.

17  Q    Specifically at Fort Hood and you had contacts because of

18  your service.

19  A    Correct.

20  Q    Okay.  And we spoke yesterday about the fact that, you

21  know, you're a patriotic individual and you have, I believe --

22  is it eight children?

23  A    I do.

24  Q    At that point in time you never would have embarked on

25  some career path that you felt was unlawful, would you?

1   A    No.

2   Q    Especially as it pertains to something that so obviously

3   involves federally-funded money.

4   A    Correct.

5   Q    You -- As you moved on through this with CMGRx, you used

6   a bank account the whole time, right?

7   A    I did.

8   Q    Money was transferred via a contractual agreement and a

9   W-2 tax form, right?

10  A    Yes.

11  Q    Your taxes were withheld that are going to then be paid

12  to the Federal Government.

13  A    Yes.

14  Q    The W-4, I-9 information that you give to make sure that

15  you can receive a W-2 and pay lawfully is going to go to the

16  Federal Government.

17  A    Yes.

18  Q    Trilogy is paying money as a direct deposit, ACH, into

19  your bank account.

20  A    Yes.

21  Q    Nobody's taking you out into a dark alley and saying,

22  "Here you go, Mr. Straw; here's your money;" right?

23  A    No.

24  Q    I mean it's -- it's amusing, right?  They're not paying

25  you that way, correct?

1    A    No.

2    Q    Okay.  And Trilogy is a -- Well, I mean it's a beautiful

3    facility, wasn't it?

4    A    It's nice.

5    Q    Very nice, wasn't it?

6    A    Yes.

7    Q    Okay.  And Mr. Baumiller is reassuring, isn't he?

8    A    Yes.

9    Q    He's a pretty "with it" individual, wasn't he?

10   A    It seems like it.

11   Q    Very hard working?

12   A    Of course.

13   Q    Okay.  And diligent in his effort?

14   A    I mean he's a nice guy.  He seemed like he knew what he

15   was doing.

16   Q    Okay.

17         MR. CHRIS KNOX:  Mr. Slyter, can we get Government

18   547 back?  And maybe let's try Page 15.  I think it's Term 6.1

19   at the top there.

20   Q    (By Mr. Chris Knox) Mr. Straw, before I move to this, let

21   me ask you a question.  Were you ever presented with a legal

22   opinion from Frier Levitt explaining specifically how the

23   marketing works when marketing a compounding pharmacy?

24   A    Not that I can remember.

25   Q    Okay.  It's 15 pages.  You don't recall reading that at

1    all?

2    A    I don't.

3    Q    Okay.  Here, this is from this same contract that you

4    signed on November the 6th, right?

5         Do you -- Would you like for me to have them back out

6    so you can see it or you accept my representation that's what

7    this is?

8    A    I can see it.

9    Q    Okay.  And so this here has a term, "This agreement will

10   become effective as of the effective date," right?

11   A    Yes.

12   Q    "And will remain in effect for a period of three years as

13   an initial term, will automatically renew for additional

14   successive one-year periods," correct?

15   A    Right.

16   Q    "Unless terminated earlier in accordance with the

17   provisions," right?

18   A    Correct.

19   Q    Okay.  Are you aware that that is contemporaneous -- I

20   mean that is -- Let me back up.  Let me start over.

21        Are you aware that those term periods mesh with legal

22   advice that Trilogy had received previously?

23   A    I did not know at the time.

24        MR. CHRIS KNOX:  Thank you, Mr. Slyter.  You can take

25   that down for the moment.

1    Q    (By Mr. Chris Knox) And we discussed yesterday -- You

2    recall now, after having your memory refreshed, that when you

3    received that, you actually also received information that

4    this will be updated to a W-2 agreement in the near future,

5    even the next seven days.

6    A    Correct.

7    Q    Did you have any part in setting the prices for the

8    compounding creams?

9    A    I did not.

10   Q    Do you know who did set the prices?

11   A    I'm not really sure.

12   Q    Okay.  Do you recall ever having any knowledge that they

13   were specifically set by Express Scripts?

14   A    I'm not real sure.  I can't remember.

15   Q    Do you know who Express Scripts is?

16   A    I do.

17   Q    Okay.  Your understanding of Express Scripts is that they

18   are a Pharmacy Benefit Management company?

19   A    Correct.

20   Q    Are you aware of their recent sale?

21   A    No, I'm not.

22   Q    You don't have any recollection of ever having any

23   knowledge whatsoever that Express Scripts was actually who

24   determined what the reimbursement rate was going to be?

25   A    I did not know specifically them.

1    Q    And you said at one point when you found out the cost of

2    the creams, you asked Mr. Cesario about it?

3    A    Yes.

4    Q    Do you recall telling the Government in your interviews

5    and sit-downs that you recall talking to Mr. Cesario about it

6    because you were wondering why you weren't getting paid more?

7    A    Correct.

8    Q    Okay.  And he explained to you that that money is divvied

9    up between a lot of people, right?

10   A    Correct.

11   Q    Did you ever look into how these prices were set at that

12   period of time?

13   A    I did not, not past that.

14   Q    And you've described the roles of Mr. Cesario and

15   Mr. Cooper on your -- during your testimony, correct?

16   A    Correct.

17   Q    And I believe some of the things that you said is

18   Mr. Cesario called the shots, right?

19   A    He would -- Yes.

20   Q    He was the man in charge at CMGRx.

21   A    Yes.

22   Q    He was the face, and he was involved in the contracting

23   and negotiations?

24   A    Correct.

25   Q    And Mr. Cooper worked on making sure that the books

1   balanced and that the pay went to where it needed to be.

2   A    Correct.

3   Q    And Mr. Cesario, this was his goal and vision from the

4   get-go.

5   A    Correct.

6   Q    It was not one that Mr. Cooper had thought up.

7   A    I'm not sure.  I don't believe so.

8   Q    Okay.  That's just beyond the purview of your knowledge,

9   right?

10  A    Right.  I don't know.

11  Q    Fair enough.  There was discussion on your Direct

12  Examination that you guys were told not to call doctors

13  directly, right?

14  A    Yes.

15  Q    Okay.  Do you find that to be completely 100 percent

16  normal?

17  A    I'm not sure.  I know I call my doctor.

18  Q    Sure.  You call your doctor, right?  Correct?

19  A    Correct.

20  Q    But as a sales rep, to be calling the doctors to talk to

21  them about scripts or your money or anything else seems to be

22  a little bit outside the scope of professional, doesn't it?

23  A    Correct.

24  Q    Okay.  And so any indication of, "Well, Cooper and

25  Cesario told us not to call the doctors" would be completely

1    consistent with the normal business hierarchy, would it not?

2    A    Yes.

3    Q    Normal business professional relationship.

4    A    Yes.

5    Q    Okay.  You also indicated that you're not sure if there

6    were ever any patients who weren't qualified for this, right,

7    or who were deemed not qualified for the -- for the study?

8    A    There was -- There was patients not qualified.

9    Q    There were a lot of them, right?

10   A    I can't -- I really can't remember, but ---

11   Q    Well, you were one, correct?

12   A    I know I didn't qualify.

13   Q    So, undoubtedly, people did not qualify.

14   A    They did not qualify.

15   Q    And if -- And if a marketer had given this script to

16   CMGRx, this person's information to CMGRx, who would then fill

17   out the specifics of this individual, correct, on the face of

18   a script?  Right?

19   A    Right.

20   Q    And then that goes to the doctor, right?

21   A    Yes.

22   Q    And then the doctor makes contact with the patient based

23   on the information that's on the script, correct?

24   A    Yes.

25   Q    That's not a random draw from the -- from the *Yellow*

1    *Pages*, is it?

2    A    No.

3    Q    These are patients who have expressed in some form or

4    fashion either by visiting a website or in person that they

5    have a desire to try this cream.

6    A    Correct.

7    Q    And when -- when that happens and a patient says that, as

8    a sales rep, do you sit down with the patient and ask them

9    about their opioid history?

10   A    No.

11   Q    Do you sit down with them and say, "I hear you telling me

12   you have some pain but I want to make sure.  Where does it

13   hurt?  Let me -- Let me test it out.  Let me punch on it for

14   you"?

15   A    No.

16   Q    Okay.  Do you ask them if they're addicted to any kind of

17   pill or as it pertains to opioids or otherwise that they're

18   trying to get off of?

19   A    No.

20   Q    You take them at their word --

21   A    Correct.

22   Q    -- that they would like to try the cream.

23   A    Yes.

24   Q    And you forward that information to the CMGRx office.

25   A    Yes.

1    Q    And they take a script and they handwrite on there or in

2    some form or fashion they put that information of the patient

3    on the script with the phone number and what specifically this

4    patient may want, right?

5    A    Yes.

6    Q    And that goes to the doctor via Kareo, correct?  You may

7    not know that.

8    A    I don't -- I really didn't know.

9    Q    It gets to the doctor.

10    A    Okay.

11    Q    Right?

12    A    Correct.

13    Q    Okay.  And your understanding is the doctor then calls

14    them and has a consultation.

15    A    Correct.

16    Q    And at that point in time you have no knowledge or

17    information about what specifically the doctor and this

18    patient discuss on the phone, do you?

19    A    I do not.

20    Q    You know there were patients who did not qualify.

21    A    Yes.

22    Q    And if a patient had told Dr. Elder, for example, that,

23    "Hey, I really don't have much pain, Doc, but this sounds like

24    something I want to try out," you certainly believe as you sit

25    there right now that that patient would not have qualified,

1    right?

2    A    Probably not.

3    Q    Okay.  Because you have no reason to believe Dr. Elder

4    was not exercising his medical judgment.

5    A    Right.

6    Q    And let me ask you this:  Do you recall telling the

7    Government recently, in fact, the day before you testified,

8    that Mr. Cesario told you that doctors were paid per person?

9    A    For their work.

10   Q    Yes, sir.

11   A    Yes.

12   Q    Okay.  And "per person" means per assessment.

13   A    Yes.

14   Q    Per assessment they do when they call, talk to the

15   patient, and exercise their medical judgment.

16   A    Yes.

17   Q    You also discussed with the prosecution that there was no

18   marketing on social media.  Do you recall that?

19   A    Yes.

20   Q    In fact, I think you even answered a question as to why;

21   because you felt as though or they -- that the suggestion was

22   made that you felt as though that could have been a very

23   productive avenue of marketing, right?

24   A    It could have.  It always is.

25   Q    Sure.  Are you aware of any FDA restrictions on -- on --

1    or any restrictions on compound pharmacies being able to

2    market because of FDA rules or regulations?

3    A    I'm not aware of those.

4    Q    Okay.  As far as you know, there's certainly an extensive

5    body of law there, right?

6    A    It's a ---

7         MS. HUNTER:  Objection, Your Honor.  Calls for a

8    legal conclusion and assumes facts not in evidence.

9         THE COURT:  All right.  Overruled.

10   Q    (By Mr. Chris Knox) Certainly could be, right?

11   A    Right.  Yes, it could be.

12   Q    And would that possibly be a reason why you were

13   specifically told, "Do not market for compounding pharmacies

14   on social media"?

15   A    Yes.

16   Q    Okay.  You also testified that when you spoke directly to

17   any potential participants or patients, that you were -- you

18   never reference specifically a prescription, right?

19   A    Correct.

20   Q    You asked them what kind of conditions or ailments they

21   may have.

22   A    Yes.

23   Q    And when they told you, you took them at their word.

24   A    Correct.

25   Q    You also testified on Direct that your understanding is

 1   that the patients were paid for their participation in the

 2   study, right?

 3   A    Yes.

 4   Q    Okay.  And that was your understanding certainly at the

 5   time, all the way through May or June whenever you left or

 6   stopped working on behalf of Trilogy.

 7   A    Right.

 8   Q    Mr. Straw, do you -- And I don't need specifics, but do

 9   you have knowledge of or have you ever been close to anybody

10   who's had a major opioid addiction?

11   A    No.

12   Q    Okay.  If you had been at this time, would you have

13   recommended the creams to them?

14   A    Probably.

15   Q    Did you believe it was a viable alternative to opioids?

16   A    Yes.

17   Q    Do you believe that now?

18   A    Yes.

19   Q    You believe the creams worked.

20   A    Yes.

21   Q    And that they very well may have been addressing the

22   opioid issue in some small drop in the bucket.

23   A    Yes.

24   Q    You testified on Direct that you were motivated by money

25   that you were making in this, right?

1    A    Yes.

2    Q    Is that abnormal?

3    A    No.

4    Q    I mean if you could have a job playing for the Cowboys

5    and making millions, would you do it?

6    A    Absolutely.

7    Q    Any job that you think, "This is great, I love it and I'm

8    making money," is a good job; right?

9    A    Right.

10   Q    If you're making millions for the Cowboys, you may still

11   want a higher contract for the next season, wouldn't you?

12   A    As long as it's not the Giants.

13   Q    Fair enough.  My point is:  In the capitalistic economy,

14   there's nothing abnormal about that, is there?

15   A    That's -- That's true.

16   Q    To such a degree, you were not motivated by the money to

17   such a degree that if you had known that you were going to be

18   accused of doing stuff unlawfully, you would have kept doing

19   it; right?

20   A    Correct.

21   Q    If -- If that had ever crossed your mind to where you

22   felt the least bit insecure about it, you would have gotten up

23   and walked out of this deal.

24   A    Yes.

25   Q    Okay.  And you're aware that each one of these scripts

1    were submitted to Express Scripts and TRICARE, right?

2    A    They were.

3    Q    And that's who paid the adjudications, right?

4    A    Right.

5    Q    Nothing about that made you believe or think that this is

6    unlawful, did it?

7    A    It did not.

8    Q    In fact, it probably gave you some reassurance.

9    A    Yes, it did.

10   Q    Now I want to cover a topic with you.  I'm specifically

11   going to shift gears to this meeting in Killeen; right?

12   A    Okay.

13   Q    You're aware before -- And this meeting happened sometime

14   in January.  Is that right?

15   A    Yes.

16   Q    And you're aware that before this meeting happened, there

17   were some complaints to Mr. Cooper about the distribution of

18   some of the funds that were paid to you.

19   A    I was not aware of that before the meeting.

20   Q    Are you aware now that that occurred before the meeting?

21        THE COURT:  Can you clarify that whenever you're

22   referring to "Mr. Cooper," you're referring to John Cooper?

23        MR. CHRIS KNOX:  I will, Judge.  I apologize.

24   Q    (By Mr. Chris Knox) My question -- specifically my last

25   question was:  The meeting in January, are you aware that

```
 1   there had been complaints to Mr. John Cooper about

 2   disbursement of funds that had been paid to you?

 3   A     To me or to my marketers?

 4   Q     To Smart -- What is it?  Smart ---

 5   A     Smart Rx.

 6   Q     Smart Rx.

 7   A     Right.

 8   Q     Are you aware of that?

 9   A     No, I wasn't aware.

10   Q     You weren't aware then.  Are you aware now that that had

11   occurred?

12   A     I don't really under -- Are you asking was I aware of

13   complaints of payments paid to me, to Smart Rx, from

14   John Cooper?

15   Q     Fair enough.  Let me start over.

16   A     Okay.

17   Q     Are you aware that when some of your -- of reps that were

18   with you --

19   A     Correct.

20   Q     -- had their withholdings on their W-2s and on their

21   taxes explained to them, --

22   A     Okay.

23   Q     -- that they felt it did not mesh with the amount of

24   money that they had received from you?

25             MS. HUNTER:  Objection, Your Honor; assumes facts not
```

1    in evidence.

2            THE COURT:  Rephrase that.

3    Q    (By Mr. Chris Knox) Were you aware at the time prior to

4    the meeting that any of your reps you were working with felt

5    as though they had been underpaid?

6    A    No.

7    Q    Okay.  Are you aware of that situation -- that that

8    existed then now as you sit on the witness stand?

9    A    Right.

10   Q    You are aware of that.

11   A    Correct.

12   Q    Before my questions today; right?

13   A    Right.

14   Q    Okay.  Knowing that, does it make more sense as to why

15   you did not participate in the meeting in Killeen?

16   A    Well, it makes sense, but I still don't understand why I

17   wasn't there.

18   Q    I understand.  And fair to say that you don't agree with

19   the decision of you not being in the meeting, right?

20   A    Correct.

21   Q    Okay.  I understand.  I'm not trying to quibble with

22   that, but can you -- You can see the logic behind Mr. Cooper,

23   having that information, wanting to talk directly to your reps

24   without you specifically in the room, right?

25   A    Correct.

1    Q    Okay.  And following that meeting, what happened was your

2    team became all just individuals, correct?  Sales reps.

3    A    I don't know what happened after that because I wasn't --

4    Q    Okay.

5    A    -- I wasn't privy to see everything as to how is it laid

6    out or structured, so I'm not sure.

7    Q    Okay.  So you lost your ability to access some of the

8    specific information that you had been able to access at the

9    beginning.

10   A    Yes.

11   Q    You would agree with me that at the beginning this was a

12   pretty small operation.

13   A    Yes.

14   Q    And it was growing.

15   A    Yes.

16   Q    And it was growing significantly.

17   A    Correct.

18   Q    And people were expressing positive feedback about the

19   creams.

20   A    Yes.

21   Q    And so this was getting bigger and bigger.

22   A    Correct.

23   Q    And it was very difficult, you would agree with me, at

24   that point in time to keep wraps on all of the moving parts

25   and information that's coming in.

1    A    For me or just period?

2    Q    For a business period.

3    A    Correct.  Well, depending on -- Yes, it could be.

4    Q    Okay.  It required some adjustment period.

5    A    Yes.

6    Q    And from what you see now, whether you agree with the

7    decisions or not, you can testify that those efforts were

8    being made; right?

9    A    Correct.

10    Q    To rein things in and to stay as compliant as possible

11    and do things right.

12    A    Correct.

13    Q    Okay.  And so what ultimately happened is some people who

14    may have had access to specific business information at the

15    beginning, the reins were being tightened a little bit.

16    A    Right.

17    Q    And those people's access may have been eliminated to

18    some things.

19    A    Correct.

20    Q    Okay.  Scott Meyer, the lawyer, is still around at this

21    point in time.

22    A    I believe so.

23    Q    Okay.  And so as this business rolls on and this stuff is

24    going on, your -- the individuals that were specifically under

25    you now were kind of broken up, and each one of them had to

 1    give their information directly to John Cooper and CMGRx.

 2    A    Yes.

 3    Q    Okay.  There were some questions about what changed after

 4    you became a W-2 employee.  Do you recall that --

 5    A    Yes.

 6    Q    -- on Direct?  Okay.  And you, I think, may have said or

 7    it was suggested that nothing really changed; right?

 8    A    Correct.

 9    Q    That's not exactly accurate, is it?

10    A    As far as -- It was to me.  I mean I didn't -- My day

11    just continued about the same.

12    Q    You had at least 40 percent of your taxes withheld.

13    A    Yes.

14    Q    You had a sales team that had been with you through the

15    beginning was broken up on direction of at least somebody

16    who's above you in this chain, right?

17    A    Correct.

18    Q    They told you, "That's not going to be the case anymore.

19    Now everybody has to come directly to us."

20    A    Yes.

21    Q    Do you have any idea if that was at the direction of

22    Trilogy and their counsel?

23    A    I have no idea.

24    Q    Okay.  But that's not information you were privy to

25    anymore.

1    A    No.

2    Q    In fact, you weren't privy to a lot of information that

3    you were privy to at the beginning.

4    A    Correct.

5    Q    You -- Specifically, your sales team was going directly

6    to Mr. Cooper with their information, and you were only now

7    receiving any pay for Joe Straw.

8    A    Yes.

9    Q    Okay.  Those are pretty significant changes, are they

10   not?

11   A    Those are -- Those are big changes.

12   Q    Okay.  So this whole idea of nothing really changed is

13   not exactly accurate, is it?

14   A    Well, all the changes just really had to do with me

15   controlling my team, so.

16   Q    And that was taken from you.

17   A    It was.

18   Q    By somebody who had more authority.

19   A    Yes.

20   Q    Okay.  And you didn't go in and say, "No, this isn't the

21   way it's going to be.  I don't want any of these changes."

22   A    I didn't say that.

23   Q    Okay.  Now in fairness, who -- if you have a job as a

24   sales rep and you work for this subsidiary who's got a parent

25   company, the parent company is paying your checks, you're an

```
 1   employee there, right, of the parent company?

 2              MS. HUNTER:  Objection, Your Honor.  This is

 3   misleading and calls for a legal conclusion.

 4              THE COURT:  Overruled.  If you don't understand the

 5   question or if there's an assumption that you don't agree

 6   with, you can correct that.

 7   A    Yeah.  I don't understand.  It just seems like you're

 8   trying to lead me to say that I was an employee, but ---

 9   Q    You know -- Well, that's not my intention.

10   A    Okay.

11   Q    I'm asking you specifically:  If you're working for a

12   subsidiary and the parent company is the one who's paying your

13   paychecks and they're paying you via W-2 and they have the

14   ability to terminate you and they have the ability to control

15   your sales force and they have the ability to change you from

16   contract to ---

17              MS. HUNTER:  Objection, Your Honor.  The lawyer is

18   testifying.

19              THE COURT:  I'm sorry.  I couldn't hear the last

20   part.

21              MS. HUNTER:  Counsel is testifying.

22              THE COURT:  It's Cross Examination; overruled.

23   Q    (By Mr. Chris Knox) And they have the ability to change

24   you from hourly to commission or vice versa.  They are, in

25   fact, in that scenario, your employer, are they not?
```

1    A    In that scenario, yes.

2    Q    Okay.

3         MR. CHRIS KNOX:  May I have a brief moment, Judge?

4         THE COURT:  Yes.

5         MR. CHRIS KNOX:  Mr. Slyter, can we get Government

6    Exhibit No. 11, please?  And just Page 1 is fine at first.

7    Q    (By Mr. Chris Knox) And, Mr. Straw, you were shown that.

8    Do you recognize this?

9    A    Yes.

10   Q    Okay.  And this is a Government summary chart that's got

11   counts from the Indictment listed above.  Do you see that?

12   A    Yes.

13   Q    Okay.  And really all this is is a bank statement that

14   shows that Joe Straw received a payment via W-2 from Trilogy,

15   right?

16   A    Yes.

17   Q    So the top one is from Trilogy.  It's the bank account,

18   right?

19   A    Yes.

20   Q    To Smart Rx, right?

21   A    Correct.

22   Q    And at the top from Trilogy it says, "Online ACH Payment

23   to Joe Straw W-2," right?

24   A    Yes.

25   Q    And above that, people you probably don't know and people

1    who probably weren't associated with this, Trilogy is making

2    other W-2 payments for employment, right?

3    A    Correct.

4    Q    Okay.  And below that on the bottom there on 323 we have

5    a Trilogy Pharmacy description, "ACH Payment to Joe Straw

6    W-2," right?

7    A    Yes.

8    Q    And the amount matches, right?

9    A    It does.

10   Q    And then just in case you didn't notice that, there's an

11   arrow that points from the top to the bottom and shows that

12   the amount is the same on both sides of the ledger, correct?

13   A    Yes.

14        MR. CHRIS KNOX:  If we could go to Page 3 of that,

15   please, Mr. Slyter, and you can stay zoomed out.

16   Q    (By Mr. Chris Knox) Can you read that well enough?

17        MR. CHRIS KNOX:  One step in probably.  Okay.

18   Q    (By Mr. Chris Knox) Do you see that, Mr. Straw?

19   A    I do.

20   Q    Okay.

21        MR. CHRIS KNOX:  Mr. Slyter, can we zoom out just a

22   bit just to capture the -- There you go.  That's perfect.

23   Q    (By Mr. Chris Knox) And in the middle there, this is

24   actually the bank record that was cut and pasted to the front

25   of this exhibit, correct?

```
 1    A    Correct.

 2    Q    Same amount, right?

 3    A    Yes.

 4    Q    And there are W-2s from top to bottom here, right?

 5    A    Yes.

 6    Q    You recognize ---

 7              MR. CHRIS KNOX:  Scroll back up for me, Mr. Slyter.

 8    That's my fault.

 9    Q    (By Mr. Chris Knox) Do you recognize the name

10    "Alyssa Straw" at the very top?

11    A    Yes.

12    Q    Any relation?

13    A    That's my daughter.

14    Q    Okay.  And she worked for CMGRx?

15    A    Yes.

16    Q    You wouldn't have brought her in there if you thought

17    there was specifically a problem?

18    A    No.

19    Q    Certainly, you would have done everything you could to

20    shield her if you are, in fact, in the middle of violating the

21    law knowingly with federal dollars.

22    A    Correct.

23    Q    You see "Amber Washington"?

24    A    Yes.

25    Q    Is she associated with CMGRx?
```

1   A    I'm not sure.

2   Q    Okay.  What about "Brian Gray"?

3   A    I don't -- I'm not real -- I don't know.

4   Q    Fair enough.  What about "Dianna Davied" in the middle?

5   A    I don't know these people.

6   Q    What about "Elizabeth Arlotta"?

7   A    No.

8   Q    Okay.  "Katherine Pfaff" at the bottom?

9   A    I don't know that name.

10       MR. CHRIS KNOX:  Mr. Slyter, you can take that down,

11 if you could.  Thank you.

12   Q   (By Mr. Chris Knox) That was, in fact, Trilogy's bank

13 account of W-2 payments, wasn't it?

14   A    Yes.

15   Q    Okay.  In your knowledge and experience, maybe some

16 recently gained, it isn't very difficult for the Federal

17 Government to find people's bank accounts, is it?

18   A    No.

19   Q    They bring them in.  They look through Trilogy's.  They

20 see these payments going out from Trilogy to you as W-2,

21 right?

22   A    Right.

23   Q    No effort to conceal that, was there?

24   A    From -- I don't know.  I don't understand the question.

25   Q    Okay.  Any effort to conceal how you were getting paid on

1   your part?

2   A     Oh, no.

3         MR. CHRIS KNOX:  Mr. Slyter, can we get Government

4   Exhibit 116?

5   Q     (By Mr. Chris Knox) And, Mr. Straw, this was discussed

6   with the prosecution.  Do you recall that?

7   A     Yes, I do.

8   Q     Okay.  And it's "Patient" -- This is from Mr. John Cooper

9   to you, correct?

10  A     Yes.

11  Q     And it's very early on in your involvement, right?

12  A     Correct.

13  Q     And it's a physician based initiative, PSI, to provide

14  safe drug alternatives; correct?

15  A     Correct.

16  Q     One of these initiatives is to provide pharmaceutical

17  compounds in the form of creams as an alternative to scheduled

18  Level III drugs to help stay off addiction, correct?

19  A     Yes.

20  Q     He says, "All assessment compounds are provided through

21  FDA-approved ingredients and prescribed -- and the prescribing

22  doctor," right?

23  A     Correct.

24  Q     And if they want to complete this assessment, it's no

25  expense to the patient.  "We would like the feedback," right?

```
 1   A    Yes.
 2        MR. CHRIS KNOX:  Mr. Slyter, could we go back to
 3   Government Exhibit 547?  And can we zoom in there on the --
 4   where it starts with "ACS agreement," but I want to scroll
 5   just a tad bit -- Okay.
 6   Q    (By Mr. Chris Knox) Can you read that, Mr. Straw?
 7   A    Yes, I can.
 8   Q    "Assessment means patient study that markets the products
 9   and services provided by CMG," right?
10   A    Correct.
11   Q    "And assessment study means the package of services
12   offered by CMG and the independent marketing organization to
13   patients under this agreement," right?
14   A    Right.
15   Q    There wasn't any tricks about what they were trying to
16   market when you signed on, was there?
17   A    No.
18   Q    And you believed that that was, in fact, one of the very
19   main goals the whole way through your life with CMGRx, right?
20   A    Yes.
21   Q    Do you believe it was having success marketing these pain
22   creams to people?
23   A    Oh, it was very successful getting it -- getting it to
24   the people.
25        MR. CHRIS KNOX:  Thank you, Mr. Straw.  I have no
```

```
 1    further questions, Judge?

 2              THE COURT:  Ms. Wattley?

 3                         CROSS EXAMINATION

 4    QUESTIONS BY MS. WATTLEY:

 5    Q    Good morning, Mr. Straw.

 6    A    Good morning.

 7    Q    I briefly introduced myself to you yesterday but other

 8    than that, we have not met, have we, sir?

 9    A    No.

10              MS. WATTLEY:  I'm sorry, Your Honor.  I forgot to ask

11    permission to proceed.

12              THE COURT:  Yes, you may.

13              MS. WATTLEY:  All right.  Thank you.

14    Q    (By Ms. Wattley) Along with Shirley Lobel, I have the

15    honor and privilege of representing Dr. Walter Simmons.

16              I want to, if I can, develop a better understanding

17    of your timeline in terms of involvement with CMGRx.

18    A    Okay.

19    Q    It's my understanding from your testimony that you ran

20    into your -- someone you knew from high school,

21    Richard Cesario.

22    A    Yes.

23    Q    And sometime in July he told you about this business

24    venture that he had going on.

25    A    Yes.
```

1   Q    He told you that he was involved with some pharmacies in

2   the creation of compounded creams, right?

3   A    Yes.

4   Q    And that those creams could be used for people who had

5   severe pain.

6   A    Yes.

7   Q    And for scar -- There's another formula for scarring, --

8   A    Yes.

9   Q    -- right?  And that these creams would provide relief

10  instead of, at least for the pain, individuals having to take

11  opioid medicines, right?

12  A    Yes.

13  Q    And he told you -- Did he tell you about the pharmacies

14  that he was working with?

15  A    I can't remember too much in detail if he did or not.

16  Q    Okay.  Told you about the doctor that he was involved

17  with, right?

18  A    Yes.

19  Q    Told you that there was a doctor from Arizona?  Did he

20  tell you that?

21  A    I remember just him telling me about there was a Chief

22  Medical Officer involved.

23  Q    Sure.  But did he tell you about the person he was

24  calling his Chief Medical Officer?

25  A    I don't really remember.

1  Q    All right.  So you don't recall if he told you he was

2  from Arizona.

3  A    I don't remember.

4  Q    Okay.  Do you recall if he told you he was a

5  Harvard-trained doctor?

6  A    Yes, I do.  I remember that part.

7  Q    So we have a Chief Medical Officer who was Harvard

8  trained.  Did he tell you, also, that he had been in the

9  Service?  The doctor himself had been in the military?

10  A    I don't remember that part.

11  Q    Did he tell you that the doctor had -- was an Emergency

12  Room physician?

13  A    I can't remember.

14  Q    Okay.  But at the very first meeting with Mr. Cesario

15  where he's talking to you about these compounded drugs, he's

16  told you that he's got a Chief Medical Officer who is a

17  Harvard-educated physician.

18  A    Correct.

19  Q    All right.  Now is it fair for me to assume, from what

20  you've told us, that you were intrigued after that first

21  meeting?

22  A    Yes.

23  Q    Sounded -- Did he tell you what role you could have?

24  A    Well, I knew people, so I could help bring people to the

25  study.

1   Q    Well -- And I guess what I'm asking very directly is:

2   Was that the role that you and Mr. Cesario actually talked

3   about during that first meeting?

4   A    Yes.

5   Q    So at that first meeting you had, more or less, concluded

6   that this was something that you really wanted to associate

7   yourself with.

8   A    Well, it sounded interesting, and I wanted to look more

9   into it.

10  Q    Absolutely.  Do you recall Mr. Cesario asking you -- Do

11  you recall that in order to look more into it, you had to sign

12  a nondisclosure, noncircumvention agreement?

13  A    Correct.

14       MS. WATTLEY:  May I approach, Your Honor?

15       THE COURT:  Yes, you may.

16  Q    (By Ms. Wattley) What was your understanding of that

17  agreement, the nondisclosure/noncircumvention agreement that

18  you signed?

19  A    Pretty much what we talked about at that meeting.

20  Q    I'm sorry.  Go ahead.

21  A    No.  Just what we talked about at that meeting was just

22  confidential between Rich and I.

23  Q    Okay.  So between the meeting -- I'm assuming Mr. Cesario

24  didn't come with the agreement in his back pocket, did he?

25  A    No.

1  Q    Okay.  So you had the meeting, right?

2  A    Right.

3  Q    And then you signed the agreement, --

4  A    Correct.

5  Q    -- right?  How did you get the physical agreement to

6  sign?

7  A    I can't remember exactly how that happened.

8  Q    All right.

9        MS. WATTLEY:  May I approach, Your Honor?

10       THE COURT:  You may.

11 Q    (By Ms. Wattley) Let me hand you what has been marked as

12 Defendant Simmons 160 and ask you if you can recognize it.

13 You can turn it over on the back.  I believe you'll see the

14 signature.  Is that your signature, sir?

15 A    Yes, it is.

16 Q    All right.  And is that the document that you signed, the

17 nondisclosure agreement?

18 A    Yes.

19       MS. WATTLEY:  Your Honor, I offer Exhibit No. 160.

20       MS. HUNTER:  No objection.

21       THE COURT:  All right; admitted.

22       MS. WATTLEY:  I'm going to put this on the Elmo.  Can

23 we do the Elmo, Mr. Slyter?  Press the button.  Which button?

24       THE COURT:  This training that the Court offers is

25 free.

1          MS. WATTLEY:  I was doing it correctly, Your Honor.

2   I was misled.  How's that?

3   Q    (By Ms. Wattley) All right.  This is at the top here a

4   restrictive -- if I can -- this is the hard part -- the

5   "Restrictive Nondisclosure/Noncircumvention Agreement" that

6   you signed following your meeting with Mr. Cesario.

7   A    Right.

8   Q    All right.  And do you recall whether there was any

9   meeting in between that meeting and signing this document?

10  A    Not that I can remember.

11  Q    All right.  Did you have phone conversations with

12  Mr. Cesario on any kind of regular basis?

13  A    I did.

14  Q    Okay.  Did you take notes of those conversations?

15  A    No, not really.

16  Q    Okay.  Maybe follow them up with an e-mail?  I'm just

17  asking.

18  A    Not normally.

19  Q    Okay.  So as of this time, you're using the "Smart Rx,

20  Inc.," right?

21  A    Yes.

22  Q    Did you actually incorporate it?

23  A    Yes.

24  Q    With the Secretary of State of Texas?

25  A    Yes.  Yes, it's been incorporated.

1    Q    Okay.  Did you have that corporation before you started

2    thinking about this venture with Mr. Cesario?

3    A    Yes, I did.

4    Q    All right.  And if we turn it over, if we look at the

5    date that you signed this, what is the date?

6    A    August 11th, 2014.

7    Q    Okay.  And at the time of your signing on August 11th, I

8    assume you dated it the same time you signed it.

9    A    Correct.

10   Q    Okay.  So when you signed this agreement on August 11th

11   of 2014, you believed that Richard Cesario had a Chief Medical

12   Officer overseeing the compounds and what he was doing based

13   on what he had told you.

14   A    Yes.

15   Q    All right.  And that's what I'm asking, --

16   A    Correct.

17   Q    -- not independent investigation.  But based upon your

18   conversation with Mr. Cesario that you've told us about at

19   that meeting, you believed that his Chief Medical Officer was

20   a Harvard-educated physician --

21   A    Yes.

22   Q    -- as of August 11th, 2014.

23   A    Correct.

24   Q    All right.  And then your friend dies, your mutual

25   friend, Toddereck -- I forget his last name.

1   A     McIntosh.

2   Q     Right.  Do you recall when he died?

3   A     Not -- Not specific date.

4   Q     If I were to ---

5         MS. WATTLEY:  May I approach, Your Honor?

6         THE COURT:  Yes.

7   Q     (By Ms. Wattley) Mr. McIntosh was a football player, was

8   he not?

9   A     Yes, he played football.

10  Q     Let me show you this and see if it perhaps refreshes your

11  recollection as to the time period as to when he died.  Don't

12  read from it.  Just see if that helps you remember.

13  A     Yes.

14  Q     Okay.  Having looked at this document, does it refresh

15  your memory as to the approximate time period when

16  Mr. McIntosh passed?

17  A     Yes.

18  Q     And when is that, sir?

19  A     It's in September.

20  Q     Okay.  Of 2014?

21  A     Right.

22  Q     Okay.  So he passed after you had signed the Restrictive

23  Nondisclosure Agreement because this was signed August 11th.

24  A     Right.

25  Q     Okay.  So you and Mr. Cesario had somehow connected

1    independent of your mutual friend's death, right?

2    A    Correct.

3    Q    Okay.  You're exploring business opportunities with him

4    already, right?

5    A    Correct.

6    Q    But you get together, presumably, and talk because

7    Toddrick has died, and so this is now another meeting because

8    there is that focus of his death, right?

9    A    Correct.

10   Q    Let me go back.  At the first meeting Mr. Cesario shares

11   with you the fact that his wife had died of an opioid

12   addiction, --

13   A    Correct.

14   Q    -- right?  And I think you've told us that you believed

15   that he was sincere when he said that.

16   A    Right.

17   Q    Did he ever give you reason to doubt his sincerity about

18   wanting to make a difference with respect to the opioid

19   crisis?

20   A    No.

21   Q    I mean even when the money is rolling in, did he ever

22   say, you know, "That was just a joke; I really don't care that

23   my wife died of that; it's always been about the money"?  Did

24   he ever give you any suggestion that that was true?

25   A    No, not really.

1    Q    Okay.  He really, at least from what you were able to

2    observe from -- in terms of his actions as well as his

3    statements to you, he was troubled and burdened by his wife's

4    death from opioid addiction.

5    A    Yes.

6    Q    Okay.  So you're meeting again with Mr. Cesario at

7    Starbucks, I believe.

8    A    Yes.

9    Q    And you're talking about your friend's death but also

10   about this business opportunity.

11   A    Correct.

12   Q    And have you tried to investigate it further by this

13   point in time?  Have you tried to look into it further by this

14   second meeting?

15   A    Look into the study?

16   Q    The opportunity; CMGRx.

17   A    Yes.

18   Q    And I apologize, and thank you for -- If you don't

19   understand my question, let me know.  Okay?

20   A    Okay.

21   Q    And so between July, August and this early September, is

22   that when you had tried to go online?

23   A    I'm not real sure if I waited for a little bit or if I

24   did it right off the bat.

25   Q    Okay.  And when you went online, were you trying to

 1    enroll to see whether you were eligible to get a prescription?

 2    A    Yes.

 3    Q    Okay.  You weren't trying to take the assessment study,

 4    were you?

 5    A    No, because you do that after you --

 6    Q    Right.

 7    A    -- after you try it, use it.

 8    Q    Right.  So I just wanted to clarify that when you went

 9    online, what you were trying to do is to see whether or not

10    you would qualify for one of the creams.

11    A    Yes.

12    Q    All right.  And I'm assuming that you believed yourself

13    to be medically situated such that you could use the creams.

14    A    Oh, absolutely.

15    Q    All right.

16         MS. WATTLEY:  May I approach, Your Honor?

17         THE COURT:  You may.

18    Q    (By Ms. Wattley) All right.  Let me show you what I've

19    marked as Defendant's Exhibit 161, and if you'll look at the

20    second to last page.  Here you can see what it is.

21    A    Okay.

22    Q    And you can flip through it, if you want to.

23    A    No, I'm good.

24    Q    Do you recognize that?

25    A    I do.

1    Q    All right.  Mr. Straw, I have shown you Defendant's

2    Exhibit 161.  Do you recognize your signature?

3    A    It's my initials.

4    Q    Your initials and printed name?

5    A    Yes.

6    Q    All right.  And then on Page 11, do you recognize your

7    signature?

8    A    I do.

9         MS. WATTLEY:  Your Honor, we offer Defendant's

10   Exhibit 161.

11        MS. HUNTER:  No objection.

12        THE COURT:  Admitted.

13   Q    (By Ms. Wattley) Now yesterday you were shown an

14   Independent Master Marketing Organization Agreement that was

15   signed in November.  This is one, if I can get it lined up,

16   that you signed in September; in fact, on September 11th,

17   correct?

18   A    Yes.

19   Q    And I'm assuming again that you date it when you sign it.

20   A    Yes.

21   Q    All right.  So what we have now is you have the

22   nondisclosure agreement that you signed on August 11th, --

23   A    Yes.

24   Q    -- correct?  You're signing your Independent Marketing

25   Agreement on September 11th.

1    A    Correct.

2    Q    And this is around -- and September 11th is around the

3    time period that your friend has died.

4    A    Correct.

5    Q    All right.  When did you start recruiting individuals to

6    participate with you?

7    A    I can't remember exactly when, but I know it was, you

8    know, shortly after I started.

9    Q    Okay.  You told us yesterday that one of the first things

10   you did was that you got home and on your regular Friday

11   morning phone call spoke to kind of your team.

12   A    Yes.

13   Q    How many people are on your team?

14   A    About six or seven.

15   Q    Okay.  Of those six or seven individuals, how many joined

16   with you and became active recruiters?

17   A    Three.

18   Q    And who were they, sir?

19   A    Derrick Perry, Henry Haley and Donald Williams.

20   Q    Who is the first to recruit a participant?

21   A    I couldn't tell you.  I don't remember.

22   Q    Did you report them as participants?  Did you have

23   Mr. Williams -- I'm sorry -- Mr. Haley and was it Mr. Perry?

24   A    Right.  They all -- They all signed up for the creams.

25   Q    Okay.  And did you get compensation for their signing up?

1    A    Yes.

2    Q    All right.  You testified yesterday, sir, that you

3    remember your first payment as this $20,000 check, but you

4    actually got a payment before then, didn't you?

5    A    If I did, I don't remember.

6    Q    Right.  Do you remember a -- an electronic transfer of

7    $1400?

8    A    I don't.

9    Q    All right.  You had a bank account in the name of "Smart

10   Rx, Inc.," didn't you?

11   A    Yes.

12         MS. WATTLEY:  May I approach I?

13         THE COURT:  Yes.

14   Q    (By Ms. Wattley) I want to show you this and just ask if

15   this refreshes your recollection as to whether or not on or

16   about that date you got a transfer in that amount.

17   A    Yes.  That's my account.

18   Q    So did you receive then a transfer, an electronic funds

19   transfer, from CMGRx of $1400 in September?

20   A    Yes.

21   Q    And is that amount approximate for the referral of three

22   individuals to the prescriptions to CMGRx?

23   A    I'm not sure.

24   Q    Okay.

25   A    I can't remember what the actual payout was on that first

1    contract.

2    Q    Would there have been any other reason for CMGRx to be

3    transferring money to you but for the fact that you had signed

4    people up?

5    A    No, not that I can think of.

6    Q    Now one of the things you told us is that everyone

7    completed, at least initially, the hard copy of the Medical

8    History Questionnaire.  Do you remember that?

9    A    Yes.

10    Q    And the Medical History Questionnaire, this is the one

11    for Mr. Williams.

12    A    Correct.

13    Q    And he's one of your people, right, --

14    A    Yes.

15    Q    -- so to speak?  Did he fill this out himself or did you

16    write it down as he told it to you?

17    A    No.  That's not my handwriting.

18    Q    Okay.  So presumably it's Mr. Williams', right?

19    A    Right.

20    Q    Do you give instructions to individuals as to how they're

21    to complete the Medical History Questionnaire?

22    A    I can't remember.  I just say, "Fill it out."

23    Q    Well, part of your role was the recruitment, training and

24    supervision of the marketers; right?

25    A    Right.

1    Q    So in training marketers, don't you tell them what

2    they're supposed to tell the potential participants?

3    A    Yes.

4    Q    Okay.  And presumably you tell the participants to be

5    truthful on their Medical History Questionnaires, right?

6    A    Right.

7    Q    I mean you don't tell them to lie and say, "Hey -- *wink,*

8    *wink* -- put down you're in pain even if you're not."

9    A    No.

10   Q    Right.  So you tell them to be truthful in providing the

11   information as to their medical history.

12   A    Correct.

13   Q    To be truthful as to the fact that they have chronic

14   pain.

15   A    Right.

16   Q    All right.  And then you also said the reason that this

17   is filled out is because the medical history is what is

18   reviewed during the doctor consults, right?

19   A    Correct.

20   Q    That's the process as described to you by

21   Richard Cesario?

22   A    Right.

23   Q    Okay.  Is it fair to say, Mr. Straw, that you don't even

24   advance anyone with the submission of the Medical History

25   Questionnaires if they do not have a pain condition?  Right?

1   A    Well, I mean if they -- if they don't -- if they fill it

2   out or don't fill it out?

3   Q    Well, I guess -- Let me -- A better question; let me ask

4   you this.

5   A    Okay.

6   Q    Who fills this out?  The participant fills this out,

7   correct?

8   A    The patient, yes.

9   Q    The patient.  What happens to it once it's completed?

10  A    Then it comes in to me and CMGRx and then it -- excuse

11  me -- and then it goes to see if it gets approved.

12  Q    Okay.  So let me -- let me take it in a smaller step.

13  A    Okay.

14  Q    Does it come directly to you?

15  A    Yes, --

16  Q    Okay.

17  A    -- in the beginning.

18  Q    Is this where you're talking about you have the website

19  and what comes to you goes to CMGRx at the same time?

20  A    No.  I'm talking about the paper.

21  Q    Okay.

22  A    So the paperwork comes to me and then I would forward it

23  to CMGRx.

24  Q    Okay.  And then along with this paperwork, you've told us

25  there's a copy of the driver's license and the military ID.

1    A    Right.  Thank you.  Yes.

2    Q    Okay.  And you make a full copy of that and give it to

3    CMGRx, correct?

4    A    Correct.

5    Q    If someone completed this and they indicated that they

6    did not have pain, would you have forwarded their Medical

7    History Questionnaire?

8    A    No.

9    Q    Okay.  So it's not shocking then that CMGRx is getting

10   Medical History Questionnaires for patients ---

11        THE COURT:  Ms. Wattley, excuse me just a minute.

12        Ladies and Gentlemen, let's take a stretch break here

13   for a minute.

14        (Pause)

15        THE COURT:  Okay.  Thank you.

16        MS. WATTLEY:  May I proceed, Your Honor?

17        THE COURT:  Yes.

18   Q    (By Ms. Wattley) Mr. Straw, if you would not forward the

19   Medical History Questionnaire if the patient did not indicate

20   that they had a pain condition to CMGRx, --

21   A    No.

22   Q    -- then it is not surprising that the Medical History

23   Questionnaires that CMGRx does receive are virtually a hundred

24   percent of patients with pain conditions.

25   A    For the most part, yes.

1    Q    All right.  That is the way the process -- the procedure

2    and process was set up, right?

3    A    Yes.

4    Q    So what we essentially have, if you will, is kind of a

5    big funnel; right?

6    A    Right.

7    Q    You've got people, then you've got people that you reach

8    out to and know and through your marketers, right?  That makes

9    it smaller.

10   A    Right.

11   Q    Even smaller because you look at veterans have a high

12   possibility and probability of pain, --

13   A    Correct.

14   Q    -- right?  And then you go down further and it's only

15   those people who self-diagnose -- or "self-report" is a better

16   phrase -- who self-report that they have chronic pain

17   conditions; right?

18   A    Right.

19   Q    And then those are the individuals who get essentially

20   referred over to CMGRx.

21   A    Yes.

22   Q    Okay.  Now how did you, sir, go about recruiting your

23   marketers?

24   A    Just the people that I knew.

25   Q    Okay.  So you gave us the names of your -- of your --

1    I'll call them -- can I call them like your "Executive Team"?

2    Your three?

3    A    That's fine.

4    Q    Okay.  Did you all have meetings?

5    A    Yes.

6    Q    Okay.  And at those meetings would you tell individuals

7    about the creams and the product?

8    A    Well, we do conference calls for the most part.

9    Q    Okay.  Did you ever have a meeting?

10   A    Like live and in person?

11   Q    Yes, with a group of people.

12   A    I can't remember if we did.

13   Q    Okay.  Did you know a "Claire Joseph"?

14   A    Yes.  That name sounds familiar.

15   Q    Do you recall a marketing meeting where a presentation

16   was made and I believe you were present and Ms. Joseph may

17   have been present?

18   A    Yes.

19   Q    All right.  And essentially at that meeting, the CMGRx is

20   being introduced to the people who are there, --

21   A    Right.

22   Q    -- right?  And it's been offered, opened up to veterans;

23   right?

24   A    Yes.

25   Q    Recently retired members of the military.

```
1    A    Yes.

2    Q    And you're telling individuals about the fact that these

3    creams have been created to help fight the opioid crisis.

4    A    Yes.

5    Q    And that it's -- it is helpful to people who have chronic

6    pain.

7    A    Yes.

8    Q    That individuals can volunteer to participate and receive

9    these creams.

10   A    Yes.

11   Q    And do -- You actually had some literature from CMGRx,

12   didn't you?

13   A    I probably did.

14   Q    All right.  May I -- Let me show you this and ask you if

15   you're familiar with this document.

16   A    I remember that.

17   Q    All right.

18        MS. HUNTER:  We have no objection, Your Honor.

19        THE COURT:  What is the exhibit number?

20        MS. WATTLEY:  Oh, I'm sorry; 263.

21        THE COURT:  Admitted.

22   Q    (By Ms. Wattley) Now is this one of the pieces of

23   literature that would be used in informing people about CMGRx

24   and the compounds?

25   A    Yes.
```

1    Q    Okay.  And from the CEO is a reference to

2    Richard Cesario.

3    A    Yes.

4    Q    Okay.  And if we get to Page 2, we will see this is

5    actually a letter from him; "for anyone who suffers from

6    chronic pain or muscle pain to have an alternative to narcotic

7    pain medication, such as Hydrocodone, Vicodin and Xanax."

8    Mr. Cesario goes on to write that, "I personally have seen the

9    side effects of painkillers."

10          In your marketing meetings or meetings with potential

11   marketers, do you share the genesis of this being

12   Mr. Cesario's up-close and personal experience with

13   addiction --

14   A    Yes.

15   Q    -- through his wife?

16   A    Yes.

17   Q    All right.  And he says, "I lost my loving wife."  Then

18   he talks about the "Patients Safety Initiative," right?

19          And it has a dash, "educate doctors to explore

20   alternatives that are just as effective for pain treatment

21   without the side effects," right?

22   A    Yes.

23   Q    So in this material Mr. Cesario is telling people that

24   the Patients Safety Initiative is going to also include a

25   component that educates doctors about there's an alternative

 1   to the pills.

 2   A     Correct.

 3   Q     That's pretty exciting, isn't it?

 4   A     Yes.

 5   Q     And that's part of -- You share that part of -- Excuse

 6   me.  You share part of that excitement as you recruit

 7   individuals to be marketers, right?

 8   A     Right.

 9   Q     How many individuals did you recruit?

10   A     All together, maybe eight; eight or nine.

11   Q     And through those eight or nine, how many then became

12   under your purview?

13   A     Well, all of them initially.

14   Q     Let's just go to the end; at the end.

15   A     None of them.

16   Q     Well, I'm sorry.  Before the Killeen meeting.  Let's say

17   the end of December.

18   A     Probably about five or six.

19   Q     Okay.  So you only added two people after your initial

20   team of three.

21   A     Right, that actually stuck with it, yeah.

22   Q     Okay.  Do you have any idea of how many individuals

23   received prescriptions through marketers who stemmed from you

24   and then your team?

25   A     The last count that I was able to see was around 13, 14

1    hundred people.

2    Q    So you -- Through your activities and those of the people

3    that you brought in, 13 to 14 hundred people started receiving

4    compounded creams; right?

5    A    Yes.

6    Q    And when you would have these kind of -- I'll call them

7    more generalized meetings to recruit marketers, you would

8    share testimonials from patients who said the creams provided

9    relief, right?

10   A    Right.

11   Q    And that from the information that you were hearing back

12   was that the creams worked.

13   A    Yes.

14   Q    All right.  Now the -- You explained to the patients, the

15   prospective patients, that they had to enroll and get the

16   creams.  That was really the first part, right?

17   A    Right.

18   Q    And then once they had used them for a month, they could

19   participate in an assessment study; right?

20   A    Yes.

21   Q    And one of the exhibits that we just looked at,

22   Government's Exhibit 116, just to keep it easy, this e-mail

23   references it as a "marketing assessment," isn't that correct?

24   A "marketing assessment study."

25   A    Yes.

1    Q    All right.  Now you would explain to the people -- to the

2    potential participants that they would go online and fill out

3    this form.

4    A    Correct.

5    Q    Take pictures of the cream; two things.

6    A    Yes.

7    Q    Do you agree, sir, that value is not always measured in

8    time?

9    A    Not necessarily.

10   Q    You think time is the only way we can value what somebody

11   does?

12   A    No, not all the time.

13   Q    Okay.  So -- Okay.  Poorly phrased question.  I

14   apologize.

15        Would you agree that there are other ways to value

16   someone's contribution other than the time they put into it?

17   A    Yes, of course.

18   Q    The fact that they're willing to do it is worthy of

19   appreciation, right?

20   A    Right.

21   Q    But you were told by -- You know Scott Meyer to be an

22   attorney.

23   A    Yes.

24   Q    Who worked with Richard Cesario.

25   A    Yes.

1    Q    And CMGRx.

2    A    Yes.

3    Q    And you were present when he was talking about how a

4    nonprofit could be used to pay the patients, weren't you, sir?

5    A    With Scott?

6    Q    Yes.

7    A    I don't remember that, being there for that meeting.

8    Q    Do you remember -- Do you remember being informed that

9    Scott Meyer had advised that it was legal to pay the

10    participants through a nonprofit organization?

11    A    I don't remember -- remember that statement either.

12    Q    All right.  Do you remember meeting with the agents of

13    the Federal Government in March of 2016?

14    A    Yes.

15    Q    All right.  Because this was after Richard Cesario had

16    been arrested, --

17    A    Okay.

18    Q    -- right?  Do you remember that?

19    A    Right.

20    Q    Do you remember that your first meeting was after his

21    arrest?

22    A    Yes.

23    Q    Because you told us yesterday about the crime tape being

24    up around his house --

25    A    Yes.

1   Q    -- and his kids having to go live with his father?

2   A    Yes.

3   Q    So you went to meet with the Government with the trauma

4   of his circumstances really fresh on your mind.

5   A    Yes.

6   Q    Okay.  And in that context, they asked you, I presume,

7   about Scott Meyer or your knowledge of the study; right?

8   A    Yes.

9   Q    Let me ask you to read the highlighted portion.  Don't

10  read it out loud but read it to yourself, sir.

11  A    Yes.

12  Q    Okay.  Having -- Having read that, does that refresh your

13  recollection that at some point you were informed that

14  Scott Meyer had advised that it was lawful to pay the

15  participants if a nonprofit organization was used?

16  A    Right.  For the most part I more than likely heard that

17  from Rich.

18  Q    Okay.

19  A    I was not at a meeting where Scott said that.

20  Q    And I apologize for my question, sir.  The point is:  To

21  your -- the information that you had was that Scott Meyer, an

22  attorney, --

23  A    Yes.

24  Q    -- had said using a nonprofit organization to pay

25  participants was lawful.

1    A    Yes, it's legal.

2    Q    It was legal.  That's why you felt comfortable in

3    bringing people who would get paid for participating in the

4    marketing study, isn't it, sir?

5    A    Of course.

6    Q    If Scott Meyer had given the opinion, "Hey, that's an

7    Anti-Kickback Statute violation," would you have recruited

8    individuals?

9    A    I wouldn't have.

10   Q    Fair to say you relied upon the information that

11   purported to come from Scott Meyer?

12   A    Right.

13   Q    You believed Richard Cesario --

14   A    I did.

15   Q    -- when he told you that.

16   A    Right.

17   Q    And it was very clear in terms of the information coming

18   from Mr. Cesario that the use of a nonprofit made it legal.

19   A    Right.

20   Q    And one step further, sir, that you are aware that

21   Freedom From Pain was the nonprofit organization that got set

22   up.

23   A    Yes.

24   Q    Okay.  And do you remember attending a meeting with

25   Scott Meyer where Freedom From Pain was explained?

```
 1   A    I don't remember attending a meeting with Scott.

 2   Q    And you had a second meeting with the federal agents and

 3   prosecutors, right?

 4   A    I did.

 5   Q    Let me show you this memo and -- right there and it

 6   continues over, and ask you to read that and see if that

 7   refreshes your memory.

 8   A    It doesn't.

 9   Q    Well, look at this.

10        THE COURT:  It's cold in here.  Even I'm cold today.

11   I'm going to wear my gloves tomorrow, so you feel free.

12   A    Yeah, I don't remember ever being in a meeting with Scott

13   discussing that.

14   Q    (By Ms. Wattley) Do you remember being in a meeting with

15   the agents --

16   A    Yes.

17   Q    -- and a prosecuting attorney?

18   A    Yes.

19   Q    All right.  And your attorney.

20   A    Yes.

21   Q    Okay.  Was there discussion, if you recall, at that

22   meeting about the Freedom From Pain Foundation?

23   A    Yes.

24   Q    Was there discussion about the fact that Richard Cesario

25   had set it up as the mechanism to pay patients for
```

1    participating in the study?

2    A    Yes.

3    Q    Was there discussion about the fact that an attorney had

4    provided advice that that was a lawful way to proceed?

5    A    Yes.

6    Q    Was there discussion at that meeting that Richard Cesario

7    had secured an independent Chief Executive Officer to run that

8    nonprofit?

9    A    Probably, yes.

10   Q    Okay.  Are you familiar with the name "Joe King"?

11   A    No.

12   Q    Okay.  You discussed this study with Mr. Cesario.

13   A    Right.

14   Q    Became aware that Scott Meyer had been involved, right?

15   A    Yes.

16   Q    But you never discussed the study with Dr. Simmons, did

17   you, sir?

18   A    No.

19   Q    In fact, you met Dr. Simmons on one occasion?

20   A    Yes.

21   Q    And on that one occasion he really was talking to you

22   about a business that dealt with people who had chronic care

23   needs, right?

24   A    Correct.

25   Q    Did he tell you that the name of that business was

1    "Elevate Seniors"?  Do you remember that?

2    A    I can't -- I can't remember the name of it.

3    Q    All right.  But that he had a venture that was focused on

4    helping people who had multiple medical issues and they needed

5    coordination.

6    A    Correct.

7    Q    All right.  And that this was something that he thought

8    would really help people who had -- well, needs for chronic

9    care management.

10   A    Right.

11   Q    In fact, Mr. Cesario also talked to you about

12   Dr. Simmons' business as well, didn't he?

13   A    Yes.

14   Q    He asked you if you wanted to invest in Dr. Simmons'

15   business, didn't he?

16   A    Yes.

17   Q    Mr. Straw, ---

18   A    Yes.

19   Q    I'm sorry.  I started my question before I found my

20   paper.  You are very saddened by the fact that you're sitting

21   in that witness chair today, correct?

22   A    It's -- It's not the best place in the world.

23   Q    All right.  And you're saddened by the circumstance that

24   you found yourself in, aren't you?

25   A    Correct.

1    Q    And what you wrote -- And you had to write a statement

2    accepting responsibility, didn't you, sir?

3    A    Yes.

4    Q    Because you're facing sentencing.

5    A    Correct.

6    Q    Okay.  Because you've entered a plea.

7    A    Right.

8    Q    And what you said in your statement of acceptance, you

9    never said, "I was part of a conspiracy."  You never used that

10   "conspiracy" word, did you, sir?

11   A    I did not.

12   Q    In fact, in this courtroom, your very first question, why

13   are you here, "Because I am a member of a conspiracy," that's

14   really the first time you've characterized your role that way,

15   right?

16   A    Correct.

17   Q    Because the whole time you were in this, you believed it

18   was lawful, didn't you, sir?

19   A    I started having doubts.

20   Q    No.  You had doubts that you were being cheated out of

21   your money after the Killeen meeting, right?

22   A    It was before that.

23   Q    Well, the point is, sir:  You had thoughts that you were

24   being squeezed out of your money, right?

25   A    It was ---

1    Q    Come on, sir.  You thought they weren't being fair with

2    you and the money that you were entitled to.

3    A    Right.  Well, you asked me a question and I just -- I

4    just gave you my best answer.

5    Q    I understand.  I understand, because you also know the

6    perception of your testimony by these fine attorneys who are

7    behind me may impact your sentence, right?

8    A    It does.

9    Q    And so the fact of the matter is you've described

10   yourself as a patriot, right?

11   A    Yes.

12   Q    You described yourself as a good citizen, right?

13   A    Right.

14   Q    If you thought Richard Cesario was running this

15   mastermind conspiracy that had as its target bilking TRICARE

16   out of millions of dollars, you would have gone running to one

17   of these people, wouldn't you, sir?

18   A    I would have.

19   Q    Okay.  You did not have that belief, did you?

20        You did not believe that Mr. Cesario was the

21   mastermind of a group of people who were deliberately,

22   intentionally, knowingly trying to defraud TRICARE, did you,

23   sir?

24   A    I knew -- I felt something was wrong.

25   Q    My question, sir:  If you had firmly believed, you would

1  have gone running to the Government.  You can't be a patriot

2  and be honorable and say that isn't what you would have done.

3  A    Correct.  I believe that is a true statement.

4  Q    All right.  In fact, even after you knew Mr. Cesario had

5  been charged, you didn't say on your first meeting with the

6  Government, "You know what?  With this bright light, I now see

7  I'm a co-conspirator."  You never said that to them, did you,

8  sir?

9  A    I did not.

10  Q    You never said -- In fact, you've pretty much said

11  factually what you said here in the courtroom; that you

12  believed the study was okay because it was a nonprofit.  You

13  thought they could get prescriptions.  You were providing

14  information.  That's what you told them back in March of 2016,

15  isn't it?

16  A    Correct, at the first meeting.

17  Q    Right.  And that's the same thing you told them again in

18  June of 2016, right?

19  A    Right.

20  Q    You get indicted in October of 2016, right?

21  A    Correct.

22  Q    You meet with them again February of 2019, right?  That's

23  when you meet with the federal authorities; Mr. Brasher and

24  the agents, right?

25  A    Yes.

1    Q    You get your plea bargain the end of March, 2019, don't

2    you?

3    A    I think that's correct.

4    Q    All right.  And none of those interviews, those three

5    interviews that preceded your plea bargain, did you say, "I am

6    a conspirator," did you, sir?

7    A    The only one that I talked to about that was my attorney.

8    Q    All right.  My question to you, sir, and I apologize if

9    it wasn't specific:  In none of the three meetings with the

10   Government agents before your plea bargain did you say, "I am

11   a co-conspirator."

12   A    I never said those words.

13   Q    You never said, "From -- At this point in time I knew it

14   was illegal and we knowingly continued an illegal activity."

15   You never said that, did you, sir?

16   A    I never said that -- that phrase.

17            MS. WATTLEY:  May I have a moment, Your Honor?

18            THE COURT:  Yes.

19            (Pause)

20            MS. WATTLEY:  Your Honor, I pass the witness.

21            MS. STILLINGER:  I have no questions, Your Honor.

22            THE COURT:  Okay.  Mr. Ansley?

23            MR. BUCKLEY:  May I have a moment, Your Honor?

24            THE COURT:  Okay.  Mr. Ansley, do you have any

25   questions?

1             MR. ANSLEY:  I do, Your Honor.

2             MR. BUCKLEY:  Just a short series of questions,

3    Your Honor.

4             THE COURT:  All right.  Then we'll take a break after

5    that.

6                         CROSS EXAMINATION

7    QUESTIONS BY MR. BUCKLEY:

8    Q    Good morning, Mr. Straw.

9    A    Good morning.

10   Q    Separate and apart from these circumstances, thank you

11   for your service, sir.

12   A    You're welcome.

13   Q    Have you ever met Jeff Cockerell?

14   A    No.

15   Q    So it's fair to say, sir, that at no time during any of

16   these events did you ever engage or intend to engage in a

17   conspiracy with Jeff Cockerell.

18   A    No.

19            MR. BUCKLEY:  Thank you, sir.

20            THE COURT:  All right.  Ladies and Gentlemen, we'll

21   take a 15-minute recess.

22            COURT SECURITY OFFICER:  All rise for the jury.

23            THE COURT:  Be seated.  All right.  I'll take up what

24   Mr. Lavine wants to in a moment.

25            Sir, can you step out in the hallway?  Thank you.

```
 1                    (Mr. Straw left the courtroom.)

 2              THE COURT:  I want to take up the matter relating to

 3      Mr. Armstrong first.  Have defense counsel received the Order

 4      of deferred adjudication -- deferred community supervision and

 5      the Order deferring adjudication?

 6              MR. LAVINE:  Your Honor, I don't know that we

 7      received those.  We have received an NCIC report that appears

 8      to have been run September 17th of this year by the

 9      Government, indicating that have there had been an arrest of

10      Mr. Armstrong.

11              THE COURT:  All right.  Mr. Lavine -- Mr. Lavine, I

12      asked you a question, and I would like you to answer my

13      question.

14              Have you received the Order of deferred adjudication

15      and the Order deferring community supervision for

16      Mr. Armstrong?

17              MS. NICOLE KNOX:  Your Honor, we received it by

18      e-mail last night.

19              THE COURT:  Okay.

20              MR. LAVINE:  Then I think the answer is "yes."

21              THE COURT:  Okay.  Do counsel believe that that

22      information is admissible under Rule 609?

23              MR. LAVINE:  In all due candor to the Court, the

24      short answer is not in its form and not in the manner that we

25      have received it.  It is not a conviction for the purposes of
```

 1    general impeachment.

 2            THE COURT:  Okay.  That's the Court's view.  So with

 3    respect to Mr. Armstrong, is anyone asking the Court for any

 4    additional relief?

 5            MR. LAVINE:  No, Your Honor.

 6            THE COURT:  Okay.  All right.  Now what do you want

 7    to put on the record, Mr. Lavine?

 8            MR. LAVINE:  Just to follow up on the concerns that

 9    we have that the information we got about Mr. Armstrong came

10    yesterday afternoon, after Mr. Armstrong was released.  And

11    that information was, in fact, there had been arrests.  There

12    had been a felony arrest reduced to a misdemeanor, referred to

13    adjudication, and that was, in fact, discharged.

14            Because we received this yesterday, we did not have

15    the opportunity to pull any of those records to find anything

16    about -- anything about the underlying facts of that offense

17    for which we might have been able to use and generally focus a

18    Cross Examination of Mr. Armstrong.  It could have impacted

19    the manner and order in which we cross-examined him.  It could

20    have impacted the style.  Mr. Armstrong was a man who

21    testified that he had certain regrets.

22            We understand that there was some underlying facts

23    about this case that suggested that the restitution had to be

24    paid to the Department of Health and Human Services.  The

25    underlying arrest was for securing a document by deception;

1    yes, securing a document by deception.

2         My concern is we don't know and did not have the

3    opportunity to investigate this underlying charge to see

4    whether it could have been admissible if Mr. Armstrong opened

5    the door or the Government opened the door.  That having been

6    said, I did some research last night about the lateness of

7    this disclosure.  It is clearly *Brady* material.  There are no

8    Fifth Circuit cases that impose sanctions on this conduct.  I

9    do not believe, having done the research and my duty of candor

10   to the Court, that this rises to the level of misconduct.  It

11   is an unfortunate circumstance.  We do not ask for the -- for

12   anything further.  We do not ask to recall Mr. Armstrong.  I

13   know there are cases around the country where there have been

14   instructions given to the jury about why we would call

15   Mr. Armstrong to recross-examine him.  We're not asking for

16   that.  I just wanted to put on the record and put you on

17   notice that this document was run September 17th; I believe

18   September 17th of this year.  Mr. Armstrong was listed as the

19   very first witness the Government intended to call weeks ago

20   and we got this yesterday.

21         THE COURT:  All right.  With respect to

22   Mr. Armstrong, the Court has stated that if you want to recall

23   him, you can.  You've indicated you're not going to recall

24   him.  If you want to investigate further and then decide

25   whether to recall him, you can do that.

1           The Court has made it quite clear and I'm doing so

2   again to the prosecution:  I regard this as unacceptable

3   behavior.  And if this happens again, the Court will consider

4   all appropriate sanctions for that conduct.

5           I accept Mr. Brasher's statement to the Court that it

6   was accidental, but it's basic information, Mr. Brasher, and

7   you know that.  You should have a checklist and it shouldn't

8   have happened, and I don't expect it to happen again.

9           But beyond that, the Court intends to take no further

10  action at this time.  If defense counsel wish to recall

11  Mr. Armstrong, they may.

12          All right.  Now with respect to Mr. Cesario, does the

13  Defense wish to recall Mr. Cesario?

14          MS. NICOLE KNOX:  Your Honor, ---

15          MR. BRASHER:  We are, as we speak, printing out the

16  PSR.  We have his NCIC that's been provided again yesterday.

17  The PSR is -- it's on its way.

18          THE COURT:  Where is it on its way from?

19          MR. BRASHER:  From the third floor.

20          THE COURT:  Well, I think there's an elevator.  They

21  should be able to get it up here quite quickly.  Even if one

22  jogged up the stairs, it could get up here quickly.  So the

23  Court's instructing to get it up here quickly.  Is that

24  unclear?

25          MR. BRASHER:  No.

```
 1                 THE COURT:  Quickly.

 2                 MS. NICOLE KNOX:  That was it, Your Honor, is that we

 3      were waiting on the PSR.

 4                 THE COURT:  Okay.  Anything else?  We'll be in recess

 5      until 10:00.

 6                 COURT SECURITY OFFICER:  All rise.

 7                 (Court recessed from 9:52 AM until 10:02 AM.)

 8                 THE COURT:  All right, be seated.

 9                 Ladies and Gentlemen, I'm going to let you at the

10      next break, at the lunch break, decide when you want me to

11      call someone to try to make it warmer in here.  When I have

12      done that in the past, it has turned from the arctic into the

13      Sahara.  Now I will let you add clothes but I won't let you

14      take clothes off, so it's up to you.  I recommend we struggle

15      through as it is, but if there's a resounding vote by you that

16      I should call in the re-enforcements, let Bernadette know.

17                 MR. ANSLEY:  Judge, could we voir dire the jury on

18      that?

19                 THE COURT:  You can see everybody's adding clothes.

20      Get out the long underwear.  All right.

21                 MR. ANSLEY:  Can I proceed, Judge?

22                 THE COURT:  Yes.

23                 MR. ANSLEY:  Thank you, Your Honor.

24

25
```

1                          CROSS EXAMINATION

2    QUESTIONS BY MR. ANSLEY:

3    Q    Good morning, Mr. Straw.

4    A    Good morning.

5    Q    Now you and I spoke very briefly this morning when I

6    introduced myself.

7    A    Yes.

8    Q    But before that, you and I have not talked before, have

9    we?

10   A    No.

11   Q    And I represent Steven Kuper.  And that's "Kuper" with a

12   "K," not John Cooper.

13   A    Okay.

14   Q    I believe your answer is going to be that you don't know

15   Steven Kuper at all.

16   A    I don't.

17   Q    The name does not ring a bell with you?

18   A    It does not.

19   Q    You've never met Steven Kuper before.

20   A    No.

21   Q    You could not pick him out of a crowd of two.  Is that

22   fair to say?

23   A    It's fair.

24   Q    So is it also fair to say that in your view, you did not

25   engage in any sort of activity knowingly with Steven Kuper in

```
 1    the course of your involvement with -- with CMGRx?

 2    A    No, I didn't.

 3    Q    Thank you, sir.  And you mentioned, I think, in -- I

 4    believe in your Cross Examination; you talked about at some

 5    point in time being -- I think your words were "taken out of

 6    the loop," I believe is what you said.  Is that -- Do you

 7    recall that testimony?

 8    A    Correct.

 9    Q    In ballpark, when would you say that was that you were

10    taken out of the loop?

11    A    Around January of 2015.

12    Q    Okay, January of 2015.  Do you think it was early

13    January, late January, or do you know?

14    A    I couldn't remember.

15    Q    Okay.  And did that -- If you're taken out of the loop in

16    January of '15, did that continue during the rest of your time

17    with CMGRx?

18    A    Yes.

19    Q    So in other words, it continued in February?

20    A    Yes.

21    Q    In March?

22    A    Yes.

23    Q    In April?

24    A    Yes.

25    Q    In May?  And, of course, things were shut down in May.
```

1    A    Right.

2    Q    And that's when you -- I think you were terminated as --

3    as an employee of Trilogy, I believe, in May of 2015.  Is that

4    correct?

5    A    Right.

6    Q    So if you stayed out of the loop for that entire time

7    period, that means -- that means that information in your view

8    was kept from you.  Is that fair?

9    A    Yes.

10    Q    Can you -- And maybe it's hard to say without knowing

11    what it was, but can you specify what type of information you

12    think was kept from you; why you felt that you were kept out

13    of the loop?

14    A    I have no idea.

15    Q    And if that -- if that was the case with you, is it fair

16    to say that other people like you probably were kept out of

17    the loop as well?

18    A    Once again, I don't know for sure.

19         MS. HUNTER:  Object to speculation.

20    Q    If you know.

21         THE COURT:  That's sustained.  That's sustained.

22    Don't answer.

23    A    I don't know.

24         THE COURT:  Don't answer.

25    Q    (By Mr. Ansley) And, of course, that continued throughout

1    the time period of your involvement with CMGRx.

2    A    Yes.  For me it did.

3    Q    And, of course, we talked a minute ago about you never

4    spoke with Steven Kuper.

5    A    Correct.

6    Q    Did you -- But you had other people that you knew that

7    worked with CMGRx, correct?

8    A    Yes.

9    Q    And, of course, that included -- that included your

10   daughter, Alyssa Straw.  Is that correct?

11   A    Yes.

12   Q    And my understanding is Alyssa, your daughter, started

13   sometime in October of 2014?

14   A    Yes.

15   Q    And then did she -- How long, sir, did she continue with

16   CMGRx?

17   A    She stayed there until, I believe, the end.

18   Q    So May of 2015?

19   A    Correct.

20   Q    And do you recall, sir, what -- what position your

21   daughter held with the company?

22   A    She worked in the office.  I'm not sure exactly what she

23   did, but I just know she worked in the office.

24   Q    Okay.  Was she also identified as an employee to your

25   knowledge?

1   A    Yes, of CMGRx.

2   Q    We saw an exhibit earlier that identified a lot of names.

3   A    Yes.

4   Q    One of which included, I think, your daughter --

5   A    Correct.

6   Q    -- as -- as a W-2 employee.  Do you recall that?

7   A    Yes.

8   Q    And did you ever -- You talked about being out of the

9   loop in January and I think you said 2015.  Did you ever tell

10  your daughter during that time period that she shouldn't be --

11  shouldn't be employed by CMGRx?

12  A    I didn't.

13  Q    That she should leave CMGRx?

14  A    No, I didn't.

15  Q    And, of course, she stayed, we just talked a minute ago,

16  until the very end.  Is that correct?

17  A    Correct.

18  Q    And is it fair to say as a -- You testified, I think, on

19  Direct.  As a caring, loving father, can we assume that you

20  would not have let your daughter remain someplace that you had

21  concerns about or thought that she herself would be at hazard

22  if she stayed as an employee there?

23  A    No.

24  Q    And we talked, I think, with a lot of lawyers so far; you

25  talked about -- you talked about the study.  Do you recall

```
 1   that testimony?

 2   A    Yes.

 3   Q    And a lot of things -- Bottom line, a lot of things were

 4   told to you to give you comfort that the study that was being

 5   run by CMGRx was legitimate.

 6   A    Correct.

 7   Q    That there was a CMO?

 8   A    Right.

 9   Q    You didn't hear that doctor's name but you heard that he

10   was a Harvard-educated physician.

11   A    Right.

12   Q    You, of course, hold -- You heard, rather,

13   Richard Cesario's story and his compelling story about what

14   his wife went through; what his first wife went through.

15   A    Right.

16   Q    And that story, that seemed, first of all, to you heart

17   felt.

18   A    Yes.

19   Q    It was compelling to you.  Is that correct?

20   A    Yes.

21   Q    And, sir, of course that was part in parcel to you

22   becoming involved and deciding to be a marketer with CMGRx.

23   That was part of why you thought that it made sense to be a

24   part of this process.

25   A    Correct.
```

1   Q    And part in parcel of that is the idea that -- that --

2   again, part of that story that was heart felt and genuine in

3   your view was this process, these medications, creams would be

4   used to help get veterans, which was near and dear to your

5   heart, off of opioids or help them either get off of opioids

6   or avoid them entirely.  Is that all fair to say?

7   A    Yes.

8   Q    And that, in your view, all of that -- Of course, in

9   addition to that, we talked about Scott Meyer several times

10  already in your examination.  Do you recall Mr. Meyer?

11  A    Yes.

12  Q    And you knew him to be a lawyer that represented CMGRx.

13  A    Yes.

14  Q    And had Mr. Meyer's presence, along with the

15  Harvard-educated CMO, the story that made sense to you from

16  Mr. Cesario, all those things made you believe this study was

17  legitimate.

18  A    Correct.

19  Q    And as we talked earlier in your examination, you would

20  not have gotten involved in that, in the process, if you

21  thought there was any sort of illegitimacy to it.  Is that

22  fair?

23  A    I would not have gotten involved, correct.

24  Q    Okay.  And, in turn, you would not have allowed your

25  daughter to become involved if you thought that there was

1    something wrong with it at that time.

2    A    Correct.

3    Q    Thank you, sir.  And you talked earlier about being an

4    employee of Trilogy Pharmacy.  Do you recall that?

5    A    Yes.

6    Q    You were never an employee of any other pharmacies in

7    this case, correct?

8    A    No.

9    Q    And by other pharmacies, the name "Dandy Drugs" as a

10    pharmacy, does that name even ring a bell with you?

11    A    I've -- I've heard it.

12    Q    But you were never an employee of Dandy Drugs?

13    A    No, I was never an employee.

14    Q    Never an employee of Steven Kuper or Dandy Drugs.  Is

15    that fair?

16    A    I was never an employee.

17        MR. ANSLEY:  Okay.  Thank you, sir.

18        I pass the witness, Your Honor.

19                    CROSS EXAMINATION

20    QUESTIONS BY MS. NICOLE KNOX:

21    Q    Good morning, Mr. Straw.

22    A    Good morning.

23    Q    My name's Nicole Knox.  I represent Michael Kiselak in

24    this trial.  First, I want to start by thanking you for your

25    service to our country.

1    A    Thank you.  You're welcome.

2    Q    And then I want to talk about Mr. Kiselak for a minute.

3    You don't know Mr. Kiselak, do you?

4    A    I do not.

5    Q    You all didn't work together?

6    A    No, we didn't.

7    Q    You certainly didn't join a conspiracy together.

8    A    I -- I don't know him at all.

9    Q    I want to talk a little bit about your employee status.

10   On Direct Examination you referred to your time in the

11   military as an employee and to distinguish that from your

12   employee status at Trilogy.  Do you remember that testimony?

13   A    Correct.

14   Q    You would agree with me that being an employee of the

15   military is about as strict or stringent of an employee as it

16   gets, wouldn't you?

17   A    We have a lot of time we can -- We have a lot of sham

18   time, too.

19   Q    In other words, what I mean is ---

20   A    But I know -- I know what you mean.

21   Q    Okay.  You didn't have the freedom in the military to

22   work from home --

23   A    No.

24   Q    -- in an outside sales job.

25   A    No.

1   Q    And you would agree with me that just because you're

2   employed in the capacity of having an outside sales job, that

3   doesn't disqualify you from being an employee, correct?

4   A    Not necessarily.

5   Q    In other words, you don't have to go to an office and

6   clock in every day in order to be an employee of any company.

7   A    It could get -- That's true.

8   Q    We talked a little bit about training and oversight.  Do

9   you recall telling the agents that you were trained -- well,

10  first of all, that you had HIPAA training, correct?

11  A    Yes.  We had went through something.

12  Q    And you had a 30- to 35-page PowerPoint that was

13  presented to you?

14  A    Yes.

15  Q    And that was represented to you as some form of training.

16  A    Yes.

17  Q    I believe Richard Cesario led that training.

18  A    He gave it to me.  I got it from him.

19  Q    And then did you train your representatives who worked

20  under you with that PowerPoint?

21  A    Not all of them saw that PowerPoint, but I did have it.

22  Q    In other words, did he entrust you to train the people

23  who worked under you?

24  A    Yes.

25  Q    We talked a little bit about the people who worked under

```
 1    you, and I've heard a lot of different numbers, and I'm not
 2    quarreling with you about that.  I just want to understand
 3    kind of the umbrella or -- I guess it's the best way to say
 4    it, the umbrella of people who worked under you.
 5    A    Okay.
 6    Q    We talked about the top three or the first three.
 7    A    Right.
 8    Q    Can you clarify for me?  Meaning Perry, Haley and
 9    Williams?
10    A    Right.
11    Q    Were they the first three reps who worked with you?
12    A    Right.
13    Q    For you, I should say.
14    A    Yes.
15    Q    And you would agree that your top earner was Luis Rios.
16    A    Yes.
17    Q    And then you said at some point that there was something
18    like 1400 participants under you?  Is that correct.
19    A    Right.
20    Q    And by that, you mean people who participated in the
21    study.
22    A    Correct.
23    Q    Do you have any idea how many representatives worked
24    under you?
25    A    Total all together, no, not -- not an accurate count.
```

1   Q    More than a hundred?

2   A    I wouldn't say more than a hundred.

3   Q    More than 75?

4   A    Once again, ---

5   Q    I'm not going to hold you to it.  I'm just ---

6   A    I just -- I just don't know, so.

7   Q    Okay.  I'm just trying to get a ballpark from you.  More

8   than 50?

9   A    No.

10  Q    Not more than 50 reps.  More than 25?

11  A    Maybe closer to that number that I knew of.

12  Q    Okay.  That's fair.  And when you say "that I knew of,"

13  you mean that people like -- let's take Luis Rios, for

14  example.  He could recruit other reps, and they would

15  essentially be working under you.

16  A    Correct.

17  Q    But you might not know about them because they're

18  reporting to Luis Rios.

19  A    Right.  When I say I knew of, I knew that there were more

20  than three people out there talking to people about the study.

21  Q    Fair.

22  A    But did I personally know each and every one of those 15,

23  20, to 25, not personally like I knew the first three.

24  Q    And that's what we're referring to as the -- or I think

25  you referred to as "tier marketing"?

1   A   Or network level.  I mean it's marketing.

2   Q   Well, sure.  And the reason we use a word like "tier" or

3   what did you just say?

4   A   Network marketing.

5   Q   Network --

6   A   Right.

7   Q   -- is that you do have levels, right?

8   A   Right.

9   Q   And the reason you wouldn't know what Luis Rios' people

10   were doing or if they even worked for you at one point is

11   because you're supervising Rios and that's about where it

12   ends.

13   A   Right.

14   Q   From your perspective.

15   A   Right.

16      MS. NICOLE KNOX:  If we could look at Defendant's

17   Simmons Exhibit 267, Page 2.  And scroll up, please,

18   Jacqueline Ewings, 3019.

19   Q   (By Ms. Nicole Knox) Jacqueline Ewings, you recognize

20   Jacqueline as someone who was a sales representative under

21   your umbrella.

22   A   Yes, I know her.

23   Q   And you also know she worked under you based on this

24   number "3019," correct?

25   A   Correct.

1   Q    That's because anyone who worked under your umbrella was

2   assigned a 3000 number.

3   A    Correct.

4   Q    A number starting with 3000.

5   A    Right.

6   Q    And is it your understanding that every marketing rep had

7   a series of numbers assigned to them?

8   A    Correct.

9   Q    And that was part of how you would at least attempt to

10  track who was within your network or umbrella.

11  A    Right.

12        MS. NICOLE KNOX:  If we could look at Government

13  Exhibit 24, Page 6.  Oh, I'm sorry.  Well, that's fine.  We

14  can start here.

15  Q    (By Ms. Nicole Knox) We see the payment that's

16  highlighted that we've previously talked about which was the

17  subject of Count 24 in the indictment.  Do you remember that?

18  A    Yes.

19  Q    Before we talk about these bank records for a minute,

20  let's talk about Count 24.  You did not plead guilty to Count

21  24, right?

22  A    Right.

23  Q    You only pled guilty to Count 1 which is the conspiracy

24  count.

25  A    Yes.

1   Q    Count 24 was the anti-kickback count, correct?

2   A    Right.

3   Q    And that's why -- And the anti-kickback count, as it

4   pertains to you, was that you were charged or it was alleged

5   that you unlawfully received funds.

6   A    Correct.

7   Q    And that's the reason we have this number highlighted

8   here, the $68,980.39.

9   A    Right.

10  Q    This was, in fact, in the form of a W-2 payment.

11  A    Yes.

12  Q    That you received via ACH deposit.

13  A    Correct.

14  Q    From someone represented to be your employer.

15  A    Right.

16  Q    Trilogy Pharmacy.

17  A    Correct.

18  Q    You received these deposits regularly.

19  A    Once a week.

20  Q    And, in fact, on this March bank statement, we see at

21  least three other payments to you from Trilogy.  We can start

22  at the bottom.  March 27th you received another payment of

23  $65,642.

24  A    Correct.

25  Q    And -- Sure, we'll go to the top.  March 9, $61,549.99;

1    and then March 13, we see another one for $62,594.89.

2    A    Yes.

3    Q    You made a lot of money working for Trilogy Pharmacy,

4    didn't you?

5    A    Yes.

6    Q    I mean this is just one month.  And you testified on

7    Direct, in all fairness, that you made almost two million

8    dollars.

9    A    Right.

10        MS. NICOLE KNOX:  May I approach?

11        THE COURT:  Yes, you may.

12   Q    (By Ms. Nicole Knox) Mr. Straw, I'm showing you what's

13   been previously marked as Defendant Kiselak's Exhibit 107.

14   This is Page 68, and Defendant Kiselak's Exhibit 109, Page 38.

15   Do you recognize these as W-2s that you received --

16   A    Yes.

17   Q    -- in the course of your employment for Trilogy Pharmacy?

18   A    Yes.

19        MS. NICOLE KNOX:  Your Honor, at this time I would

20   offer these pages -- these excerpts from 107 and 109, and I

21   would mark them as Defendant Kiselak's 199 and 200.

22        MS. HUNTER:  No objection.

23        THE COURT:  Admitted.

24   Q    (By Ms. Nicole Knox) I'm going to put them on the screen.

25   A    Oh, I'm sorry.

1    Q    No, no worries.

2            MS. NICOLE KNOX:  Let's first look at 2014.

3    Q    (By Ms. Nicole Knox) This is your W-2 from Trilogy for

4    2014, and do you see where it says you made almost a million

5    dollars that year?

6    A    Yes.

7    Q    And we talked about your federal -- the income tax that

8    was withheld was -- was about 40 percent, and that's reflected

9    here.

10   A    Yes.

11   Q    And then we're looking at 2015, and here in 2015 you made

12   almost two million dollars, --

13   A    Right.

14   Q    -- correct?  So I'm not sure what you were referring to

15   on Direct where you said under 2 million dollars.  I can think

16   of two logical explanations; either you're referring to just

17   2015 or you were referring to your net income after taxes were

18   withheld.

19   A    Yeah.  I think it's a combination of just net, after

20   taxes, and just more closer to 2 than it was here.

21   Q    But you would agree with me that your total reported

22   income and income that you received, --

23   A    Is close to 3.

24   Q    -- including taxes, is almost 3 million dollars.

25   A    It is, yeah.

```
 1   Q    Luis Rios also made a lot of money working for Trilogy

 2   Pharmacy, correct?

 3   A    Yes.

 4   Q    Have you seen his W-2 forms?

 5   A    I have not.

 6   Q    Are you aware that he made over $500,000 in the course of

 7   his employment?

 8   A    I didn't know.

 9   Q    Would that surprise you?

10   A    No.

11   Q    Did he -- Did you also -- If -- If Trilogy Pharmacy paid

12   him more than $500,000, would that exclude the payments that

13   you made him -- made to him?

14   A    I'm not sure.

15   Q    Okay.  Because you testified earlier that you made

16   payments to him initially, --

17   A    I did.

18   Q    -- right?  And then Trilogy and CMGRx took over that role

19   for you.

20   A    They did.

21   Q    Okay.  You also testified that Luis Rios, you noticed

22   some activity through your website --

23   A    Yes.

24   Q    -- that was traced to his IP address.

25   A    Right.
```

1   Q    And that was -- Can you remind me?  It was surprising to

2   you why?

3   A    Because of the volume because no one else was submitting

4   7 to 10 people a day at one time, just all in succession.

5   Q    And he was regularly doing that.

6   A    Correct.

7   Q    And as the top tier representative, you're responsible

8   for Luis Rios' activity.

9   A    Right.

10  Q    And you brought that to his attention?

11  A    To his attention and also to Rich and John.

12  Q    Were you aware that Luis Rios was inputting participants'

13  info into the website himself?

14  A    That's the way it looked.

15  Q    Were you aware that Luis Rios was paying participants

16  cash?

17  A    No, I had no idea.

18  Q    Because the way it's supposed to work is that -- is that

19  CMGRx is supposed to pay the participants, correct?

20  A    Correct.

21  Q    And so anything to the contrary -- Well, I'll scratch

22  that question.

23       Your -- The website that we just referred to, you set

24  that up yourself, correct?

25  A    Yes.

```
1    Q    But you had to run decisions about the website through
2    someone with CMGRx, correct?
3    A    Correct.
4    Q    And they, in turn, exercised some form of control over
5    your website.
6    A    Well, they just told me the corrections to make and then
7    after that, I pretty much -- I controlled the website.
8    Q    The purpose of the website was to track payments, I think
9    you just said that, and that was important why?
10   A    Well, because if someone's out marketing, telling people
11   about, you know, what's going on, those individuals need to be
12   credited if someone comes through and gets approved for the
13   pain or the scar.
14   Q    Because the people who were working under you as sales
15   reps were -- this was their livelihood, correct?
16   A    No.  They did other things.  Everybody ---
17   Q    They weren't relying on the money for their work?
18   A    Oh, they expected to get paid.
19   Q    Okay.
20   A    But -- But -- Yeah.
21   Q    And it was up to you to make sure they got paid.
22   A    Yes.
23   Q    And while some of them might be doing other work, it
24   wasn't up to you to know if they had another job or not.
25   A    No.
```

1  Q    In fact, some of them could -- this could have been their

2  full-time job.

3  A    I have no idea.  I mean ---

4  Q    And -- I mean it was your full-time job, wasn't it?

5  A    Well, I did other things.  I had Lifestyle 700 going the

6  whole time.

7  Q    And did you receive income from Lifestyle 700 in the

8  years of 2014 and '15?

9  A    I did.  It wasn't significant, but it was -- there was

10 money still coming in.

11 Q    Now we've talked about your plea offer deal in this

12 case, --

13 A    Yes.

14 Q    -- correct?  And we've also talked about how in your

15 original meeting with the Government, meaning the agents and

16 the prosecutor and your lawyer was present, that you lied to

17 federal agents.

18 A    Yes.

19 Q    And that you know that that's a crime.

20 A    It is.

21 Q    And that you were never charged with that crime.

22 A    Not yet I haven't been.

23 Q    You also understand that you have been given credit for

24 your acceptance of responsibility in this case, correct?

25 A    Well, I know I may.  I haven't been given anything in

1    writing.

2    Q    Well, you accepted responsibility for your role in the

3    offense.

4    A    I did.

5    Q    You understand that in your sentencing process, you can

6    lose acceptance of responsibility points, don't you?

7    A    Right.

8    Q    In other words, it's a deduction from your sentence?

9    A    Correct.

10   Q    And lying to federal agents is one way not to get the

11   credit for your acceptance.  Do you understand that?

12   A    Yes.

13   Q    As far as you know, you're not going to suffer that

14   penalty, correct?

15   A    I don't know yet.  I have no idea.

16   Q    You also know that as part your plea deal, you only have

17   one count; correct?

18   A    Yes.

19   Q    And that's a penalty -- that carries a penalty of up to

20   ten years.

21   A    Yes, it does.

22   Q    You don't know what kind of time you're going to get.

23   You don't know if you're going to get ten years or you're

24   going to get less than ten years.

25   A    I don't.

1   Q    I think you previously testified that that's up to the

2   Judge.

3   A    Yes.

4   Q    But you know in actuality that it's up to the Government,

5   don't you?

6           MS. HUNTER:  Objection.  I think that misstates.

7           MS. NICOLE KNOX:  I can clarify, Your Honor.

8           THE COURT:  Yes.

9   Q    (By Ms. Nicole Knox) You understand that the Government

10  can make a motion to the Judge for a lesser sentence, don't

11  you?

12  A    Yes, I do know they have input.

13  Q    And that's based on your testimony in court today?

14  A    From what I was told, it's -- it's input that they have

15  but it's still up to the Judge at the end of the day.

16  Q    And that's all part of your plea deal.

17  A    Yes.

18          MS. NICOLE KNOX:  I'll pass the witness.

19          THE COURT:  Okay.  Anybody else?

20          All right.  Any Redirect?

21          MS. HUNTER:  Briefly, Your Honor.

22                       REDIRECT EXAMINATION

23  QUESTIONS BY MS. HUNTER:

24  Q    Mr. Straw, to the extent that the Government has any

25  input in asking the Judge for a reduction in your sentence,

1    what is the most important thing in making that determination

2    as you understand it?

3    A    That I be completely truthful.

4        MS. HUNTER:  If we could have Government's Exhibit

5    No. 11.

6    Q    (By Ms. Hunter) We looked at, Mr. Straw, a check from

7    Trilogy a little bit earlier.

8        THE COURT:  We don't have it.  We don't have it up.

9        MS. HUNTER:  I'm sorry.

10       THE COURT:  Old-fashioned way, paper.

11       MS. HUNTER:  There we go.  As soon as I was going to

12   show my Elmo skills.

13   Q    (By Ms. Hunter) Mr. Straw, we looked at Exhibit No. 11,

14   specifically the payment from Trilogy Pharmacy for $68,980.39.

15   A    Yes.

16   Q    Do you recall admitting in connection with your Plea

17   Agreement that this particular payment was made in violation

18   of the Anti-Kickback Statute?

19   A    That I was made aware of it?

20   Q    Did you -- Do you recall admitting that this particular

21   payment was made in violation of the Anti-Kickback Statute?

22   A    Oh, yes.

23       MS. HUNTER:  Now if we can turn to Page 3 of

24   Government's Exhibit 11.

25   Q    (By Ms. Hunter) Mr. Knox went over some of the names on

1    this page with you.  Do you recall that?

2    A    Yes, I do.

3    Q    But he skipped over a couple of names, and I just want to

4    ask you about some additional folks on there.  Are you

5    familiar with an Antwan Stanley?

6    A    Yes.

7    Q    And who was that?

8    A    A gentleman that was -- that lived in Killeen that was

9    referred to the program to start marketing it.

10    Q    And this document reflects that Mr. Stanley was -- it

11    appears to be paid as a W-2.

12    A    Yes.

13    Q    To your knowledge, was Antwan Stanley an employee of

14    Trilogy Pharmacy?

15    A    No, he wasn't.

16    Q    If we could look at Denise Brooks-Robertson.  Are you

17    familiar with Denise Brooks-Robertson?

18    A    Yes.

19    Q    Who is that?

20    A    Once again, another individual that was under one of the

21    people that I recruited to come on and market it, and she

22    wanted to market it as well.

23    Q    And do you know where Ms. Denise Brooks-Robertson

24    resides?

25    A    Fort Hood, Killeen.

```
 1    Q    To your knowledge, was she an employee of Trilogy?

 2    A    No.

 3    Q    Now you testified earlier about a Jacqueline Ewings.

 4    A    Yes.

 5    Q    She was a marketer underneath you?

 6    A    Yes.

 7    Q    Was she an employee of Trilogy?

 8    A    No, she wasn't.

 9    Q    Looking further down, Luis Rios, Mr. Rios was your top

10    marketer.

11    A    Yes.

12    Q    To your knowledge, was he an employee of Trilogy?

13    A    No, he wasn't.

14    Q    And then lastly, Henry Haley, who was that?

15    A    Henry Haley was a retiree but had he a full-time job.  He

16    worked on range control on Fort Hood.

17    Q    To your knowledge, was Mr. Haley an employee of Trilogy?

18    A    It would have been impossible for him to be an employee

19    because he had a full-time job on range control at Fort Hood.

20    Q    Now you testified on Cross Examination that the payments

21    went through a bank account from Trilogy.

22    A    Correct.

23    Q    They were made out in the open.

24    A    Yes.

25    Q    But, in fact, were those payments concealed as employee
```

```
 1  wages?

 2  A    Yes.

 3  Q    So were those payments made out in the open?

 4  A    They were.

 5  Q    Were they concealed to be something else?

 6  A    Yes.

 7  Q    As employee wages.

 8  A    Correct.

 9  Q    Why would you have to conceal a payment as an employee

10  wage?

11  A    Well, if you're just trying to make it seem what it's

12  not, you know.  You don't want it to appear to be anything

13  illegal or anything that you're doing wrong.  So you would

14  make it a W-2.  It makes it look legitimate.

15  Q    Now you pled guilty to conspiracy, correct?

16  A    I did.

17  Q    And you testified that you didn't know Mr. Cockerell.

18  A    Correct.

19  Q    Are you familiar with a pharmacy called "360"?

20  A    I am familiar with the pharmacy.

21  Q    And how are you familiar with 360?

22  A    I just remember Rich, one time we sat down and he kind of

23  wrote down just some of the people that they were doing

24  business with, some of the pharmacies, and he wrote that --

25  that pharmacy name down on a napkin for me.
```

1    Q    Was 360 one of the pharmacies that was filling the

2    prescriptions that you were referring people to?

3    A    Yes.

4    Q    Do you know whether Dandy Pharmacy was one of the

5    pharmacies who was filling prescriptions that you were

6    referring folks to?

7    A    I remember hearing the name, and I'm assuming if I heard

8    -- I'm not real sure.  I can't say for certain on that one.

9    Q    Now you testified on Direct that you saw red flags along

10   the way while you were participating in the conspiracy.

11   A    Yes.

12   Q    And to be clear, do you admit that you conspired with the

13   Defendants?

14   A    I did.

15   Q    And we talked about how originally you thought this study

16   was legitimate.

17   A    Yes, I did.

18   Q    And, of course, you never thought in a million years

19   you'd be sitting here in this room right now.

20   A    Not at all.

21   Q    But you saw the red flags along the way.

22   A    Yes.

23   Q    And what did you do about the red flags that you

24   observed?

25   A    Well, once again, with Rios I brought it up and just some

 1    of the other ones.  I just didn't do anything.

 2    Q    Did you feel like at the time that you were doing

 3    something wrong?

 4          MS. WATTLEY:  Your Honor, I'm going to object to the

 5    leading nature of the questions.

 6          THE COURT:  Overruled.  You may answer that.

 7    Q    (By Ms. Hunter) When you started seeing those red flags,

 8    did you feel like you might be doing something wrong?

 9    A    In a way, yes.

10    Q    And knowing that you might be doing something wrong, did

11    you ask any questions that might have got to the bottom of

12    what you thought you might be doing wrong?

13    A    I did not.

14    Q    Could you have asked those questions?

15    A    Yes, I could have.

16    Q    Were you willing to take a risk, even though you thought

17    you were doing something wrong, because the money was so good?

18    A    It was.

19    Q    Now with regard to the information that you saw on the

20    MHQs that we talked about that you thought was problematic,

21    specifically the dates of birth, --

22    A    Correct.

23    Q    -- that's something that you caught on your own that was

24    flagging for you as a problem.

25          MR. CHRIS KNOX:  Your Honor, I'm going to object to

1    the leading.

2          THE COURT:  That's leading.  Rephrase that, please.

3    Q    (By Ms. Hunter) What on the MHQs caught your attention?

4    A    The age.  I could see the date of births and then the

5    actual pictures of -- of these soldiers.

6    Q    And was the volume problematic for you?

7    A    The volume was problematic and then also the fact that

8    they didn't even have their own home.  They lived in the

9    barracks, so they were living in government quarters.

10   Q    Is this information that you believed that the doctors

11   would have been privy to?

12         MS. WATTLEY:  Objection, Your Honor; calls for

13   speculation.  It's beyond the scope of Cross Examination.

14         THE COURT:  Overruled as to the second objection.  If

15   you know, you may answer.  If you don't, don't guess.

16   A    Yes, I do know that everyone in that succession chain is

17   privy to that information from the -- from the applicant.

18   Q    (By Ms. Hunter) Is that same information information that

19   you would believe that the pharmacies would be privy to?

20   A    Once again, I just -- everyone in that whole food chain,

21   from the time I get it, from the time CMGRx gets it, they all

22   have access to that information.

23         MS. WATTLEY:  Your Honor, again, I'm going to object.

24   There's no foundation for Mr. Straw's knowledge of what goes

25   to any place other than CMGRx.

1          THE COURT:  Overruled.

2          MS. HUNTER:  Thank you, Your Honor.

3          THE COURT:  Proceed.

4    Q    (By Ms. Hunter) Mr. Straw, you went through with Ms. Knox

5    that you made a lot of money.

6    A    Correct.

7    Q    Was the money part of the reason that you were willing to

8    ignore the red flags that you saw while you were participating

9    in the conspiracy?

10   A    That was the main reason.

11   Q    And are you in fact, guilty of conspiring with the

12   Defendants?

13   A    I am.

14   Q    And did those payments that you received from Trilogy ---

15         MR. BUCKLEY:  Excuse me.  I object to that.  The

16   statement is multifarious in that it's the "Defendants."

17         THE COURT:  Clarify your question, please.  Clarify

18   your question, please.

19         MS. HUNTER:  Permission to approach, Your Honor.

20         THE COURT:  Yes.

21         MS. NICOLE KNOX:  Your Honor, may we approach?

22          (Bench conference on the record with counsel and the

23   Court:)

24         MS. NICOLE KNOX:  This is Nicole Knox for

25   Michael Kiselak.  I just want to make sure that we're not

1    getting into the contents of the physical Plea Agreement, the

2    paper documents, pursuant to the motion *in limine*.

3         MS. HUNTER:  No, Your Honor.  We're just showing him

4    a copy of his factual to refresh his memory as to who he

5    conspired with.

6         MS. STILLINGER:  And, Your Honor, I would just like

7    to object because I think the Plea Agreement says that he

8    conspired with, among others, Dr. Elder.  And he's testified

9    to no contact with Dr. Elder, and so I think that's legalese

10   in the Plea Agreement.  I don't think that's an accurate

11   factual statement and it's outside the scope.

12        THE COURT:  In asking your questions, I mean it's not

13   -- you say it's wrong by asking the questions.  Okay.  I'm

14   going to -- If you go up into this as you're about to, I'm

15   going to give them an opportunity to recross him.

16        MS. HUNTER:  I'm not, Your Honor.

17        THE COURT:  Okay.

18             (End of discussion at side bar.)

19        THE COURT:  (To The Jury) You're in charge.  If

20   you're still standing up, they can't talk.  All right.  Okay.

21        MS. HUNTER:  I have no further questions for this

22   witness, Your Honor.

23        THE COURT:  All right.  Thank you very much.

24        All right.  Thank you, sir.  You may step down.

25   Thank you.

1            Any objection to excusing Mr. Straw?

2            MS. HUNTER:  No objection, Your Honor.

3            THE COURT:  Okay.  Thank you.  You're excused, sir.

4            THE WITNESS:  Thank you, Your Honor.

5            MR. BRASHER:  The Government calls Captain Chelsea

6   Kluge.

7            THE COURT:  Captain Kluge, come on up here to the

8   front, please.  If you would stand right here in front of this

9   lady.

10            Raise your right hand, please.  State your full name

11   and spell your first name and your last name.

12            Captain Chelsea Kluge.  First name is C-H-E-L-S-E-A.

13   Last name is K-L-U-G-E.

14                 (The Witness, CAPTAIN CHELSEA KLUGE, Is Sworn.)

15            THE COURT:  Be seated.  When you're comfortable,

16   slide the base of the microphone closer to you so we can hear

17   you.  It's very hard to hear in here.

18            THE WITNESS:  Yes, ma'am.

19            THE COURT:  State your name again.

20            THE WITNESS:  Oh.  Chelsea Kluge.  Oh, very loud.

21            THE COURT:  Okay.

22                      DIRECT EXAMINATION

23   QUESTIONS BY MR. BRASHER:

24   Q    Good morning, Captain Kluge.  How are you?

25   A    I'm well.  How are you?

```
 1   Q    Can you tell the jury how you're employed?

 2   A    I am a Captain in the U.S. Army.  I'm stationed at Fort

 3   Hood.

 4   Q    Okay.  And what do you do for the Army?

 5   A    I'm an Aeromedical Physician Assistant.

 6   Q    What training and experience have you had or education

 7   and experience have you had to be in that role?

 8   A    I have a Bachelor's Degree in Physician Assistant Studies

 9   from the University of Nebraska Medical Center which is where

10   I also received my Master's in Physician Assistant Studies,

11   and then I received additional training through the military

12   from Fort Rucker for the Flight Surgeons course in order to

13   treat pilots and crew members.

14   Q    Where -- Other than Fort Hood, where have you served?

15   A    I've been at Fort Hood twice.  I'm there for the second

16   time, and I've also been up at Fort Carson in Colorado.

17   Q    Okay.  Have you ever been deployed overseas?

18   A    I have.

19   Q    Where?

20   A    Iraq.

21   Q    And what is a -- Can you explain for the jury what a

22   Flight -- what you do on a day-to-day basis?

23   A    So I am a Flight PA.  I'm currently the Senior Physician

24   Assistant for the 1st Air Calvary Brigade which is

25   approximately 2800 soldiers.  The brigade is comprised of
```

1    different types of helicopter pilots, the crew chiefs,

2    mechanics, UAV operators, air traffic controllers, and then

3    the support staff; so people who take care of the unit when

4    we're in the field, cooks, things like that.

5    Q    Are you -- Are you familiar with an individual by the

6    name of "Allison Bradley"?

7    A    I am.  She was a patient of mine.

8    Q    And back -- Is she currently your patient?

9    A    She's not.

10   Q    Back when she was your patient, did you go by a different

11   last name?

12   A    I did.  I was married back then.  My last name was

13   "Luongo."

14   Q    Okay.  So is that the name she would have known you by?

15   A    Yes.

16   Q    Okay.  How -- Do you recall an incident involving

17   prescriptions with Allison Bradley?

18   A    Yes.

19   Q    What do you recall about that?

20   A    I was doing a prescreen of her medical records in

21   anticipation of an upcoming flight physical.  Anyone who is

22   involved with the aircraft, whether they're a pilot or a crew

23   member, UAV operator, air traffic controllers, is required to

24   undergo an annual physical.  And then every five years the

25   physical is considered what we call a long physical where it

1    includes a more comprehensive evaluation.  And all of those

2    pieces of information get submitted to Fort Rucker for

3    approval.  And I was screening her records to make sure she

4    didn't have any new medications, no new illnesses, Emergency

5    Room visits, off-post physician visits that could possibly

6    impact her flight physical.

7    Q    And why -- Are flight physicals important?

8    A    Extremely.

9    Q    Why?

10   A    Because if there's someone who's not medically or

11   mentally fit to either operate or crew an aircraft, it can

12   have devastating consequences.

13   Q    Devastating in -- in what manner?

14   A    Death.

15   Q    Why do you review medications that a patient might be

16   taking as part of a flight physical?

17   A    Many medications, even ones that you can get over the

18   counter that may seem very benign, can decrease your

19   awareness.  They can cause sedation.  Something as simple as

20   Benadryl is not authorized for use while on flight status

21   because of the potential for sedation.  So something like that

22   that can decrease someone's reaction time in the event of an

23   aircraft emergency where they're having to perform emergency

24   procedures could -- could delay performance of those actions.

25   Q    Were you familiar with the type of work that Ms. Bradley

1    did?

2    A    Yes.  She was an air traffic controller.

3    Q    And so those concerns applied to someone in her position

4    as well?

5    A    Absolutely.  An air traffic controller would be

6    communicating by radio to multiple aircrafts at the same time

7    and making sure that they are safely landing on an appropriate

8    runway.

9    Q    Okay.  When you were reviewing -- You said you were

10   reviewing her prescription history before she came in for a

11   physical.  Is that correct?

12   A    Correct.

13   Q    And did you see something that -- Did you see something

14   that concerned you?

15   A    I did.  I noticed in her regular prescriptions that

16   appeared to have been prescribed by an off-post provider in

17   the electronic medical records that the military uses -- they

18   are highlighted in kind of a pale yellow color so it draws

19   your attention to that -- the medication itself.  I didn't

20   recognize the provider, but I did recognize one of the

21   components of the medication which was Ketamine.

22   Q    When you the say "off-post," do you just mean not on Fort

23   Hood?  A doctor somewhere else?

24   A    Correct.

25   Q    And what -- what was -- Did Ketamine stick out to you?

1  A    Absolutely.  Ketamine, depending on how it's used, can be

2  a very strong sedative or used in general anesthesia.  It's

3  also a dissociate of medication.

4  Q    What do you mean by "dissociate of"?

5  A    We use it in general anesthesia when it's being given IV

6  because it can put people to sleep, but it also creates a

7  little bit of amnesia sometimes when it's being used.

8  Q    And as a result of seeing that in the prescription

9  history, what did you do?

10  A    I contacted Ms. Bradley and asked her when she received

11  the prescription and why and if she was using it.

12  Q    Okay.  Do you recall what she told you?

13  A    She told me that she wasn't using any medication.

14  Q    Okay.  Did that concern you?

15  A    It did.  Initially, my thought was that she was being

16  dishonest with me, and so I continued to ask her more

17  questions in terms of, you know, if she had been seeing any

18  off-post providers or anything like that, and she continued to

19  deny that she was using any medications.

20  Q    Okay.  Did you continue to investigate after that point?

21  A    I did.

22  Q    And what did you find?

23  A    I contacted the provider that had written the

24  prescription, and I had a conversation with him.  He did not

25  know Ms. Bradley.  He said that she was not a patient.  There

1    were no records in his office of her having been a patient.

2            And at that point my next concern was that possibly

3    someone was fraudulently writing prescriptions under that

4    provider's name.

5    Q    Did you -- Did you ever contact the pharmacy?

6    A    I did.

7    Q    And what do you recall about that?

8    A    The -- The individual at that pharmacy that I spoke to

9    informed me that they did have a copy of the prescription with

10    that provider's signature on it.  They had all of

11    Ms. Bradley's information to include her proper home address,

12    date of birth, phone number and they had also given me

13    information on when they had mailed a refill of that

14    prescription to her.

15    Q    Did you ever learn any information that led you to either

16    confirm that Ms. Bradley was lying to you or confirm that she

17    was not lying to you?

18    A    I did confront her with the additional information that a

19    refill of that prescription had been mailed to her.  She

20    informed me that on the date that that medication was

21    refilled, she was actually at the National Training Center at

22    Fort Erwin which is a one-month-long training exercise in the

23    middle of Death Valley, so she was not home during that time.

24    And she told people that she had not been using any medication

25    but that she had been signed up for some sort of program, but

 1    she said that she was never using the medication.

 2    Q    Okay.  Do you recall the name of the -- So you speak to

 3    the prescribing physician --

 4    A    I did.

 5    Q    -- or who was -- the person who was listed as the

 6    prescribing physician.

 7    A    Correct.

 8    Q    Do you recall who that was?

 9    A    Dr. Elder.

10    Q    Okay.  Prior to that -- How did you contact him?

11    A    By phone.

12    Q    Prior to that phone call, had you ever met him?

13    A    No.

14    Q    Had you ever spoken with him?

15    A    No.

16    Q    And why did you reach out to him?

17    A    Because I wanted to confirm that Ms. Bradley was not a

18    patient or if she was a patient, what she was being seen for,

19    what other medications she might be taking.

20    Q    And after you spoke with him, did you have some follow-up

21    conversations by e-mail?

22    A    I did.  I followed up our conversation with an e-mail

23    just to let him know what I had found from the pharmacy when I

24    spoke to them.

25    Q    Okay.  If you take a look at the binder up here on the

1    ledge in front of you, ---

2              MR. BRASHER:  May I approach?

3              THE COURT:  Yes.

4    Q    (By Mr. Brasher) Showing you Government's Exhibit 354, do

5    you recognize that as the chain of e-mails that you had with

6    Dr. Elder?

7    A    I do.

8              MR. BRASHER:  We offer Government's 354.

9              MS. STILLINGER:  No objection, Your Honor.

10             THE COURT:  It's admitted.

11   Q    (By Mr. Brasher) And so as an e-mail chain, you

12   understand I have to start at the bottom and work up?

13   A    Correct.

14   Q    So if we start on Page 2 of Government's or -- I'm sorry

15   -- at the bottom of Page 1, on June 3rd, 2015, is this your

16   e-mail to Dr. Elder?

17   A    Yes, it is.

18   Q    So here it has "Luongo," your former name?

19   A    Correct.

20   Q    And can you read what you wrote?

21   A    Yes.  "Dr. Elder, thank you for discussing this patient

22   issue with me this morning.  The patient I was referring to is

23   Allison E. Bradley, Date of Birth:  19" ---

24   Q    And you don't need to actually read that part.

25   A    Okay.

1   Q    Then you described the medication that you saw in her

2   record.  Is that correct?

3   A    Correct.

4   Q    And then you say -- start again with, "This was filled

5   at" ---

6   A    "Dandy Drug in Burleson, Texas."

7   Q    Okay.  And then continue the rest.

8   A    "Filled at Dandy Drug in Burleson, Texas, on February

9   25th, 2015.  Please provide what information you can on when

10  you saw this patient, et cetera, so that I can try to discern

11  what happened and why she is showing record of this medication

12  when she has not been stationed in El Paso, Texas, and was

13  attending training in California at the time of this

14  medication refill.  Thank you for your information this

15  morning and your willingness to assist me with investigating

16  this matter further."

17  Q    And if we were to scroll up, when did you send this

18  e-mail?

19  A    This was on June 3rd, 2015.

20  Q    And so by that point, you had already had one phone

21  conversation with Dr. Elder.  Is that correct?

22  A    Correct.

23  Q    Had you spoken with the pharmacy by that point?

24  A    No, I don't believe I had spoken with the pharmacy at

25  that point.  I believe I contacted them after I confirmed with

1    Dr. Elder that he had no patient records on Ms. Bradley.

2    Q    Okay.  So if we scroll up now, we see his response.  Is

3    that the response you just mentioned where he says, --

4    A    Correct.

5    Q    -- "I reviewed my February medical records and

6    Ms. Allison Bradley is not my patient.  No prescription was

7    written by me"?

8    A    Correct.

9    Q    And then scrolling further up, you responded on the next

10   day, June 4th, 2015.  And what do you say?

11   A    "Dr. Elder, thanks for getting back to me so quickly."

12   Q    Let me stop right there.  Were you -- Was there something

13   interesting about the response you got from him?

14        Let me ask you this:  Did you -- Did you provide a

15   HIPAA release or any other authorization to get information

16   from Dr. Elder?

17   A    I did not.

18   Q    And did you find that -- How did -- How did that strike

19   you?

20   A    Typically if you're asking for information on a

21   particular patient, they will ask for a release from that

22   patient to discuss their medical records.

23   Q    And that didn't happen here?

24   A    No.

25   Q    So continue where we left off.  "Thank you for getting

1    back to me so quickly."

2    A    "I contacted the pharmacy where this was filled and they

3    informed me that the prescription was faxed to them with your

4    signature for a medication called PCN.11 which is a scar

5    cream.  It was then mailed to the patient.  I'm not sure if

6    this falls into that telemedicine program you were referring

7    to but it appears that may be the case."

8    Q    Okay.  So at this point had you spoken with someone at

9    the pharmacy?

10   A    I had.

11   Q    And that would have been Dandy Drug?

12   A    Correct.

13   Q    And do you recall whether it was a male or female you

14   spoke to?

15   A    I believe it was a male.

16   Q    Do you remember the name?

17   A    I don't.

18   Q    Do you remember if it was a pharmacist or like a cashier

19   or pharmacy technician, anything like that?

20   A    I don't.  I assume that it would have been a pharmacy

21   technician or the pharmacist simply because I was not speaking

22   with someone at the front of the store.

23   Q    And did you have to provide a HIPAA release or anything

24   to get information from Dandy Drug?

25   A    No.

1    Q    And how did that strike you?

2    A    Again, typically if you're going to be releasing patient

3    information, they like to have some sort of form showing that

4    the patient is authorizing that information release.

5    Q    Okay.  And then if we scroll up to the top, Dr. Elder

6    asks you to call him, if necessary.

7    A    Correct.

8    Q    Do you recall if you did call him after this?

9    A    I -- I honestly cannot remember with any certainty just

10   because of the amount of time.

11   Q    Okay.  Did you know where Dandy Drug was located?

12   A    Not until I did a Google search.

13   Q    Okay.  Did you -- And where -- What did you learn?

14   A    It's in Burleson, Texas.

15   Q    And did you know where Dr. Elder was located?

16   A    I was able to find that out by looking up his NPI number

17   which is the National Provider Identification number that all

18   providers have.

19   Q    And where was he located?

20   A    I believe El Paso.

21   Q    Did you have any understanding as to why Allison Bradley,

22   who was stationed at Fort Hood, received a prescription from a

23   doctor in El Paso, that was filled by a pharmacy in Burleson,

24   Texas, while she was temporarily stationed in California?

25   A    No.  None of that made sense to me.

1  Q    What did you do as a result of that?

2  A    I spoke to my supervising physician at that time and I

3  voiced my concerns to him.  And I went through the rest of the

4  records of all of the soldiers in my battalion at that time

5  which was in the neighborhood of 500 individuals, and I

6  scrubbed their medical records and found that there were

7  several other soldiers.

8       MS. STILLINGER:  Your Honor, I'm going to object to

9  the relevance as she's talking about other physicians and

10  other patients.

11       THE COURT:  Sustained.  Ask another question, please.

12  Q    (By Mr. Brasher) Did you see -- In looking at that, that

13  investigation you undertook, did you see other prescriptions

14  by Dr. Elder?

15  A    I did.

16  Q    And did you see other prescriptions filled by Dandy Drug?

17  A    There were several pharmacies.

18  Q    In the conversations that you had with Dr. Elder, did he

19  ever tell you that he had received a letter from the Defense

20  Health Agency that he was suspended from practicing -- writing

21  prescriptions to TRICARE beneficiaries?

22  A    I don't believe he ever ---

23       MS. STILLINGER:  Your Honor, I'm going to object to

24  leading and also facts not in evidence, Your Honor.

25       THE COURT:  Rephrase that, please, Mr. Brasher.

1          MR. BRASHER:  I'll ask a different question.

2    Q    (By Mr. Brasher) Did -- Did the person that you spoke

3    with at Dandy Drug inform you that that pharmacy had been

4    suspended by the Defense Health Agency?

5    A    No.

6    Q    Did Dr. Elder tell you that he had submitted an invoice

7    to a marketing company for a vitamin encounter for

8    Allison Bradley?

9    A    I don't believe so.

10          MS. STILLINGER:  Object again as to relevance.

11          THE COURT:  Overruled.

12          MR. SANDEL:  Object as to leading, Your Honor.

13          THE COURT:  The question has been asked and answered

14    already.  So to the extent it hasn't, overruled.  You may

15    answer the question if you haven't already.

16    Q    (By Mr. Brasher) He never said that?

17    A    I don't believe so.

18    Q    Did you ever learn anything about a study that was being

19    done?

20    A    Information came to me later that soldiers were being

21    solicited through the Boss program.

22          MS. WATTLEY:  Your Honor, I'm going to object.  This

23    calls for hearsay.

24          THE COURT:  Sustained.

25          MR. BRASHER:  I pass the witness, Your Honor.

```
 1              THE COURT:  All right.  Cross Examination?

 2              MS. WATTLEY:  No questions on behalf of Dr. Simmons.

 3              THE COURT:  Ms. Stillinger?

 4              MS. STILLINGER:  Thank you, Your Honor.

 5                        CROSS EXAMINATION

 6   QUESTIONS BY MS. STILLINGER:

 7   Q    Captain -- Is it "Fruge"?

 8   A    Kluge.

 9   Q    Kluge; I'm sorry.

10   A    That's okay.

11   Q    There's someone else that has the name "Fruge" in this

12   case.

13          Okay, Captain Kluge, I'm sorry.  I wanted to ask you

14   first how you got a hold of Dr. Elder, how you found his

15   number.

16   A    In the electronic medical records, there was his NPI

17   number associated with the prescriptions.  So I was able to do

18   a Google search for that NPI number to determine where he was

19   practicing.

20   Q    Okay.  And, in fact, there's -- you can do a Google

21   search or there's even like an NPI look-up site, isn't there?

22   A    Correct.

23   Q    Okay.  And that took probably a few seconds to find his

24   phone number?

25   A    Correct.
```

1  Q    And you were able do that from his -- Well, do you know

2  if the NPI search site you can also search by someone's name?

3  A    I have never tried that way.

4  Q    Okay.

5  A    I had just looked up the NPI number --

6  Q    Okay.

7  A    -- and confirmed that it belonged to the same individual.

8  Q    Okay.  And, Captain Kluge, did you get Dr. Elder when you

9  first called him on the phone or did he have to call you back?

10  A    I don't recall, although I don't believe that I was able

11  to speak to him immediately.  I might have spoken to his front

12  desk clerk and given my information.

13  Q    Okay.  But you don't remember?

14  A    I don't.  I'm sorry.  It was a little bit of time ago.

15  Q    Yes.  Yes, it was.  Okay.  And, Captain Kluge, when --

16  when you found Dr. Elder on the phone, however that happened,

17  was he -- did he communicate well with you?

18  A    Yes.

19  Q    Okay.

20  A    It was a generally pleasant conversation as I recall.

21  Q    Okay.  And did he answer the questions that you had?

22  A    He did.

23  Q    Okay.  And, Captain Kluge, let me -- let me ask you -- I

24  guess go back just a little bit.  You said that medical

25  records are very important, correct?

1    A    Indeed.

2    Q    And, in fact, you found his name because you're able to

3    access a system that shows you prescriptions that soldiers

4    have received.  Is that right?

5    A    Correct.

6    Q    Okay.  So am I right that if a soldier has a prescription

7    filled and it's -- it's done through military medical

8    benefits, it's going to be in your computer system, right?

9    A    Correct.  If they paid cash for it out of their own

10   pocket, we won't see it.

11   Q    Okay.  Or, for instance, if somebody goes and gets

12   Benadryl at Walgreen's, it's not going to be in your system,

13   right?

14   A    Correct.

15   Q    Okay.  Benadryl is an antihistamine, right, that is an

16   over-the-counter drug?

17   A    Correct.

18   Q    And so because you're saying that something like Benadryl

19   can affect a pilot, for instance, or it's not just the pilots;

20   it's the whole flight crew, right?

21   A    Correct.

22   Q    Okay.  Because something like Benadryl can affect

23   somebody, I imagine that the soldiers are trained as to what

24   they can take and what they can't take.  Is that right?

25   A    Correct.  At the bottom of their -- their upslip, which

1    basically tells them that they are allowed and authorized to

2    fly both by the Medical Officer and the Commander, there's a

3    disclaimer at the bottom that cites several regulations that

4    tells them that they must follow up with an aviation-qualified

5    provider after receiving any medical care, whether on-post,

6    off-post, receiving any new medications or any changes in

7    health.

8    Q    Okay.  Because a flight crew would have different, I

9    guess, regulations than some other soldiers.  Is that right?

10   A    Correct.

11   Q    Okay.  And that -- So it's the soldier's responsibility

12   to be careful about what their taking?

13   A    Correct.

14   Q    And I imagine if they're seeing a physician other than

15   somebody like you that's trained in the specific requirements

16   for a flight crew, it's the soldier's responsibility to tell

17   the other physician, right?

18   A    Correct.

19   Q    Okay.  You talked a little bit about Ketamine and the

20   serious effects it can have, correct?

21   A    (Affirmative gesture).

22   Q    And that is -- I mean Ketamine sometimes is used

23   intravenously or administered intravenously, correct?

24   A    Correct.

25   Q    Okay.  Are you familiar with -- Well, could you tell by

1    looking at the medical record that this Ketamine was a topical

2    ointment?

3    A    It was unclear, but I assumed, because there were

4    multiple medications listed, that it was probably a compounded

5    medication.

6    Q    Okay.  And it -- By "compounded," you knew that that

7    meant topical, meaning it's -- it's used on the skin, correct?

8    A    Not all compounded medications are topical.

9    Q    Well, that's true, so I misspoke.  So you did not know if

10   this was something that would be ingested or something that

11   would be topical, correct?

12   A    I did not.  However, a topical medication, depending on

13   what it is, would still be unauthorized.

14   Q    Okay.  You do know, though, that a topical medication

15   is -- is going to affect the body much differently than

16   something that is administered intravenously, correct?

17   A    Correct, but the standards from Fort Rucker are very

18   clear.

19   Q    Sure.  I imagine the standards are very, very stringent

20   because safety would be the primary concern, correct?

21   A    (Affirmative gesture).

22   Q    Okay.  When you spoke to Dr. Elder, it sounds to me like

23   he mentioned to you a telemedicine program.  Is that right?

24   A    Correct.

25   Q    Okay.  So Mr. Brasher asked you right now would you know

1  why a doctor in El Paso would be prescribing something to a

2  soldier in Killeen and you said "no," but -- but if it were a

3  telemedicine consult, that -- that would make sense, right?

4  A    It would, but it would be very uncommon for that to occur

5  through a military treatment facility.

6  Q    Sure; through a military treatment facility, correct?

7  A    Correct.

8  Q    Okay.  And I don't know if you've ever worked in practice

9  outside of the military?

10  A    I have.  I've done some moonlighting as a PA.

11  Q    Okay.  And -- And you know that telemedicine is actually

12  quite common these days, right?

13  A    It is.

14  Q    Okay.  So you -- Well -- And if -- I mean Dr. Elder,

15  eventually he got back to you and confirmed that

16  Allison Bradley was not a patient of his, correct?

17  A    Correct.

18  Q    And, in fact, he said he checked his medical records,

19  correct?

20  A    Correct.

21  Q    And if, in fact, she was not a patient of his, that he

22  had had no contact with her, that would be a truthful

23  response; right?

24  A    I would assume so, yes.

25  Q    Okay.  But then you would wonder why there's a

1   prescription that he signed for her; right?

2   A    Correct.

3   Q    Okay.  That would appear to be a mistake; correct?

4   A    I -- I guess it would depend on the recordkeeping.

5   Q    Sure.

6   A    I couldn't say.

7   Q    Sure.  Because medical recordkeeping is, again, really

8   important; right?

9   A    Correct.

10  Q    So in the military, you've got everything in a big

11  electronic system; right?

12  A    For the most part, yes.

13  Q    Okay.  And you're -- You work with flight crews, but

14  other military healthcare professionals have the same access.

15  I mean if -- if -- if I'm a military doctor treating some

16  other kind of soldier, I'm still going to be able to get into

17  that same system and see my patients' prescriptions, right?

18  A    Right.

19  Q    If they've been paid by TRICARE, right?

20  A    Correct.

21  Q    Okay.  I think I -- Let me just check one moment.

22       Mr. Brasher asked you right now if you would expect

23  someone to request a HIPAA release or have a HIPAA release

24  before they gave you any information about a patient, correct?

25  A    Correct.

144

```
 1   Q    Okay.  You would agree with me, wouldn't you, that you

 2   don't need a HIPAA release to tell somebody that this is not

 3   your patient?

 4   A    Correct.

 5   Q    Okay.  Because a HIPAA release is something that protects

 6   confidential patient information, right?

 7   A    Correct.

 8   Q    And if all you're doing is saying, "I have no information

 9   on this person," I don't need a release to give you that,

10   right?

11   A    That would be correct.

12        MS. STILLINGER:  Okay.  I pass the witness,

13   Your Honor.

14        MR. LAVINE:  No questions, Your Honor.

15        MR. SANDEL:  No questions, Your Honor.

16        MR. ANSLEY:  Yes, Your Honor.  May I proceed, Judge?

17        THE COURT:  Yes.

18                  CROSS EXAMINATION

19   QUESTIONS BY MR. ANSLEY:

20   Q    Captain Kluge, good morning.

21   A    Good morning.

22   Q    You and I have not talked before today, have we?

23   A    I beg your pardon?

24   Q    You and I have not spoken before today, have we?

25   A    No.
```

1    Q    I represent Steven Kuper in this case.  You spoke of

2    Steven Kuper a few minutes ago and, I guess, about Dandy Drug.

3    Do you recall that?

4    A    (Affirmative gesture).

5    Q    And let's -- I want to, I guess, go through the process

6    that you went through on behalf of your patient,

7    Allison Bradley, when you figured out what the -- I guess when

8    you looked at those prescriptions that she had received.  The

9    steps you took included contacting the pharmacy that you saw

10   the information for.  Do you recall that?

11   A    I do.

12   Q    And in contacting that pharmacy, you -- you contacted

13   them because you had prescriptions that you seen or at least

14   heard of, were aware of, concerning Allison Bradley.  Is that

15   correct?

16   A    That's correct.

17   Q    When you spoke with the pharmacy, did you already have

18   those prescriptions in place?  Did you physically have those

19   prescriptions?

20   A    You mean did Allison Bradley turn in the medications to

21   me?

22   Q    No, Ma'am.  Did you have written copies -- Did you have

23   copies of those prescriptions?

24   A    I didn't have a photocopy of the prescription.  I only

25   had the record of it in my electronic medical record.

1  Q    Okay.  And those -- That electronic medical report, what

2  -- for these prescriptions, what generally did that electronic

3  record show?

4  A    That would show the name of the medication, the name of

5  the provider and in this case also the NPI number.  And it

6  also showed the amount to dispense if there were any refills,

7  the date it was dispensed, and then the pharmacy from where it

8  was dispensed.

9  Q    And that electronic information, is that what you

10  gleaned, I guess, the name of the pharmacy to contact?

11  A    Yes.

12  Q    And then when you spoke with that pharmacy, you said you

13  think it was either a pharmacist or maybe a pharmacy tech;

14  you're not sure which one it is.

15  A    That's correct, I'm not sure.

16  Q    Okay.  And when you spoke with them, did you -- whoever

17  it was at that pharmacy, did you identify for them the patient

18  that you were calling about?

19  A    I would have, yes.

20  Q    Would you identify the fact that you were the Physician's

21  Assistant for -- You're a PA?  Is that correct?

22  A    Correct.

23  Q    So, Captain, you identified a signature of the PA for

24  this patient as well.  Is that correct?

25  A    I did.

1    Q    And in doing so, did you then provide information

2    regarding this patient, asking questions about the

3    prescriptions that you had found in that electronic system?

4    A    Yes.  I would have had to provide some kind of

5    information in order for them to look her up.

6    Q    And I know it's been -- it's been a while, but do you

7    recall generally what information you provided to the

8    pharmacist or the pharmacy tech?

9    A    I can't specifically recall but, in general, it's usually

10   name and date of birth.

11   Q    You provide identifying information for that patient,

12   correct?

13   A    Correct.

14   Q    Name, date of birth.  Any other identifiers that you

15   recall that you would have provided to that pharmacy or

16   pharmacist tech -- pharmacy tech?

17   A    I don't recall.

18   Q    And you're essentially providing information that they're

19   confirming the information that you provide, whether they have

20   that, in turn, in their system.  Is that fair?

21   A    Yes.

22   Q    So is that -- What information do you recall receiving,

23   not giving but receiving, from that pharmacy when you spoke

24   with them?

25   A    They confirmed that they had a proper address for her.

1    So it did get mailed to the home of record that I had on file

2    for her.  They also confirmed that they had a prescription

3    with provider signature.

4    Q    So they're essentially confirming information that you,

5    at least in part, were already aware of.

6    A    Correct.

7    Q    And you -- Your information in your system showed at

8    least there -- there was information for prescriptions.  You

9    didn't have the physical prescriptions.

10   A    Correct.

11   Q    But your electronic information showed that there should

12   have been prescriptions, correct?

13   A    Correct.

14   Q    And, in turn, speaking with the person at the pharmacy,

15   they effectively told you the same thing.

16   A    Correct.

17   Q    Okay.

18        MR. ANSLEY:  If we can -- Keith, if we can pull up

19   Government's Exhibit 565.

20   Q    (By Mr. Ansley) And, ma'am, this will be on your screen

21   as well, I believe.

22        MR. ANSLEY:  And, Keith, if we can turn to Page 2 of

23   this.

24   Q    (By Mr. Ansley) Have you ever seen this document before?

25   A    No, sir.

1   Q    And I'll represent to you this is a way -- this is a

2   prescription that was received by -- received by Dandy Drugs.

3   Would this be consistent, the information on this document,

4   consistent with the information in your electronic system

5   concerning these prescriptions?

6   A    It would.

7        MR. ANSLEY:  Keith, if we can page down a little bit.

8   Q    (By Mr. Ansley) I want you, Captain, to look at the

9   second half of this page.  Just confirm the same thing.  Is

10  this consistent with what you would expect to have seen or I

11  guess consistent with the information in your electronic

12  system?

13  A    The only thing that would have been missing is I didn't

14  have details on the purpose of the prescription that you see

15  on the left-hand side.

16  Q    Yes, ma'am.  And at the bottom we see a signature.  Do

17  you see that on the bottom left?

18  A    I do.

19  Q    And then a date, February 2nd, 2015.  Do you see that?

20  A    Yes.

21  Q    And is that information consistent with what the

22  pharmacist or pharmacy tech told you at Dandy that they, in

23  fact, had a prescription?

24  A    I don't know what date that they would have told me.  I

25  can't recall that specifically, but they did tell me that they

1    had a prescription with his signature.

2    Q    That's a better answer to a bad question.  They told you

3    they had a prescription.

4    A    Correct.

5    Q    Didn't tell you the date, but this at least confirms that

6    they, in fact, did have a prescription.

7    A    Correct.

8    Q    Yes, ma'am.

9         MR. ANSLEY:  And if we can, Keith, look at the next

10   page.

11   Q    (By Mr. Ansley) And, Captain, I'll ask you the same

12   questions about this next prescription; ask you if this

13   prescription is, in turn, consistent with the information that

14   your electronic system showed?

15   A    Yes.

16   Q    Then looking at the bottom of the page, we'll see a

17   signature as well and a date.  Same question, Captain:  Is

18   this consistent with what you -- at least what was purported

19   to you by the person at the pharmacy with whom you spoke?

20   A    Yes.

21        MR. ANSLEY:  And then, Keith, the last one; I think

22   the last page.

23   Q    (By Mr. Ansley) Captain Kluge, this will be another

24   prescription.  Same question there, ma'am:  Do you recognize

25   this as being consistent with the information that your

1    electronic system showed?

2    A    Yes.

3    Q    Then bottom of the page, do you recognize the same --

4    what appears to being a similar signature and then the same

5    date?  Do you recognize that?

6    A    Yes, from the other prescriptions.

7    Q    Okay.  And that, again, is consistent with having the

8    information you got from the pharmacy that they had

9    prescriptions from a physician that supported the

10   prescriptions that they filled?

11   A    Correct.

12   Q    And, Captain, isn't that -- In your experience as a PA,

13   isn't that what you would expect a pharmacy or pharmacist to

14   do?

15   A    They fill the prescriptions they're given.

16   Q    That's right, they fill prescriptions.  Once they receive

17   prescriptions with a provider's signature on them, the

18   pharmacist's job -- the pharmacy's job is to fill those

19   prescriptions.

20   A    Correct.

21   Q    That's their role in the process.  Is that correct?

22   A    Yes.

23   Q    And in doing so, is it fair to say the information that

24   you received from the pharmacy was accurate?

25   A    It was accurate to the best of their knowledge, yes.

1    Q    Yes, ma'am.  And to the best of your knowledge as well.

2    A    Correct.

3    Q    Is -- Remind me, Captain:  How long have you been in the

4    military?

5    A    In May, I will hit 17 years.

6    Q    And thank you for your service.

7    A    Thank you.

8    Q    Captain, in -- in the course of being -- Have you been a

9    PA in the military all those 17 years?

10   A    No, I have not.  I've been a PA since 2012, so about

11   seven years.

12   Q    Okay.  So in those seven years and I guess before that as

13   well, have you seen in your time in the military is -- are

14   opioids an issue among soldiers?

15   A    They certainly have the potential to be.  We do have some

16   pretty strict opioid prescription practices.  We have sole

17   providers.  We try to limit the prescription of opioids to

18   pain management, to the Surgery Department, sometimes to

19   Dental.  It would be very rare for me as a primary care

20   provider to be prescribing narcotics.

21   Q    Yes, ma'am.  And would you say as soldiers, as military,

22   is that population, are they -- are they more susceptible or

23   vulnerable to the possibility, based on what they do for a

24   living, the possibility at least of opioid addictions, more so

25   than the general population?

1    A    I suppose it would depend on their -- their particular

2    job.  Some military occupational specialties are more prone to

3    injury, chronic injury, things of that nature than others will

4    be.

5    Q    And if that's the case, Captain, is it -- is it

6    reasonable to say that if there are options other than the use

7    of opioids to treat, whether it's pain, scars, things like

8    that, that those types of options beyond opioids would be

9    attractive to you and other providers within the military to

10   treat -- to treat military patient?

11   A    Using non-narcotic pain control would certainly be

12   preferred, yes.

13   Q    Yes, ma'am.  And -- And for the reasons that we're

14   talking about, at least the possibility of opioid abuse,

15   addiction, however you want to put it.  Is that pretty much

16   the reason why?

17   A    Correct.

18   Q    And then as far as non-narcotic options, would those

19   include things like, where it's appropriate, where it's

20   medically appropriate, compounding medications, topical

21   medications that can be used instead of opioids for treatment

22   of pain, scars, things like that?

23   A    As you said, within reason; depending on the type of

24   injury or pain that you're treating, yes.

25   Q    Yes, ma'am.  Thank you.

1          MR. ANSLEY:  I'll pass the witness, Your Honor.

2          THE COURT:  All right.  Redirect?

3                    REDIRECT EXAMINATION

4    QUESTIONS BY MR. BRASHER:

5    Q    What type of non-narcotic pain relief options do you

6    typically prescribe in your practice?

7    A    I prefer to use antidepressants.  You can use sometimes

8    Lidocaine patches.  Lidocaine is an anesthetic where you can

9    apply it to an area of musculoskeletal pain.  Gabapentin is a

10   nerve specific pain medication.  So those are things that I

11   prefer to use.  There's no study out there that shows that

12   long-term narcotic use gives you more benefit than an

13   anti-inflammatory long term.

14   Q    What about Tylenol?

15   A    Tylenol would certainly be appropriate.

16   Q    Okay.  Ibuprofen?

17   A    Yes.

18   Q    Other over-the-counter things?

19   A    Correct.

20   Q    Icy Hot?

21   A    I have my own opinions about Icy Hot but it works for

22   some people.

23   Q    Same thing; types of things that distract from the pain.

24   A    Correct.

25          MR. BRASHER:  I'll pass the witness, Your Honor.

```
 1              THE COURT:  All right.  Thank you.

 2              You may step down.  Thank you so much.  You may be

 3    excused.

 4              THE WITNESS:  Thank you.

 5              THE COURT:  Call your next witness, please.

 6              MS. HUNTER:  The United States calls Sharon Watts.

 7              THE COURT:  Just a minute, please.

 8              (Pause)

 9              THE COURT:  Okay.  We're going to take a five-minute

10    break here.

11              COURT SECURITY OFFICER:  All rise for the jury.

12              (Jury escorted to the Jury Room by the Court Security

13    Officer.)

14              (Court recessed from 11:17 AM until 11:23 AM.)

15              COURT SECURITY OFFICER:  All rise for the jury.

16              (Jury seated in the jury box.)

17              THE COURT:  All right.  Be seated, please.  You have

18    Sharon Watts?

19              THE WITNESS:  Yes, ma'am.

20              THE COURT:  And your last name is spelled W-A-T-T-S.

21              THE WITNESS:  Yes.

22                  (The Witness, SHARON WATTS, Is Sworn.)

23              THE COURT:  Thank you.  Be seated there.  When you're

24    comfortable, slide the base of that microphone a little closer

25    to you and tell us your name again to make sure we can hear
```

1    you, please.

2              THE WITNESS:  Sharon Watts.

3              THE COURT:  Very good.  Thank you.

4              Proceed, Ms. Hunter.  Thank you.

5              MS. HUNTER:  Thank you, Your Honor.

6                      DIRECT EXAMINATION

7    QUESTIONS BY MS. HUNTER:

8    Q    Good afternoon, Ms. Watts.

9    A    Hi.

10   Q    Could you, please, introduce yourself to the jury and

11   tell them a little bit about your background?

12   A    My name is Sharon Watts.  I'm in the military 20 years.

13   I have two kids, two grandkids, and that's about it.

14   Q    What's your rank in the military?

15   A    I'm a Mass Sergeant, E8.

16   Q    And at some point did you become a participant in what

17   you understood to be a study about pain and scar creams?

18   A    Yes, ma'am.

19   Q    Approximately when did you learn about that study?

20   A    In 2015, I believe.

21   Q    How did you find out about the study?

22   A    It was word of mouth.

23   Q    And what was your understanding with respect to the

24   purpose of the study?

25   A    It was almost like, the way I interpret it, like if

1    you're at the mall and somebody with a survey will approach

2    you and say, "Hey, if you try these products out, we'll give

3    you a certain amount of money."  So that's what I assumed it

4    was.

5    Q    Did you understand that the study was designed to be

6    studying anything in particular?

7    A    I'm not understanding your question.

8    Q    Did you -- Were you ever told anything about opioids?

9    A    No.

10   Q    What steps did you get to get enrolled in the study?

11   A    You had to fill some information out online.

12   Q    And do you recall where you went online?

13   A    I don't know the link but I went online.

14   Q    And were you -- Did you understand that you would receive

15   compensation for participating in the study?

16   A    Yes.

17   Q    And how much did you expect to receive?

18   A    I think it was 250 per product.

19   Q    And when you say "product," are you referring to a

20   prescription?

21   A    One was the vitamin and I think cream.

22   Q    Did -- Were those prescription vitamins and prescription

23   creams?

24   A    Yes, I think so.

25   Q    After you went to the website to get enrolled in the

1    study, did you receive a phone call from anyone?

2    A    Yes.  It was a phone call from a female.  I do not recall

3    her name.  And then she asked me some questions.  I do not

4    recall them.  And then she said we would receive a phone call

5    from a doctor.  Then I think maybe a day later I received a

6    phone call or the same day; I'm not for sure, but I did

7    receive a phone call from a male.  I'm assuming it was a

8    doctor.

9    Q    Did you ever have a face-to-face meeting with a

10   physician?

11   A    I did not.

12   Q    After you spoke with the doctor, did you receive any

13   medications in connection with the study?

14   A    Yes, through the mail.

15   Q    And do you recall what those prescriptions were?

16   A    Yes, the vitamin and the cream.

17   Q    Did you receive a pain cream?

18   A    Yes.

19   Q    Did you receive a scar cream?

20   A    Yes.

21   Q    Did you receive refills of those creams?

22   A    Yes.

23   Q    Do you recall approximately how many prescriptions in

24   total you received?

25   A    I want to say it was a total of four; three to four.

```
 1   Q    Do you recall which pharmacy you received the

 2   prescriptions from?

 3   A    I do not.

 4   Q    Did you use the creams?

 5   A    I used one.

 6   Q    Which cream is that?

 7   A    I think it was the pain cream.

 8   Q    Did you use all of the cream that you were sent?

 9   A    No, I did not.

10   Q    What were your thoughts on the pain cream?

11   A    It wasn't working at the time.

12   Q    Did you experience any side effects that you thought were

13   attributable to the creams?

14   A    At the time I thought I did but I wasn't for sure if

15   it -- if it was the cream or not.

16   Q    And what did you think might have been attributable to

17   the creams?

18   A    I thought it was hair loss, but I didn't look into it

19   more to see if it was the cream or it was just something else

20   that was making the hair loss.

21   Q    Do you recall filling out any surveys in connection with

22   the study?

23   A    Yes, I did online.

24   Q    If you can take a look at Government's Exhibit 254.  It

25   should be right in front of you.  Do you see it?
```

```
 1   A    Yes.

 2   Q    Do you recognize that document?

 3   A    Yes, I do.

 4   Q    What is it?

 5   A    It's the survey online.

 6        MS. HUNTER:  The Government moves to admit

 7   Government's Exhibit 254.

 8        MR. SANDEL:  No objection.

 9        THE COURT:  Admitted.

10   Q   (By Ms. Hunter) Where did you go to fill out this

11   assessment, if you recall?

12   A    You would go online to fill it out on the website.

13   Q    And do you recall attaching a photo to this survey?

14   A    Yes, ma'am.

15        MS. HUNTER:  If we could go to Page 3, please.

16   Q   (By Ms. Hunter) Is this the photo that you attached?

17   A    Yes, ma'am.

18   Q    Do you know why you had to attach a photo?

19   A    The -- What we're supposed to do is once we finish using

20   the product, we take a picture of the empty product, and then

21   we attach it and then send it up with the survey.

22   Q    And it appears on the bottles that there's a prescriber

23   by the name of William Elder.  Do you see that?

24   A    I do.

25   Q    Do you recognize that name?
```

1    A    No, ma'am.

2    Q    Did you ever have a patient relationship with Dr. William

3    Elder?

4    A    No, ma'am.

5    Q    Do you recall approximately how long it took you to fill

6    out the assessment?

7    A    More than five, less than ten.

8    Q    And what was your overall impression of the assessment?

9    A    It was just something just to fill out.

10    Q    After you filled out the assessment, do you recall

11    receiving any compensation?

12    A    Yes, I did.

13    Q    And how were you paid?

14    A    By check.

15        MS. HUNTER:  If you could pull up Government's

16    Exhibit 40 which has been previously admitted.  If we could go

17    to Page 4, please.

18    Q    (By Ms. Hunter) Do you recall how much compensation you

19    received in connection with the study?

20    A    Yes, ma'am.

21    Q    How much was that?

22    A    750.

23    Q    Okay.  And this is your name on this check, right?

24    A    Yes, ma'am.

25        MS. HUNTER:  And if we can scroll down a little bit.

1   Q    (By Ms. Hunter) Is that your handwriting, "Deposit Only"?

2   A    Yes, ma'am.

3   Q    And would this be one of the checks that you believe you

4   would have received from the study?

5   A    Yes, ma'am.

6   Q    And did you know what "Freedom From Pain Foundation" was?

7   A    I'm assuming it's a part of the survey.

8   Q    Tell the jury, if you could, what impact the compensation

9   you received in connection with this study had on your desire

10  to continue participating.

11  A    I'm not understanding what you're saying.

12  Q    Was the compensation you received a factor in your

13  decision to get the prescription creams in connection with the

14  study?

15  A    Yes, ma'am.

16  Q    Was that the main factor?

17  A    Yes, ma'am.

18  Q    Would you have participated in this study had you not

19  been compensated?

20  A    No, ma'am.

21  Q    Do you recall which insurance you had at the time.

22  A    Yes, ma'am.

23  Q    What insurance was that?

24  A    We have TRICARE.

25  Q    And do you know how much TRICARE was billed?

```
 1   A     No, ma'am.

 2         MS. HUNTER:  If we could pull up Government's Exhibit

 3   72 which has been previously admitted.

 4   Q    (By Ms. Hunter) Okay.  Ms. Watts, I'm showing you

 5   Government's Exhibit Number -- excuse me -- 74.  I'm showing

 6   you Government's Exhibit 74, Ms. Watts, and I will represent

 7   to you that this is a summary chart of the claims that were

 8   submitted to TRICARE in connection with the prescriptions you

 9   received.  Were you aware that TRICARE was billed over $60,000

10   and paid over $38,000 for the prescriptions you received?

11   A     No, ma'am.

12   Q     And those are prescriptions that were sent to you over

13   the course of what appears to be three months.

14   A     Correct.

15   Q     Did you stop participating in the study at some point?

16   A     Yes, ma'am.

17   Q     Why did you stop participating?

18   A     The link went down.

19   Q     Was there any other reason that caused you to stop

20   participating in the study?

21   A     We didn't receive the products.  I didn't receive the

22   products.

23   Q     Do you recall -- Was it your understanding there was

24   concerns about the study?

25   A     Yes.
```

1          MR. ANSLEY:  Objection; leading, Your Honor.

2          THE COURT:  Overruled.

3   Q    (By Ms. Hunter) What were those concerns?

4          MS. WATTLEY:  Your Honor, I'm going to object.  I

5   believe it calls for hearsay.

6          THE COURT:  Overruled.

7   Q    (By Ms. Hunter) What were -- What was your understanding

8   of the concerns with regard to the study?

9   A    A lot of the -- As to my opinion or what I heard?

10  Q    What is your opinion?

11         THE COURT:  Well, you need to ---

12         MS. WATTLEY:  I'll renew my hearsay objection,

13  Your Honor.

14         THE COURT:  You need to establish a basis for the

15  witness having an opinion, and then I will rule on the hearsay

16  objection.  Go ahead.

17  Q    (By Ms. Hunter) Did you develop any concerns about the

18  study?

19  A    I'm not understanding your question.

20  Q    Was there a point where you became concerned about the

21  legality of the study?

22         Were you concerned that there were some issues with

23  the study at some point?

24         MR. ANSLEY:  Object to the leading.

25         THE COURT:  Overruled.

1    Q    (By Ms. Hunter) You can answer.  Sorry.

2    A    Oh, okay.  I had concerns, yes.

3    Q    And what were those concerns?

4    A    The concern was there was some issue with this study.

5    Q    Any particular issues?

6         MR. SANDEL:  Renew the hearsay objection.  I don't

7    believe we got the foundation or where these were.

8         THE COURT:  Where did you -- What was the source of

9    the concerns?  Without you telling us what -- Was the source

10   your own experience or what someone else told you?

11        THE WITNESS:  It was not receiving the product

12   anymore because the link was down and also what other people

13   were saying, the reason why the link was down.

14        THE COURT:  Okay.  All right.  And who were those

15   people?  Other people that you dealt with at ---

16        THE WITNESS:  No, ma'am, not that I dealt with; just

17   this here.

18        THE COURT:  Okay.  The hearsay objection is sustained

19   to that testimony.

20   Q    (By Ms. Hunter) Do you have any opinion as to how much

21   TRICARE was billed for these creams?

22        MS. WATTLEY:  Objection, Your Honor.  She just showed

23   her an exhibit.

24        THE COURT:  Okay.  Overruled.

25   Q    (By Ms. Hunter) You can answer.

1    A    Yes.  I didn't realize it was that amount of money, and I

2    was kind of upset about it.

3    Q    Why were you upset about that?

4    A    I didn't realize it was that amount of money.

5    Q    Had you known that the creams were costing the military

6    insurance that much, would you have participated in the study?

7    A    I would not.

8         MS. HUNTER:  I'll pass the witness.

9         THE COURT:  Cross Examination?

10                      CROSS EXAMINATION

11   QUESTIONS BY MR. SANDEL:

12   Q    Ms. Watts, how are you?

13   A    Fine; thank you.

14   Q    My name is Ryan Sandel, and I represent John Cooper in

15   this case.  And you and I have never met, have we?

16   A    No.

17   Q    And I don't expect you to know who John Cooper is, do

18   you?

19   A    I do not.

20   Q    I just wanted to ask you a couple of brief questions

21   about the study that you were just talking about on Direct

22   Examination.  Okay?

23         If any of my questions are unclear, just let me know

24   and I'm happy to rephrase them.  All right?  Is that fair?

25   A    Yes.

1    Q    Okay.  You said you first heard of the study, you said,

2    through word of mouth.  Is that correct?

3    A    Correct.

4    Q    Was that through other people who were participating in

5    the study or was that through somebody that was a

6    representative of the study, if you recall?

7    A    Participating in the study.

8    Q    And they told you about the study, and they told you what

9    would be expected of you if you were to participate.  Is that

10   right?

11   A    Correct.

12   Q    And your understanding was that your role in this

13   marketing study was to receive certain medications and then

14   provide your feedback on whether or not you think they worked,

15   that sort of thing.  Is that correct?

16   A    My assessment, yes.

17   Q    Okay.  And so the first step in you participating in this

18   study, you said you went online to a website.  Is that

19   correct?

20   A    Correct.

21   Q    And you recall, sitting here today, what that website is?

22   A    I do not.

23   Q    Okay.  Did you spend any time looking at that website

24   about any of the documentation they had about what the study

25   was or anything like that?

1    A    No, I did not.

2    Q    You signed up on the website and said that you wanted to

3    participate, correct?

4    A    Yes.

5    Q    When you were enrolling, do you recall having to fill out

6    a form that provided some information about you and your

7    background and your medical history?  Do you recall that?

8    A    It was some -- some information I needed to fill out.

9    Q    Sure.  And as part of that enrollment process on those

10   forms, one of the things you had to do was select which

11   medications you were interested in and why you were interested

12   in them.  Is that correct?

13   A    Correct.

14   Q    And I believe you selected -- you said you had selected

15   the pain cream and the scar cream and the vitamins.  Is that

16   true?

17   A    Correct.

18   Q    And you selected the pain cream.  My understanding is you

19   were having some pain issues with your back.  Is that correct?

20   A    Correct.

21   Q    And scar cream, were those scars -- Did you have some

22   scarring that you were going to test that product out on?

23   A    No.

24   Q    Okay.  Or at least some skin blemishes, some -- some

25   stretchmarks or something like that you were testing that

1    product on?

2    A    Oh, yes.

3    Q    Okay.  So when I said "scarring," you were thinking I was

4    meaning like an injury scar.  But you had something on your

5    skin and you were going to test that product out.

6    A    Yes.

7    Q    Okay.  After you submitted your enrollment form, I

8    believe what you said is the next thing that happened is you

9    received a call from an office or some female in an office,

10   correct?

11   A    Correct.

12   Q    And what was the contents of that call, if you recall?

13   A    I don't recall.

14   Q    Is it fair to say that was just somebody saying, "We

15   received your application and you've been approved," and I

16   think what you said is, "You'll hear from a doctor soon."

17   A    Correct.

18   Q    So the office worker that called you confirmed that you

19   had actually applied; correct?

20        MS. HUNTER:  Objection, Your Honor.  The witness has

21   already testified she doesn't recall what happened on that

22   call.

23        THE COURT:  All right.  You may proceed.  Overruled.

24        MR. SANDEL:  Thank you, Your Honor.

25   Q    (By Mr. Sandel) And so the female office worker that you

```
 1    spoke to confirmed that you had -- you were the one that

 2    submitted that application; correct?

 3    A    I don't -- I don't recall what she said.

 4    Q    Sure.  But you do recall her saying, "A doctor will reach

 5    out to you shortly."

 6    A    Yes.

 7    Q    And shortly thereafter, you said you got a call from a

 8    doctor; you believe it was a male, but you're not sure who

 9    that doctor was, fair?

10    A    Correct.

11    Q    And how long was that phone call with the doctor, the

12    male doctor?

13    A    Time-wise?

14    Q    Time-wise, yes, ma'am.

15    A    I can't say.

16    Q    Was it about 30 minutes or so?

17    A    Maybe less than that.

18    Q    You just can't recall as you sit here today?

19    A    Correct.

20    Q    And it was a long time ago.  I get it.  Do you recall

21    meeting with Government agents in this case when they were

22    asking you about your participation?

23         Did Government agents at some point come and talk to

24    you about the study?

25    A    Oh.
```

1   Q    And by "Government agents," I mean investigators,

2   prosecutors, somebody like that.

3   A    Yes.

4   Q    Do you remember when that meeting might have taken place?

5   A    I do not.

6   Q    Would January of 2016 sound about right?

7   A    Yes.

8   Q    To the best of your recollection, how many agents were

9   there speaking to you that day?

10  A    Two.

11  Q    Two.  And do you recall watching them take notes during

12  your interview?

13  A    (Negative gesture).

14  Q    Not sure?  Okay.  Would -- If I were to show you a report

15  of that interview, would that help refresh your recollection

16  on what you might have told them and how long that phone call

17  with the doctor lasted?  Would that help?

18  A    Sure.

19  Q    Okay.  Just read it to yourself.  Don't read it out loud.

20        All right, Ms. Watts.  Now that I've shown you that,

21  is your memory or recollection refreshed on how long the phone

22  call with the doctor lasted?

23  A    At that time, that's what I said.

24  Q    Okay.  And so you had -- you had told the Government that

25  that phone call lasted about 30 minutes.

1    A    If that's what is written down.

2    Q    Well, let's -- let me ask you this:  This phone call with

3    the doctor would have happened sometime in early 2015.  Is

4    that fair?

5    A    Yes.

6    Q    And you were interviewed by agents in January of 2016,

7    correct?

8    A    Correct.

9    Q    So is it fair to say that when you were speaking to those

10    agents, that was much closer in time than as we sit here now?

11    It's been almost five years.  Is that fair?

12    A    Correct.

13    Q    Okay.  So your memory would probably have been a little

14    bit fresher back in 2016?  Is that fair?

15    A    Yes.

16    Q    Okay.  So a 30-minute call with the doctor.  He spoke to

17    you about the creams that you had selected.  Is that fair?

18         Would you like me to show you this again and help

19    refresh your recollection?

20    A    Sure.

21         (Pause)

22    Q    Does that help refresh your recollection?

23    A    Yes.

24    Q    Okay.  So in that 30-minute phone call with the doctor,

25    did he speak to you about the creams that you had selected?

1   A    Yes.

2   Q    And did he explain to you what those creams were and what

3   to expect?  Possibly?

4   A    Yes.

5   Q    Okay.  In any event, at some point the doctor told you

6   that based on your answers, he would be sending a prescription

7   and the creams would be on their way.  Is that fair?

8   A    I received the creams.

9   Q    Okay.  And you said you believe you received three, maybe

10  four different medications?

11  A    Actually it was -- it was a total of two different

12  creams.

13  Q    Okay.  So two creams and then one of the vitamins.  We

14  saw that pill bottle in that picture.

15  A    Correct.

16  Q    And did you use them?

17  A    Yes.  I used the cream.

18  Q    Sure.  Now let me ask you this:  When you were enrolling

19  in the program, did anybody pay you money right when you

20  enrolled?

21  A    No.

22  Q    No.  When you spoke to the doctor or to the pharmacist,

23  did anybody say, "A check's on the way"?

24  A    No.

25  Q    When you received the prescriptions, after you had spoken

1    with the doctor for 30 minutes, did they come with the check

2    that we were looking at just earlier?

3    A    No.

4    Q    So at this point you've spoken to the pharmacist, you've

5    spoken to the doctor; you've received the creams; you're using

6    the creams or at least one of the creams.  You haven't been

7    paid at this point, correct?

8    A    Who's the pharmacist?

9    Q    Well, I'm sorry.  I misspoke.  The -- The female, we

10   don't know who that female worked for, but you spoke to a

11   female before you spoke with the doctor, correct?

12   A    Okay, yes.

13   Q    Is that fair?

14   A    Yes.

15   Q    Did I fix that?  Okay.  But at this point you've received

16   no money, correct?

17   A    Correct.

18   Q    And that's because your understanding is:  In order to

19   get compensated, you had to use the medications and then

20   provide your feedback?

21   A    That is correct.

22   Q    That's correct.  So you used them for approximately 30

23   days.  You went online and then you submitted your assessment.

24   A    Correct.

25   Q    You filled out that form, right?

1          MR. SANDEL:  Mr. Slyter, if we could see Government's

2     254, please.

3     Q    (By Mr. Sandel) All right.  And this is the assessment

4     that you filled out, correct?

5     A    Correct.

6     Q    Now I want to go over a couple of your answers.  So the

7     first is:  You see a little bit down, "How would you rate your

8     doctor consult," and you wrote, "Great."  Was that a true

9     statement?

10    A    Yes.  That's what I put down.

11    Q    Okay.  If we scroll down a little bit more, "How would

12    you rate the pain cream?"  You wrote, "Good; some relief."  So

13    not great but you were seeing at least some relief.  Is that

14    fair?

15    A    That's what I wrote down, yes.

16    Q    Okay.  And then right here, "Did you experience any side

17    effects?"  "The cream was hard to rub in the skin."  Do you

18    see where you wrote that?

19    A    Yes.

20    Q    And so is it safe for me to assume that when you were

21    filling this form out, you had the ability to type in what you

22    wanted.  Is that fair?

23    A    That's true.

24    Q    Okay.  And -- And I'm not fussing with you about that,

25    but I just wanted to see that you -- you were providing -- Is

1    it fair to say you were providing feedback that at the time

2    you thought, "Hey, you guys should know; this cream is kind of

3    hard to rub in"?

4    A    Correct.

5    Q    Okay.

6         MR. SANDEL:  If we could go to the next page.

7    Q    (By Mr. Sandel) And they received comments, and you were

8    repeating some of the comments that the creams were a little

9    hard to rub into your skin.  Do you see that?

10   A    Yes.

11   Q    And, again, that's -- that's something that you typed

12   when you were providing your feedback, correct?

13   A    Correct.

14   Q    Okay.  And then down here a little bit further, "Do you

15   want any information on vitamins for nerve and overall

16   wellness," it looks like you wrote, "Yes; please call me,"

17   correct?

18   A    Yes.

19   Q    So you were interested in receiving some more information

20   on some -- some different vitamins.  Is that fair to say?  Or

21   at least that's what you put down.

22   A    That's what I put down.

23   Q    Okay.  And then if we could go to the last page, you said

24   this was the picture that you submitted; correct?

25   A    Correct.

1    Q    And your understanding was had you not submitted this

2    picture, you would not have received any compensation,

3    correct?

4    A    That's correct.

5    Q    So just to kind of summarize, you had the consult with

6    the doctor.  You received the medication.  You used the

7    medication.  You provided your feedback, your honest feedback

8    on the medication.  And only once all of those steps were

9    completed, then you eventually got compensation for your time

10   and your participation, correct?

11   A    Filled the survey and the picture, yes.

12   Q    Sure.  And so once you did that, only then did they send

13   you a check, correct?

14   A    Correct.

15   Q    Okay.

16        MR. SANDEL:  I'll pass the witness, Your Honor.

17        MS. WATTLEY:  No questions, Your Honor.

18        MS. STILLINGER:  No questions, Your Honor.

19        MR. LAVINE:  Just a few, Your Honor, if I might.  May

20   I proceed, Your Honor?

21        THE COURT:  Yes.

22                      CROSS EXAMINATION

23   QUESTIONS BY MR. LAVINE:

24   Q    Good morning, Sergeant.  My name is Jim Lavine.  I have

25   just a couple of questions for you.

1      MR. LAVINE:  If you would bring up Exhibit 254,

2  please?

3  Q    (By Mr. Lavine) Just to review, Sergeant, you actually

4  received one bottle of vitamins and two or three bottles of

5  cream, correct?

6  A    Correct.

7  Q    And when you got them, can you describe how they were

8  packaged?  Do you remember?

9  A    No, sir.  It was in a box.

10  Q    In a box.  And inside the box, were there other papers

11  that included a set of instructions about how to use them?

12  A    I don't recall, sir.

13  Q    Were they packaged in a way that they were protected?

14  Come in bubble wrap or peanuts or something like that?

15  A    I'm sorry; I don't recall.

16  Q    All right.  And do you recall whether or not there was a

17  set of instructions or a phone number?  "If you have any

18  questions, here's the number to call"?

19  A    I don't recall what was in the box besides the product.

20  Q    But you did open it, and you indicated you used some of

21  it or all of it?

22  A    Some of it, yes, sir.

23  Q    And you used the pain cream?

24  A    Yes, sir.

25  Q    Scar cream?

1   A    A little bit of the scar cream.  That's the one that was

2   described that had a ---

3   Q    That it was tough to put on?

4   A    Yes, sir.

5   Q    And the vitamins?

6   A    No, sir.

7        MR. LAVINE:  And would you scroll down to the bottom,

8   please?  I'm sorry, Keith; if you'll move back up to the top.

9   Q    (By Mr. Lavine) When you filled out this survey,

10  underneath your name, "How would you rate the doctor consult,"

11  did you write in "Great"?

12  A    Yes, sir.

13  Q    And that's -- that was your honest opinion of what the

14  history of that experience was, correct?

15       You could have put in "poor", "not responsive."  You

16  could have put in, "Guy didn't speak English."

17  A    Correct.

18  Q    You could have put in anything, right?

19  A    Correct, sir.

20  Q    Nobody told you that you had to write the word "Great" in

21  order to complete the survey or get paid for your

22  participation, did they?

23  A    Correct, sir; yes.

24  Q    In fact, you were asked to put in your honest assessment

25  of all the things, based on the questions you were asked,

1    correct?

2    A    Yes, sir.

3          MR. LAVINE:  Now if you could scroll to the bottom,

4    please; the picture.  Keep going.  Keep going.  All right,

5    stop there, please.

6    Q    (By Mr. Lavine) Now without remembering how they were

7    contained, how the box was contained, these particular three

8    bottles -- there are four bottles -- they're all empty, aren't

9    they?

10   A    Yes.

11   Q    All right.  And I think you said that you used just one

12   of them, the scar cream, or used a little bit of it and it was

13   hard to put on?

14   A    Yes.

15   Q    And the pain cream, you tried just a little bit and that

16   didn't really work for you?

17   A    Yes.

18   Q    So -- And the vitamins you didn't use at all.

19   A    No.

20   Q    All right.  So did you throw out all of the pain cream

21   and the vitamins?

22   A    Yes.

23   Q    Just so you could take the picture?

24   A    Yes.

25   Q    Did you intend to have this picture taken so it would

1    look like you had actually taken all of the product so that

2    you could get paid?

3    A    Yes.

4    Q    So this photograph is actually staged, isn't it?

5    A    It's empty, yes.

6    Q    But you emptied them not by using them.  You emptied them

7    by throwing them away.

8    A    Correct.

9         MR. LAVINE:  Thank you.  I'll pass the witness.

10        MR. ANSLEY:  No, Your Honor.

11        THE COURT:  Thank you.  Any Redirect?

12        MS. HUNTER:  No further questions for this witness.

13        THE COURT:  Thank you very much, ma'am.

14        THE WITNESS:  Thank you, ma'am.

15        THE COURT:  You may step down.

16        All right.  Call your next witness.

17        MR. RAYBOULD:  Thank you, Your Honor.  The United

18   States call Andrew Baumiller to the stand.

19        THE COURT:  Ladies and Gentlemen, I need to give you

20   a five-minute break so we can get the witness.  And then we

21   will go for about a half hour and take our lunch break.

22        COURT SECURITY OFFICER:  All rise for the jury.

23        (Jury escorted to the Jury Room by the Court Security

24   Officer.)

25        THE COURT:  You all can be seated.  I'm waiting five

 1    minutes.

 2              (Court recessed from 11:54 AM until 11:57 AM.)

 3              COURT SECURITY OFFICER:  All rise for the jury.

 4              (Jury seated in the jury box.)

 5              THE COURT:  All right.  Be seated, please.

 6              State your name, please, and spell your last name.

 7              THE WITNESS:  Andrew Joseph Baumiller.  My last name

 8    is B-A-U-M-I-L-L-E-R.

 9              THE COURT:  Raise your right hand, please.

10              (The Witness, ANDREW BAUMILLER, Is Sworn.)

11              THE COURT:  Thank you.  Be seated.  When you're

12    comfortable, move the base of the microphone close to you and

13    state your name.

14              THE WITNESS:  Andrew Baumiller.

15              THE COURT:  Very good.  All right.  Proceed, counsel.

16              MR. RAYBOULD:  Thank you, Your Honor.

17                        DIRECT EXAMINATION

18    QUESTIONS BY MR. RAYBOULD:

19    Q    Good afternoon, Mr. Baumiller.

20    A    Good afternoon.

21    Q    Why are you here today?

22    A    I'm here to testify at this proceeding.

23    Q    Okay.  And did you plead guilty in this case?

24    A    I did.

25    Q    And tell the Jury what you pled guilty to?

1    A    I pled guilty to conspiracy to commit healthcare fraud.

2    Q    In your own words, what did you do wrong?

3    A    I did many things wrong.  When faced with situations in

4    which I could have done the right thing, I simply did the

5    wrong thing.  And as a result, TRICARE and our country lost a

6    great deal of money.

7    Q    And are you a cause of that?

8    A    I am.

9    Q    Did you do it alone?

10   A    I did not.

11   Q    Who did you work with?

12   A    I worked with many people listed in the Indictment, along

13   with others.  I think together, it was probably 50 or 60

14   people.

15   Q    Now you pled guilty in this case, correct?

16   A    Correct.

17   Q    And do you have an understanding of the maximum exposure

18   you have?

19   A    I do.  It's quite a bit of time.

20   Q    Okay.  Do you know the number?

21   A    Well, with my Plea Agreement, I think it's zero to ten

22   years.

23   Q    Okay.  And where are you currently being housed?

24   A    Seagoville Jail.

25   Q    Now I want to go back and talk about your educational

1    level.  Okay?

2    A    Okay.

3    Q    What's your highest level of education?

4    A    I have a B.S. in Finance.

5    Q    And where did you go?

6    A    Bowling Green in Ohio.

7    Q    Okay.  And after graduating from Bowling Green, take us

8    through your work history.

9    A    My first job out of college was with a small

10   biotechnology company in Baton Rouge, Louisiana.  About 2008,

11   I moved back to Dallas and started working in healthcare and

12   not long after, got into the pharmacy business.

13   Q    And when did you start getting into the pharmacy

14   business?

15   A    It was 2010 to 2012.

16   Q    And in 2010 what was the name of the pharmacy you were

17   associated with?

18   A    It was Trilogy Pharmacy.

19   Q    And who was the owner and operator of Trilogy Pharmacy in

20   2010?

21   A    Jeff Fuller.

22   Q    Okay.  And what was your role at Trilogy Pharmacy?

23   A    I was the CEO and I was the Compliance Officer.

24   Q    Now you said Jeff Fuller.  Are you familiar with

25   Jeff Fuller?

1    A    I am.

2    Q    Okay.  And are you and Mr. Fuller currently married?

3    A    Yes, we are.

4    Q    Okay.  And Mr. Fuller has worked at Trilogy with you?

5    A    Yeah, for the same amount of time.

6    Q    Now did you do business with Blue Star Biotech in 2013?

7    A    I did.

8    Q    Okay.  Just describe for the jury the nature of that

9    business.

10    A    They were a marketing group that approached us to work

11    with us on filling prescriptions for their compounded pain

12    medications.  They had already been doing so, but they weren't

13    satisfied with their current pharmacy.  So we decided to do

14    business together.

15    Q    And do you recall how long you did business with Blue

16    Star Biotech?

17    A    Twelve to eighteen months.

18    Q    And did that stop?

19    A    It did.

20    Q    Okay.  Do you know why?

21    A    They went their own way, and some of their reps that were

22    kind of in their group decided to stay on with us.  So we

23    really weren't doing business with Blue Star anymore but

24    really some of their reps just decided to stay on with us

25    afterwards.

1   Q    Did you do business with a "Corinthian"?

2   A    We did.

3   Q    Okay.  Tell the Jury the nature of that business.

4   A    They were very similar to Blue Star Biotech.  They were a

5   -- really they are a marketing and management group for many

6   neurologists located in and around the DFW area.  And so we

7   worked with them as well to market compounded pain creams to

8   their patients.

9   Q    Okay.  And did you end your relationship with Corinthian?

10  A    I did.

11  Q    Okay.  And do you know why?

12  A    We just weren't satisfied with the terms of our

13  relationship going forward.  We weren't really doing that much

14  business with them anymore.  Coverage of compounded pain

15  medications kind of dwindled towards the end of our

16  relationship with them, and we both decided to go our separate

17  ways.

18  Q    Now Trilogy Pharmacy, did it have a physical location?

19  A    It did.

20  Q    Okay.  Where was that?

21  A    That was 2603 Oak Lawn Avenue in Dallas, Texas.

22  Q    Okay.  And you said the owner was Mr. Fuller.

23  A    Correct.

24  Q    Okay.  Did Mr. Fuller run the day-to-day ---

25  A    No, he did not.

1    Q    Okay.

2         MR. RAYBOULD:  If we could pull up Exhibit 366 which

3    is in evidence.

4    Q    (By Mr. Raybould) Is that Mr. Fuller there?

5    A    Yes, it is.

6    Q    Okay.  Thank you.  Now at Trilogy Pharmacy, did you have

7    pharmacists?

8    A    We did.

9    Q    Okay.  Tell the Jury which pharmacists you had.

10   A    CD Parks; Kim and Mark Watkins, they're husband and wife;

11   Clint Hopkins and Steve Baldridge.

12   Q    And in 2014 and '15 who were your pharmacists?

13   A    Kim and Mark Watkins; Steve Baldridge and a few I don't

14   remember.

15   Q    Okay.  Did you have other employees that worked at

16   Trilogy?

17   A    We did.  We had pharmacy billers and we had pharmacy

18   technicians.

19   Q    In 2014 and '15 how many folks worked for you at Trilogy?

20   A    In the office, it was about 15 to 20.

21   Q    Okay.  Now at Trilogy, did you -- I want to talk to you

22   about compound creams.  Okay?  Are you familiar with compound

23   creams?

24   A    I am.

25   Q    Okay.  How are you familiar with compounding creams?

1   A    I know quite a bit about them due to my experience at

2   Trilogy Pharmacy.

3   Q    Okay.  And what is your understanding of what compound

4   creams should be based on?

5   A    Compound creams have always traditionally been prescribed

6   by the patient and for the patient, not prescribed to many,

7   many patients with the same formula.

8   Q    And when did you start getting into filling orders for

9   compound creams?

10  A    We were doing it in 2010 and through 2012, but it was

11  really in 2013 and '14 we started doing a lot, lot more of

12  them.

13  Q    And do you know why that is?

14  A    We started -- We learned how to bill those to a patient's

15  insurance.

16  Q    Okay.  Was that a lucrative venture?

17  A    It was.

18  Q    Okay.  Now do you -- Did you meet someone named

19  "Rich Cesario"?

20  A    I did.

21  Q    Okay.  And just tell the jury how you met Mr. Cesario.

22  A    There was a meeting at the office that I was just lightly

23  involved with, but he had met with some other members of our

24  group, a physician we were working with out in California,

25  along with someone else that we just happened to know

```
 1   peripherally.  And it wasn't until later on that I started

 2   working with Rich and meeting with him on a regular basis.

 3   Q    Okay.  Do you recall when that meeting was?

 4   A    That would have been late -- later in 2013.

 5   Q    And do you know when you started working with

 6   Mr. Cesario?

 7   A    I believe it was 2013.

 8   Q    Okay.  And now were you aware of Mr. Cesario's -- what

 9   had happened to his former wife?

10   A    He did tell me, yes.

11   Q    Okay.  What did he communicate to you, if anything?

12   A    That she had a substance abuse problem specifically with

13   prescription medications and eventually she overdosed.

14   Q    And as you understand it, what was the purpose of that --

15   that communication with Mr. Cesario?

16   A    For him, it was his impetus behind wanting to help

17   patients get off of prescription medications.

18   Q    Was he convincing to you?

19   A    Yes, he was convincing to me.

20   Q    And so did you start to engage Mr. Cesario further?

21   A    I did.

22   Q    Did anyone else enter the picture into those discussions?

23   A    Yes.  There was an individual named "Mike Quarders."

24   That was the first person who Rich brought on board as his

25   business partner, but it wasn't long after that, him and Mike
```

1    decided to part ways, and Rich brought John Cooper on board.

2    Q    Okay.  Do you know -- Have you met John Cooper before?

3    A    I have.

4    Q    Do you see Mr. Cooper in the courtroom here today?

5    A    I do, yes.

6         MR. RAYBOULD:  May the record reflect an in-court

7    identification of Mr. Cooper?

8         THE COURT:  He didn't identify him.

9    Q    (By Mr. Raybould) Would you, please, identify Mr. Cooper

10   if you see him by location or article of clothing?

11   A    Right there, yes.

12        THE COURT:  Is it the person standing?

13        THE WITNESS:  Yes, that's him.

14        THE COURT:  Yes.  Thank you.  The record will reflect

15   his identification.

16        MR. RAYBOULD:  Thank you, Your Honor.

17   Q    (By Mr. Raybould) Tell the jury how you came to know

18   Mr. Cooper.

19   A    Rich -- Richard Cesario introduced John Cooper as his new

20   business partner.  And really since Rich didn't have much

21   money at the time, John was going to be his financial backer,

22   so to speak.

23   Q    Were you aware of Mr. Cooper's financial background and

24   business background?

25   A    Only limited at the time.

1    Q    Okay.  And at the time when you met him, what did you

2    understand was his business background?

3    A    He was a business owner.  He was an entrepreneur.  He had

4    a number of restaurants and food trucks that he owned and

5    operated, and that was pretty much the gist of it.

6    Q    Okay.  Now did you learn more about Mr. Cooper's business

7    acumen?

8    A    I did.  I did later on.  He was who I worked with on a

9    pretty much continual basis on the numbers, the sales

10   resulting from our joint endeavors.  I worked with him on who

11   to pay within his organization and how much.  So we interacted

12   on a pretty frequent basis in regards to the actual dollars

13   and cents of our joint venture.

14   Q    Do you have a sense of his business acumen?

15   A    I do.  He's a pretty sharp guy.  He's very much a numbers

16   guy.

17   Q    Now with respect to Mr. Cesario, what would you describe

18   his sort of strengths as?

19   A    Mr. Cesario, he's a marketer.  He's very affable.  He's

20   very charismatic, so he really knows how to talk to people.

21   Q    Okay.  Is it fair to say he's not as much of a numbers

22   guy?

23   A    Correct.

24   Q    Okay.  Now I want to take you to these -- these meetings

25   where Mr. Cooper came into the picture.  Is it around 2014?

1    A    Correct, early 2014.

2    Q    Okay.  And just tell the jury the nature of these

3    discussions when you're coming up with a business idea.

4    A    Really what we met with a lot in the beginning was coming

5    up with a marketing presentation for physicians, and that

6    coincided, at least in some part, with a kind of study

7    initiative, a Freedom From Pain initiative in where we would

8    help patients gets off of opioids and onto some type of

9    topical pain remedy.

10    Q    Was -- Before meeting Mr. Cesario and Mr. Cooper, was

11    trying to get patients off of opioids something that you were

12    particularly passionate about?

13    A    No.

14    Q    Did you develop this overwhelming passion when you were

15    meeting with Mr. Cesario and Mr. Cooper?

16    A    To a limited degree.

17    Q    Okay.  What do you mean by that?

18    A    I thought it was a good idea from a marketing standpoint,

19    but I didn't think genuinely we were going to help people beat

20    their opioid addiction.

21    Q    Why didn't you think that at that time?

22    A    Well, we had -- I had worked in the past consulting for

23    different pharmacies and specifically ones that specialize in

24    pain management.  And I know due to some of the very chronic

25    and severe pain a lot of these patients suffer from, that a

1    topical pain cream is only going to marginally help them.  It

2    wasn't going to be a real solution for them.

3    Q    Now you said you met with Mr. Cesario and Mr. Cooper,

4    correct?

5    A    Correct.

6    Q    Okay.  Did a doctor come in the picture?

7    A    Yes.

8    Q    Okay.  Who was that doctor?

9    A    A Dr. Walter Simmons.

10   Q    Okay.  Now did you interact with Dr. Simmons?

11   A    I did.

12   Q    Okay.  And do you see Dr. Simmons in the courtroom here

13   today?  And if you do, please identify Dr. Simmons by an

14   article of clothing and location.

15   A    Yes.  He's wearing a suit, and he's standing up on the

16   left -- left side of the courtroom.

17          MR. RAYBOULD:  May the record reflect in-court

18   identification, Your Honor?

19          THE COURT:  Yes.

20   Q    (By Mr. Raybould) What was your understanding of

21   Dr. Simmons's role?

22   A    He was going to be John and Rich's Chief Medical Officer.

23   So he was going to advise them from a medical perspective.  He

24   was also going to help with physicians they were recruiting.

25   He was really going to be the expert those physicians could

1    speak with if they had any questions about how all this was

2    going to work.

3    Q    And did you know anything about Dr. Simmons' background?

4    A    I did.  I knew he's Ivy league educated.  He served in

5    Desert Storm.  So from what I could tell at the time, he had a

6    great pedigree for what we were trying to accomplish.

7    Q    Now before you met Rich and John -- Let me scratch that.

8         Did Mr. Cooper have a healthcare background before

9    you met him that you're aware?

10   A    Not to my knowledge.

11   Q    Okay.  And did Mr. Cesario?

12   A    No.

13   Q    Okay.  What was your understanding of the businesses --

14   Did you know that they ran businesses together before?

15   A    No, I wasn't aware of that.

16   Q    Okay.  Now with Dr. Simmons, did you know what kind of

17   doctor he -- he is or was?

18   A    He was an ER doctor, yes.

19   Q    Okay.  And during meetings in 2014, did Dr. Simmons play

20   a role, if any?

21   A    He did.  He was instrumental in developing what I

22   considered the study and/or the Freedom From Pain marketing

23   initiative.  He was kind of the brains behind it, and it was

24   John and Rich's job to execute.

25   Q    Okay.  And what makes you say he was really the brains

1    behind the operation?

2    A    It wouldn't have been in John and Rich's purview to come

3    up with something like that.

4    Q    Okay.  Now I want to -- I want you to look at -- Did you

5    ever see Dr. Simmons' CV or resume?

6    A    I believe I did later on.

7    Q    Okay.

8            MR. RAYBOULD:  If we could pull up Exhibit 91 which

9    is admitted, and if we could go to the second page there.

10   Q    (By Mr. Raybould) Does this appear to be a resume for

11   Dr. Simmons?

12   A    It does.

13   Q    Okay.  And it looks as though he graduated from Brown

14   Medical School in Providence, Rhode Island.  Do you see that?

15   A    Correct.

16   Q    Okay.

17           MR. RAYBOULD:  And if we could zoom out, and if we

18   could look at -- highlight from 2001 to 2002, all the way down

19   to the bottom.

20   Q    (By Mr. Raybould) It looks like Dr. Simmons received a

21   degree and/or certification from Harvard School of Public

22   Health?

23   A    Correct.

24   Q    Okay.  Do you have an understanding of sort of the value

25   or traction this would get with folks?

1   A    I certainly do because it had a great deal of traction

2   with me.

3   Q    Why is that?

4   A    Anyone who graduates from Harvard must really be quite

5   intelligent and qualify to pretty much do anything for which

6   then have a degree for.

7   Q    During your conversations with Dr. Simmons, did he strike

8   you as an intelligent person?

9   A    He did.

10  Q    Did he seem like someone who's going to get duped?

11  A    No.

12  Q    Now are you familiar with someone named "Luis Rios"?

13  A    I am.

14  Q    Tell the Jury how you're familiar with Mr. Rios.

15  A    He was a sales and marketing representative that worked

16  within John and Rich's organization.

17  Q    Your employee?

18  A    I mean I guess you could say that but, no, not really.

19  Q    Okay.  What makes you say "not really"?

20  A    Well, we paid him to be a W2, but I never met the

21  individual.

22  Q    Okay.  Did you control his hours?

23  A    No.

24        MR. RAYBOULD:  If we could pull up Government's

25  Exhibit 368.  This is already admitted.

1    Q    (By Mr. Raybould) Does that appear to be Mr. Rios?

2    A    I don't know.

3    Q    Never met him?

4    A    Correct.

5    Q    Okay.  So you don't know who that is.

6    A    I do not.

7    Q    Now do you know someone named "Joe Straw"?

8    A    I do.

9    Q    Okay.  How are you familiar with that name?

10   A    I am.

11   Q    Say that again?

12   A    I am familiar with that name, correct.

13   Q    Okay.  How are you familiar with that name?

14   A    He was a sales and marketing representative that worked

15   within John and Rich's organization as well.

16   Q    Okay.  Was he one of your employees?

17   A    Same situation with Mr. Rios.  We paid him via W-2, but

18   other than one phone call, I never met him face to face.

19   Q    Okay.  Would you be able to recognize him?

20   A    Maybe.

21   Q    Okay.

22        MR. RAYBOULD:  Let's pull up Government's Exhibit 367

23   which is admitted.

24   A    Correction.  I did meet Mr. Straw after we were arrested.

25   Q    (By Mr. Raybould) Okay.  And do you know if you met him

1    previously or not?

2    A    No, I did not.

3    Q    Okay.  Do you recognize that individual?

4    A    Only from being arrested.

5    Q    Okay.  Now are you familiar with someone named

6    "Liz Valdez"?

7    A    I am.

8    Q    Okay.  Tell the jury how you're familiar with Ms. Valdez.

9    A    She was the head biller within our pharmacy organization,

10   and she was -- worked extensively with all our marketing

11   groups to make sure that when they came on board, everything

12   was handled properly, and then she also trained all the other

13   billers in our organization.

14   Q    And physically where did she work?

15   A    She worked upstairs on the fifth floor.  We had a

16   pharmacy on the first floor at the 2603 Oak Lawn address and

17   then we also had administrative offices on the fifth floor.

18   Q    And so she -- Was she an employee of Trilogy?

19   A    She was.

20   Q    Okay.

21         MR. RAYBOULD:  Permission to approach, Your Honor?

22         THE COURT:  Yes.

23   Q    (By Mr. Raybould) I'm handing you what's been marked as

24   Exhibit 370.

25   A    Okay.

1    Q    Do you recognize --

2    A    I do.

3    Q    -- that individual?

4    A    That's Liz, yes.

5         MR. RAYBOULD:  We move for the admission of Exhibit

6    370 into evidence.

7         THE COURT:  Any objection?

8         MS. LOBEL:  None, Your Honor.

9         THE COURT:  Admitted.

10   Q    (By Mr. Raybould) And that's Ms. Valdez?

11   A    Correct.

12   Q    Okay.  When you were working with John, Rich and

13   Dr. Simmons, was Ms. Valdez working at Trilogy?

14   A    She was.

15   Q    Okay.  Do you know how long she worked at Trilogy?

16   A    She worked from 2014 until -- of course, I guess business

17   ended; not long after August of 2016.

18   Q    Okay.  I want to go back to those discussions with John

19   and Rich and Dr. Simmons.  Did you all come up with a kind of

20   business concept or idea?

21   A    We did.  That was the Freedom From Pain marketing

22   initiative.

23   Q    Okay.  Who was the primary driver of those discussions,

24   if you recall?

25   A    Well, it was Dr. Simmons, John and Richard.

1    Q    Okay.  And you played a role, too?

2    A    I did.  Yes, of course.

3    Q    Okay.  How were you important to helping that business

4    model out?

5    A    We were the pharmacy aspect.  So, of course, we were

6    going to be the ones filling all the medications, filling all

7    the prescriptions for all the physicians they were working

8    with.  So we played an instrumental part in that.

9    Q    Did you guys sit around a table and say, "Let's commit

10   fraud right now"?

11   A    No, we didn't.

12   Q    At some point was it very clear that you were involved in

13   a conspiracy with these guys?

14   A    I would have to say "yes."  Once -- Once the dollar

15   amounts started adding up, it really seemed like it was too

16   good to be true.  And based upon the legal advice I sought

17   from attorneys, it really didn't seem like we were doing that

18   much, if anything, to comply with the advice they had given

19   us.

20   Q    And your -- You said "legal advice."  Who were these

21   attorneys that were giving you legal advice?

22   A    They were healthcare attorneys located in New Jersey;

23   Frier Levitt.  We also later on had our own internal corporate

24   counsel.

25   Q    And who was that?

```
 1   A    Ben Casey.

 2   Q    Okay.  And who had a lawyer/client relationship with

 3   Frier Levitt?

 4   A    Trilogy Pharmacy.

 5   Q    Okay.  What about Dr. Simmons?

 6   A    No.

 7   Q    What about John Cooper?

 8   A    No.

 9   Q    What about Mike Kiselak?

10   A    No.

11   Q    Okay.  What about Steven Kuper with a "K"?

12   A    I don't believe so.

13   Q    Okay.  Was Steven Kuper ever on those phone calls?

14   A    No.

15   Q    What about Dr. Elder?  Was he on the phone call?

16   A    No.

17   Q    Are you familiar with someone named "Dr. Elder"?

18   A    I am.

19   Q    Okay.  Tell the jury how you're familiar with Dr. Elder.

20   A    He wrote a great number of prescriptions that we filled

21   at our pharmacy, and he believe -- I believe he -- Well, of

22   course, we paid John and Rich commissions for the

23   prescriptions he wrote, so he would have belonged to their

24   group.

25   Q    Did you ever meet Dr. Elder?
```

202

1   A    I did not.

2   Q    So you wouldn't be able to recognize him?

3   A    No.

4   Q    Do you know where Dr. Elder was physically located?

5   A    Southwest Texas, I believe; El Paso.

6   Q    Now in 2014 and '15, give the jury a sense for the volume

7   of the prescriptions coming out of Trilogy.

8   A    It was anywhere from 10 to 20 million dollars a month in

9   revenue.

10  Q    Okay.  And who was the primary prescriber related to

11  those prescriptions, if anyone?

12  A    Dr. Elder.

13  Q    Okay.  As you sit here today, do you recall other

14  prescribers?

15  A    Dr. Simmons, Dr. Jones.  I mean there's -- there's

16  several, of course.

17  Q    Okay.

18  A    Other names, there was a lot of the -- Well, we talked

19  about Corinthian earlier, so many of their physicians.  So I

20  don't seem to recall many of the other names at the moment,

21  but I know there were -- there were multiple physicians.

22  Q    Now if you could give the jury a sense for how the

23  prescription would get to Trilogy and how it would get filled.

24  A    Well, as it pertained to our relationship with John and

25  Rich, they would interface with their physicians' offices.

1    They would collect all the prescriptions, all the patients'

2    demographics.  They would put it into a batch, and then send

3    it over to us once or twice a week.

4    Q    And who would send the batch over to Trilogy Pharmacy?

5    A    That was typically Miranda Stevens, I believe.

6    Q    Okay.  And where would it go once it got to Trilogy

7    Pharmacy?

8    A    It would go to Liz Valdez.

9    Q    Okay.  The woman we just spoke about a moment ago?

10    A    Correct.

11    Q    And once Ms. Valdez received the prescription

12    information, what would she do, if anything.

13    A    She would begin processing those claims.  She would work

14    with our other billers to distribute the workload and they

15    would begin contacting the patients and filling their

16    prescriptions.

17    Q    Okay.  Now in 2014 and '15, what type of insurance

18    companies were being billed?

19    A    It was commercial and private insurance.  So you would

20    have prescriptions filled for Blue Cross/Blue Shield patients,

21    Aetna patients, United Healthcare patients, and primarily

22    TRICARE beneficiaries.

23    Q    You said primarily TRICARE beneficiaries.

24    A    Right.

25    Q    What makes you say that?

1    A    Because I know based upon looking back at all the data

2    for all the prescriptions we filled that anywhere from 85 to

3    90 percent of the prescriptions we filled were for TRICARE

4    beneficiaries.

5    Q    And what was your understanding of the relationship

6    between the TRICARE beneficiaries and the study you spoke

7    about a moment ago, if any?

8    A    They were to be enrolled in that study and to be

9    compensated for receiving prescriptions and providing

10   feedback.

11   Q    Okay.  Now in August of -- or August and September of

12   2014, do you know whether or not Trilogy was billing out to

13   TRICARE?

14   A    Yes, we were.

15   Q    Okay.  And how long did that last that you were billing

16   out to TRICARE for prescriptions of compound creams?

17   A    We probably filled our first TRICARE claim in 2013 and

18   our last one in May of 2015.

19   Q    Okay.  And why did you stop filling prescriptions in May

20   of 2015?

21   A    TRICARE no longer covered compounds at that point.

22   Q    Are you familiar with an entity named "IFG"?

23   A    I've only heard of it.  I don't remember exactly who they

24   were.  I believe they were a marketing group that John and

25   Rich were trying to work with.

1    Q    Okay.  So a lot of questions about IFG you wouldn't have

2    much information on.

3    A    Could you repeat that question?

4    Q    Is that all you know about IFG?

5    A    Pretty much, yes.

6    Q    Okay.  What about "KA Enterprises"?

7    A    I know the name, and I believe that was a -- a business

8    set up, an LLC set up between Richard Cesario and Ken Reilly.

9    Q    Is that the extent of your knowledge?

10   A    I don't think it was the study, no.

11   Q    No.  Is that the extent of your knowledge?

12   A    Yes, that is it; yeah.

13   Q    And I want to talk to you about the patients that were

14   enrolled in this study.  Okay?

15   A    Okay.

16   Q    What was your understanding of the patients as far as

17   their insurance goes?

18   A    Well, I guess when we first started talking about it --

19   we weren't talking about TRICARE in the very, very beginning.

20   It was only after we discovered TRICARE paid for these

21   compounds and paid very, very well that that became the focus.

22       But any patient that was receiving a topical pain or

23   a scar cream from our pharmacy that was associated with John

24   and Rich's group would receive that medication and provide

25   some type of feedback.  For example, if it was a pain cream,

1    they would answer questions as to how well it worked.  If it

2    was a scar cream, they would take before and after pictures of

3    the scar to see if there was any improvement, and they would

4    be compensated for doing so.

5    Q    And how was this compensation determined?

6    A    That, I do not know.

7    Q    Okay.  Do you know the amount of the compensation?

8    A    Only from the Indictment.  I believe it was anywhere from

9    50 to 2 or 300 dollars.

10        MS. LOBEL:  Objection.

11        THE COURT:  I'll instruct you, Ladies and Gentlemen,

12   to disregard that.

13        Only testify what you know.  Don't repeat what's in

14   the Indictment unless you know.

15   A    Several hundred dollars; maybe more, maybe less.

16   Q    (By Mr. Raybould) You weren't actually writings Checks

17   out to the -- you yourself writing checks out to the

18   beneficiaries.

19   A    No, I wasn't.

20   Q    Okay.  Do you have an understanding as to who was

21   responsible for paying the beneficiaries?

22   A    It was CMG, correct.

23   Q    Do you know how these patients, these beneficiaries, got

24   recruited into the study?

25   A    It's what you would call "direct patient solicitation."

1    So either John or Rich or one of their other sales and

2    marketing representatives would go talk to TRICARE

3    beneficiaries, I believe the majority of which were on or

4    around Fort Hood; asked them if they had pain or scars; asked

5    them if they wanted to receive these medications at which at

6    that point in time they would direct them to one of their

7    physicians, and then the process would start in which we would

8    begin filling the prescription.

9    Q    Okay.  And once you submitted the prescription to

10   TRICARE, tell the Jury how the money would actually come back

11   to Trilogy.

12   A    We would submit a claim to TRICARE.  We would know

13   exactly how much we were going to get in real time just like a

14   credit card transaction, for example.  And about three to four

15   weeks later, they would directly deposit the funds into our

16   account.

17   Q    And what would you do with those funds?

18   A    We would pay them out as commissions to our marketing

19   reps.

20   Q    Okay.  What was the purpose of those payments out to the

21   marketing reps?

22   A    They were to entice them to send us more business, to

23   send us more prescriptions.  We paid them a commission based

24   upon the dollar value of the total prescriptions they sent to

25   us in a given point in time.

1  Q    And when you were making those payments, did you see that

2  as a problem?

3  A    It was clearly a kickback.

4  Q    And who were you -- at CMGRx -- were you sending these

5  dollars to?

6  A    We were sending them primarily to John and Rich but also

7  any other individual that they had us pay monies to.  So it

8  would have been anyone pretty much that worked in their office

9  or any of the other sales and marketing reps they used.

10  Q    Had you not gotten prescriptions, would you be paying

11  John and Rich millions of dollars?

12  A    No.

13  Q    Had you not gotten prescriptions signed by Dr. Elder or

14  Dr. Simmons, would you be paying CMGRx millions of dollars?

15  A    No.

16  Q    Okay.  Tell the Jury why not.

17  A    There'd be no reason to do it from a business

18  perspective.

19  Q    Now are you familiar with the cost of these

20  prescriptions?

21  A    I am.

22  Q    Okay.  Tell the jury, just ballpark figure, the cost of

23  these compound prescriptions.

24  A    If a compound reimbursed, let's say, $3000, the total

25  cost of the ingredients would be anywhere from 100 to 150

1    dollars.

2    Q    Was there a range as far as how much these compounds

3    could be billed out?

4    A    Based upon the ingredients, they could go up to $250,000

5    for a single prescription.

6    Q    That was almost never done, though, correct?

7    A    Never done.

8    Q    Okay.  As relates to CMGRx, are you familiar with the

9    general range?

10   A    Yeah.  It was anywhere from $3000 for a lower reimbursing

11   pain cream all the way up to $15,000 for a high quantity of

12   scar cream.

13   Q    And as it relates to prescriptions filled with respect to

14   CMGRx, what types of compound creams did Trilogy fill?

15   A    Primarily pain and scar creams.

16   Q    Okay.  And who in your office, if anyone, would be

17   putting together the compound creams?

18   A    It was the pharmacists along with the pharmacy

19   technicians.

20   Q    Okay.  Now are you familiar with Express Scripts?

21   A    I am.

22   Q    Okay.  How are you familiar with Express Scripts?

23   A    They are a PBM.  In our particular case, they were the

24   PBM that processed all the claims for TRICARE.

25   Q    And you said "PBM."  Does that mean "Pharmacy Benefit

```
 1    Manager"?

 2    A      It does.

 3    Q      Okay.  And when you would submit a claim, it was done

 4    electronically?

 5    A      Correct.

 6    Q      Okay.  How much time -- I think you said it would be

 7    about four weeks before you got money back from TRICARE.

 8    A      Three to four weeks, correct.

 9    Q      Okay.

10           THE COURT:  Is this a convenient place to break?

11           MR. RAYBOULD:  Yes, Your Honor.

12           THE COURT:  All right.  We'll be in recess for an

13    hour and 15 minutes.

14           COURT SECURITY OFFICER:  All rise for the jury.

15           (Jury escorted to the Jury Room for lunch by the

16    Court Security Officer.)

17           THE COURT:  All right.  I'd like Mr. Baumiller back

18    at 20 minutes of 3:00 -- twenty minutes of 2:00.

19           MS. NICOLE KNOX:  What time did you say for everyone

20    to return?

21           THE COURT:  An hour and 15 minutes.

22           All right.  Anything else before we recess for lunch?

23           All right.  Thank you.

24           (Court recessed from 12:28 PM until 1:42 PM.)

25           COURT SECURITY OFFICER:  All rise for the jury.
```

```
 1              (Jury seated in the jury box.)

 2              THE COURT:  All right.  Be seated, please.  Thank

 3  you.

 4              All right, proceed.

 5              MR. RAYBOULD:  Thank you, Your Honor.

 6                      CONTINUED DIRECT EXAMINATION

 7  QUESTIONS BY MR. RAYBOULD:

 8  Q    Mr. Baumiller, when we left off, we were discussing a bit

 9  of the flow of TRICARE dollars from Trilogy to CMGRx.

10  A    Correct.

11  Q    Do you recall that?

12  A    Yes, I do.

13  Q    Now do you have an understanding of, after the money went

14  to CMGRx, how it would be dispersed?

15  A    I would give -- I would provide John and Rich a

16  spreadsheet that listed all the prescriptions we filled for a

17  given time period.  I would also list on that spreadsheet the

18  total amount of commission due to their organization which was

19  CMG.  At that time it was anywhere between 45 and 50 percent.

20  John would respond back to me with another spreadsheet that

21  listed how much I was to pay each person within their

22  organization.

23  Q    And that information came from -- you said John?

24  A    Correct.

25  Q    Is that Mr. Cooper?
```

1    A    It is.

2    Q    Okay.  And based off that information from Mr. Cooper,

3    what would you do, if anything?

4    A    Based upon his reply, based upon his spreadsheet, I would

5    then issue payments via payroll.

6    Q    Okay.  And you said "via payroll."  Why did you pay it

7    via payroll?

8    A    It was just -- We elected to pay everyone a W-2.  Really

9    it allowed us to operate under one umbrella as it pertains to

10    HIPAA so we could exchange patient health information freely

11    as long as everyone was compensated W-2, at least that's how I

12    viewed it in my eyes.

13    Q    Okay.  Was there any other reason why you paid people as

14    W-2?

15    A    We wanted to look at least somewhat compliant.

16    Q    Okay.  And you said "somewhat compliant."  What do you

17    mean by that?

18    A    Well, I mean we had legal opinions from our attorneys

19    that told us everything we needed to do.  And specifically if

20    we were going to pay people based upon the volume or value of

21    referrals, i.e., prescriptions, they would have to be bona

22    fide employees of our organization.  Part of that, at least

23    minimally, is paying them W-2 as opposed to 1099.

24    Q    Okay.  And so the folks you were paying a W-2 that were

25    associated with CMGRx, were they actually -- quote/unquote --

1   "bona fide employees"?

2   A    No.

3   Q    Okay.  As you understand it, what was the purpose of

4   those payments?

5   A    Those payments were for prescriptions they referred to --

6   or they were kickbacks for prescriptions they referred to our

7   pharmacy.

8   Q    And the information, in order to pay those folks as W-2

9   wages, that came from Mr. Cooper.

10  A    Yes.

11  Q    And Mr. Cesario?

12  A    It was -- I don't know if Rich had any input on those.

13  The spreadsheet I always received as to who was to be paid

14  always came from John.

15  Q    Now I want you to look at the folder in front of you.

16  There's a document, Exhibit 127, and they should be in

17  numerical order.

18  A    I have it.

19  Q    Okay.  Is that your e-mail address?

20  A    It is.

21  Q    And is that Mr. Cooper's e-mail address?

22  A    It is.

23  Q    Okay.

24       MR. RAYBOULD:  We move for the admission of Exhibit

25  127 into evidence.

```
 1              THE COURT:  Any objection?

 2              MS. LOBEL:  One moment, Your Honor, please.  No,

 3    Your Honor.

 4              THE COURT:  Admitted.

 5              MR. RAYBOULD:  Now if you would highlight just the

 6    top.  Yes, that's perfect.

 7    Q    (By Mr. Raybould) On Exhibit 127, that's an e-mail from

 8    you to Mr. Cooper?

 9    A    Correct.

10    Q    Just tell the jury what you're discussing here.

11    A    I had been advancing John and Rich's group $850 per

12    prescription we received.  As we discussed earlier, we didn't

13    get paid from TRICARE until about four weeks after we

14    submitted the claim, but John and Rich needed some of that

15    money basically upfront.  So what I would do is I would take

16    $850, pay them as soon as -- basically the same week we

17    received the prescription.  Then I would deduct that 850 from

18    future commissions.

19    Q    And you said that John and Rich needed some of the money

20    upfront.  Do you know why?

21    A    Probably to cover operating expenses.  I don't really

22    know what else.

23    Q    Okay.  It says, "Fifty percent of total commission due."

24    Do you see that?

25    A    Correct.
```

1    Q    And explain to the jury what that means.

2    A    I had been paying them $850 advance per prescription.

3    After this e-mail, I increased it to 50 percent of the total

4    that would be due, come later, after we were paid by TRICARE.

5    Q    Okay.  And did -- That 50 percent number, was it always

6    that 50 percent number?

7    A    No.  We -- We didn't advance any of our other groups'

8    commissions.  And 850 was something requested by John and Rich

9    and then, of course, increasing it was something requested by

10   them as well.

11        MR. RAYBOULD:  If we could turn to Page 2, and if we

12   could highlight where it starts with 404772 all the way to the

13   end; just the first couple of lines or -- excuse me -- zoom in

14   all the way to the very end.  Okay.

15   Q    (By Mr. Raybould) Could you give the jury a sense of --

16   well, what we're looking at with respect to this spreadsheet?

17   A    This is a spreadsheet listing all the prescriptions we

18   filled for -- that were registered under CMG physicians.  It

19   lists items such as the prescription number, the date, the

20   patient information, the drug dispensed.  It also lists other

21   items such as the reimbursement and the copay.

22   Q    Okay.  And was this information that you used in order to

23   make the payments back to CMG?

24   A    That is exactly the information we used.

25   Q    Okay.  And this document came from CMG?

1    A    I generated this document, which I would then send to

2    John Cooper, and that's when he would respond to me with

3    another spreadsheet indicating who I should pay.

4    Q    Okay.

5         MR. RAYBOULD:  If we could pull up -- this has

6    already been admitted as Exhibit 128.  If we could highlight

7    the top part.

8    Q    (By Mr. Raybould) Now, Mr. Baumiller, that's your e-mail

9    address?

10   A    Correct.

11   Q    And the date is October 23rd, 2014.

12   A    Correct.

13   Q    Okay.  Could you explain to the jury the nature of this

14   conversation, if you can recall?

15   A    On this -- On this spreadsheet you previously saw, there

16   was an amount that we get from the insurance company.  In

17   addition to that, there's always some type -- well, for the

18   most part there's a patient responsibility otherwise known as

19   a "copay."  What John is talking about in this e-mail is that

20   he's upset that he's not getting his cut for the copay amount

21   which, if we're talking about TRICARE patients, was either

22   zero dollars or it would have been 45 percent of $17.  So

23   either way it was a small amount of money compared to the

24   overall amount of business we were doing with their group.

25   Q    What did you think when you were discussing this with

1    Mr. Cooper?

2    A    Oh, I -- He certainly counted his pennies.  I mean he

3    really wanted every last penny.  I didn't think much of it.  I

4    didn't think it was a big deal.  We didn't pay any of our

5    other groups commissions on copays, so I don't see why their

6    group was entitled to such.

7    Q    You continued to work with him, though; right?

8    A    I did, yes.

9    Q    Why is that?

10   A    Because there was plenty of other money to be had.

11   Q    Okay.  Now I want to talk to you about how the formulas

12   from the prescriptions were determined.  Okay?

13   A    Correct.  Yeah, I can opine on that.

14   Q    Okay.  Well, you know how those were determined, correct?

15   A    I do.

16   Q    Okay.  Can you tell the Jury, as it relates to CMGRx and

17   TRICARE, how the prescription formula was determined?

18   A    Well, I had given them some formulas we received from

19   other marketing groups and then we used that for a while, but

20   eventually as John and Rich became more familiar with the

21   business, they started asking me about incorporating more

22   exotic ingredients and/or more expensive ingredients.  A good

23   example of that would be using something like an

24   anti-inflammatory, such as Flurbiprofen, in place of

25   Ibuprofen; whereas Ibuprofen in a topical compound would

1    reimburse, as you would expect, very low.  Something like

2    Flurbiprofen would -- may reimburse eight to ten times as

3    much.

4    Q    So it's fair to say initially you had gotten

5    prescriptions and you had sent those to CMGRx.

6    A    The actual form?

7    Q    Yes.

8    A    Correct.

9    Q    And then eventually John and Rich had buy-in.

10   A    They did.  As they learned more about the business, they

11   started tweaking things and we started pushing the envelope,

12   so to speak.

13   Q    What was the ingredients -- What was it based off?

14   A    Reimbursement.

15   Q    Okay.

16   A    I mean there was a mild consideration of, you know,

17   patient benefit, therapeutic value, but for the most part it

18   was all about the money.

19   Q    Is there a table that you would look at to determine what

20   would pay out higher?

21   A    Yeah.  It was -- TRICARE specifically paid out 85 percent

22   of the AWP.  So you could very easily inquire with any of your

23   bulk chemical suppliers.  Those are the people that supplied

24   the powders that we used in the topical creams.  They would

25   give a list of all of their AWPs for all their products and

1   you could simply build a formula on what you thought would

2   reimburse best.

3   Q    You said "AWP."  What is "AWP"?

4   A    That is "Average Wholesale Price."

5   Q    Okay.  And what is your understanding of what the AWP is

6   or what it's used for?

7   A    AWP is what manufacturers of drugs suggest as the Average

8   Wholesale Price; i.e., what a pharmacy could and/or acquire

9   that drug for.  But primarily what it's used for, it's -- it's

10  the amount from which you're paid by insurance companies.  So

11  as I said, with TRICARE, they pay you 85 percent of the AWP

12  value.

13  Q    And when you were looking at which ingredients reimbursed

14  highest, who was involved in that process?

15  A    John, Rich, myself; pretty much us three.

16  Q    Okay.  Now did you also look at whether or not to add

17  vitamins?

18  A    We did.

19  Q    Okay.  And did you discuss this with Mr. Cooper?

20  A    I did.

21  Q    If you could look in front of you, there's an exhibit

22  marked 143 which has not yet been admitted.  If you would look

23  in that binder or that folder rather.

24  A    I see it, yes.

25  Q    Okay.  Do you recognize Mr. Cooper's e-mail address?

1   A    I do.

2   Q    And do you recognize your e-mail address?

3   A    I do.

4   Q    And is that an e-mail that was sent from you to or --

5   excuse me -- from Mr. Cooper to you?

6   A    Correct.

7          MR. RAYBOULD:  We'd move for the admission of 143

8   into evidence.

9          THE COURT:  Any objection?

10         MR. CHRIS KNOX:  May I have a brief moment, Judge?

11         MR. ANSLEY:  Your Honor, can I request that we be

12  more careful which Mr. Cooper is being referred to?

13         MR. RAYBOULD:  Yes.  I apologize.

14         THE COURT:  Yes.  If you would, sir, when you're

15  testifying, if you're referring to John Cooper, say

16  "John Cooper."

17         THE WITNESS:  Okay.

18         MR. CHRIS KNOX:  No objection, Judge.

19         THE COURT:  Admitted.

20  Q    (By Mr. Raybould) Now, Mr. Baumiller, did you ever meet

21  Steven Kuper with a "K"?

22  A    Only after we were arrested.

23  Q    Okay.  So if you are going to refer to Steven Kuper, just

24  would you please say "Steven Kuper"?  Otherwise, John Cooper

25  we'll address as "Mr. Cooper."

1    A    I will do so.

2    Q    Thank you.  Now if we look at the top there, it says

3    "Updated Script Pad For CMG"?

4    A    That's correct.

5    Q    Okay.

6         MR. RAYBOULD:  And I want to zoom out and go down to

7    the bottom, the first -- where it says -- if we could start --

8    yeah, from there.

9    Q    (By Mr. Raybould) Now if you would read from, "I've

10   received several requests."

11   A    "I've received several requests to update your script

12   pad; legibility, formula typos, et cetera.  Attached to this

13   e-mail is the updated version.  I've included most of the

14   formulas from your old script pad.  I've also added a couple

15   new formulas.  I've included the AWP for each formula in

16   parentheses.  It's the four digit number towards the end of

17   the each formula.  It should be clear which ones you want your

18   prescribers to focus on.  We can discuss tomorrow.  I would

19   like to put this into play as soon as possible.  Have a good

20   evening."

21   Q    Now when you say, "I would like your prescribers to focus

22   on this," what are you trying to communicate to Mr. Cooper, if

23   anything?

24   A    There are new formulas on that script pad that we can

25   start using with their patients.  They're going to reimburse

 1    well, and I would like their physicians to start using this

 2    updated script pad right away.

 3    Q    Did -- When you're sending out script pads and discussing

 4    this with Mr. Cooper, did you ever get a phone call from

 5    Dr. Elder saying that, you know, "This is my purview; I need

 6    to be making this decision"?

 7    A    No.

 8    Q    Okay.  Now if we could go up, what does Mr. Cooper say?

 9    A    I think there's a typo.  He said -- I think he meant to

10    say, "Hell yeah.  Rich and I need to discuss details.  Put

11    them on there."

12    Q    Okay.  But before that, you asked, "Do you want to add

13    the weight loss supplement to it?  They reimburse like pain

14    creams," correct?

15    A    Correct.

16    Q    Did Mr. Cooper indicate that, "We need to consult with

17    physicians in order to start prescribing these weight loss

18    supplements"?

19    A    No.  He just said that he wanted to -- it to discuss with

20    Rich but "I'll put them on there, anyway."

21    Q    Okay.  Now were there instances where you would obtain a

22    prescription from a doctor but the reimbursement rates from

23    TRICARE changed and, as a result, you'd get a new

24    prescription?

25    A    I don't recall specifically.  That -- That would have

VOLUME 13                    223

1    been something we did with other insurance plans.  TRICARE

2    really covered any and all ingredients.  And like I said

3    before, they would always reimburse at 85 percent of the AWP.

4    So there wasn't, in my mind, a great need to change the

5    formula that was already covered to the max, anyway.

6    Q    Okay.

7    A    But, yes, we did do that with other plans.

8    Q    Okay.  Now do you see Exhibit 148 there?

9    A    I do.

10   Q    Okay.  And do you recognize your e-mail there?

11   A    Yes, I do.

12   Q    Do you recognize Rich Cesario's e-mail?

13   A    I do.

14   Q    And do you recognize John Cooper's e-mail with a "C"?

15   A    I recognize John Cooper's e-mail, yes.

16   Q    Okay.

17              MR. RAYBOULD:  We move for the admission of Exhibit

18   148 into evidence.

19              THE COURT:  Any objections?

20              MR. CHRIS KNOX:  No objections, Your Honor.

21              MS. LOBEL:  No, Your Honor.

22              THE COURT:  All right.  Admitted.

23   Q    (By Mr. Raybould) If we could -- This is another example

24   of a script pad that was created?  We can go to Page 2.

25   A    I'm sorry.  What was the question?

1    Q    Is this another example of a script pad?

2    A    It is; it is; our primary script pad.

3    Q    Okay.  And now if we could go to the first page there.

4    You say, "As discussed, we need to have your prescribers to

5    start using attached script in order to correct the issues

6    with current script form."  And then you list, "There should

7    not be circles around multiple formulas, and markups should be

8    kept to a minimum."  Did I read that correctly?

9    A    Correct.

10   Q    What are you trying to communicate there to Mr. Cooper

11   and Mr. Cesario and others?

12   A    Based upon some feedback I would, of course, have

13   received at the time from our pharmacists, they would have --

14   it would be at their request to not have prescriptions

15   prefilled; like there would at least appear to be some input

16   from the physician and not that someone from CMG is basically

17   checking off all the boxes and stamping the physician's

18   signature on it.

19   Q    And you see -- And why is that a problem?

20   A    Well, I mean the physician has to write the prescription.

21   If it's some -- someone else other than the physician that we

22   have, we're doing it completely wrong.

23   Q    Okay.  Now if we could -- And it says there -- If you

24   could start reading, "Some of the doctors write their scripts

25   clearly"?

1    A    Yes.  One moment.  Oh.  "Some of the doctors write their

2    scripts clearly and the aforementioned issues are not a

3    problem, but other doctors, like Elder, are not writing their

4    prescriptions correctly.  Either way, we still need to put the

5    attached script into play as soon as possible, as in today.

6    You should be able to edit the attached version, if need be,

7    since it only has a few tables and minimal formatting."

8    Q    And this -- When you're writing this e-mail on November

9    21st, 2014, what are your concerns primarily?

10    A    That Dr. Elder, probably a few other physicians within

11    the CMGRx organization, aren't writing their own

12    prescriptions.  Their signatures are just being stamped on

13    there, and at least to try to be somewhat -- to at least

14    somewhat meet my pharmacist expectations, make it at least

15    look like the physician's writing the prescription.

16    Q    Okay.  Did you have a sense that there were issues with

17    prescriptions getting to you?

18    A    Yes.

19    Q    Okay.  What were those issues?

20    A    That the physician wasn't writing these prescriptions.

21    He wasn't seeing these patients.  I mean the prescriptions

22    themselves are really just coming from CMG.

23    Q    But you didn't call the cops, did you?

24    A    I did not, no.

25    Q    Why not?

1    A    The money was coming in and I just wanted to keep it

2    going.

3    Q    Did you discuss any of these issues with Mr. Cooper?

4    A    I -- I think I did in this e-mail right here.

5    Q    Okay.

6          MR. RAYBOULD:  Now if we could go to Exhibit 140

7    which is already in as evidence, and if we could go to the

8    second attachment there.

9    Q    (By Mr. Raybould) With respect to Exhibit 140, Page 2, if

10   you could look on the screen, what are we looking at here?

11   A    That is very similar to the prescription form we just

12   looked at with the addition of the AWP in parentheses towards

13   the end of the formula name.  That would be the four-digit

14   numeric number.

15   Q    Okay.  And, again, what does that "AWP" indicate?

16   A    That is the total AWP for, I believe, either 100 grams of

17   that particular formula or 120 grams.

18   Q    And why is that important?

19   A    Because that would tell you exactly what -- Eighty-five

20   percent of that would be your reimbursement from TRICARE.

21   Q    Okay.  Was that the number you were focused on?

22   A    Yes, it was.

23   Q    Was that the number that Mr. Cooper was focused on?

24   A    Yes.

25   Q    Mr. Cesario?

```
 1   A    Yes.

 2   Q    Dr. Simmons?

 3   A    Yes.

 4   Q    Okay.  Now it says, "Ketamine there, 10 percent."  Did

 5   you have Ketamine in your facility at Trilogy?

 6   A    We did.

 7   Q    Okay.  Was that something that needed to be handled with

 8   care?

 9   A    Yeah.  It's a controlled substance, Level III.

10   Q    Okay.  Now Exhibit 144 is in front of you as well.  Do

11   you recognize Exhibit 144?

12   A    I do.

13   Q    Is that an e-mail from Mr. Cooper to you?

14   A    Yeah, it's from John Cooper to me.

15   Q    Okay.

16        MR. RAYBOULD:  We'd move for the admission of Exhibit

17   144 into evidence.

18        THE COURT:  Any objection?

19        MR. CHRIS KNOX:  No objections, Your Honor.

20        MS. LOBEL:  No, Your Honor.

21        THE COURT:  Admitted.

22   Q    (By Mr. Raybould) And this is the discussion here about

23   the subtraction of copays.  Is that right?

24   A    Correct.

25   Q    Okay.  And if we could go -- start from, "So the amount
```

1   that was subtracted," do you see that?

2   A    I do.

3   Q    Okay.  If you would read that.

4   A    "So the amount that was subtracted was $20,226.36 to date

5   which in my first view should have been an addition.  So it's

6   an overall swing if it was added instead of subtracted or

7   basically doubled which would total $40,452.72."

8   Q    Okay.  You had said earlier that Mr. Cooper was very good

9   with numbers.  Is that true?

10  A    Correct.

11  Q    Okay.  And how often did you discuss the payouts and

12  reimbursements with Mr. Cooper on a weekly basis?

13  A    On a weekly basis, if not more than once a week.

14  Q    Okay.  Now Exhibit 161 is in front of you there.  It's

15  not been admitted yet.

16  A    160 or 161?

17  Q    161.

18  A    I don't -- I don't know if I have that one.

19  Q    Oh.  I think it's been ---

20       MR. RAYBOULD:  Permission to approach?

21       THE COURT:  You may.

22  Q    (By Mr. Raybould) 161, do you see in the middle your

23  e-mail?

24  A    I do.

25  Q    And do you see John's?

1    A    I see John Cooper's e-mail.

2    Q    And Rich Cesario's?

3    A    And Rich Cesario's.

4    Q    Okay.  And at the top do you see Dr. Simmons' e-mail?

5    A    I do.

6    Q    Do you recognize that e-mail account?

7    A    I do.

8    Q    Okay.

9         MR. RAYBOULD:  We move for the admission of 161 into

10   evidence.

11        THE COURT:  Any objection?

12        MS. LOBEL:  Excuse me just a moment, Your Honor.  I

13   don't believe this witness is in a position to authenticate

14   this document, Your Honor.

15        THE COURT:  We'll see.  Go ahead.

16   Q    (By Mr. Raybould) Now without reading the contents of

17   Exhibit 161, did you discuss dosages with Dr. Simmons?

18   A    Yes.

19   Q    Okay.  And were those conversations sometimes captured in

20   e-mails?

21   A    I believe so, yes.

22   Q    Okay.

23        MR. RAYBOULD:  We'd move for the admission of Exhibit

24   161 into evidence.

25        MS. LOBEL:  I'm not objecting to the testimony,

```
 1   Your Honor.  I'm objecting to the document he's been asked to

 2   authenticate and I don't believe can.

 3          MR. CHRIS KNOX:  Same objections.

 4          THE COURT:  That's sustained.

 5          MR. RAYBOULD:  Okay.

 6   Q    (By Mr. Raybould) Now you said you discussed dosages with

 7   Dr. Simmons?

 8   A    Correct.

 9   Q    Okay.  And do you know what his concerns were?

10   A    I don't recall specifically what his concerns were.  We

11   interfaced more on really the multivitamin that came a little

12   later in the game, but I don't know if he had a great deal of

13   concern in terms of the specific formulas and/or the dosages.

14   I do know we discussed it, but I couldn't tell you what his

15   concerns were.

16   Q    Okay.  If we could look at Exhibit 145 which has not been

17   admitted.  That's in front of you.

18   A    I see it.

19   Q    Okay.  Is that an e-mail from Mr. Cooper to you?

20   A    It is.  That e-mail is from John Cooper to me.

21   Q    Okay.

22          MR. RAYBOULD:  We move for the admission of Exhibit

23   145 into evidence.

24          THE COURT:  Any objections?

25          MR. CHRIS KNOX:  No objection, Judge.
```

1          THE COURT:  Admitted.

2          MS. LOBEL:  No, Your Honor.

3          MR. RAYBOULD:  And if we could highlight just the top

4    part.

5    Q    (By Mr. Raybould) And that e-mail there, if you would

6    read from what Mr. Cooper writes.

7    A    "We submitted 288 new confirmed scripts today to Trilogy

8    for fill.  We are sending 73 more for a total of 361 for day;

9    our best day.  Thought you and Jeff would like to know."

10   Q    So this is dated November 17th of 2014, right?

11   A    Correct.

12   Q    At that time if you could give the jury a sense of what

13   the breakdown was for TRICARE beneficiaries that you were

14   billing for versus private payer?

15   A    With CMG, it was probably 90 to 95 percent TRICARE; 5 to

16   10 percent commercial and private insurance.

17   Q    Okay.  Now I'd like to talk to you about Trilogy a little

18   bit more.  Okay?

19   A    Okay.

20   Q    Now did you guys -- Was that a walk-in clinic?

21   A    No.  We satisfied the basic minimum requirement from what

22   the State Board of Pharmacy will consider a retail pharmacy in

23   that we had a front desk but we had very, very little walk-in

24   patients.

25   Q    At this point in November of 2014, what is the primary

1    business that you're doing?

2    A    All mail order compounds through TRICARE.

3    Q    And if you could give the jury a sense of the total

4    amount of money on a monthly basis that's coming back.

5    A    Anywhere from 10 to 15 million per month.

6    Q    Is that the most that you've ever started receiving since

7    running Trilogy?

8    A    I don't recall specifically.  Maybe 20; I don't know.

9    Q    Okay.  I want to talk to you about the prescribers of the

10   compound creams as it relates to TRICARE business.

11   A    Okay.

12   Q    Do you know if there was an individual, a doctor that was

13   one of the main prescribers?

14   A    Yes.

15   Q    Who's that?

16   A    Dr. Elder.

17   Q    Okay.  And did you notice a rise in the volume of

18   compound creams when you were there?

19   A    When I was there, yes.

20   Q    Okay.  And do you know whether or not those are

21   attributed to Dr. Elder?

22   A    The majority of them were, yes.

23   Q    Did that give you cause for alarm?

24   A    It did, especially later on.  I -- I guess I didn't look

25   too carefully at the prescriber data when I was sending those

1    reports to John.  But when I did receive some investigatory

2    documents from the Federal Government and I started ---

3    Q    Well, let me -- We just got to talk about at the time.

4    A    Okay.  All right.  No, I didn't think too much of it.  I

5    knew he was writing a lot of prescriptions, but I didn't think

6    he was writing such an overwhelming majority of them.

7    Q    Okay.  And now Dr. Simmons, I think you said he also

8    submitted prescriptions?

9    A    He did.

10   Q    Okay.  And how are you aware of that?

11   A    He came on the reports as well.

12   Q    Okay.  Had you ever met with Dr. Simmons before?

13   A    Yes.

14   Q    And did he ever indicate to you that he knew the types of

15   prescriptions that were being written?

16   A    He did, yes.

17   Q    Okay.  Explain that to the jury.

18   A    There was a conversation that I believe Dr. Simmons told

19   me about and/or it was an e-mail he sent to me.  It might have

20   been both, but he elaborated on the fact that he got a call

21   from United Healthcare and they were asking about the volume

22   of compound prescriptions he was writing, and he basically

23   said, "FU," and that was it.  And I really wanted to get his

24   feedback on what he had said to them so I could use it with

25   some of our physicians in case they received pushback from

1   some of the big insurance companies.

2   Q    And did you reach out to Dr. Simmons to get what you

3   should say?

4   A    I did, yes.

5   Q    Okay.  What, if anything, did he tell you to say?

6   A    He said that unless the healthcare provider -- unless the

7   insurance provider was going to take full liability for the

8   opioid medications that those patients would otherwise be

9   taking if they weren't taking a compounded pain cream, then he

10  wasn't going to stop writing them.

11  Q    If you would look in front of you, there's Exhibit 250.

12  A    I have it.

13  Q    Okay.  And is that an e-mail from you to Dr. Simmons?

14  A    It's from me to Dr. Walter Simmons.

15  Q    And that's dated March 12th, 2015?

16  A    It is.

17  Q    And is that in reference to that conversation we just had

18  a moment ago regarding what to say with regards to the volume

19  of prescriptions?

20  A    That is correct.

21  Q    Okay.

22       MR. RAYBOULD:  We move for the admission of Exhibit

23  250 into evidence.

24       THE COURT:  Any objection?

25       MS. LOBEL:  No objection, Your Honor.

1          THE COURT:  All right.  Admitted.

2          MR. RAYBOULD:  If we could highlight the top there.

3    Q    (By Mr. Raybould) And just read that for the jury.

4    A    "Hi, Walter.  Were you able to put together a quick

5    summary of what I should have this other doctor say in regards

6    to the same line of questioning that you/Dr. Elder received

7    from UHC about prescribing too many compounds?  I can probably

8    articulate what you said but I would like to -- prefer to get

9    a quick summary from you first."

10   Q    Okay.  And did you get that summary?

11   A    I did.

12   Q    Okay.  And Dr. Simmons indicated to you what?

13   A    I think I alluded to it earlier, but he said -- he told

14   the representative from United Healthcare unless they were

15   going to take full responsibility, i.e., the liability for his

16   patients taking oral narcotics, then he was going to -- if

17   they wouldn't do that, he would continue prescribing

18   compounds.

19   Q    Okay.  Now if you -- We've talked about it a little bit,

20   but you had mentioned a study.  Is that right?

21   A    I did, yes.

22   Q    And what was your understanding of the study as it

23   relates to CMGRx?

24   A    The study as it pertained to topical and -- topical pain

25   creams and scar creams was -- were patients were to fill out a

1    questionnaire for the pain creams, I think, to rate its

2    effectiveness and potentially the quality of the service of

3    our pharmacy.  And once they submitted that form, they would

4    receive some type of compensation.  For the scar creams, they

5    would probably answer a similar type of questionnaire, but I

6    do know that they would take a picture so they could compare

7    before and after results of the scar therapy.

8    Q    Okay.  And did you discuss with Mr. Cooper and

9    Mr. Cesario whether or not they should be doing a study?

10   A    Yeah.  I mean we talked about doing the study early on

11   and based upon some feedback I received from our attorneys,

12   that we should not do the study with any federal healthcare

13   programs; i.e., TRICARE.

14   Q    And that feedback came from the folks at Frier Levitt?

15   A    Correct.

16   Q    All right.  And did you communicate that information to

17   Mr. Cesario and Doctor -- excuse me -- and Mr. Cooper with a

18   "C"?

19   A    I did.

20   Q    Okay.  As the months went up, were you aware that a study

21   had happened?

22   A    I'm pretty sure the study kept going.  I think I just

23   turned a blind eye to it because we were making so much money;

24   I didn't want to stop the parade, so to speak.  I did ask John

25   if they were still paying patients.  He told me "no."  There

1    were patients -- It gets a little murky, but they told me they

2    weren't doing a study.  I knew they were doing a study, and I

3    think we just left it at that and continued on as usual.

4    Q    And why is that?

5    A    Because we were making a lot of money.

6    Q    Now do you think that if patients weren't getting paid as

7    part of the study, you would have gotten as many prescriptions

8    as you got?

9    A    No.

10   Q    Why is that?

11   A    Because I think a lot of these patients really didn't

12   need these medications.  I know after speaking with at least

13   some of the TRICARE patients myself and looking at some of the

14   notes in our pharmacy software and speaking to some of our

15   billers, a lot of these patients didn't want these

16   medications.  They never even used most of the medications

17   they received.  So I would have to suspect that if they didn't

18   receive compensation, they would never seek out these

19   medications in the first place.

20   Q    Did you -- Was anyone else aware at Trilogy, let's start

21   there, that these patients weren't using the medications?

22   A    Yeah.  I mean our billers were pretty much aware of that.

23   They were our Customer Support representatives as well, so

24   they would be interfacing with the patients on a monthly

25   basis, and they would know how much, if any, of the medication

1    the patient was using.

2    Q    Would Ms. Valdez be one?

3    A    She would.

4    Q    Okay.  Would Mr. Cooper -- Was he aware of that?

5    A    John Cooper?

6    Q    Yes, with a "C."

7    A    I don't know what -- what knowledge John would have about

8    that.

9    Q    Okay.

10         MR. RAYBOULD:  If we could look at Exhibit 170 which

11   has already been admitted.

12   Q    (By Mr. Raybould) Now is this an e-mail from Mr. Cooper

13   to you?

14   A    It's from John Cooper to me, correct.

15   Q    Okay.  And I want you to read where it says, "Hi, guys."

16   A    "Hi, guys.  We have a patient, Martin -- first name

17   Alexander, last name Martin, a TRICARE patient that we've been

18   filling prescriptions for.  He posted five hours ago in

19   quotes, 'still have yet to receive my checks; was told it was

20   sent out Monday.  Well, a week later and still nothing.  Then

21   called my wife to tell her that there isn't a card on file for

22   her when there is and have proof of being billed.  It doesn't

23   take over a week for mail to arrive within state when I get

24   out-of-state mail in three to four days,' end quote.  On

25   Trilogy Pharmacy's Facebook page as a review."

1  Q    And you identify a couple of things to consider.  Is that

2  right?

3  A    I do.

4  Q    And you say, "I presume the check he's alluding to is a

5  study check"?

6  A    Correct.

7  Q    And you say, "I thought we had done away with that and we

8  were instructing federal/state patients accordingly."

9  A    Correct.

10  Q    And then what do you say in Point 2?

11  A    And I said, "We do have a credit card on file for his

12  wife.  He doesn't have any copays since he's active duty.  So

13  I don't know he's accurate with the part of his first

14  statement -- with that part of his statement."

15  Q    Okay.

16       MR. RAYBOULD:  Thank you.  If we could go to the top.

17  Q    (By Mr. Raybould) And what does Mr. Cooper write?

18  A    "Please update us on payment.  It was never received."

19  Q    Yeah.  If we could just read, "I text you today."

20  A    "I text you today.  If you didn't receive it, Rich and I

21  wanted to say we appreciate both you and Jeff as our partners.

22  Coop."

23  Q    Did you and Mr. Cooper and Mr. Cesario e-mail about

24  patients that talked about their checks?

25  A    We did.

1    Q    Okay.  If you could look at in front of you Exhibit 171

2    as well as Exhibit 183.

3    A    I'm looking at Exhibit 171?

4    Q    Yes.  And what is Exhibit 171?

5    A    It's an e-mail from John Cooper to me.

6    Q    Okay.  And it's dated December 22nd, 2014?

7    A    Correct.

8         MR. RAYBOULD:  We'd move for the admission of Exhibit

9    171 into evidence.

10        THE COURT:  Any objection?

11        MS. LOBEL:  One moment, Your Honor.  No, Your Honor.

12   Q    (By Mr. Raybould) And Exhibit 183 in front of you ---

13        THE COURT:  Sorry.  Did you say "no objection"?

14        MS. LOBEL:  Yes, Your Honor.

15        THE COURT:  All right.  Admitted.

16        MR. RAYBOULD:  And before publishing that.

17   Q    (By Mr. Raybould) If you would look at Exhibit 183 in

18   that pile.

19   A    That's an e-mail from me to John Cooper and

20   Richard Cesario.

21   Q    Okay.  And you're discussing a patient, correct?

22   A    Correct.

23   Q    Okay.

24        MR. RAYBOULD:  We'd move for the admission of Exhibit

25   183 into evidence.

1          MR. CHRIS KNOX:  No objection.

2          MS. LOBEL:  No objection, Your Honor.

3   Q    (By Mr. Raybould) And then if you would look at ---

4          THE COURT:  It's admitted.

5          MR. RAYBOULD:  Thank you, Your Honor.

6   Q    (By Mr. Raybould) If you would look at Exhibit 184.

7   A    That's an e-mail from John Cooper to me.

8          MR. RAYBOULD:  And we'd move for that admission as

9   well, Your Honor.

10         THE COURT:  Any objection?

11         MR. RAYBOULD:  184.

12         MR. CHRIS KNOX:  No objection, Judge.

13         MS. LOBEL:  No objection.

14         THE COURT:  Admitted.

15         MR. RAYBOULD:  If we could publish 171, and

16  highlight.

17  Q    (By Mr. Raybould) Mr. Cooper's response, you were talking

18  about Alexander Martin.  Is that right?

19  A    Yeah.  The previous e-mail I read out loud, let me see if

20  that's it.  Yeah, the Facebook post and the check and the

21  couple points I mentioned down below, and that's John's

22  response to that e-mail.

23  Q    And what does Mr. Cooper say?

24  A    "Yes, we had done away with CMGRx and checks.  Will have

25  patient called and will handle."

1   Q    Patients keep calling after this date?

2   A    Yes.

3   Q    Keep getting prescriptions?

4   A    Yes.

5   Q    Did your business generally change?

6   A    No.  If anything, it increased.

7   Q    Okay.  Do you still have concerns that folks were getting

8   checks?

9   A    Yes.

10  Q    Did you care to stop it?

11  A    No.

12  Q    Why is that?

13  A    I didn't want the money to stop.

14  Q    Now if you would go to Exhibit 183 or -- excuse me --

15  184, not 183, which has been published.

16       MR. RAYBOULD:  And if you could highlight that top

17  part there.

18  Q    (By Mr. Raybould) Mr. Cooper -- you're talking about a

19  patient here named Andy Pichardo, correct?

20  A    Correct.

21  Q    And he's calling regarding the status of his check?

22  A    Yes.

23  Q    All right.  And what does Mr. Cooper say?

24  A    "I don't recognize him as an employee but I will call him

25  now."

1    Q    What did you think about that statement when you got

2    that?

3    A    It was like he didn't even read my e-mail.

4    Q    Okay.  And he's referencing "employee."  Do you know why

5    he would reference "employee"?

6    A    It might have been a patient that they hired as a sales

7    representative.  He may have just been confused.  I -- I just

8    don't think he read my e-mail.

9    Q    Okay.  Did -- Were you ever a donor of the Freedom From

10   Pain Foundation?

11   A    I might have been.

12   Q    Okay.  Do you know who the donors were at Freedom From

13   Pain Foundation?

14   A    I don't.

15   Q    Okay.  Do you know whether or not you donated directly to

16   Freedom From Pain?

17   A    I could have.

18   Q    Okay.  Do you know any other donors of Freedom From Pain?

19   A    I don't know for sure.

20   Q    Okay.  And we talked about some of the patients a moment

21   ago.  Do you recall that?

22   A    Yes, I do.

23   Q    Do you know where these patients came from?

24   A    Yeah.  They were paid from Freedom From Pain.

25   Q    Okay.  And as you understood it, what was the purpose of

1    those payments?

2    A    It was for their participation in a study for the

3    prescriptions they received from our pharmacy.

4    Q    Okay.  Had you been a member or involved in a study in

5    the past?

6    A    Yes.  Some time ago when I left the Biotech company and

7    moved back to Dallas, we worked with a contract research

8    organization in Florida to do what we called an FDA-registered

9    longitudinal study pertaining to a growth hormone,

10   secretagogue.

11   Q    And did you have an independent review board as part of

12   that study?

13   A    We did.

14   Q    Did you have control set in place?

15   A    Correct.

16   Q    Okay.  Tell the jury, based on your experience, what went

17   into that study.

18   A    We worked with a Contract Research Organization to study

19   the effectiveness of what is a growth hormone, secretagogue.

20   So you may or may not be familiar with growth hormone, but

21   there are other things called "secretagogues" that can

22   naturally increase your level of growth hormone in your body

23   which most -- most physicians would consider a good thing.  So

24   we wanted to study just how effective -- how much that

25   actually worked.  So in doing so, we worked with a Contract

1   Research Organization which utilized an institutional review

2   board, along with a Chief Medical Officer, and what they

3   developed was what was considered an FDA-registered

4   longitudinal study where you study the effects of something

5   over time.  There's no particular end point.  And so in doing

6   so, we had all those elements in place.  We conducted the

7   study.  We really didn't get far into it until we moved on to

8   other things.  But from my experience with that particular

9   study, I knew if you really wanted to do what the FDA would

10  consider a "real study," those are at least some of the

11  minimum factors you needed.

12  Q    Okay.  So you said "independent review board."  What's

13  that?

14  A    That's a -- That is the -- an organization within the CRO

15  that overseas the study to make sure you're doing things

16  unbiasedly and correct.

17  Q    Now you -- you mentioned charities a moment ago.  Did you

18  donate to any charities in connection with John and Rich?

19  A    I could have.  I'm not sure.

20  Q    Do you recognize the name "Kids Matter" or no?

21  A    No.

22  Q    We had talked a little bit about Frier Levitt.

23  A    Correct.

24  Q    Okay.  And just tell the jury the nature of your

25  relationship with Frier Levitt.

1    A    Frier Levitt was a legal firm out of New Jersey that in

2    our particular case specialized in providing legal

3    representation to compounding pharmacies.  At the time

4    compounding pharmacies -- As a result of all the really big

5    reimbursements you saw within the healthcare industry,

6    compounded pharmacies were using marketing representatives and

7    making a lot of money, paying a lot of commissions.  So most,

8    if not all, were violating many laws, and they needed legal

9    representation such as we did.  So I sought them out and began

10   the process with them.

11   Q    Okay.  Who did you seek out that was associated with

12   Frier Levitt?

13   A    Their entire firm; specifically Jonathan Levitt.  He was

14   one of the partners.  Jesse Dresser, he focused specifically

15   on your relationships with PBMs.  John Morrone dealt with

16   employment agreements and such and legal marketing opinion

17   letters.

18   Q    And did you converse with these lawyers?

19   A    I did.

20   Q    Okay.  Did you typically converse with them on Saturday

21   morning?

22   A    John Morrone specifically.  The rest of them, we had set

23   up conference calls throughout each week.

24   Q    Okay.  And -- Now would they give you legal advice on the

25   nature of the relationship between Trilogy and CMGRx?

1   A    They did, but I never really disclosed all the details of

2   our relationships, only because I knew what they would tell

3   me.  They would tell me, "You need to stop."

4   Q    And what kind of things did you not disclose to Frier

5   Levitt?

6   A    I didn't disclose the fact that we were simply just

7   paying people W-2 and nothing else.  I didn't disclose nearly

8   the volume we were doing.  I didn't disclose the fact that I

9   was suspicious of people -- patients getting paid for taking

10  these medication.  I kind of just left that out or spoke of

11  other -- "I heard another pharmacy was doing this; what do you

12  guys think?"

13  Q    And why did you keep paying Frier Levitt to do legal

14  work, if that's the case?

15  A    You know, I guess I hoped that if we had good legal

16  representation and I spoke with them on a regular basis, then

17  this situation that we have here wouldn't happen.  Somehow it

18  would indemnify us.

19  Q    Did it?

20  A    No.

21  Q    And when you're talking with Frier Levitt, what is your

22  understanding about the legality of your conduct?

23  A    Can you repeat that question?

24  Q    Sure.  When you're having conversations with Frier

25  Levitt, you said that you weren't disclosing all the facts to

1    Frier Levitt.  Is that right?

2    A    Correct.

3    Q    Okay.  Why not?

4    A    Because I knew if they knew the full story, they would

5    advise us against doing what we were doing.

6    Q    Did you sometimes get, for example, an opinion letter

7    from Frier Levitt?

8    A    We did.

9    Q    Okay.  Did you follow that opinion letter and -- to the

10   "t"?

11   A    No.

12   Q    Why not?

13   A    Because we wouldn't have made nearly as much money if we

14   did so.

15   Q    Is that because it was telling you that it was illegal

16   what you were doing?

17   A    Correct.

18   Q    And did it reference that you couldn't pay marketers?

19   A    It did, yes.

20   Q    Okay.  Now did you create an employee arrangement with

21   CMG?

22   A    We paid them W-2 but that was the gist of it.  That was

23   it.

24   Q    Okay.  What makes you say that?

25   A    They didn't have offices.  We didn't reimburse them for

1    expenses.  We didn't provide them with health insurance or

2    retirement benefits.  We didn't oversee what they were doing.

3    We didn't set their hours.  We really -- Any oversight we had

4    was minimal, if any.

5    Q    Okay.  Why would you create this employment arrangement,

6    pay taxes and the like?

7    A    Really I wanted it to cover us from a HIPAA perspective

8    so we could exchange PHI freely.

9    Q    Okay.  And was there a benefit as far as the appearance

10   of not violating the Anti-Kickback Statute?

11   A    Yeah.  I mean we used it as a marketing tool for other

12   marketing groups in which we would tell them, "Well, if you're

13   not getting paid W-2 at your pharmacy, you're probably

14   violating the law; so you should come work with us."

15   Q    And did you know you were violating the law?

16   A    Yes.

17   Q    Okay.  Did you do it alone?

18   A    No.

19   Q    What was the purpose of all this paper?

20   A    Like I said before, I thought if we papered up and hired

21   some good attorneys, then something like this wouldn't happen.

22   Q    Okay.  Did you ever think you'd be here today?

23   A    No.

24   Q    Okay.  But you knew what you were doing was wrong.

25   A    Correct.

1    Q    Okay.  Now I want you to look at Exhibit 192 which is in

2    that packet.  Do you recognize Exhibit 192?

3    A    I do.  That's an e-mail from me to Mike@CMGRx.com, and

4    that would be Mike Kiselak.

5    Q    Okay.

6         MR. RAYBOULD:  We move for the admission of the

7    Exhibit 192 into evidence.

8         THE COURT:  Any objection?

9         MS. NICOLE KNOX:  No objection.

10        MS. LOBEL:  No objection, Your Honor.

11        THE COURT:  Admitted.

12        MR. RAYBOULD:  If we could publish the first page.

13   Q    (By Mr. Raybould) Is that an e-mail -- You see

14   "Mike@CMGRx.com"?

15   A    It is, correct.

16   Q    And that's from you?

17   A    Correct.

18   Q    Okay.  And that would be Mike Kiselak?

19   A    Correct.

20   Q    Okay.  Did you do some HIPAA-type training?

21   A    We did.  As a requirement in our contracts with PBMs,

22   each -- each individual that we paid W-2 had to receive some

23   type of fraud, waste and abuse and HIPAA compliance training

24   on an annual basis.  So we worked with a company called PAAS

25   National which allowed us to do that online via an employee

1   portal.

2   Q    Okay.  Did you teach any classes?

3   A    No.  No, no classes.

4   Q    Okay.  And it says "Employee Handbook."  What is that

5   referring to?

6   A    That was basically a template provided by PAAS National

7   where we just filled in all the blanks.

8   Q    Okay.  Were you concerned at this point, January of 2015,

9   about being a hundred percent compliance?

10  A    I was always concerned about that, yes.

11  Q    Okay.  Were you always compliant?

12  A    No.

13  Q    And so here you have an Employee Handbook.  What are you

14  communicating to Mr. Kiselak, if anything?

15  A    "These are the things you" -- Well, let me take a look at

16  it real quick.  I guess in this, we wanted to inform him that

17  what I suspect he's already doing, he shouldn't be doing

18  anymore.

19  Q    If we can go to the second page.  And is this the front

20  page of the Employee Handbook?

21  A    It is, yes.

22  Q    Okay.  And would this have gone out -- This type of

23  Employee Handbook, was this provided to all of the, you know,

24  employees?  Quote/unquote "employees"?

25  A    I tried to provide that to everyone, yes.

1    Q    Okay.  Who were your employees, though?  Real employees.

2    A    People that worked at the office and in the pharmacy.

3    Q    Okay.  Was Mike Kiselak ever an employee?

4    A    No.

5    Q    Okay.  When did you meet Mr. Kiselak?

6    A    After we were arrested.

7    Q    Have you ever had any conversation with him before then?

8    A    I don't believe so.

9    Q    What was the purpose of creating this employment

10   arrangement with Mr. Kiselak?

11   A    I mean to really -- Well, so we could exchange PHI.  I

12   was more concerned about maintaining our contracts with the

13   PBMs than I was concerned with complying with any federal

14   statute.  So this, if a PBM, such as Caremark or Express

15   Scripts ever audited us, I didn't want to lose that contract.

16   So I had to make sure that we at least had some paperwork in

17   place.

18   Q    So this would be a document you would provide the PBM.

19   A    Correct.

20   Q    Okay.

21        MR. RAYBOULD:  Now if we could go to Page 2 or --

22   excuse me -- Page 11 and 12.  Start at the bottom of 11.

23   Q    (By Mr. Raybould) And there's references to the "Federal

24   False Claims Act."  Is that right?

25   A    That is correct.

1    Q    Okay.

2         MR. RAYBOULD:  If we could go to the next -- or

3    excuse me.  Go down to the -- or go to the next page rather.

4    Q    (By Mr. Raybould) And look at the very bottom.  It looks

5    like there's a reference to the "Anti-Kickback Law"?

6    A    There is at the bottom.

7    Q    Okay.  Since you started -- And I want to pause here for

8    a second.  When you started your own pharmacy back in 2010,

9    did you understand that you couldn't pay patients for scripts?

10   A    I wouldn't have even thought of something back then.

11   Q    Why is that?

12   A    Because we weren't billing insurance.  There wasn't

13   enough money in it to pay a patient for taking something that

14   they would otherwise pay for themselves.

15   Q    Did you know that that was wrong?

16   A    I would have suspected that it was wrong, yeah.

17   Q    Okay.  What about paying doctors for prescriptions?

18   A    Yeah.

19   Q    Okay.  And did anyone give you any legal advice saying

20   that you could pay a doctor for a prescription?

21   A    No.

22   Q    Did anyone give you any legal advice saying that you

23   could pay a patient in exchange for a script?

24   A    No.

25   Q    Or that you could dress it up with a sham study?

```
1    A    No.

2         MR. RAYBOULD:  If we could go to the next page, the

3    top there, and if we could start where it says, "The Federal

4    Anti-Kickback Law."

5    Q    (By Mr. Raybould) If you would read, "The Federal

6    Anti-Kickback Law provides" ---

7    A    "The Federal Anti-Kickback Law provides for criminal

8    sanctions if anyone knowingly or willfully offers pay,

9    solicits or receives anything of value to influence or reward

10   referrals business."

11        MR. RAYBOULD:  Okay.  We can take that down.

12   Q    (By Mr. Raybould) Do you see ---

13        MR. RAYBOULD:  If you would put Exhibit 189 up which

14   is already in evidence.

15   Q    (By Mr. Raybould) Now do you see this e-mail from

16   Mr. Cooper to you?

17   A    I do.

18   Q    Okay.  "Please split difference between me and Richard

19   and wire tomorrow.  Thank you."

20   A    I do see that, yes.

21   Q    Okay.  What was the nature of the relationship, as you

22   observed it, between Mr. Cesario and Mr. Cooper?

23   A    They split the proceeds from this particular enterprise

24   50/50.

25   Q    Okay.  And at some point did you make a big tax payment?
```

1    A    I did, yes.

2    Q    Okay.  Tell the jury about that tax payment.

3    A    John had requested that we pay CMGRx a large sum of money

4    to help him with taxes; meaning CMGRx did not have enough

5    income to offset his expense, and the monies that him and Rich

6    were receiving via W-2 were generating too much income taxes

7    for him.  So at the end of -- I can't remember which year it

8    was.  I think it was 2014, right at the beginning of 2015, I

9    made a 1099 payment to CMGRx for approximately one million

10   dollars; $1,002,000.

11   Q    Was that out of the goodness of your heart?

12   A    I wanted the prescriptions to keep coming, and I knew if

13   I didn't, John would send them elsewhere.

14   Q    Okay.  Now I want to talk a moment about Dr. Simmons.

15   All right?

16   A    Okay.

17   Q    Okay.  Did you ever have a conversation with Dr. Simmons

18   about compensation?

19   A    Yes.

20   Q    Okay.  Tell the jury the nature of that conversation and

21   what happened.

22   A    Several months after working with CMGRx, Dr. Simmons

23   brought over John Cooper and Richard Cesario.  There may have

24   been somebody else in the meeting.  The main point of

25   conversation in the meeting, which was headed by Dr. Simmons,

1    was increasing the commission we paid from Trilogy Pharmacy to

2    CMGRx.  He led the meeting.  He talked about how much we were

3    reimbursed.  He talked about how much we were paying for the

4    ingredients which I was somewhat shocked by that a physician

5    would know how much a pharmacy pays for its ingredients

6    because most people outside the pharmacy space don't know how

7    much these particular components cost.  So his point was that

8    based upon the amount of money Trilogy Pharmacy was making

9    from all the business they were bringing to us, CMGRx was

10   headed to a higher commission rate.

11   Q    You said Dr. Simmons was leading the conversation?

12   A    Yes.

13   Q    And did you find it odd that he knew the reimbursement

14   rate for these creams?

15   A    Not -- Not only the reimbursement, yes, which was odd,

16   but more specifically the cost of the ingredients.

17   Q    Okay.  And what was your take-away from that

18   conversation?

19   A    I don't know why he would be negotiating for a higher

20   commission if he wasn't getting a cut of it.

21   Q    In the binder in front of you, there are some bank

22   statements.  If you would turn to Exhibit 6.

23   A    I have it.

24   Q    Okay.  And if you would turn to the second page of

25   Exhibit 6.

1   A    I see it.

2   Q    All right.  Is that a business signature card for you and

3   Mr. Fuller?

4   A    It is.

5   Q    All right.  And if you would turn to Page 3.  Do you see

6   that is an account statement for you and Mr. Fuller?

7   A    It is, for Trilogy Pharmacy.

8   Q    Okay.

9        MR. RAYBOULD:  We'd move for the admission of Exhibit

10  6 into evidence.

11       THE COURT:  Any objection?

12       MR. CHRIS KNOX:  No objections, Your Honor.

13       THE COURT:  Admitted.

14       MS. LOBEL:  No additional objection other than the

15  fact that it is a summary exhibit for which not all the

16  underlying documentation has been provided.

17       THE COURT:  All right.  That objection is preserved.

18       MS. LOBEL:  Thank you.

19  Q    (By Mr. Raybould) If we go to -- This appears to be --

20  The first page of this appears to be a payment from Trilogy to

21  CMGRx for about $133,000?

22  A    Correct.

23  Q    Okay.  And if it's going to CMGRx, what was the purpose

24  of this?

25  A    That was commission for prescriptions they sent to our

1    pharmacy.

2    Q    Okay.  If we could go to Page 2, and is that the account

3    statement or -- excuse me -- the signature card for you and

4    Mr. Fuller?

5    A    It is.

6    Q    And it says that Mr. Fuller is the President.

7    A    Correct.

8    Q    And you're the signer?

9    A    Correct.

10   Q    Was Mr. Fuller on the paperwork as the owner of Trilogy

11   Pharmacy?

12   A    Yes.

13   Q    Tell the jury the nature of the relationship between you

14   and Mr. Fuller as it relates to the everyday functions of

15   Trilogy.

16   A    He was really just the owner on paper.  I handled all the

17   day-to-day activities.

18   Q    Did he work or have other businesses going on at the same

19   time?

20   A    Yes.

21   Q    Was he involved in gyms?

22   A    Yes, he was.

23   Q    Okay.  If we could go to Page 3, and the bottom there, it

24   looks like this is a withdrawal from your account of $133,000,

25   correct?

1    A    Correct.

2    Q    Okay.  And the next page, it's with respect to a -- looks

3    like a cashier's check?

4    A    Correct.

5    Q    And who controlled the money at CMGRx?

6    A    John and Rich both did, I believe.

7    Q    Okay.  If we could go to -- Thank you.  If you look at

8    Exhibit 7 in front of you, Exhibit 8, Exhibit 9, Exhibit 10,

9    Exhibit 11 and Exhibit 12, we'll start there.  Just take a

10   moment.

11   A    You said start with Exhibit 12?

12   Q    Or excuse me; start with Exhibit 7.

13   A    Oh 7, okay.

14   Q    If you would look at the second page.

15   A    All right.

16   Q    Do you see your signature card again?

17   A    I do.

18   Q    And the third page, do you see an account statement for

19   you and Mr. Fuller?

20   A    I do.

21   Q    Okay.  If you look at Exhibit 8, do you see the same type

22   of documents?

23   A    I do.

24   Q    Exhibit 9, if you look at Pages 2 and 3, do you see the

25   same type of documents?

```
1    A    I do.

2    Q    Okay.  Exhibit 10, Page 2 and 3?

3    A    Correct.

4    Q    Okay.  And Exhibit 11?

5    A    Correct.

6    Q    Okay.  If you'll look at Exhibit 12, Pages 2 and 3?

7    A    The same.

8    Q    Okay.  Do you see Exhibit 13 in front of you?

9    A    I do.

10   Q    Okay.  Look at Pages 2 and 3.

11   A    The same.

12   Q    Okay.  Exhibit 19, Pages 2 and 3?

13   A    The same.

14   Q    Okay.  Exhibit 20?

15   A    The same.

16   Q    Okay.  Exhibit 21?

17   A    The same.

18   Q    And Exhibit 22?

19   A    The same.

20   Q    And Exhibit 25?

21   A    The same.

22   Q    Okay.  And the last one being Exhibit 26.

23   A    The same.

24   Q    Okay.

25        MR. RAYBOULD:  Your Honor -- and I can go slow --
```

1    we'd move for the admission of Exhibit 7, 8, 9, 10, 11, 12,

2    13, 19, 20, 21, 22, 25 and 26 into evidence.

3             THE COURT:  Any objection to those?

4             MS. LOBEL:  Your Honor, may I have a couple of brief

5    questions on voir dire with respect to those summaries?

6             THE COURT:  All right, yes.

7             VOIR DIRE EXAMINATION BY MS. LOBEL:

8    Q    Good afternoon, Mr. Baumiller.

9    A    Good afternoon.

10   Q    How are you today?

11   A    I'm good.  Thank you.

12   Q    Excellent.  Do you have the -- There are a number of

13   exhibits.  It's a lot to handle at one time, but if you could,

14   beginning with Exhibit 6, will you tell us whether or not --

15   Let's look at 6, 3; Page 3 on 6.  Do you see that?

16   A    I do.

17   Q    And do you see where there are online ACH payments to

18   various individuals?

19   A    I do.

20   Q    Okay.  Are those W-2 payments?

21   A    Some of them are 1099 payments to marketing groups.

22   Q    Okay.

23   A    And I think most of them are actually.

24   Q    All right.  Would you look at Exhibit 10 and see if,

25   similarly, W-2 payments have been excerpted there?

```
 1    A     I don't see any payments to marketers there.

 2    Q     All right.  Would you look at 11?  Same question.

 3    A     Yeah, I do see payments to marketers there.

 4    Q     All right.  And would that be what you were referring to

 5    earlier in your Direct Examination about the W-2 payments that

 6    were made to various people?

 7    A     Correct.

 8    Q     And that would begin with, at least on this excerpt,

 9    Ms. Straw and end with Mr. Hamit.

10    A     Correct.

11    Q     Is that right?  Do you happen to know whether or not this

12    excerpt is the whole W-2 payroll for that period?

13    A     No, I do not.

14    Q     Okay.  So if -- Do you have the documents available to

15    you that would enable you to show the whole payroll as opposed

16    to simply an excerpt?

17    A     No.

18    Q     All right.

19          MS. LOBEL:  I'm going to object, Your Honor, to the

20    exhibit to the extent that it depicts payroll and may be

21    incomplete on each of those that depict a payroll.

22          THE COURT:  Response?

23          MR. RAYBOULD:  It's just bank statements, Your Honor.

24    That's a subject for Cross.

25          THE COURT:  All right.  The Court overrules the
```

 1   objection; admitted.

 2                  CONTINUED DIRECT EXAMINATION

 3   QUESTIONS BY MR. RAYBOULD:

 4   Q    You were asked about W-2 payments.  Do you recall that?

 5   A    Yes.

 6   Q    Okay.  Did you pay Rich and John in other ways just

 7   separate and apart from only W-2 payments?

 8   A    Yes.

 9   Q    Okay.  Tell the jury how you would pay Rich and John.

10   A    Early on, we paid them 1099 and then, of course, later

11   on, as I mentioned, I made a large payment to them of

12   approximately a million dollars at the end of 2014, beginning

13   of 2015.

14   Q    Okay.

15            MR. RAYBOULD:  Your Honor, we'd move for the

16   admission of those exhibits.

17            THE COURT:  Any further objections?

18            MS. LOBEL:  No further objections.

19            THE COURT:  All right, admitted.

20            MS. LOBEL:  Excuse me, Your Honor.  Other than our

21   running objection on the summaries, --

22            THE COURT:  Yes.

23            MS. LOBEL:  -- I assume I don't have to keep saying

24   that.

25            THE COURT:  No.

VOLUME 13                    264

1              MS. LOBEL:  Thank you.

2              MR. RAYBOULD:  If we could publish Exhibit -- Exhibit

3    9, please; the first page.

4    Q    (By Mr. Raybould) The first page there shows a payment

5    dated May 7th?

6    A    Correct.

7    Q    Okay.  And it's to Mr. Cesario?

8    A    I don't see where it says that in that line.  Am I

9    missing it?

10   Q    If you would turn to Page 4 of that exhibit, do you

11   recognize this document?

12   A    I do.

13   Q    Okay.  Tell the jury what we're looking at here.

14   A    That is a payroll document.  So that would have been the

15   W-2 payroll I generated, and it would list amounts that needed

16   to be paid to each individual.

17   Q    Okay.  And what's the date here?

18   A    It is all for May 8th.

19   Q    Now on May 8th, 2015, had business slowed down?

20   A    Yes, it did.

21   Q    And do you know why?

22   A    Because TRICARE was going to -- had either already done

23   so or was going to end the coverage of compound pain

24   medications.

25   Q    Okay.  And did you still make a payment to Mr. Cooper and

1    Mr. Cesario each for over $353,000?

2    A    Correct.

3    Q    Okay.  And what was the purpose of that payment?

4    A    That was for commissions.

5    Q    Okay.

6         MR. RAYBOULD:  If we could go to Exhibit 10.

7    Q    (By Mr. Raybould) Are you familiar with the entity

8    "Cooper WCTB, LLC"?

9    A    No, I am not actually.

10   Q    Okay.  Would that have been an LLC controlled by

11   Mr. Cooper?

12   A    If I'm making a payment for CMGRx commissions, I would

13   have to presume so.

14   Q    Does that look about the same amount, $353,000?

15   A    It does.

16   Q    And if you would go to Page 4 of that exhibit, do you see

17   the same payroll sheet that we referenced earlier?

18   A    I do.

19   Q    Okay.  And that was for May 8th payments, correct?

20   A    Correct.

21   Q    Okay.  If you would go to Exhibit 11, Page 3, and I want

22   to highlight the first one on March 20th,

23   Denise Brooks-Robertson.

24   A    I'm sorry; which exhibit?

25   Q    This is Exhibit 11, Page 3.  It's on the screen,

```
 1    Mr. Baumiller.

 2    A    Oh, okay.  I see it, yes.

 3    Q    Okay.

 4         MR. RAYBOULD:  And if you could highlight

 5    Denise Brooks-Robertson.

 6    Q    (By Mr. Raybould) Was Denise Brooks-Robertson one of your

 7    employees?

 8    A    She worked at CMG.

 9    Q    Okay.  Why did you pay her as a W-2?

10    A    John would have requested I pay her that amount.

11    Q    Okay.  Now Mr. Straw, did you have control over

12    Mr. Straw?

13    A    No.

14    Q    Okay.  Was he an employee?

15    A    No.

16    Q    Okay.  And what was the purpose of this payment?

17    A    That was for prescriptions he sent to our pharmacy.

18    Q    Okay.  To be clear, is this for assessments or for

19    prescriptions?

20    A    This is for prescriptions.

21    Q    Okay.  Because no one makes money if there's no

22    prescriptions.

23    A    Correct.

24    Q    And if you look at Luis Rios, do you see him below there?

25    A    Scroll down.
```

1    Q    Yes.

2    A    Yes, I do.

3    Q    Okay.  Was Mr. Rios ever your employee?

4    A    No.

5    Q    What about Mr. Kiselak?

6    A    No.

7    Q    Okay.  And do you see Miranda Stevens' name?

8    A    I do.

9    Q    Okay.  And where did Ms. Stevens work?

10    A    At CMG.

11    Q    Okay.  Now Ms. Valdez, was she your employee?

12    A    Yes.

13    Q    Okay.  Did patients call about their checks to Trilogy?

14    A    They did.

15    Q    Did you give Ms. Valdez any advice as to what to do?

16    A    Yes.  I gave advice to all of our billers in case they

17    were to experience a call like that.

18    Q    Okay.  What was that advice?

19    A    Basically to tell the patient that our pharmacy, Trilogy

20    Pharmacy, wasn't associated with any study and that if the

21    patients had any questions about getting paid, they should

22    contact the study sponsor.

23    Q    Okay.  Was that true?

24    A    No.

25    Q    Okay.  Why isn't it true?

 1   A    Because the patients were getting paid, and they were

 2   getting paid by a company that Trilogy Pharmacy was paying.

 3   So by default, Trilogy Pharmacy was indirectly paying these

 4   patients.

 5   Q    Okay.  And was that wrong?

 6   A    Yes.

 7   Q    Okay.  And you understood that at the time?

 8   A    Yes.

 9   Q    Okay.  Now if you could look at Exhibit 199 in front of

10   you; excuse me, in your notebook there.

11   A    199?

12   Q    199.

13   A    It doesn't -- It doesn't go up that high.

14   Q    Okay.  Let me show you what's been marked as Exhibit 199.

15   A    Okay, I see it.

16   Q    Is that an e-mail with you and Ms. Valdez?

17   A    It is.

18   Q    Okay.

19        MR. RAYBOULD:  We'd move for the admission of Exhibit

20   199 into evidence.

21        MS. LOBEL:  One moment, Your Honor.

22        MR. CHRIS KNOX:  Judge, I'm going to object to

23   hearsay and relevance.

24        THE COURT:  Objection overruled; admitted.

25        MR. RAYBOULD:  If we could highlight the very bottom

 1    of Exhibit 199, the first part of the e-mail.

 2    Q    (By Mr. Raybould) Mr. Baumiller, is this an e-mail

 3    between you and folks at Trilogy?

 4    A    It is.

 5    Q    Okay.  And you're directing folks in your office to

 6    deflect questions about the study, correct?

 7    A    Correct.

 8    Q    If you would read that for the jury.

 9    A    "If a patient inquires about participation in a study,

10    please instruct the patient to contact the individual or group

11    affiliated with the study.  Trilogy Pharmacy does not sponsor,

12    nor are we affiliated with studies pertaining to medications.

13    Please contact me if you have any questions about this

14    policy."

15    Q    And what does Ms. Valdez write?

16    A    Scroll up.

17         MR. RAYBOULD:  If we could go to "Got it."

18    A    Yeah.  She said, "Got it.  I have been reprogramming to

19    remove the word 'study' from the everyday convos with CMG

20    patients.  Again, I'm really sorry about that slip-up during

21    that last meeting with the new rep."

22    Q    Do you know why this would be a slip-up?

23    A    Probably because we had embraced the idea of a study and

24    then we're slowly trying to backtrack from it.

25    Q    Okay.  Why is the study a problem?

1    A    Because the attorneys are telling us, no, we can't do it;

2    we're doing too much TRICARE business, and we know that's a

3    clear violation of the law.

4    Q    Okay.  Did you discuss the study with Mr. Cooper and

5    Dr. Simmons?

6    A    I did, yes.

7    Q    Okay.  Tell the jury the nature of those conversations.

8    A    Well, we discussed the development of the study in the

9    beginning but later on, I discussed with them that we really

10   couldn't do a study anymore since we were doing so much

11   TRICARE business, and that was really the gist of it.

12   Q    Did anything change with respect to the study?

13   A    No.

14   Q    Did you keep getting calls about the study?

15   A    Yes.

16   Q    Were patients asking for their checks?

17   A    Yes, they were.

18   Q    Okay.  And what did you do when you got these calls?

19   A    I would send a message to John, like you've seen a couple

20   examples of, in hopes that he would somehow handle it.

21   Q    Okay.  Now you were arrested in this case; correct?

22   A    Correct.

23   Q    And you met with the Government --

24   A    I did.

25   Q    -- during your arrest.

```
1   A    I did, yes.

2   Q    You met with the federal agents?

3   A    Correct.

4   Q    Okay.  And the first time you spoke to investigators,

5   were you a hundred percent truthful?

6   A    No.

7   Q    Okay.  Why not?

8   A    Because I knew that what we had done, most of it, was

9   illegal.  And I knew if I disclosed that to them, I'd probably

10  be arrested on the spot.

11  Q    Okay.  What all did you lie about?

12  A    I lied about the study.  I lied about John and Rich and

13  other people being our employees.  I lied about patients

14  getting kickbacks and doctors getting kickbacks.  That's what

15  I remember most of all.

16  Q    And since lying, you've pled guilty in this case.

17  A    I have.

18  Q    And you've met with the Government.

19  A    I have.

20  Q    Okay.  And you have representation.

21  A    I do.

22  Q    And you've since told the Government what's happened,

23  correct?

24  A    I have.

25  Q    Okay.  And your version of what happened, what you said
```

1    to the agents the first time, is it fair to say that's a lie?

2    A    True.

3    Q    Okay.  And since making those lies, have you done your

4    best to be truthful?

5    A    I have.

6    Q    Okay.  And are you aware of Express Scripts?

7    A    I am.

8    Q    And are you aware of what a "Provider Manual" is?

9    A    I am.

10   Q    Okay.  Tell the jury what those "Provider Manuals" are.

11   A    A "Provider Manual" is basically a part of your contract

12   that a pharmacy has with a PBM.  And it basically tells you

13   how you are to operate in compliance with your contract with

14   that PBM.  So it dictates everything down to how -- as to how

15   prescriptions are filled; everywhere -- everywhere from how

16   you're supposed to do fraud, waste and abuse and HIPAA

17   compliance training; handling prior authorizations; basically

18   everything and anything you do in engaging that PBM as a

19   pharmacy.

20   Q    And are you required to certify you understand that

21   Provider Manual?

22   A    Yes, we are.

23   Q    And in that Provider Manual, are you affirming you

24   understand various federal laws?

25   A    That's correct.

1    Q    Including the Anti-Kickback Statute?

2    A    That's correct.

3    Q    And is this a -- Is your understanding that these

4    Provider Manuals are given to folks who are in network with

5    Express Scripts?

6    A    That is correct.

7    Q    Okay.

8         MR. RAYBOULD:  If we could publish Page 1 of Exhibit

9    516.

10   Q    (By Mr. Raybould) Is this a copy of a Provider Manual for

11   Express Scripts?

12   A    It is.

13        MR. RAYBOULD:  If we could go to Page 13 and

14   highlight Section 2.2.

15   Q    (By Mr. Raybould) Is there advice on collection of

16   copayments?

17   A    There is.

18   Q    Okay.  And is it -- What is some of the advice on the

19   collection of copayments?

20   A    Basically that you need to collect them.  You can't

21   routinely and/or regularly waive them.  I think that's the

22   gist of it.

23   Q    Okay.  Why is waiving a copay a problem?

24   A    Because it's really the patient's responsibility.  It's

25   how insurance premiums are calculated and it's how benefits

1    are administered.  Without the patient responsibility, I guess

2    the thought is that patients will, more likely than not,

3    overutilize their healthcare benefits.  So the patient has to

4    at least pay a little bit to make it fair.

5    Q    Now if we could go to Page 10, Section -- Oh, excuse me.

6    If we could go to Page 46 which is Section 5.10.  Is there a

7    reference to the Anti-Kickback Statute?

8    A    There is, yes.

9    Q    Okay.

10         MR. RAYBOULD:  And if we could highlight that.

11   Q    (By Mr. Raybould) Is the Anti-Kickback Statute 42 USC

12   Section 1320(a)(7)(B)?

13   A    It's referenced there, yes.

14   Q    Okay.  And during this time, 2014 and 2015, were you

15   violating the Anti-Kickback Statute?

16   A    We were.

17   Q    And you said "we."  Who else was violating it?

18   A    Me, John, Rich, and Dr. Simmons.

19         MS. STILLINGER:  Your Honor, I'm going to object to

20   him testifying to legal conclusions unless it's based on -- He

21   can testify about facts.  I'm objecting to legal conclusions.

22         THE COURT:  Okay.  Rephrase your question.

23   Q    (By Mr. Raybould) Were you getting prescriptions from

24   John and Rich?

25   A    We were, yes.

1    Q    And what was that in exchange for?

2    A    Kickbacks that we were paying to them for those

3    prescriptions.

4    Q    Dr. Simmons, tell us about that.

5    A    I can't speak specifically as to what amounts Dr. Simmons

6    was receiving from John and Rich, but if he received anything,

7    it was a result of kickbacks we paid to John and Rich.

8    Q    Okay.  And -- Now Dr. Elder, you never saw any checks go

9    directly to Dr. Elder, correct?

10   A    That's correct.

11   Q    Okay.  Had Dr. Elder been getting paid per prescription,

12   would that have been an issue?

13   A    Yes.

14        MS. STILLINGER:  Your Honor, I'm going to object to

15   him asking for a legal conclusion as to this witness.

16        THE COURT:  Overruled.  Ask the next question.

17   A    Can you repeat the question?

18   Q    (By Mr. Raybould) Had Dr. Elder been getting paid per

19   prescription, would that have been an issue?

20   A    Yes.

21   Q    Why is that?

22   A    Because that's a clear violation of the Anti-Kickback

23   Statute.

24        MS. STILLINGER:  Your Honor, ---

25        THE COURT:  Well, with respect to that, Ladies and

1    Gentlemen, I've instructed you -- I will instruct you on what

2    the law is; the witness may not.

3    Q    (By Mr. Raybould) Did any lawyer ever say that you could

4    pay per prescription?

5    A    No.

6    Q    Okay.  Did any lawyer ever say that you could pay a

7    patient per prescription?

8    A    No.

9    Q    Okay.  Now in May of 2015 did things slow down?

10    A    Yes.

11    Q    Did you and Mr. Cooper have a strategy as to how to deal

12    with the TRICARE dollars kind of slowing down?

13    A    We did.  Since the medications were no longer covered, we

14    had put together a whole packet of evidence-based research as

15    to why we felt these topical pain medications would still be

16    beneficial for those patients.  And we were going to have each

17    patient submit it to their Customer Care Department, and we

18    were going to submit it on behalf of each patient to the Prior

19    Authorization Department; two departments.  The idea was that

20    we were going to overwhelm Express Scripts and maybe they

21    would just cave and start filling these prescriptions for

22    those patients again.

23    Q    At that point -- So you were going to paper them up.

24    A    Yes.

25    Q    At that point did Mr. Cooper understand what he was doing

1    was wrong?

2    A    Yes.

3    Q    Explain that to the jury.

4    A    I mean he knew that TRICARE was no longer going to cover

5    these medications because they were out of money because we

6    billed so much to them.  He knew he was getting illegal

7    kickbacks from Trilogy Pharmacy.

8         MR. CHRIS KNOX:  Your Honor, I'm going to object to

9    speculation; his mental state on illegal kickbacks.

10        THE COURT:  All right.  First of all, don't talk

11   about what the law is.  Second of all, if you have a basis for

12   answering that, you may.  Go ahead.

13   Q    (By Mr. Raybould) Did Mr. Cooper discuss overwhelming

14   TRICARE?

15   A    The specific conversations we had between John and I were

16   to the point of billing TRICARE for as much as possible before

17   it all came to an end in May.

18   Q    Okay.  And Mr. Cooper said that?

19   A    Yes.

20   Q    Did he ever say that he was so passionately moved by the

21   opioid crisis?

22   A    No.

23   Q    Did Dr. Simmons ever tell you at any point that he has

24   made it his life's mission to get folks off of opioids?

25   A    No.

1    Q    Or he was passionately moved by this opioid crisis?

2    A    He may have said that he was passionately moved by it.

3    Q    Okay.  What about Mr. Cesario?  Initially, he discussed

4    the opioid crisis, correct?

5    A    He did.  He had the most compelling story since he was so

6    intimately involved with someone who had had a problem with

7    opioids.  But as to whether -- as to how much -- how

8    believable he was, I mean I just went along with it.

9    Q    Okay.  And why is that?

10   A    Because I knew he was going to be a good sales rep.

11   Q    Okay.

12        MR. RAYBOULD:  Court's indulgence, Your Honor.

13        (Pause)

14   Q    (By Mr. Raybould) Now in May of 2015, did you continue to

15   do business with Dr. Simmons?

16   A    Yes.

17   Q    Okay.  And did he ever tell you that he had an issue with

18   your business model?

19   A    No.

20   Q    He kept requesting money from you?

21   A    It wasn't specifically then.  It wasn't until sometime

22   later that I started working with Dr. Simmons on another

23   project which was "SmartCCM" which at the time -- which was a

24   chronic care management company.

25   Q    Okay.  Now I'm going to hand you Exhibit 360 and 358.

1          MS. LOBEL:  I'm sorry.  Mr. Raybould, what was the

2    first one?

3          MR. RAYBOULD:  360, 358 and 362.

4    Q    (By Mr. Raybould) Do you recognize Exhibit 358?

5    A    Yes.  This is an e-mail from Trilogy Pharmacy to

6    Dr. Walter Simmons.

7    Q    Okay.  And did you have access to that account?

8    A    I did.

9    Q    Okay.  If you'll look at 360.

10   A    It's an e-mail from Walter via a new e-mail address I

11   created for him at SmartCCM to Jeff Fuller and me in a bulk

12   mailbox we had at Accounting@SmartCCM.com.

13   Q    Okay.  And Exhibit 362?

14   A    That's an e-mail from Dr. Walter to, I guess, himself;

15   Keisha, our HR Director; Jeff Fuller and me.

16   Q    Okay.  We move for the admission of Exhibits 358, 360 and

17   362 into evidence.

18         THE COURT:  Any objection?

19         MS. LOBEL:  Hold on one minute, Your Honor, please.

20   No objection, Your Honor.

21         MR. CHRIS KNOX:  Judge, may we approach on this

22   briefly?

23         THE COURT:  All right.  I'll go ahead and give the

24   jury a break.

25         Ladies and Gentlemen, take a quick 15-minute recess.

```
 1                    COURT SECURITY OFFICER:  All rise for the jury.

 2                    (Jury escorted to the Jury Room by the Court Security

 3        Officer.)

 4                    THE COURT:  All right.  Mr. Baumiller, I need you to

 5        take a seat in there for just a moment and we'll come get you.

 6        If you need to go to the restroom, this is a good time to do

 7        it.

 8                    (Mr. Baumiller escorted out of the courtroom.)

 9                    THE COURT:  All right.  Be seated.

10                    Is there an objection?

11                    MR. CHRIS KNOX:  Yes, Judge.  We're going to object

12        under 403 and also because this is between a Trilogy Pharmacy

13        address and Doc Walter; doesn't have anything to do with us,

14        and it's a discussion about something that has to do with

15        prescriptions written a year -- it looks like a year prior and

16        certainly after the time that these -- these payments to these

17        Defendants was still ongoing.  So under 403, any argument by

18        the Government that this is somehow wrongdoing and trying to

19        cover something up in the conspiracy, we would object as

20        highly prejudicial and of minimal probative value.

21                    THE COURT:  Response?

22                    MR. RAYBOULD:  Thank you.  They're continuing to work

23        together and one of the defenses is that, you know,

24        Dr. Simmons washed his hands of this in May of 2015.  The fact

25        that he's continuing to engage in activity with Mr. Baumiller
```

1    suggests otherwise, and it is within the Indictment.  It does

2    -- The indictment does go all the way up to 2016, so we think

3    it is relevant to describe the nature of their relationship

4    and their continuing to work together by their statements.

5            THE COURT:  Okay.  This document refers to a

6    prescription in September of 2014.

7            MR. RAYBOULD:  Yes, Your Honor; 358 does.

8            THE COURT:  Okay.  That's the one I was looking at at

9    the moment.  So what's the relevance of that?

10            MR. RAYBOULD:  The relevance is that they're

11    continuing to work together.  And one of the main defenses is

12    that Dr. Simmons had nothing to do with any of these

13    individuals in May of 2015, and he's continuing to work with

14    Mr. Baumiller after that date which shows the nature of their

15    relationship.  And it's related to patient Derrick Perry who

16    was a part of the Joe Straw referral network, so it is

17    relevant to this scheme.

18            And if you go to Page 3 of that exhibit, you can see

19    that Derrick Perry's the patient; Killeen, Texas, and the fax

20    is to John Cooper.  So it shows their continuing involvement.

21            THE COURT:  Does this just have multiple copies of

22    the same thing in the exhibit?

23            MR. RAYBOULD:  It's different patients, Your Honor.

24    It was copied twice, so we would only move for the admission

25    of Pages 1 through 5.

1          THE COURT:  So it's not different patients.  Is that

2    what you're saying?  That's what I asked you.

3          MR. RAYBOULD:  Excuse me?

4          THE COURT:  There's one page at the end, but there

5    are four pages that appear to be duplicates of the preceding

6    pages.  Is that correct?

7          MR. RAYBOULD:  Yes, Your Honor.

8          THE COURT:  Okay.  So whatever I do with them, I

9    don't want the same pages duplicated in the exhibit.

10         All right.  Do you want to be heard on the last thing

11   that was said?

12         MR. CHRIS KNOX:  No, Your Honor.

13         THE COURT:  Does this last page relate to the balance

14   of the exhibit?

15         MR. RAYBOULD:  Is that Page 10, Your Honor?

16         THE COURT:  Well, it's Page 5 which appears to be

17   duplicated at Page 10.  Is Page 5 part of this exhibit or not?

18         MR. RAYBOULD:  Yes, Your Honor.  It's just Pages 1

19   through 5.  It was just duplicated.  Pages 6 through 10

20   appears to be duplicates of Pages 1 to 5.  So we would remove

21   6 through 10.

22         THE COURT:  Okay.  I'm going to admit that one, Pages

23   1 through 5.

24         What's your objection to Exhibit 360?

25         MR. CHRIS KNOX:  I was speaking more, Judge, to 358.

 1    I'm not sure I have an objection to 360.

 2            THE COURT:  Okay.  362, any additional objection?

 3            MR. CHRIS KNOX:  No, Your Honor.  I don't have any

 4    objection.

 5            THE COURT:  All right.  358, 360 and 362 are admitted

 6    with the modification the Court required on 358.

 7            Okay.  You got 10 minutes.

 8            (Court recessed from 3:19 PM until 3:25 PM.)

 9            COURT SECURITY OFFICER:  All rise for the Jury.

10            (Jury seated in the jury box.)

11            THE COURT:  Be seated, please.  Thank you.

12    Mr. Raybould, you may continue.

13            MR. RAYBOULD:  Thank Your Honor.

14                    CONTINUED DIRECT EXAMINATION

15    QUESTIONS BY MR. RAYBOULD:

16    Q    Before the break we were talking about your continued

17    work with Dr. Simmons.  Do you recall that?

18    A    Yes, I do.

19    Q    And that continued after May of 2015?

20    A    It did.

21    Q    Okay.  And I'm placing on the Elmo what's been

22    admitted ---

23            THE COURT:  Oh, I'm sorry.  I admitted three exhibits

24    while you were out:  358, 360 and 362.

25            MR. RAYBOULD:  May I proceed, Your Honor?

```
 1              THE COURT:  Yes.

 2    Q    (By Mr. Raybould) Exhibit 358 here I'm placing on the

 3    Elmo.  And is there -- Do you see the e-mail account "Trilogy

 4    Pharmacy" there at the top?

 5    A    I do see that, yes.

 6    Q    Okay.  Is that an e-mail account that you had control of?

 7    A    It is.

 8    Q    And who were you e-mailing with?

 9    A    I was e-mailing Dr. Walter Simmons, along with our

10    Pharmacist-in-Charge at the time, Clint Hopkins.

11    Q    And the date of this?

12    A    September 22nd, 2015.

13    Q    So this is after TRICARE has shut down?

14    A    That's correct.

15    Q    And you're continuing to work with Dr. Simmons?

16    A    Correct.

17    Q    If we could go to Page 3 of that exhibit, do you see a

18    patient "Derrick Perry"?

19    A    I do.

20    Q    And his address is Killeen, Texas?

21    A    Correct.

22    Q    And down at the bottom of Page 3 of Exhibit 358, do you

23    see Dr. Simmons' signature?

24    A    I do.

25    Q    And what's the date of that?
```

1    A    September 16th, 2014.

2    Q    Okay.  And what are you continuing to work with

3    Dr. Simmons on?

4    A    Filling prescriptions.  Much later on, it was chronic

5    care management.

6    Q    I'm going to put Exhibit 360 on the Elmo here.  What's

7    the date of this e-mail between you and Dr. Simmons?

8    A    October 16th, 2015.

9    Q    And what is Dr. Simmons providing you, if anything?

10   A    He's indicating that he's proud to be part of the

11   SmartCCM team.

12   Q    And does Dr. Simmons provide a copy of a voided check?

13   A    He does.

14   Q    Okay.  Page 2, does Dr. Simmons provide a copy of a W-9?

15   A    He did, yes.

16   Q    Okay, on Page 3.  And it looks like that signature is

17   September 11th, 2015?

18   A    Correct.

19   Q    Okay.  And does Dr. Simmons provide you with an invoice?

20   A    He did.  That was for his consulting fees, and it doesn't

21   look like there was any travel included; just a ballpark --

22   just a whole number of $20,000.

23   Q    And what's the date?

24   A    October 31st, 2015.

25   Q    Were you aware that CMGRx was working with other

1    pharmacies?

2    A    Yes.

3    Q    Okay.  How were you aware of that?

4    A    I had just heard.  I don't remember who from specifically

5    but I was aware of it.

6    Q    Why did you continue to work with CMGRx if you had heard

7    that other pharmacies were involved?

8    A    We were still making plenty of money.

9    Q    I'm placing on the Elmo Exhibit 6 here, and we talked

10   about this briefly.  Exhibit 6, is that a payment from Trilogy

11   to CCMGRx?

12   A    It is.

13   Q    And was this a payment before the W-2 type arrangement?

14   A    I don't -- Let's see here, 2014.  No.  I think that would

15   have been W-2 wages.

16   Q    Okay.  If we could go to Page 3 here.  The top, do you

17   see your account?  One second.

18   A    I do, yes.

19   Q    Okay.  And you see the amount of $133,000?

20   A    I do, yes.

21   Q    Okay.  Payment back to CCMGRx was for referrals?

22   A    Correct.

23   Q    We've talked a lot about your role, correct?

24   A    Yes, we have.

25   Q    And are you hoping in some way to benefit from your

1    testimony?

2    A    I'm really just looking to put this all behind me, and

3    the best way I know how to do that is to simply come in here

4    and tell the truth.

5    Q    Okay.  And are you sorry for what you did?

6    A    I am; very much so.

7    Q    Okay.  And why are you sorry?

8    A    Because it was wrong.  And I think what we did, by taking

9    all this money out of the TRICARE system is -- ultimately

10   leads to worse patient outcomes rather than better.

11   Q    When you set out to embark in your career in the

12   healthcare field, was that your goal?

13   A    No, it certainly wasn't.

14   Q    Well, what happened along your journey?

15   A    I just got greedy.

16   Q    And are you sorry for what you've done?

17   A    Very much so, yes.

18   Q    Okay.  Tell the jury.

19   A    I am very sorry for what I've done.  It was wrong.  I

20   can't say specifically that people were hurt, but I guess

21   people were hurt in some way, shape or form.  But not only did

22   we hurt active and retired men and women that served in our

23   Armed Forces but we hurt our country.

24           MR. RAYBOULD:  I'll pass the witness, Your Honor.

25           THE COURT:  Cross Examination?

```
 1                    CROSS EXAMINATION

 2   QUESTIONS BY MR. CHRIS KNOX:

 3   Q    Mr. Baumiller, my name's Chris Knox.  I represent

 4   Mr. John Cooper.  Excuse me.  I've been a little bit under the

 5   weather, so if you can't hear me or I'm not clear, just ask me

 6   and I'll rephrase it.  Okay?

 7   A    Okay.

 8   Q    You spoke with the prosecutors about meeting with the

 9   Government and what you indicated to the Government when you

10   first spoke with them.  Do you recall that?

11   A    That's correct.

12   Q    And where did you first speak with them?

13   A    At my home.

14   Q    Okay.  And how many people were in the room with you?

15   A    It was me and two individuals from the FBI.

16   Q    Okay.  Did you have a lawyer with you?

17   A    No.

18   Q    Okay.  Did they give you any kind of protection

19   agreement?  "You do this and this is what we'll do for you"?

20   A    No.

21   Q    Any kind of deal where, you know, "We're not going to

22   hold this against you"?

23   A    No.

24   Q    Okay.  So they show up, knock on the door; "Can we talk

25   to you"?  Is that how it happened?
```

1    A    Yes.

2    Q    And you say, "Absolutely; come in"?

3    A    Yes.

4    Q    And you all sit down in your living room or kitchen

5    table?

6    A    That's correct.

7    Q    Where?

8    A    I sat down on the floor and they sat down -- No.

9    Actually, I sat down on the one sofa and I think they were

10   sitting on the other sofa.

11   Q    Okay.  How long did the conversation last?

12   A    Three to four hours.

13   Q    So in the privacy of your own living room, two agents,

14   three to four hours, talking about everything as it pertained

15   to Trilogy and at this point CMGRx, Mr. John Cooper, and

16   probably Richard Cesario at this point.

17   A    Correct.

18   Q    Okay.  And you were adamant, very clear, completely and

19   totally that they were, in fact, employees of Trilogy

20   Pharmacy.

21   A    I believe I did say that, yes.

22   Q    And during your Direct testimony today you answered a lot

23   of questions as it pertains to employment, so I'm going to ask

24   you a couple specifically about that topic to start.  Okay?

25   A    Okay.

1    Q    You said that you had never met Joe Straw and, thus, he

2    couldn't have been an employee of Trilogy; correct?

3    A    I did say that, yes.

4    Q    Does the fact that you never met Joe Straw in any way,

5    shape or form change the likelihood that he could legally be

6    an employee of Trilogy Pharmacy?

7    A    Not to my knowledge, no.

8    Q    Okay.  You said you had never met Luis Rios, so he

9    couldn't possibly be an employee of Trilogy Pharmacy; correct?

10   A    I did say that, yes.

11   Q    Okay, same question.  Does the fact that you had never me

12   Luis Rios in any way, shape or form change the likelihood that

13   he could be a legal employee of Trilogy Pharmacy?

14   A    No.

15   Q    You paid them W-2s; Trilogy Pharmacy did.

16   A    Correct.

17   Q    Does the fact that you paid them W-2s have any effect on

18   the likelihood that they are legal employees of Trilogy

19   Pharmacy?

20   A    I believe so, yes.

21   Q    Okay.  You talked about or you testified how you paid

22   Mr. Cooper a 1099.  Is that correct?

23   A    Correct.

24   Q    Those tax -- A "1099" refers to a tax document, does it

25   not?

1   A    Correct.

2   Q    Have you seen any 1099s from you to Mr. John Cooper?

3   A    No.

4   Q    Okay.  Because they don't exist, do they?

5   A    I don't believe so.

6   Q    Okay.  Mr. John Cooper received payment from Trilogy

7   Pharmacy only as a W-2 employee, correct?

8   A    Early on he would have received payments that were not

9   via W-2.

10  Q    That would not have been W-2?

11  A    Correct.

12  Q    Were they included on his W-2 tax document that he

13  received?

14  A    No.

15  Q    They were not?

16  A    No.

17  Q    So they were not 1099'd.

18  A    No; correct.

19  Q    They were not included on his W-2.

20  A    Correct.

21  Q    To prepare the W-2 is the responsibility of the employer,

22  is it not?

23  A    Correct.

24  Q    And so all of these specific individuals that are W-2

25  employees of Trilogy are having their taxes withheld, aren't

1  they?

2  A    Correct.

3  Q    And so Trilogy -- What that means is Trilogy literally

4  withholds some of their money when they pay them their

5  paychecks.

6  A    That's correct.

7  Q    And we saw in the overhead an exhibit that listed a whole

8  bunch of payments to the various W-2 employees of Trilogy,

9  right?

10 A    Correct.

11 Q    And Trilogy had a lot of W-2 employees, didn't it?

12 A    We did.

13 Q    Not just at CMGRx, not just at Trilogy main headquarters,

14 but other places, didn't they?

15 A    That is correct.

16 Q    Okay.  Did the agents ask you about those W-2 employees

17 when they spoke with you in your living room?

18 A    They did.

19 Q    They did?

20 A    Yes.

21 Q    Okay.  When do you think that -- This is not a trick

22 question, but do you recall the date?

23 A    Of that interview?

24 Q    Yes, sir.

25 A    I think it was a day or two after John and Rich were

1    arrested.

2    Q    Okay.  Was it, I mean, April 13th, 2016?

3    A    I don't recall specifically.

4    Q    Okay, sure; fair enough.  And so Trilogy Pharmacy

5    withholds the taxes that are due to these W-2 employees.

6    What -- In your estimation, what would happen if Trilogy

7    didn't pay those taxes for those employees and, instead, you

8    just skipped town with the money?

9    A    That would be some type of fraudulent activity with the

10   IRS.

11   Q    And they would come to you as the employer first,

12   wouldn't they?

13   A    They would, yes.

14   Q    So there was times when you had discussions with people

15   at CMGRx, specifically maybe Adam Still, if you recall, asking

16   you, "Do you really have to withhold everybody's money?"  Do

17   you recall that?

18   A    Yes.

19   Q    And do you recall telling him, "I do because if I don't,

20   the IRS is going to come to the employers first"?

21   A    Correct.

22   Q    Okay.  In other words, if I don't withhold the money

23   under W-2 and then this employee is later unable to pay his

24   tax bill, the IRS is first going to come to the employer.

25   A    Correct.

1    Q    Meaning Trilogy Pharmacy.

2    A    Correct.

3    Q    Okay.  And who was "Adam Still"?

4    A    He was their bookkeeper/CFO when they first got started.

5    Q    Excuse me.  He was the bookkeeper and accountant for

6    CMGRx.

7    A    Correct.

8    Q    Hired by John Cooper with a "C."

9    A    Correct.

10   Q    He was not there when Trilogy Pharmacy was engaged in

11   doing business only with Mr. Cesario, was he?

12   A    No.

13   Q    John Cooper brought him on, didn't he?

14   A    I believe so.

15   Q    John Cooper brought on Scott Meyer, didn't he?

16   A    I believe so.

17   Q    Who is "Scott Meyer"?

18   A    He was their business attorney.

19   Q    Okay.  Scott Meyer specifically represented John Cooper,

20   Richard Cesario, CMGRx; correct?

21   A    I believe he did, yes.

22   Q    And Frier Levitt was counsel for Trilogy Pharmacy.

23   A    Correct.

24   Q    Okay.  Scott Meyer and lawyers from Frier Levitt had

25   multiple discussions about the business arrangement, didn't

1    they?

2    A    I had one conversation with Scott Meyer.  I had multiple

3    conversations with Frier & Levitt.

4    Q    Okay.  As you sit on the witness stand, are you familiar

5    with how many conversations Scott Meyer had with Frier Levitt?

6    A    No, I don't believe he had any.

7    Q    Did you -- Do you recall receiving billing statements

8    from Frier Levitt?

9    A    Yes.

10   Q    And they -- I mean it's a form statement.  They look the

11   same other than the work that had been completed, right?

12   A    Correct.

13   Q    Okay.  And they were addressed to you.  Were you the

14   point of contact there for Frier Levitt?

15   A    I was.

16   Q    And I think you said that your title was Compliance

17   Officer --

18   A    Correct.

19   Q    -- and President.

20   A    CEO.  I don't know if I was President.

21   Q    Okay, CEO.  Let me focus briefly on just Trilogy.  How

22   did it get started?

23   A    Really when we left Baton Rouge and we moved out of

24   Biotechnology, we were teaching physicians how to do

25   anti-aging programs for men and women.

1    Q    Okay.  Let me stop you just because it's easier to

2    digest.  Who is "we" here?

3    A    "We" is me, Jeff Fuller and CD Parks.

4    Q    Okay.  And you all left Baton Rouge together?

5    A    CD Parks was not with us in Baton Rouge.

6    Q    CD Parks became the actual -- I mean he is the Head

7    Pharmacist.

8    A    Yeah; Pharmacist-in-Charge, yes.

9    Q    And -- And CD Parks has a reputation in compounding

10   pharmacy.

11   A    To some extent.  It was really with the vitamins and

12   nutritional, things like that.

13   Q    He's very well known as being very good at what he does.

14   Is that correct?

15   A    That's very true, yes.

16   Q    Okay.  So Trilogy Pharmacy was not just a, you know,

17   "Hey, why don't we hang a shingle and start telling people

18   we're going to mix some things up for them."

19   A    That's correct.

20   Q    It was a very legitimate compounding pharmacy business.

21   A    You could say that, yes.

22   Q    Okay.  And when this started, was compounding pharmacy --

23   Is there -- Is there something bad or nasty about compounding

24   pharmacies?

25   A    Not generally speaking, no.

1    Q    Okay.  I mean it's a very widely-accepted practice, isn't

2    it?

3    A    To some extent.

4    Q    Okay.  And so you guys thought, "Let's do this," and a

5    lot of your business was -- pertained as much to anti-aging

6    and cosmetology-type work as it did compounding pharmacy.

7    A    So the compounds we were making in the beginning were for

8    cosmetology and anti-aging.

9    Q    Okay.  And you all continued to do stuff like that,

10   specifically even with medical operations, right?

11   A    We did.

12   Q    Okay.  So when Trilogy starts, did you all have any --

13   any business to begin with or did you have to drum it up on

14   your own?

15   A    We drummed it up on our own.

16   Q    And you had an arrangement with what was the -- you

17   referenced it with the prosecution, the other marketing group

18   at this point, Blue ---

19   A    Blue Star Biotech.

20   Q    And I don't want to focus on them long, but you had that

21   relationship, and at some point you learned from counsel that

22   this arrangement as independent contractors could certainly be

23   viewed as unlawful.

24   A    Correct.

25   Q    And that's what caused you to kind of break off from them

1    and spurge you into tracking down a better law firm.

2    A    Correct.

3    Q    And so during that, you probably did what most people do.

4    You started asking questions, looking on the Internet and

5    everything pointed you to Frier Levitt.

6    A    That's correct.

7    Q    Because they are the pinnacle of healthcare.

8    Specifically as it pertains to pharmaceuticals and compounding

9    pharmacies in the United States of America.

10   A    They had a lot of information online.

11   Q    Okay.  And so you made contact with them and you get

12   together with them and you start explaining to them what it is

13   you want to do.

14   A    Correct.

15   Q    And they told you at that point that the business

16   structure you had with Blue Star was probably not the way to

17   go?

18   A    To some extent.  I mean the general idea back then was

19   that with commercial and private insurance, at least in most

20   states, you could get away with an independent contractor

21   model.  But if you're going to do any federally or

22   state-funded healthcare programs, anyone you're paying

23   commissions has to be a bona fide W-2 employee.

24   Q    Okay.  And we're -- we're going to go through the

25   progression, but what Frier Levitt told you is, "This

1    arrangement with Blue Star is probably not the way to go."

2    A    Correct.

3    Q    And I'm, obviously, making it very simplistic.  That was

4    the gist.

5    A    Correct.

6    Q    Okay.  And then they write you a legal opinion.

7    A    They do; they did.

8    Q    In fact, that legal opinion is 20 pages.  It is dated May

9    7th of 2014.

10   A    I believe it's dated that, yes; correct.

11   Q    That legal opinion became something that you showed

12   everybody in which you were trying to engage a business

13   contract.

14   A    If they requested it from me, I did show it to them, yes.

15   Q    Okay.  Now on Direct Examination I believe that you said

16   or maybe the prosecutor hinted and you went with it that that

17   legal opinion said what you were doing here was unlawful?

18   A    Basically, yeah.

19   Q    That's the -- Okay.  That's the opinion that you're

20   sharing with people that I know the date of --

21   A    Correct.

22   Q    -- that's 20 pages long.

23   A    Correct.

24   Q    And you're now saying it says what you were doing was

25   unlawful.

1   A    I didn't really read it closely at the time, but looking

2   back on it, yes, I realize that it said what we had done was

3   unlawful.

4   Q    Okay.  That legal opinion takes you through the

5   Anti-Kickback Statute.

6   A    Correct.

7   Q    Takes you through various arrangements that you can have

8   as a compounding pharmacy.

9   A    Correct.

10  Q    And it tells you if they are W-2 employees, they can be

11  paid by commission.

12  A    It said if they're bona fide employees.

13  Q    Okay.  Now "bona fide employees," the very first time

14  that you've actually had a very significant discussion about

15  that and what that means to you is with the Federal

16  Government, isn't it?

17  A    No.  I discussed it with attorneys prior to that.

18  Q    Okay.  And when you disclosed it to them, you disclosed

19  it to them specifically in writing as it pertains to what's

20  going on with your arrangement with CMGRx.

21  A    I didn't give them specifics.  I told them what we were

22  doing generally and that we were paying commissions for

23  prescriptions and what type of legal risks were we subject to

24  at that point.

25  Q    Okay.  Let me ask you some questions to be fair here.

```
 1    When was the last time that you went through your e-mails?

 2    A    It's been a while.

 3    Q    Maybe some since you wrote them?

 4    A    Yes; correct.

 5    Q    So you haven't seen a full slot -- thing of discovery in

 6    this case.

 7    A    Correct.

 8    Q    And you've met with the Government how many times since

 9    you first were arrested?

10    A    Three or four times; maybe five.

11    Q    Was one of them Tuesday of this week?

12    A    Yes.

13    Q    At the jail?

14    A    Correct.

15    Q    Did you or -- You visited with the agents, correct?

16    A    I did, yes.

17    Q    How long was that visitation?

18    A    Sixty to ninety minutes.

19    Q    Did they take notes?

20    A    I'm not sure if they did.

21    Q    Okay.  Could you see them?

22    A    They -- The people from the Government, yes.

23    Q    Okay.  And you don't know that they took notes?

24    A    I don't know if they wrote anything down.

25    Q    Did they go over documents with you?
```

1    A    I don't recall seeing any documents.

2    Q    Okay.  But in these four to five meetings prior to -- to

3    Tuesday, they've shown you a lot of documents.

4    A    Yes; correct.

5    Q    More than 100?

6    A    Probably so.

7    Q    Okay.  Somewhere roughly around that; probably more than

8    100?

9    A    Probably more than 100, yes.

10    Q    More than 200?

11    A    That, I don't know.

12    Q    Okay.  But a significant amount.

13    A    (Affirmative gesture).

14    Q    Did they ever show you e-mails that you specifically

15    referenced the study, employment, CMGRx morphing to a charity

16    that you've sent to Frier & Levitt in writing?

17    A    I don't know if they showed me those, but I vaguely

18    recall sending e-mails like that, yes.

19    Q    Okay.  Did they -- Did they ever show you that around the

20    exact same time on those Frier Levitt billing invoices that

21    Frier Levitt has included that they had conference calls with

22    Scott Meyer and spoke with you and Mr. Cooper about morphing

23    this study that they've been aware of into a charity?

24    A    That, I don't recall.

25         MR. RAYBOULD:  Objection to hearsay.

```
 1              THE COURT:  Sorry.

 2   Q    (By Mr. Chris Knox) Were you ever shown that billing

 3   invoice?

 4   A    I don't remember.

 5   Q    Okay.  So just to make sure that we're clear on some

 6   timeline stuff, you met with Mr. Cesario, maybe introduced to

 7   him in some way, shape or form as late -- as early as late

 8   2013.

 9   A    Correct.

10   Q    Certainly by early 2014.

11   A    Yes.

12   Q    He comes to Trilogy Pharmacy.

13   A    Correct.

14   Q    Okay.  And at that meeting specifically, the first time

15   it is you and Mr. Jeff Fuller.

16   A    I wasn't in the first meeting.  I just kind of passed

17   through and said "hi" and "bye."

18   Q    Okay.  Mr. Fuller?

19   A    I believe he was in that meeting, yes.

20   Q    And Mr. Ken Reilly?

21   A    Correct.

22   Q    And Mr. Cesario.

23   A    Correct.

24   Q    And Dr. Ali was probably at the first meeting as well.

25   A    And Dr. Darren Claire as well.
```

1    Q    And Dr. Darren who?

2    A    Darren Claire.

3    Q    Okay.  And Cesario is given an overview on the healthcare

4    pharmacy compound prescription industry.

5    A    I believe that was provided to Rich at that time.

6    Q    Okay.  And at that point in time he specifically made you

7    guys or whoever's in the room still at this point aware of his

8    wife?

9    A    That wasn't at that meeting.  I don't know.

10   Q    Okay.  Do you recall telling the agents that happened at

11   the first meeting?

12   A    I don't believe I did, no.

13   Q    Okay.  Did Dr. Ali give a PowerPoint presentation about

14   how compounds worked?

15   A    Later on, yes.

16   Q    Okay.  Not at the first meeting?

17   A    I don't think it was at the first meeting, no.

18   Q    Okay.  So there's a second meeting.

19   A    There was many meetings after that, yes.

20   Q    Second meeting with just Mr. Cesario and Mr. Reilly?

21   A    No.  It would have been, I believe, just me, Dr. Ali and

22   Richard.

23   Q    Okay.  And at that point there's a PowerPoint, and at

24   that point Mr. Cesario tells you about his wife.

25   A    Yeah, I think he would have shared his story then.

1    Q    Okay.

2    A    He may have shared a story to everyone at that first

3    meeting, but like I said, I wasn't at the first meeting.

4    Q    Sure.  And then there was a third meeting where it was

5    only you and Mr. Cesario.

6    A    That probably happened, yes.

7    Q    Okay.  And all of this is before Mr. Cooper is involved.

8    A    Yes.

9    Q    And when you first described Mr. Cooper, you said he was

10   an investor?

11   A    I believe he did invest, yes.

12   Q    Okay.  Well, you know that when Mr. Cooper's

13   involvement -- John Cooper; sorry, Your Honor -- became

14   involved is because Mr. Cesario needed money.

15   A    Correct.

16   Q    And he told that you that, "I'm going to line up some

17   investors.  Specifically, I'm going to try and get

18   Mr. John Cooper who I know has some money to invest in this."

19   A    Yeah.  He told me they were going to be 50/50 business

20   partners.

21   Q    Okay.  And at that point in time he didn't have

22   Mr. Cooper involved.

23   A    Correct.

24   Q    And so Mike Quarders had been where Mr. Cooper was going

25   to be.

1   A    Now that -- Oh, I'm sorry; yeah.  Mike Quarders was in

2   John Cooper's place at the time, yes.

3   Q    Okay.  And there was actually a CMGRx where Quarders was

4   49 percent owner and Cesario was 51.

5   A    That may be the case.

6   Q    Okay.  And so from that point, Mr. Quarders eventually

7   is -- moves on his way, goes to Arizona and doesn't come back;

8   correct?

9   A    Yes, that's correct.

10  Q    And Mr. Cooper, who Mr. Cesario has already told you he's

11  going to try and recruit to this, takes Mr. Quarders' place.

12  A    Correct.

13  Q    And he brings an injection of capital so that CMGRx can

14  try and get off the ground.

15  A    That's correct.

16  Q    And at that point in time Trilogy certainly didn't want

17  to float them the capital because what if these guys have no

18  idea what they're doing and it turns out to be a disaster.

19  A    True.

20  Q    And when Mr. Cooper comes in, he is given the 20-page

21  legal opinion.

22  A    Correct.

23  Q    Okay.  Sorry; you have to answer for the court reporter.

24  A    Yes; correct.

25  Q    He's given the short PEO summary, term summary sheet from

```
 1   Frier Levitt; two pages.

 2   A    That I don't recall.

 3   Q    Okay.  PEO was the business model you were setting up.

 4   A    We were talking about it, yes.  We weren't actually going

 5   through and setting it up.

 6   Q    Well, there's signed documents for it, aren't there?

 7   A    I think they gave me those documents.  I mean I don't

 8   know if I signed it or not.

 9   Q    Okay.

10        MR. CHRIS KNOX:  Mr. Slyter, can we get -- it's

11   already admitted -- Cooper Exhibit 19?

12   Q    (By Mr. Chris Knox) Okay.  You see this e-mail here?

13   A    Correct.

14   Q    That's from you to Ken Reilly, Richard Cesario.

15   A    (Affirmative gesture).

16   Q    And it's on June 24th.

17   A    Correct.

18        MR. CHRIS KNOX:  Can we go to Page 2?  And zoom out,

19   if you could.

20   Q    (By Mr. Chris Knox) And it starts here with the breakdown

21   of the Federal Anti-Kickback Law?

22   A    It looks like that, yes.

23   Q    Right?

24   A    Correct.

25   Q    And it says, "knowingly, willfully solicit, receive
```

1  remuneration in return," and it breaks down what it means;

2  correct?

3  A    Correct.

4  Q    Okay.  And it says, "Specifically, the use of independent

5  contractors, referred to as 1099 agents, who are paid a

6  commission based on revenue derived from referrals generated

7  by the contractor have been found to have violated the

8  Anti-Kickback Statute."

9  A    Correct.

10  Q    And then it goes through some carve-outs, right?

11  A    Correct.

12  Q    Okay.  And it says specifically there's Safe Harbor

13  provision relative to this discussion, right?

14  A    Correct.

15  Q    And it's the "Bona Fide Employee Safe Harbor."

16  A    That's correct.

17  Q    Okay.  And this is all actually discussed in the 20-page

18  legal opinion.

19  A    I believe it is, yes.

20  Q    And so when I say earlier that the first time that you

21  really had any relevant indepth discussion and thought about

22  what "bona fide employee" meant was when you spoke with the

23  Government, wasn't it?

24  A    No.  I thought -- I had thought about it prior to then.

25  Q    Okay.

1    A    What I had been ---

2    Q    Based on the writings, right?

3    A    Yeah.  What I had been thinking about is the IRS's

4    21-factor test --

5    Q    Okay.

6    A    -- of whether someone is a bona fide employee or not.

7    Q    Now -- Fully understand.  Now there are multiple tests,

8    aren't there?

9    A    I don't know if there's multiple tests.

10   Q    Okay.  Let me ask you this:  Will you agree with me that

11   this is an extremely complex area of law?

12   A    Yes.

13         MR. CHRIS KNOX:  If we could go down to the bottom of

14   this page, please.

15   Q    (By Mr. Chris Knox) And, "The determination of whether an

16   employer/employee relationship exists is not stipulated in the

17   Safe Harbor.  Rather, the Office of Inspector General, who is

18   the Government actor charged with enforcing the Anti-Kickback,

19   defers to the IRS;" right?

20   A    Correct.

21   Q    The IRS provides a 13-factor test, correct?

22   A    I thought there was more factors than that.

23   Q    Okay.  But now you see there's 13, right?

24   A    Correct.

25   Q    Okay.  And this is from Frier Levitt.

```
 1    A    I believe this document is from Frier & Levitt, yes.

 2    Q    Okay.  And they provided this to you specifically in

 3    response to your query about this --

 4    A    Correct.

 5    Q    -- or your inquiry.  And so then, if we could scroll all

 6    the way down to Section (C).  "A PEO is typically an

 7    organization that exists to hire a client's employees as its

 8    own and subleases or leases the employees back to and/or

 9    shares the employees with the client," correct?

10    A    Correct.

11    Q    "The specific structure requirements, such as

12    registration and all that, vary by state;" right?

13    A    Correct.

14    Q    "However, the IRS recognizes a unique status when an

15    individual is employed by a PEO, yet works for their client;"

16    right?

17    A    Correct.

18    Q    The client would be Trilogy.

19    A    Correct.

20    Q    The PEO would be CMGRx.

21    A    In that case, yes.

22    Q    Okay.  The IRS classifies these types of individuals as

23    co-employees of the PEO and the client.

24    A    That's what it says.

25    Q    Okay.
```

1    MR. CHRIS KNOX:  If we could go to Page 2 or I guess

2  the next page of this, and we'll take it at (D).

3  Q    (By Mr. Chris Knox) "In the context of a pharmacy/sales

4  representative relationship, a PEO could hire the sales

5  representatives, co-employ them with one or more pharmacies,"

6  right?

7  A    Correct.

8  Q    That's what happened here, wasn't it?

9        Well, let me break that down.  Mr. Cooper worked for

10  more than one pharmacy.

11  A    He did.

12  Q    Okay.  And his sales representatives are bona fide

13  employees of both the PEO and the pharmacy.  And assuming Safe

14  Harbor requirements are met, the relationship would be swept

15  within the Safe Harbor, and the pharmacy could compensate the

16  sales representatives based on performance, right?

17  A    That's what it says, correct.

18  Q    Okay.  Now I'm going to read you the beginning of that

19  first sentence that's not highlighted.  This is from Frier

20  Levitt.  They say, "As the sales representatives are bona fide

21  employees of both the PEO and the pharmacy," based on

22  everything that we just included above in this PEO summary

23  term sheet from your lawyers, doesn't it?

24  A    Correct.

25  Q    Okay.  And this document is given to Mr. Cooper at this

1    business meeting, isn't it?

2    A    I don't know if it was.  I don't recall that.

3    Q    Okay.  Do you know if it was e-mailed to Mr. Cooper by

4    Mr. Cesario?

5    A    More than likely, either Richard or I e-mailed it to

6    John Cooper, yes.

7    Q    Okay.  As well as this 20-page legal opinion.

8    A    That's correct.

9    Q    That you now say -- and I don't necessarily doubt you --

10   that you hadn't read, right?

11   A    I just glanced at it.

12   Q    But that you sent this, Mr. Baumiller, did you not, to

13   other marketers at other times that you were trying to get to

14   sign a contract with Trilogy?

15   A    To do business with us, yes.

16   Q    Okay.  Certainly you wouldn't have sent them a document

17   that at the time you had an impression said that you were

18   breaking the law.

19   A    Correct.

20   Q    And at the bottom here it puts it all into -- as bullet

21   pointed as it could be, the "Summary."

22           "The structuring of a PEO will allow the PEO to

23   co-employ the sales force of Trilogy as well as become a bona

24   fide employer of the sales representatives.

25           In addition to contracting with the co-employees, the

1    PEO will contract with each individual pharmacy, and initially

2    Trilogy, but that arrangement can be extended to other

3    pharmacies," correct?

4    A    Correct.

5    Q    "The PEO will then share, or co-employ, the employee with

6    the pharmacy to perform these designated services."

7    A    Correct.

8    Q    "And to compensate the employee for his or her services,

9    the PEO will provide any payment and benefits to the employees

10   and will recover these costs, plus any applicable overhead and

11   expenses, from the contracted pharmacies;" right?

12   A    Correct.

13   Q    "And the bona fide employment relationship between the

14   PEO and the co-employee will protect the co-employer pharmacy

15   by placing its co-employment relationship within the

16   Anti-Kickback Safe Harbor.  In doing so, compensating the

17   sales force will not be considered a crime under federal and

18   most state laws."

19   A    Correct.

20   Q    And this is what is presented to get this business model

21   rolling.

22   A    I believe it was, yes.

23   Q    Okay.  Now this was occurring, your meetings with

24   Mr. Cesario, are occurring sometime in early 2014 and leading

25   up through July of 2014; right?

```
 1   A    That sounds correct, yes.

 2            MR. CHRIS KNOX:  And if we could go to Cooper Exhibit

 3   65, please, which is already in evidence.  I'm sorry.  That's

 4   not it.  I may have mislabeled it.

 5            Okay.  I believe -- I believe 65 is what I'm looking

 6   for.  That's it.  Thank you.  Mr. Slyter, if we could cover

 7   that briefly.  Okay.  We can put it back up.  I apologize.

 8   Q    (By Mr. Chris Knox) And this is an e-mail from you to

 9   Mr. John Cooper, right?

10   A    Correct.

11   Q    And has new employee forms for Mr. Cooper.

12   A    Correct.

13   Q    Has his Employee Handbook, has his Form I-9, his W-4 and

14   his Associate Agreement, right?

15   A    Correct.

16   Q    Okay.  Now one thing you testified on Direct that I'd

17   like to go through with you is that:  The handbook was sent

18   because you didn't want to lose a contract with a PBM?

19   A    Correct.

20   Q    Okay.

21   A    That was the primary reason.

22   Q    Okay.  Now let me ask a couple of questions on that.  I

23   believe that you're referring to specifically stuff that you

24   had had with Caremark.

25   A    Caremark or really any other PBM.
```

 1          MR. RAYBOULD:  Objection, Your Honor.  The defense

 2   attorney is testifying; "I believe."

 3          THE COURT:  Yes; overruled.

 4   Q    (By Mr. Chris Knox) Did the Caremark contract -- Does

 5   that specifically pertain to what you're talking about here

 6   with losing it with the PBM?

 7   A    I mean we did lose a Caremark contract, but we would want

 8   to protect our contracts with any PBM.

 9   Q    Okay.  You would agree with me that at no point in time

10   ever was there a discussion with Mr. John Cooper about you

11   wanting to send a handbook so that you could protect your

12   contract with PBMs?

13   A    We may have actually had that conversation.

14   Q    Was there ever -- put in writing anywhere?

15   A    No.

16   Q    So -- So that we can break this down in a digestible

17   manner, "PBM" is a "Pharmacy Benefit Management."

18   A    Correct.

19   Q    And what they do is they oversee a healthcare plan.

20   A    They specifically oversee a pharmacy benefit, correct.

21   Q    Okay.  In laymen's terms, they determine adjudication;

22   whether it should be paid out on medicines.

23   A    Correct.

24   Q    Whether a healthcare coverage plan covers a specific

25   procedure for this specific insured individual.

1  A    Yeah, a specific drug.

2  Q    Okay.  So as it pertains to this case, Express Scripts is

3  TRICARE's PBM.

4  A    Correct.

5  Q    And so that's what that means.  You didn't want to lose a

6  contract with TRICARE.

7  A    In the event of an audit, we would not want Express

8  Scripts to cancel all of our contracts with Express Scripts,

9  including TRICARE.

10 Q    Did you go through a very extensive audit for Caremark?

11 A    We did, yes.

12 Q    Did you go through a very extensive audit for Caremark

13 around the same time that all of this stuff is going on with

14 CMGRx and TRICARE?

15 A    That could be the case.

16 Q    So specifically -- More specifically, from at least late

17 2014 through early to mid-2015, Trilogy Pharmacy is going

18 through an audit for Caremark PBM.

19 A    Correct.

20 Q    Caremark PBM is associated with CVS?

21 A    Correct.

22 Q    And it was a pretty extensive audit.

23 A    Extensive what?

24 Q    Audit.

25 A    Yeah, but all the audits with the PBMs are pretty

1    extensive, yes.

2    Q    Sure.  And at that point in time, in this exact same time

3    period as you're dealing with CMG, Frier Levitt is

4    representing Trilogy in their audit with Caremark.

5    A    Correct.

6    Q    And so Frier Levitt is certainly aware of whatever issues

7    Caremark is bringing to you, saying, "This may have violated

8    our contracts."

9    A    Correct.

10   Q    Frier Levitt knows exactly what those are.

11   A    At that time it was specifically copays.

12   Q    Okay.  But that was the issue.

13   A    Copays, yes.

14   Q    And Frier Levitt's aware of it.

15   A    Correct.

16   Q    And they are specifically representing you as it pertains

17   to that.

18   A    Yes.

19   Q    And they are also representing Trilogy as it pertains to

20   business dealings with CMGRx in setting this up as W-2 under a

21   PEO.

22   A    I don't think they thought we were setting up this PEO at

23   all.  We were really engaging these employees directly via the

24   pharmacy, via W-2.

25   Q    Well, we'll -- we'll get there, but they're -- Frier

1    Levitt is representing you on this business structure as well.

2    A    Yes.

3    Q    Simultaneously.

4    A    Simultaneously.

5    Q    Okay.  Does Caremark have any federally-funded programs?

6    A    They do.

7    Q    They do?

8    A    Yes.

9    Q    What is that?  Medicare and Medicaid or ---

10   A    Well, most of the major PBMs have some type of Medicare

11   Coverage, Part D, but Caremark specifically represents United

12   States Postal Workers.

13   Q    Okay.  Not TRICARE.

14   A    No.

15   Q    Okay.  So to the extent that you and I have discussed

16   Caremark as it pertains to this time period, it really has

17   absolutely nothing to do with this case.

18   A    Can you repeat that question?

19   Q    Sure.  The Caremark audit on Trilogy really is somewhat

20   outside the scope of CMGRx/TRICARE.

21   A    Correct.

22   Q    So to the extent that we've discussed it, it's because it

23   was happening contemporaneous to this; right?

24   A    Correct.

25   Q    And because Frier Levitt's involved in both.

1    A    Correct.

2    Q    And because today you have testified that you sent the

3    handbook to these employees so that it didn't affect your

4    contract with the PBM.

5    A    Correct.  That's one of the reasons.

6    Q    Okay.  If I haven't seen an e-mail of that anywhere, do

7    you think I've overlooked it?

8         MR. RAYBOULD:  Objection; outside the witness'

9    personal knowledge.

10        THE COURT:  Sustained.  Ask that question

11   differently.  Don't answer it, please.

12   Q    (By Mr. Chris Knox) Has the Government ever shown you a

13   single document where you have communicated in writing to an

14   individual that you sent the handbook so that you didn't

15   affect your contract with the PBM?

16   A    No.

17   Q    Okay.  Have they shown you multiple documents that

18   indicate that you sent the handbook to employees of Trilogy

19   Pharmacy because it's to remain in compliance with the law?

20   A    Correct.

21   Q    Have you told the Government before today that you sent

22   it because it had something to do -- sent the handbook to not

23   lose a contract?

24   A    Yes, I did.

25   Q    Okay.  So we've established the beginning of this

```
 1   timeline.  Specifically Mr. Cooper's involvement, at least on

 2   paper here, is August 18th, 2014.

 3   A    Correct.

 4   Q    And at some point in time you know he was shown the legal

 5   opinion as well as the PEO document, right?

 6   A    Correct.

 7   Q    And he has joined this by investing -- Do you know how

 8   much money he invested?

 9   A    I don't.

10   Q    Okay.  Do you know how much money they were shooting to

11   get invested or that Mr. Cesario was looking for?

12   A    No, I don't.

13   Q    You know Mr. Cooper was aware or made aware by

14   Mr. Cesario about his wife as well.

15   A    I believe he was, yes.

16   Q    Did you know that they had a credit card processing

17   business?

18   A    I think later on they did.

19   Q    Later on or before that?

20   A    I don't know if they did merchant services prior to

21   working with us.

22   Q    Okay.  And we're going to come back to these documents.

23   Do you recall being shown an exhibit on Direct Examination by

24   the prosecutor where it says, "We've made commitments to other

25   merchant services and we would like an advancement"?
```

1   A    Merchant services?

2   Q    Yes.

3   A    No, I don't recall that.

4   Q    Okay.

5        MR. CHRIS KNOX:  Could I have just one brief moment,

6   Judge?

7        THE COURT:  Yes.

8        (Pause)

9        MR. CHRIS KNOX:  Mr. Slyter, if we could go to

10  Government's Exhibit 128 and if we could zoom in on the top.

11  Q    (By Mr. Chris Knox) And Mr. Cooper says -- This is

12  October 23rd of 2014, right?

13  A    Correct.

14  Q    Okay.  And Mr. Cooper says, "I and Richard are confused

15  and a bit upset.  The discussion we had from last week was

16  that we would be paid in full what was due up until now.

17  Richard and I both interpreted this and confirmed this with

18  you.  We made commitments on other merchant services business

19  based on that discussion.  So roughly, this is the amount

20  owed;" right?

21  A    Correct.

22  Q    Okay.  You see that now?

23  A    I see it now, yes.

24  Q    Okay.  This sounds a lot like an employee asking his

25  employer to maybe abide by the conditions they talked about as

1    far as payment goes, doesn't it?

2    A    It could be interpreted that way.

3    Q    Okay.  Well, on Direct Examination you interpreted it as

4    Mr. Cooper asking for money back from copays; right?

5    A    That's what it is, yes.

6    Q    Okay.  Well, bear with me here.  Were you aware that they

7    had a merchant services business?

8    A    I had -- I wasn't aware they had started it at that time.

9    I really didn't know what he was talking about in this e-mail.

10   Q    You weren't aware that it preexisted any relationship

11   they had with you?

12   A    No.

13   Q    You weren't aware that Mr. Cesario specifically knew

14   Mr. Cooper from merchant services business way back when?

15   A    I didn't know they knew each other back then, no.

16   Q    Okay.  If Mr. Cesario has testified to that, if that has

17   been established testimony in this case, that would surprise

18   you?

19   A    Yes.

20        MR. RAYBOULD:  Objection, Your Honor.  Asked and

21   answered and outside the witness' personal knowledge, asking

22   him what other people testified to.

23        THE COURT:  All right.  Overruled.

24   Q    (By Mr. Chris Knox) Okay.  Now if I represent that to you

25   and you accept that as a fact for purposes of this question,

1   does that now make it a little bit more relevant that they're

2   asking for merchant service business?  That they made

3   commitments to -- in their merchant services business so they

4   need money to go ahead and pay that off?

5          MR. RAYBOULD:  Objection; asking the witness to

6   assume facts not in evidence.

7          THE COURT:  All right.  Overruled.  Ladies and

8   Gentlemen, the jury will recall the evidence.

9   A    Can you repeat that question?

10  Q    (By Mr. Chris Knox) Sure.

11  A    Okay.

12  Q    If you assumed that they do have a merchant services

13  business for purposes of this question, --

14  A    Correct.

15  Q    -- you could now read that as though they need some money

16  so that their other business can take an injection of capital.

17  A    Correct.

18  Q    Okay.  But, Mr. Baumiller, what -- what you spoke to was

19  copays here, right?

20  A    Is this the same e-mail?

21  Q    This is the one you answered with copays.  Do you recall

22  that?  In fact, you just did it again when I asked you the

23  question, right?

24  A    But I believe this is about copays.

25  Q    Okay.

1   A    It may not be; it may be.

2   Q    Okay.

3   A    Is this the same e-mail I looked at?

4   Q    This ---

5         MR. CHRIS KNOX:  Well, can we go to Government's 144,

6   please?

7   Q    (By Mr. Chris Knox) This was the next e-mail the

8   Government showed you.

9   A    Okay.

10  Q    And Mr. Cooper is asking you about copays.

11  A    Okay.

12  Q    Do you recall that?

13  A    I do.

14  Q    So the one right before this has absolutely nothing to do

15  with copays.

16  A    Correct.

17  Q    This one does, right?

18  A    Correct.

19  Q    But you answered the copay answer to the exhibit before

20  this one, didn't you?

21  A    I don't know if I did.

22  Q    Okay.  If that's what the record shows, would that

23  surprise you?

24  A    It may, yes.

25  Q    Is this one of the exhibits that was shown to you on

1   Tuesday?

2   A    No.

3   Q    Okay.  Was the exhibit right before this, which is

4   Government's Exhibit 128, shown to you on Tuesday?

5        THE COURT:  I know don't that Government 128 is in

6   evidence.  Is it?  All right.  Does everyone agree it is?

7        MR. RAYBOULD:  It's in, Your Honor.

8        THE COURT:  Okay.  Thank you.

9        MR. CHRIS KNOX:  Could we go back to 128, please,

10  Mr. Slyter?

11  Q    (By Mr. Chris Knox) Was this exhibit shown to you on

12  Tuesday?

13  A    No, it wasn't.

14  Q    Okay.  You understand my confusion there?

15  A    No, I don't.

16  Q    Fair enough.  Do you have -- Is there a box next to you?

17  Do you have Cooper Exhibit 226 in front of you?

18  A    I do.

19  Q    Okay.  Do you recognize that?

20  A    Yes.  It's an e-mail from one of our attorneys at Frier &

21  Levitt, Jesse Dresser, to one of the partners in the firm,

22  John Levitt, and me as well and it copied a few other

23  attorneys in the firm.

24  Q    Don't read from the document.  But do you recognize it to

25  be an e-mail between you and Frier Levitt?

1    A    Yes.

2            MR. CHRIS KNOX:  Your Honor, we'll offer Cooper

3    Exhibit 226 into evidence.

4            MR. RAYBOULD:  Objection; hearsay of lawyers.

5            THE COURT:  I'm sorry; I couldn't hear you.

6            MR. RAYBOULD:  Objection; hearsay of lawyers.

7            THE COURT:  Cooper 226, is that what you said?

8            MR. CHRIS KNOX:  Yes, Your Honor.  It's 220 -- No;

9    it's 226.

10           THE COURT:  Your objection is again, please?

11           MR. RAYBOULD:  It's hearsay, Your Honor.

12           THE COURT:  I thought you said hearsay as to the

13   lawyers.  Is that what you said?

14           MR. RAYBOULD:  Yes, Your Honor.

15           THE COURT:  Okay.  Let me see you all up here at the

16   bench.

17            (Bench conference on the record with counsel and the

18   Court:)

19           THE COURT:  Don't read that name, Mr. Knox.

20           MR. CHRIS KNOX:  Don't do what, Judge?

21           THE COURT:  Don't read the name.

22           I don't understand what you mean by that objection.

23   This is the only line that ---

24           MR. BRASHER:  May I, Your Honor?

25           THE COURT:  Yes.

1          MR. BRASHER:  There's a proper way to get in the

2    words of the lawyers and it's not through -- It's through the

3    lawyers.

4          THE COURT:  Okay.  I don't see that this exhibit is

5    the words of the lawyers.  "Let's set up the time to connect

6    on this."  That's it.  The rest of it is -- This is mostly

7    Mr. Baumiller's e-mail.  There's not really much substance in

8    here for lawyers.  That's why I was asking you.  There's just

9    one line, "not our client as far as I know."  But this text

10   down here is Mr. Baumiller.  I mean it is hearsay.  It's

11   hearsay from the lawyers.

12         MR. CHRIS KNOX:  I'm not offering it for the truth,

13   Judge.

14         THE COURT:  Well, for what?

15         MR. CHRIS KNOX:  Well, I'm offering it for his

16   specific -- He testified that he didn't talk to them about

17   compliance.  I'm offering it for his mental state.  It closes

18   my timeline which I'm going to circle back to at the end of my

19   Cross.

20         THE COURT:  Well, you can establish that he had a

21   meeting and if this refreshes his recollection, but the

22   document is not going to be in evidence.  It is hearsay

23   whether he's in here or not.  So I'm not letting this in.  You

24   can talk to him about the subject.

25         MR. CHRIS KNOX:  May I ask a question, Judge?

```
 1              THE COURT:  Yes.

 2              MR. CHRIS KNOX:  If I were to redact the lawyers'

 3    portion and it's just what he sent to his attorneys?

 4              THE COURT:  It's still -- It's still hearsay as to

 5    him.  It's an out-of-court statement by him, whether he's here

 6    or not.  I don't know if you're objecting to that.  That's why

 7    I asked you.  Are you objecting to this statement?

 8              MR. RAYBOULD:  Yes, and we're objecting to all of it.

 9    They're about to introduce this as an exhibit.

10              MR. CHRIS KNOX:  First of all, the Government has no

11    idea what I'm about to introduce.

12              THE COURT:  Let's just -- Just stick with me.  Okay,

13    talk to me.

14              MR. CHRIS KNOX:  He's testified, Judge, he did not

15    speak to his lawyers about the specifics that have to do with

16    this business structure, and that is factually incorrect, and

17    this is a prime example of one of them.  It is a prior

18    inconsistent statement to what he has testified.

19              THE COURT:  Yes, I understand that, but this is

20    hearsay as to the "juris."  You can use this to impeach him,

21    but I'm not letting this in front of the jury.  I'm not

22    letting them see that.

23              MR. CHRIS KNOX:  Okay.

24              (End of discussion at sidebar.)

25              THE COURT:  All right.  The objection is sustained,
```

1    but you may proceed as the Court indicated.

2    Q    (By Mr. Chris Knox) Mr. Baumiller, do you recall

3    communicating to your lawyers in, I believe, March of 2015

4    that you wanted to go to the Attorney General for the State of

5    Texas and turn in a competing compounding pharmacy because

6    they were paying their employees as 1099s?

7    A    Now that I've seen this e-mail, yes.

8    Q    And you wrote in there or -- Well, I apologize.  Strike

9    that.

10         Do you recall telling them that these people are

11   stealing the terminology of your models --

12   A    Correct.

13   Q    -- except for they are violating anti-kickback because

14   they are paying their employees as 1099s?

15   A    Correct.

16   Q    And they now are not using the PEO model which is your

17   specific set-up that you created with Frier Levitt?

18   A    I may have said that.

19   Q    And you -- Do you recall telling your lawyers that if --

20   if they don't change their practices -- "they" meaning the

21   other pharmacy -- you are "going to take the powers that be

22   down on their cute little pharmacy"?

23   A    I closed the e-mail with that, yes.

24   Q    Okay.  This is in March of 2015.

25         MR. RAYBOULD:  Your Honor, he's looking at the

 1    document itself.

 2            THE COURT:  Yeah.  Just proceed.

 3            I don't know what objection you're making at this

 4    point.  So proceed.

 5    Q    (By Mr. Chris Knox) It's March of 2015.

 6    A    That's correct.

 7    Q    You would agree with me it certainly sounds like you're

 8    discussing with your attorneys this exact business model.

 9    A    Yeah.  It was part of my Saturday morning conversations

10    with John Morrone.

11    Q    Do you have Mr. John Cooper Exhibit 203 in front of you?

12            MR. CHRIS KNOX:  May I approach, Judge?  I can't

13    remember if I have it or not up there.

14            THE COURT:  Yes.

15    Q    (By Mr. Chris Knox) Do you recognize that?

16    A    I do.

17    Q    Okay.  And if you could just briefly describe what you

18    recognize it to be without reading from it, please.

19    A    It's an e-mail from --

20    Q    Discussing termination?

21    A    -- to -- from -- What exactly do you want me to comment

22    on?

23    Q    Do you recognize it?

24    A    I do.

25    Q    Okay.

1    MR. CHRIS KNOX:  We'll offer Defendant Cooper Exhibit

2    203 into evidence.

3    MR. RAYBOULD:  Hearsay, Your Honor.

4    THE COURT:  Sorry?

5    MR. RAYBOULD:  Hearsay.

6    THE COURT:  Overruled; admitted, 203.

7    Q    (By Mr. Chris Knox) And you see on the cover there this

8    is an e-mail on May the 28th.  It's from Mr. Cooper to you,

9    correct?

10   A    Correct.

11   Q    And you all are the only two parties on this, right?

12   A    Right.

13   Q    As far as you can tell.  And Mr. Cooper says, "Please

14   review and make changes and get back with your signature at

15   the bottom of the memo, please, today.  Here's the memo you

16   asked me to work on based on what we discussed, to the best of

17   my memory, on the phone with you and Rich;" correct?

18   A    I mean this, I don't recall.

19   Q    Well, is that what the document says?

20   A    It does, yes.

21   Q    Okay.

22   MR. CHRIS KNOX:  Can we go to the next page, please,

23   Mr. Slyter?

24   Q    (By Mr. Chris Knox) And it is a memorandum.  It says it's

25   to Richard Cesario and John Cooper from you, correct?

1    A    Correct.

2    Q    And it is May 22nd of 2015, right?

3    A    Correct.

4    Q    You said you did this; you drafted this originally?

5    A    No, I did not draft this.

6    Q    Okay.  Did attorneys draft this originally?

7    A    I don't know who drafted this.

8    Q    Okay.  You can take from the e-mail on the front that you

9    all had a discussion about it.

10   A    I don't recall having a conversation with John about

11   this.

12   Q    Okay.  Do you recall writing back, "I don't recall having

13   any discussion with you about this"?

14   A    I don't know what I wrote back to him.

15   Q    Okay.  So there's a topic here regarding the closing,

16   right?  Correct?

17   A    John drafted this and put my name on it.

18   Q    Okay.  Was this e-mail to you?

19   A    Yes, it was.

20   Q    Okay.  Are you aware of whether or not there are

21   different versions of this document?

22   A    No.

23   Q    Okay.  Do you think there was?

24   A    That, I don't know.

25   Q    Okay.

1          MR. CHRIS KNOX:  Can we go to Cooper Exhibit 201,

2    please, which is already in evidence?

3    Q    (By Mr. Chris Knox) Have you seen this specific version

4    just freestanding by itself?

5    A    Exhibit 201?

6    Q    Oh, you may not have it.  Do you have it up there?

7    A    Well, is it on the screen or what I'm looking at from the

8    binder?

9    Q    The screen's fine.  It's already in evidence.

10   A    It looks like a very similar document.  It looks just a

11   little different, though.

12   Q    Okay.  Do you recall this?

13   A    No, I don't recall these documents.

14   Q    Okay.

15          MR. CHRIS KNOX:  Can we go back to 203, please,

16   Mr. Slyter?

17   Q    (By Mr. Chris Knox) And you would agree with me that what

18   this specifically says is, "As a follow-up to your

19   conversations yesterday and today," ---

20          MR. CHRIS KNOX:  Second page, please.

21   A    Correct.

22   Q    (By Mr. Chris Knox) Okay.  "Given the most recent changes

23   with TRICARE, we're ramping down our CMGRx division and

24   terminating all of our hourly employees that are part of CMGRx

25   division effective as of May 15th," right?

1    A    Correct.

2    Q    "Hourly employees have been paid through May 15th.  No

3    further payments will be made;" right?

4    A    Correct.

5    Q    "Commission payment employees are still due for future

6    payments upon receipt of Trilogy."

7    A    Correct.

8    Q    Okay.  And then the Government showed you specific

9    payments for 366,000 or something that were shortly after this

10   that were made to Mr. Cesario and Mr. Cooper?

11   A    Correct.

12   Q    That have now been alleged to be kickbacks.

13   A    Correct.

14   Q    This is all in writing, isn't it?

15   A    It is.

16   Q    Okay.  And sent to you on e-mail.

17   A    Correct.

18   Q    "No. 2:  You're authorized to provide the information

19   about all Trilogy Pharmacy, Inc., employees that are part of

20   the CMGRx division impacted by this decision."  Do you know

21   why that's in there?

22   A    No, I do not.

23   Q    Do you recall the PEO contract that you signed, giving

24   permission to CMGRx to notify employees upon Trilogy

25   terminating the employees?

1    A    I may have provided them that information, yes.

2    Q    It specifically gives permission.  Do you recall that?

3         MR. RAYBOULD:  Objection.  That's misleading and it's

4    a mischaracterization of his testimony.

5         THE COURT:  All right.  If you don't agree with the

6    premise, you may correct it.  It's overruled otherwise.

7    A    Can you repeat that?

8    Q    Sure.  Do you recall the agreement, the PEO agreement

9    that was signed specifically with CMGRx, granting them

10   permission to notify the employees in the event that either

11   party or Trilogy terminates this agreement?

12   A    I don't recall the specific agreement, but most PEO

13   contracts do have that type of language.

14   Q    Okay.

15   A    So in all likelihood, it was included in ours, if we had

16   one.

17   Q    Okay.  And so now, some -- I don't know -- nine months

18   later, in the actual termination letter, you're touching back

19   to the contractual terms that was signed nine months before,

20   saying, "You guys are authorized to tell your employees in

21   this -- your employees of Trilogy at this branch that may be

22   impacted by this decision."

23   A    I didn't write this -- this document you're referencing.

24   Q    Okay.  Lawyers wrote it?

25   A    I don't know who wrote it.  I believe John Cooper wrote

1   it and sent it -- copied it to me and just distributed it to

2   his employees.  I wouldn't have had much interest in what

3   CCMGRx was going to do with their employees after TRICARE

4   stopped covering other compounds they were sending to us.

5   Q    Okay.

6   A    So I would have simply told them, "TRICARE suspended

7   payments to our pharmacy.  We can no longer pay you anymore."

8   And he would have taken it upon himself to ---

9            MR. CHRIS KNOX:  Judge, I'm going to object as

10  nonresponsive at this point.

11           THE COURT:  Well, I think you asked him the question.

12  That's overruled.

13           MR. CHRIS KNOX:  Okay.

14  Q    (By Mr. Chris Knox) Okay.  May I ask you a couple of

15  questions, Mr. Baumiller?

16  A    Yes.

17  Q    You agree with me that this appears to have been sent to

18  you on e-mail.

19  A    Yes.

20  Q    Okay.  You agree with me that the e-mail references a

21  discussion about this.

22  A    Correct.

23  Q    If this was a document that Mr. Cooper created and

24  circulated without your knowledge, why would he need to send

25  it to you on e-mail?

1    A    Good question.

2    Q    Thank you.  Okay.  Can we go to Bullet Point No. 3?

3         "Please compile and deliver to our corporate office

4    all Trilogy files related to any of our customers, including

5    hard copy files, digital files in native format, et cetera,"

6    right?

7    A    Correct.

8    Q    Did that occur?

9    A    I don't know if that occurred.

10   Q    You do not know whether or not CMGRx delivered files and

11   hard drives to Trilogy Pharmacy.

12   A    I don't recall if I received hard drives from them or any

13   paperwork.

14   Q    Do you know of a document specifically I could show you

15   that would refresh your memory on that?

16   A    Go ahead and show it.

17   Q    Well, do you know of where I could narrow that down?

18   A    No, I don't.

19   Q    Okay.  Bullet Point No. 4:  "We're interested in pursuing

20   non-TRICARE PPO/private compound work as Laboratory and CCM

21   work going forward."  Let me stop for a second.  What is

22   "CCM"?

23   A    Chronic Care Management.

24   Q    What was the laboratory work?

25   A    Diagnostic laboratory work.

1    Q    And that is what Trilogy did moving forward?

2    A    That's what we were looking into doing, yes.

3    Q    Okay.  So in your hypothesis here, this is something that

4    Mr. Cooper would have just drafted and thrown on here?

5    A    No.  We probably would have discussed that last part.

6    Q    Okay.

7              THE COURT:  Is that a convenient place to stop?

8              MR. CHRIS KNOX:  Sure, Judge.

9              THE COURT:  All right.  Ladies and Gentlemen, we'll

10   recess ---

11             MR. CHRIS KNOX:  Well, may I finish this specific

12   exhibit?

13             THE COURT:  Pardon me?

14             MR. CHRIS KNOX:  Well, I'll just start with it

15   tomorrow.  I apologize.

16             THE COURT:  Okay.  All right.

17             Ladies and Gentlemen, I wish you a very happy

18   evening, and we will see you in the morning.  Thank you.

19             COURT SECURITY OFFICER:  All rise for the jury.

20             (Jury excused from the courtroom.)

21             THE COURT:  All right.  Thank you.  You may be

22   excused.  We'll see you in the morning.  Thank you.

23             (Andrew Baumiller was escorted out of the courtroom.)

24             THE COURT:  All right.  Be seated, please.

25             These boxes are blocking some of the jurors from

1    seeing the witness, so you need to put them down on a chair or

2    something.  There's plenty of chairs over there.

3              MR. CHRIS KNOX:  Yes, ma'am.

4              THE COURT:  Okay.  Mr. Knox, I think you proved today

5    that chivalry is, in fact, dead.  I just wanted to point that

6    out to you.

7              MR. CHRIS KNOX:  How is that, Judge?  I didn't see

8    it.  Judge, that's the one thing that I would have done, if I

9    had seen it.

10             THE COURT:  Okay.  Well, maybe in the morning you

11   want to move them yourself.

12             MR. CHRIS KNOX:  I will do it.  I will put them on

13   the floor when we're finished.

14             THE COURT:  It's a new world, Mr. Knox.

15             All right.  Let's talk about the schedule.  I'm not

16   talking about how long you're going to be cross-examining the

17   witness which, given this size of the box, it seems like quite

18   a while.

19             How long do each of the Defendants anticipate?  I'm

20   looking ahead to the schedule.  I'm not holding you to it.

21   I'm not asking you if your clients are testifying.  I just

22   want best estimate of how long you think the Defense cases

23   will take.

24             MR. WHALEN:  Your Honor, on behalf of John Cooper, a

25   day.

 1          MS. LOBEL:  Same with a little leeway, if it goes a

 2   little longer.

 3          THE COURT:  Okay.

 4          MS. STILLINGER:  Your Honor, I would say somewhere

 5   between a half a day and a day and a half.

 6          THE COURT:  Okay.

 7          MR. BUCKLEY:  A half day for Mr. Cockerell.

 8          THE COURT:  Okay.

 9          MR. ANSLEY:  Judge, I would say no more than a day.

10          THE COURT:  Okay.

11          MS. NICOLE KNOX:  I'd say two full days.  And I'll

12   take the time that my Co-Defendants gave me, if I need it.

13          THE COURT:  When did they give you any time?

14          MS. NICOLE KNOX:  I'm sorry, Judge?

15          THE COURT:  When did they give you any time?

16          MS. NICOLE KNOX:  Well, they just -- I'm representing

17   that they ceded some of their time to me based on their

18   previous estimate.

19          THE COURT:  Good try; excellent.

20          MS. NICOLE KNOX:  I'll represent three days, Judge.

21          THE COURT:  That's very -- Yeah.  Okay, very

22   opportunistic but unsuccessful, nevertheless.

23          All right.  So we have really only two full days next

24   week.  Thanksgiving week, we have two-and-a-half days.

25   Remember, one of the jurors wants to adjourn early on the

 1   25th.  So I'm going to give them a half-an-hour lunch, so that

 2   will pretty much make up for that.  So we have two-and-a-half

 3   days the following week, and then we have a full week.

 4        So my best guess, from what everyone is telling me,

 5   is that I'm hopeful that we will be finished with the

 6   testimony by the end of the week of the 2nd.  Does that seem

 7   like a reasonable estimate?  All right.  Now I'm going to go

 8   off the record for a moment.

 9        (An off-the-record discussion was held between the

10   Court and counsel.)

11        MS. NICOLE KNOX:  Judge, just specifically because of

12   Thanksgiving week and witness availability, is the Court

13   amenable to us calling witnesses as they're available, meaning

14   they might be out of order?

15        THE COURT:  Yes.

16        MS. NICOLE KNOX:  Thank you.

17        THE COURT:  I have no problem with that.

18        Okay.  So if this does not look like a doable

19   schedule, I want to know as soon as possible.

20        So the Government has one more witness?

21        MR. BRASHER:  That's correct, Your Honor.

22        THE COURT:  An agent?

23        MR. BRASHER:  Yes.

24        THE COURT:  All right.  Just -- Do you expect to be

25   more than all day tomorrow?

1         MR. CHRIS KNOX:  I doubt I'm more than all day.  I

2  think there's a chance that it could be all day but I don't

3  know, Judge.

4         THE COURT:  Okay.  And how much more does everyone

5  else expect to have?

6         MR. BUCKLEY:  About an hour from us, Your Honor, or

7  less.

8         MS. STILLINGER:  Mine would be less than an hour,

9  Your Honor, I believe.

10         MS. LOBEL:  I think it will be very dependent on

11  Defendant Cooper's, but I think it's safe to say no more than

12  three.

13         THE COURT:  Okay.  So I think it's unclear whether

14  Mr. Baumiller will be off the stand on Monday by noon.  He may

15  or may not be, and then we're starting the next day at noon.

16  So that's where we are.

17         So I expect that -- I think it's very likely that the

18  Government will rest no later than November 21st.  That's the

19  last day of next week that we're in session.

20         MR. BRASHER:  Thursday?

21         THE COURT:  Thursday.

22         MR. BRASHER:  Yes.

23         THE COURT:  Okay.  All right.  Anything further for

24  today?

25         Okay.  Thank you.

 1            I don't want to have any problem with getting the

 2     witness here to start at 8:00.  Do you all anticipate a

 3     problem with this?

 4            MR. JOE KENDALL:  It might be a bigger problem for

 5     his lawyer to get here at 8:00.

 6            THE COURT:  We'll just start without you,

 7     Mr. Kendall; no problem.

 8            I need him to be here at 8:00.  I've got these people

 9     showing up at 8:00 and I mean -- I guess the only alternative

10     would be to go with your agent, but I don't think that's fair

11     to them.  They're in the middle of their Cross Examination.

12            MR. BRASHER:  My understanding is the Marshals have

13     not expressed concern about getting him here by that time.  If

14     they do, we will have our agents bring him for us.

15            THE COURT:  Okay.

16            MR. BRASHER:  We'll make sure he's here.

17            THE COURT:  Well, you check because I'm not

18     comfortable that we're going to get him here unless you

19     intervene, so intervene.

20            MR. BRASHER:  We'll make sure he's here by 8:00.

21            THE COURT:  Okay.

22            (Court adjourned at 4:40 PM.)

23

24

25

CERTIFICATE OF OFFICIAL REPORTER

     I, Deborah A. Kriegshauser, Federal Official Realtime Court Reporter, in and for the United States District Court for the Northern District of Texas, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically-reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

     Dated this 26th day of May, 2020.


     /s/ Deborah A. Kriegshauser
     _____
     DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
     FEDERAL OFFICIAL COURT REPORTER